1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA
2                    KEY WEST DIVISION
          CASE NO.  13-10034-CR-MARTINEZ/SNOW
3

4

5  UNITED STATES OF AMERICA,

6               Plaintiff,

7       vs.

8                                    Miami, Florida
                                    July 16, 2015
9  FRED DAVIS CLARK, JR., and        Pages 1-47
   CRISTAL R. CLARK,
10

               Defendants.
11  _____

12

13

                TRANSCRIPT OF JURY TRIAL
14              *TESTIMONY OF MICHAEL DELK*
          BEFORE THE HONORABLE JOSE E. MARTINEZ
15              UNITED STATES DISTRICT JUDGE

16

17

APPEARANCES:
18
FOR THE PLAINTIFF:
19
                    *United States Attorney's Office*
20                  BY:  **JERROB DUFFY,  A.U.S.A.**
                    BY:  **THOMAS WATTS-FITZGERALD, A.U.S.A.**
21                  99 N.E. 4th Street
                    Miami,  Florida 33132
22
                    *United States Department of Justice*
23                  *Criminal Division Fraud Section*
                    BY:  **MICHAEL PADULA, A.U.S.A.**
24                  Bond Building
                    1400 New York Avenue, NW
25                  Washington, DC 20530

       PROCEEDINGS RECORDED BY MANUEL STENOGRAPHY
          TRANSCRIPT PRODUCED BY COMPUTER

1   **FOR DEFENDANT FRED DAVIS CLARK, JR.:**

2                        *Todd Foster Law Group*
                         **BY:   TODD FOSTER, ESQ.**
3                        **BY:   ASHLEY RECTOR, ESQ.**
                         **BY:   CLAUDIA PASTORIUS, ESQ.**
4                        1881 West Kennedy Boulevard
                         Tampa, Florida 33606
5
                         *Law Offices of Valentin Rodriguez, P.A.*
6                        **BY:  VALENTIN RODRIGUEZ, JR., ESQ.**
                         120 South Dixie Highway
7                        Suite 204
                         West Palm Beach, Florida  33401
8

9   **FOR DEFENDANT CRISTAL R. CLARK:**

10                       *Federal Public Defenders Office*
                         **BY:   MANUEL A. ARTEAGA-GOMEZ, A.F.P.D.**
11                       **BY:   AIMEE A. FERRER, A.F.P.D.**
                         150 West Flagler Street
12                       Suite 1700
                         Miami, Florida 33130
13

14  **REPORTED BY:        DAWN M. WHITMARSH, RPR**
                         **Official Court Reporter**
15                       **400 N. Miami Avenue, 10S03**
                         **Miami, Florida  33128**
16                       **Telephone:  305-523-5598**

17  _____

18                       P-R-O-C-E-E-D-I-N-G-S

19          THE COURT:  Please be seated.  Bring your next witness

20  please.

21          MR. WATTS-FITZGERALD:  United States calls Michael Delk,

22  Your Honor.

23          THE COURT:  All right.  Please remain standing and

24  raise your right hand

25          MICHAEL DELK, GOVERNMENT WITNESS, SWORN.

1          THE COURT:  Please be seated.  Get pull the chair up,

2    get close to the microphone, speak loudly, tell us your name and

3    spell it.

4          THE WITNESS:  Michael Delk.

5          THE COURT:  You got to do better than that.  Get closer

6    and talk louder.

7          THE WITNESS:  Michael Delk, M I C H A E L, D E L K.

8          THE COURT:  All right.  You may proceed, sir.

9                          DIRECT EXAMINATION

10   BY MR. WATTS-FITZGERALD:

11   Q.  Good afternoon, Mr. Delk.  Can you tell the ladies and

12   gentlemen of the jury what you do for a living?

13   A.  I'm the planning and development director for the city of

14   Clearwater.

15   Q.  Clearwater, Florida, sir?

16   A.  Yes, sir.

17   Q.  Might be Clearwater somewhere else.

18          How long have you been in that position?

19   A.  A little over ten years.

20   Q.  Okay.  What is your training and educational background for

21   that position, if you could briefly provide that to the jury?

22   A.  I have an undergraduate degree in urban and regional planning

23   from Missouri State university, what is now Missouri State

24   University, and a master's in public administration from the

25   University of Central Florida.

1   Q.   And when did you actually begin working at the city of

2   Clearwater in the planning and development division?

3   A.   February of 2005.

4   Q.   And can you explain to the jury what you do in your work, what

5   your division does?

6   A.   We administer the city's land development regulations that

7   includes planning function; current planning which is development

8   review and approval; long-range planning, which includes

9   comprehensive planning, commonly referred to.  We have the

10  building permitting process which includes plan review,

11  inspections, issuance of permits.  Our department includes code

12  compliance, enforcement of city code and ordinances.

13  Q.   Does your department have any role in the review of efforts to

14  conduct residential or commercial development within the city

15  limits?

16  A.   Yes.

17  Q.   Does that include apartment buildings?

18  A.   Yes.

19  Q.   Condominiums?

20  A.   Yes.

21  Q.   How about industrial development, say for example, a water

22  park?

23  A.   Yes.

24  Q.   Okay.  Did there come a time while working at the city of

25  Clearwater when you met David Clark?

1    A.   Yes.

2    Q.   Can you explain to the jury how that came about.

3    A.   It was fairly early in my tenure which was 2005.  We met for

4    the purpose of discussing the proposal for the Clearwater Cay

5    Club.

6    Q.   Okay.  Showing you what's marked as Government Exhibit 15.04

7    for identification.

8            MR. WATTS-FITZGERALD:  This may be an add-on, Your

9    Honor.

10           THE COURT:  Say again?

11           MR. WATTS-FITZGERALD:  15.04?

12           THE COURT:  Okay.

13           THE WITNESS:  Yes.

14       BY MR. WATTS-FITZGERALD:

15   Q.   Do you recognize that, sir?

16   A.   Yes.

17   Q.   How do you recognize it?

18   A.   It's the Venezia development in Clearwater.

19   Q.   Okay.  Did you become familiar with that as part of your

20   duties with the city of Clearwater?

21   A.   Yes, sir.

22           MR. WATTS-FITZGERALD:  Your Honor, government moves

23   15.04 into evidence.

24           MR. RODRIGUEZ:  No objection.

25           THE COURT:  Without objection, 15.04 is admitted in

**PROCEEDINGS RECORDED BY MANUEL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    evidence.

2          (Government's Exhibit 15.04 in evidence)

3      BY MR. WATTS-FITZGERALD:

4    Q.   Sir, the body of water with the bridge in the background, what

5    body of water is that?

6    A.   Tampa Bay.

7    Q.   And the red tile roof structures, is that a single

8    development?

9    A.   I believe yes, it is.

10   Q.   Okay.  When you began working at the city of Clearwater in the

11   early, late 2005 was it?

12   A.   Early, 2005.

13   Q.   Is this what it looked like at that time?

14   A.   I believe so.

15   Q.   Does it still look like that today?

16   A.   I believe so.  There have been some exterior renovations in

17   the last year or two for some maintenance purposes.  I have not

18   been there during that period of time, but the last I do recall it

19   looked.

20   Q.   Did you understand this or was this the property that

21   Mr. Clark was consulting your department or division about?

22   A.   That was a component of it.

23   Q.   Okay.  What was the purpose of Mr. Clark visiting your

24   department?  What was it that he was seeking from you?

25   A.    Well at that time, the discussion as I recall was centered

1  around the establishment of the Clearwater Cay Club.  We were

2  approached for the discussion about that future development.

3  Q.   Had you ever heard of Cay Clubs before these meetings?

4  A.   Not that I recall.

5  Q.   Okay.  And let me ask the natural follow-up question.  Was

6  there more than one meeting between you and Mr. Clark?

7  A.   I think over the course of our processing or various

8  activities relate to this, we met a couple, three times.

9  Q.   Okay.  Can you explain to the jury what's a business district?

10 A.   A business district?

11 Q.   Yes.

12 A.   Well, this -- my recollection of this was that it was a

13 community development type of district.

14        THE COURT:  Are you asking him what is a business

15 district in general or what was a business district in

16 relationship to this?

17        BY MR. WATTS-FITZGERALD:

18 Q.   In relationship to Mr. Clark's visit to your office.

19 A.   Yeah.  I believe it was for the purpose of the establishment

20 of a Community Development District, CDD, under Florida law.  So

21 that is what the visit was about.

22        And pardon me, what was your next question about that?

23 Q.   Well, now that I know what you really call it, what actually

24 is that?

25 A.   These districts function to some extent similarly to municipal

1  corporations in that they are a statutory creation.  I am not an

2  attorney about that, but in terms of the establishment of the CDD

3  to administer at the local level, various services and functions

4  to carry out the development and/or planning objectives of the

5  established district.  So at some level of implementation of those

6  objectives, they function separately from municipal government

7  which would otherwise be responsible for certain infrastructure

8  improvements, so on.

9  Q.   Did Mr. Clark explain what his plan was for this development

10 district that he wanted to establish?

11 A.   Yes.

12 Q.   Okay.  Did it include actual construction of any condominiums

13 or residential apartment units at the Bellagio, Venezia, location?

14 A.   There was a component of it which was a proposal for, I

15 believe, some hotel rooms or something of that effect.  Some

16 residential.  There was an existing apartment complex that either

17 had been or was in the process of converting to a condominium

18 ownership.

19 Q.   Did he propose to you that he wanted to do that conversion?

20 A.   My recollection is that it was -- we discussed that -- all of

21 those things in terms of what the basic form and function of the

22 CDD would be.

23 Q.   Now, approximately when in time were you having these

24 discussions, if you recall?

25 A.   This would have been early to mid 2005.  I don't recall the

1    date specifically, but it was fairly early in my tenure with

2    Clearwater.

3    Q.   Was there any more purely industrial project development

4    proposed by Mr. Clark as part of his description of the plan to

5    you?

6    A.   I don't recall any quote, unquote industrial, as I would

7    define industrial.

8    Q.   Did you have any discussions with Mr. Clark involving a water

9    park?

10   A.   I believe a water park, I -- certainly substantial water

11   feature was included in the --

12   Q.   Where was that to be constructed?

13   A.   I believe that was going to be part of the -- what is the

14   commercial portion of the property.

15   Q.   Do you recall what else was suggested as part of that

16   commercial part of the project?

17   A.   The Clearwater Cay Club proposal included that water feature,

18   and I believe the overnight accommodations or hotel units and some

19   other forms of development, I think some shops, some retail,

20   restaurants, that sort of thing.

21   Q.   Do you know if those were ever built?

22   A.   No.

23   Q.   Was ground ever broken for them?

24   A.   No.

25   Q.   You mentioned residential or hotel-style residential rentals.

1    Does the city of Clearwater have a zoning ordinances that address

2    period of rental of units within the city?

3    A.   Yes.

4    Q.   Do they have zoning that designates various aspects of the

5    city for different purposes?

6    A.   Yes.

7    Q.   Is there such a thing as a residential zone?

8    A.   Yes.

9    Q.   What is that?

10   A.   Residential zoning districts delineate those areas of the

11   community which are specifically designated and reserved primarily

12   for a residential use.

13   Q.   Is there a restriction on the period of rental?

14   A.   Yes.

15   Q.   What is that restriction?

16   A.   It's 30 days.

17   Q.   And what's the purpose of that restriction?

18   A.   In order to maintain that differentiation between what is, by

19   definition in the city of Clearwater, as a residential use versus,

20   what is by definition in the city of Clearwater, overnight

21   accommodation.

22   Q.   When Mr. Clark visited you to discuss these issues with you,

23   the issues related to what we're call Clearwater Cay Clubs, what

24   was the zoning for that area?

25   A.   I believe the zoning was HDR, high density residential.  It

```
 1   was a higher density residential form of development for the rear

 2   portions of the property which had been the apartments and then

 3   commercial up front.

 4   Q.   Was that area subject to the 30 day zoning limitation on

 5   overnight rentals?

 6   A.   Yes.

 7   Q.   Did Mr. Clark express any interest in changing that?

 8   A.   I don't know that I remember the specifics of our

 9   conversations that were at this point almost ten years ago, but I

10   do recall in a general sense that we had a discussion about

11   portions of the use activities that were going to require a land

12   use and zoning change in order to fully implement.  And the

13   proposed development recognized that there were some

14   administrative regulatory legislative changes that would have to

15   occur.

16   Q.   What municipal or governmental authority would have to approve

17   those changes?

18   A.   For the property out front, the commercial, that could

19   accommodate overnight accommodation.  For the residential portion

20   of the property to the rear, the apartments which had been

21   converted, in order to rent those short term, we would have needed

22   to have a land use change and a zoning district change.

23   Q.   And what governmental agency would have to implement or

24   approve that change?

25   A.   The city of Clearwater would.
```

PROCEEDINGS RECORDED BY MANUEL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1  Q.   Did any part of the proposals suggested to you by Mr. Clark

2  for his project require state approval?

3  A.   A land use amendment of that size would require review from

4  what at the time was the Department of Community Affairs.   It was

5  a larger than ten acre development, so that would have been a

6  charge scale amendment so that would have presumably.

7  Q.   Did you personally apprise Mr. Clark of these requirements?

8  A.   We had some discussions along the way regarding the regulatory

9  changes that would need to occur to fully implement the district.

10  Q.   In order to effectuate any of those changes, would paperwork

11  be required by your department?

12  A.   We would need to get an application for a land use change, an

13  application for a rezoning.

14  Q.   Did you ever receive such applications with respect to the

15  Clearwater Cay Clubs project?

16  A.   No.

17  Q.   In or about 2007, 2008, had any construction been completed on

18  the, what you call -- refer to as the front side of the project,

19  was more industrial?

20  A.   No, the property -- the center had been razed at some point,

21  removed, but there was no --

22  Q.   No shopping center was built?

23  A.   Nothing had been constructed to replace that.

24  Q.   Did you notice any canal or water features with gondoliers?

25  A.   No.

1   Q.   Now, over the course of time from your first meetings with

2   Mr. Clark through the next several years, did you receive any

3   permit applications on behalf of the properties that he had

4   acquired?

5   A.   For --

6   Q.   Anything.

7   A.   Land development construction, none that I recall.

8   Q.   Did you receive any permit applications whatsoever of any

9   description?

10  A.   There was some general maintenance work, typical work on

11  individual units.  There may have been some permits to common

12  area, possibly improvements.

13  Q.   Do you recall being requested by the United States, pursuant

14  to subpoenas, to search the records of your department for such

15  permits as might exist?

16  A.   Yes.

17  Q.   Did you do that?

18  A.   Yes.

19  Q.   Are you in fact the custodian of the records for the building

20  and zoning department of the city of Clearwater?

21  A.   Well, our department administers those functions for the city

22  of Clearwater and we do maintain those records.

23  Q.   And are you ultimately responsible for that?

24  A.   Ultimately the city clerk's office is responsible for all

25  public records, but we do maintain the records for which we are

PROCEEDINGS RECORDED BY MANUEL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

```
 1   responsible for administration.
 2   Q.   And did you personally or through your staff direct the
 3   collection of the permit applications that had been submitted,
 4   during the relevant time period, by Cay Clubs with respect to the
 5   Clearwater Cay Clubs properties?
 6   A.   Yes.
 7            MR. WATTS-FITZGERALD:   Your Honor, the government moves
 8   Government's Exhibits 15.02 and 15.03 into evidence.
 9            MR. RODRIGUEZ:   No objection.
10            THE COURT:   Without objection, they're admitted in
11   evidence as 15.02 and 15.03.
12            (Government's Exhibits 15.02 & 15.03 in evidence)
13       BY MR. WATTS-FITZGERALD:
14   Q.   If I can ask you to take a moment and look at the thicker
15   file, Government's 15.02.   Do you recognize that set of paperwork?
16   A.   It looks like the some of the permitting records that we had
17   provided.
18   Q.   And were you in fact able to produce the records that you
19   customarily rely upon within your department to issue permits?
20   A.   Yes, we maintain those in our system.
21   Q.   And if I can ask you to look at the two page, the thin
22   document 15.03.   Do you recognize that document?
23   A.   Yes.
24   Q.   And what is 15.03?
25   A.   Just a spreadsheet printout of permit history.
```

1  Q.   Okay.  And beginning in approximately 2004 on the first page,

2  and continuing to the end, what is the last date of a permit that

3  you've returned information regarding?

4  A.   The first page?

5  Q.   The last, the final.

6  A.   I'm sorry, the last page?

7  Q.   Yeah.

8  A.   The date is August 14th.

9  Q.   And do all of the -- did you prepare this summary?

10  A.   I had my staff run the dates for the summary, permit summary.

11  Q.   And where was this data taken from?

12  A.   This would be taken -- had been taken out of our CELA (ph)

13  system, the permit architecture that we use.

14  Q.   Does this summary document reflect what is in government's

15  15.02, the voluminous file of permit applications and grants?

16  A.   Yes.

17  Q.   Over the period of time covered by, let's see, from the time

18  of your first visit sometime in 2005, I believe you said it was by

19  Mr. Clark through 2008, what's the largest dollar value permit

20  that was issued by your office?

21  A.   Looks like there is one here for $300,000 for a remodel of two

22  condo units.

23  Q.   And why were they remodeling the two condo units?  Can you

24  tell?

25  A.   To become -- looks like they were combining the two units into

16

1    one unit, enlarging.

2    Q.   Do you see the $50,000 project immediately following that at

3    the same apartment location?

4    A.   Yes, sir.

5    Q.   Okay.  What was that for?

6    A.   Foreman to repair, replace exterior stucco wall sheeting due

7    to water intrusion, replace exterior windows and doors with impact

8    glass.

9    Q.   Are either of those considered by your department new

10   construction?

11   A.   These would be renovation and/or repair.

12   Q.   Are any of the, what are referred to as construction permits

13   reflected in the period of time I mentioned, from roughly '05 at

14   the bottom of the first page, through '08 on the second page, new

15   construction?

16   A.   One permit is for new construction.

17   Q.   Which would that be?

18   A.   It appears someone added a thousand gallon storage tank and

19   lines for pool heaters.  That would have been --

20   Q.   Would that be a common area asset?

21   A.   Yes.  In that -- presumably in that development it would be

22   for a common area improvement, the pool.

23   Q.   And what was the dollar value of that particular effort?

24   A.   $800.

25            MR. WATTS-FITZGERALD:  I tender the witness, Your Honor.

```
 1            THE COURT:  Cross-examination.

 2            MR. RODRIGUEZ:  Thank you.

 3                         CROSS-EXAMINATION

 4     BY MR. RODRIGUEZ:

 5  Q.  Good afternoon, Mr. Delk.  My name is Val Rodriguez, I

 6  represent Fred Davis Clark.  Do you see him over here?

 7  A.  Yes.

 8  Q.  Do you recognize him?

 9  A.  Yes.

10  Q.  You told us that you talked to him several times ten years

11  ago.  Do you recall that?

12  A.  Yes.

13  Q.  Be fair to say you can't really remember exactly the number of

14  times you talked to him?

15  A.  Correct.

16  Q.  It could have been two or three, could have been 12, right?

17  A.  No.

18  Q.  No?

19  A.  I did not meet with him 12 times.

20  Q.  And you're sure that you can remember that you could not --

21  did not talk to him 12 times.

22  A.  I don't believe I talked to him 12 times.

23  Q.  Now, you would agree you're not an elected public official,

24  right?

25  A.  No, sir.
```

```
 1   Q.   And you answer to ultimately your city council members?
 2   A.   I do not.
 3   Q.   You answer to the city manager; is that correct?
 4   A.   That is correct.
 5   Q.   And then the city manager of course answers to the city
 6   council members?
 7   A.   That's correct.
 8   Q.   And they're elected every four years, these city council
 9   members; is that fair to say?
10   A.   That's reasonably accurate I think.
11   Q.   And they change periodically, fair to say?
12   A.   Yes.
13   Q.   Now, you would agree that during this time in Clearwater,
14   there was a healthy debate over this 14 day and 30 day rental
15   rule.  Is that fair to say?
16   A.   The question is do I recall a healthy debate over a 14 day or
17   30 day rental rule?
18   Q.   Yes.
19   A.   I don't really recall an extensive debate over a 14 day or 30
20   day rental rule.
21   Q.   Well, isn't it true, sir, as recently as three or four years
22   ago, you have spoken to the press about the differentials between
23   the 14 day and 30 day short term rental rules?
24        MR. WATTS-FITZGERALD:  Objection, Your Honor.  Relevancy
25   of three to four years.
```

**PROCEEDINGS RECORDED BY MANUEL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1           MR. RODRIGUEZ:  I'll tie it in.

2           THE COURT:  I'll let him try.  Go ahead.

3           THE WITNESS:  Answer?

4           THE COURT:  Yes, you may.

5      BY MR. RODRIGUEZ:

6    Q.  Yes, please.

7    A.  I'm trying to recall particular focus on 14 days, but that one

8    is escaping me.  There are issues with regard to short term

9    rentals in the city generally in some areas but I don't -- my

10   apologies for not remembering the 14 day being an extensive

11   discussion.

12   Q.  Let me ask it to you this way and perhaps this would refresh

13   your recollection.

14          Isn't it true that, for example, Sand Key Lighthouse

15   Towers and Crescent Beach Club have historically allowed 14 days

16   rentals because of a grandfathering clause?

17   A.  Yes, I do recall the discussion with those towers on Sand Key.

18   Q.  And do you also recall discussions with Mr. Clark about

19   communities or developments on either side of Cay Clubs being able

20   to participate in 14 day and 30 day rental programs?

21   A.  I don't have specific recollection of talking with him about

22   the properties on either side of Clearwater Cay Clubs.  So that

23   could be true, I don't recollect it.

24   Q.  Okay.  Fair to say because it's over ten years ago, right?

25   A.  That's correct.

1    Q.   And in fact, when was the first time you talked to the

2    government about anything to do with Cay Clubs?

3    A.   Could you repeat the question, please?

4    Q.   When was the first time that you talked to any of these agents

5    or prosecutors over here about Cay Clubs?  What year?

6    A.   Well, it would have been late 2014 or early this year.

7    Q.   Okay.  So it wasn't back in 2007 or 2008, was it?

8    A.   No, sir.

9    Q.   At the time back in 2005, isn't it true that your title was

10   planning director?

11   A.   Yes.

12   Q.   And that you had a person named Cindy Terapini (ph) who worked

13   for you?

14   A.   Yes.

15   Q.   And she was the person you would contact -- persons would

16   contact to get to you?

17   A.   For a short period of time, yes.

18   Q.   And you also had a public works administrator named Mashid

19   Ariston (ph)?

20   A.   Yes.

21   Q.   You also had a planner named Carl Wielecki, W I E L E C K I.

22   A.   Carl, if he was there when I was working for the city, he was

23   not there for very long.  But I remember -- I've heard of Carl.

24   Q.   Would you agree, sir, it's common for the persons within the

25   planning department to have regular conversations with developers?

1   A.   Yes.

2   Q.   Because that's -- you're the eyes and ears of the city when it

3   comes to terms of figuring out rules, regulations and permits.  Is

4   that fair to say?

5   A.   That's correct.

6   Q.   And oftentimes you're asked to call upon interpretations of

7   rules.

8   A.   Yes.

9   Q.   If someone does not agree with your interpretation of the

10   rules, they can take it up further?

11   A.   That's correct.

12   Q.   And oftentimes that happens.

13   A.   It does.

14   Q.   And in fact, oftentimes, if a person doesn't agree with

15   whatever the city says regarding rules, they can sue in a court.

16   Is that fair to say?

17   A.   I presume that is their option.

18   Q.   Well, let's talk about that for a moment.  Isn't it true that

19   the homeowners sued the city of Clearwater over this 14 and 30 day

20   rental period in 2008?

21         MR. WATTS-FITZGERALD:  Objection, Your Honor, relevance.

22         MR. RODRIGUEZ:  I'm sorry, in 2007.

23         THE COURT:  Still objecting?

24         MR. WATTS-FITZGERALD:  I did object you, Your Honor.

25         THE COURT:  I know you did but it he changed the date to

1    2007.

2            MR. WATTS-FITZGERALD:  The date is immaterial.

3            THE COURT:  I was just wondering if that was the reason

4    you were objecting.  Don't be so feisty.  I'm not sure I see the

5    relevance, but I'll let you go a little bit in this area.  Don't

6    take long.  You can answer.  I mean, you can try to answer if you

7    can.

8            MR. RODRIGUEZ:  I'll rephrase it this year.

9        BY MR. RODRIGUEZ:

10   Q.  North Beach Landlords sued the city over its interpretation of

11   the 40 day and 30 day short-term rental provisions.

12           THE COURT:  I think you meant 14 and 30.

13       BY MR. RODRIGUEZ:

14   Q.  I'm sorry. 14 and 30 days.

15   A.  I know they were very upset about that.  I would have to defer

16   to our city attorney's office as to what the extent of the legal

17   action on that, but I do know that they were -- they were going to

18   pursue that matter with the city and I'm not sure how far that

19   got, but it was --

20           THE COURT:  He doesn't know if they sued or not.  Ask a

21   different question.

22       BY MR. RODRIGUEZ:

23   Q.  Let me ask you this:  Isn't it true that you spoke openly and

24   in public that 80 percent of the 350 condos at Lighthouse and

25   Crescent were owned as second homes or investments?

**PROCEEDINGS RECORDED BY MANUEL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   A.   It's a very high number.

2           THE COURT:  The question was --

3           THE WITNESS:  I may have said that.  I don't recall

4   specifically, but that's --

5           THE COURT:  He doesn't remember if he said that.  Ask a

6   different question.

7       BY MR. RODRIGUEZ:

8   Q.   The government asked you on direct about this concept of what

9   we call a community -- exact word is -- the abbreviation is CDD.

10  Have you heard of that abbreviation?

11  A.   Yes.

12  Q.   Isn't it true, sir, that the first action by Mr. Clark and

13  others at Cay Clubs was to go to the city of Clearwater and get

14  their approval for the Clearwater Cay Community Development

15  District Taxing Authority?

16  A.   I think that's the first specific action that was requested.

17  Q.   Right.  And so Cay Clubs went to the city commission, that you

18  at the time answered to through the city manager, and were able to

19  form this district.  Isn't that true?

20  A.   City of Clearwater did pass an ordinance forming the district.

21  Q.   Okay.  So the city took action first on behalf of Cay Clubs to

22  pass an ordinance particularly for Cay Clubs, would you agree?

23  A.   They approved the Clearwater Cay Club CDD.

24  Q.   Okay.  And that was not necessarily a quick process, was it?

25  A.   It took several months.

```
 1   Q.   And sir, you would agree that the whole notion of developing

 2   can be a very lengthy process.  Is that fair to say?

 3   A.   It can.

 4   Q.   And for example, in your city itself, you have a Beach by

 5   Design project.  Are you familiar with that?

 6   A.   Yes.

 7   Q.   And you're familiar that that Beach by Design project has

 8   taken 14 years to complete and $1 billion investment.

 9          MR. WATTS-FITZGERALD:  Objection, Your Honor,

10   irrelevant.

11          THE COURT:  I'll sustain that objection.

12          BY MR. RODRIGUEZ:

13   Q.   Do you know when Cay Clubs basically went under?  What year?

14   What month?

15   A.   No.

16   Q.   Okay.  So you have no idea how much time Cay Clubs had to

17   develop this property that you were shown, do you?

18   A.   I don't know what their time line looks like.

19   Q.   So you don't know if it's two years, four years or 12 years.

20   Fair to say?

21   A.   I don't know what the Cay Clubs time line looks like.

22   Q.   But you do know, sir, that you saw a shopping center there

23   initially when you first met with Mr. Clark.

24   A.   There was a shopping center there, yes.

25   Q.   It was a dilapidated shopping center.
```

1   A.   It was an older center, yes.

2   Q.   And you know that Mr. Clark had that shopping center removed,

3   I think you used the word razed?

4   A.   The shopping center was razed.

5   Q.   So that was the first step to clear that property, would you

6   agree?

7   A.   Well, it was a first step.

8   Q.   And --

9   A.   You would at some point have to clear the property, true.

10  Q.   Right.  I mean, to do anything you have to take a first step,

11  right?

12  A.   If you're going to redevelop the property.

13  Q.   And permits had to be obtained to raze this property.

14  A.   A permit, yes.  Development approval, no.

15  Q.   Because development approval was not required why?

16  A.   They weren't proposing to build anything.

17  Q.   Just tearing something down.

18  A.   Correct.

19  Q.   Now, you're familiar also with this community development and

20  how it legally can handle some of the functions that the city

21  would normally handle.  Is that fair to say?

22  A.   I'm not an attorney, so I won't address what they legally can

23  and cannot do.  But I believe from a public service administration

24  standpoint they will perform some functions which would otherwise,

25  you know, belong to the local government jurisdiction.

1    Q.   And in your training as planning director, you deal with CDDs;

2    is that fair to say?

3    A.   No, this is the only one I've ever dealt with.

4    Q.   This is the first CDD you've ever dealt with and the only one,

5    would you agree?

6    A.   I would agree.

7    Q.   And you understood that it was created as part of state law,

8    fair to say?

9    A.   Understood there was a foundation in statutory law for their

10   creation, yes.

11   Q.   And the lawyers were involved in creating this on behalf of

12   Cay Clubs Clearwater?

13   A.   Repeat the question, please?

14   Q.   Lawyers were involved.

15   A.   Yes.

16   Q.   Okay.  And in fact, the city has their own lawyers as well.

17   A.   Yes.

18   Q.   And you go to those lawyers to seek advice if you need it?

19   A.   Yes.

20   Q.   And that mechanism is set up because sometimes you have

21   questions about rules and regulations, so you need some advice.

22   A.   Yes.

23   Q.   And you'd also agree, sir, that the CDD itself is an advantage

24   to a city because it raises property values and therefore brings

25   in more taxes?

1  A.   I'm not sure I can state that's inherently true.

2  Q.   Well, does the CDD take over some of the functions of the city

3  government?

4  A.   There are some functions which are performed by districts that

5  would otherwise be performed by the local government.

6  Q.   And would you agree that the CDD that we're talking about here

7  is controlled by landowners and residents?

8  A.   I believe that the administration and implementation of the

9  community development districts are performed by the residents

10  and/or property owners in them, but I'm not an attorney so I can't

11  address the legal construct of CDDs.

12  Q.   So you can't tell this jury what actions the CDD was taking on

13  behalf of Cay Clubs, could you?

14  A.   Repeat the question, please.

15  Q.   You were shown a variety of permits that were asked from the

16  city.  Do you recall that exhibit?

17  A.   Correct.

18  Q.   And you were asked to testify was this permit pulled or was

19  that permit pulled, correct?

20  A.   That's correct.

21  Q.   And would it be fair to say, sir, that you have no information

22  that you can provide us about what type of work the CDD, that

23  Community Development District, did for Cay Clubs within itself as

24  a group?

25  A.   Within the CDD as a group, yes, I would not be familiar with

```
1    what they would have done internally as a CDD.
2    Q.   Now, the CDD could come to the city to ask that certain things
3    be done; is that fair to say?
4    A.   Yes, they could have.
5    Q.   And they would come as the political entity to the city
6    requesting help or permission with any variety of projects.  Is
7    that fair to say?
8    A.   I would assume they would come to the city as an
9    administrative body governing the CDD.  I would not describe it as
10   political but --
11   Q.   And you were never asked by the government what did the
12   Clearwater CDD come to Clearwater city and ask for, did you?  Were
13   you?
14   A.   What are you defining as government in that question?  The
15   government of the CDD?
16   Q.   I'm sorry.  The prosecutors over here.  The prosecutors.
17   A.   My mistake.  I'm sorry.
18   Q.   It's my mistake too.  The prosecutors never asked you for any
19   information on activity by the CDD, did they?
20   A.   Yes, they did.
21   Q.   And what did you produce?
22   A.   The records which I've been shown today.
23   Q.   And that includes all the CDD activity with the city of
24   Clearwater, is that your testimony?
25   A.   Correct.  I could not show what did not take place.
```

1  Q.   What does that mean?

2  A.   I have shown the government at their request what permits that

3  we issued relative to this property or properties over the period

4  of time.

5  Q.   Were you able to show the government what permits were not

6  issued but requested?

7  A.   Not aware of any that were requested but not issued.

8  Q.   Are you sure about that?

9  A.   No, I'm not sure.  Somebody may have applied for something

10  which we could not permit.

11  Q.   In fact, not all permits are granted, are they?

12  A.   Not all building permits are granted.

13  Q.   And the process of permitting takes a bit of time, you would

14  agree?

15  A.   Are you asking me specifically about the building permitting

16  process?

17  Q.   Yes, the building permitting process.

18  A.   The building permitting process can take some time for plan

19  review.

20  Q.   And plan review, the fancy term, explain to the jury in every

21  day language what does that mean.

22  A.   Under Florida law, building permits have to comply with the

23  Florida building code.  And so a plan which demonstrates

24  compliance with the Florida building code has to be submitted in

25  order to issue permits for things that are governed by the Florida

1   building code.

2   Q.   And in order to submit plans, you have to go to professionals

3   such as certified architects and persons of that nature.

4   A.   Or building permit plans, that's correct.

5   Q.   And there are very strict rules on what you have to receive

6   and the format it's received in.   Fair to say?

7   A.   Florida building code must be complied with, correct.

8   Q.   Now, you were asked a few questions about meetings with

9   Mr. Clark.   Isn't it fair to say it wasn't just Mr. Clark you met

10  with; at the same time you met with other persons working with Cay

11  Clubs.

12  A.   There were other people there.

13  Q.   Professionals?   You'd agree?

14  A.   I don't have a specific recollection of who the other persons

15  were at this point.

16  Q.   Well, do you recall whether there were architects?

17  A.   There may well have been, but I don't have a specific

18  recollection of that.

19  Q.   And would you agree with us that that is normal for to you

20  meet with architects and the developer at the same time?

21  A.   That would be normal.

22  Q.   And design and planning specialists?

23  A.   Yes.

24  Q.   So when you met with Mr. Clark, isn't it fair to say that you

25  met with him believing that he was serious about what he wanted to

```
 1   do with Cay Clubs.
 2            MR. WATTS-FITZGERALD:  Objection, Your Honor.  Calls for
 3   the witness to speculate what the intent.
 4            THE COURT:  No, he's asking him when he met with him did
 5   he believe he was serious.  I don't think that that means -- he's
 6   not asking him to speculate I don't think.  I'll overrule the
 7   objection.  You may answer.
 8            THE WITNESS:  I had no reason to believe he wasn't
 9   serious.
10       BY MR. RODRIGUEZ:
11   Q.  He didn't bring you cartoon drawings and stuff of that nature,
12   did he?  It was real stuff?
13   A.  I don't remember any cartoon drawings.
14   Q.  Okay.  Now likewise, sir, this project you were shown the
15   picture of, you told the jury that part of the project allowed for
16   overnight rentals.  What did you mean by that?
17   A.  Hotels are allowed in commercial zoning district, but they
18   would not have been accommodated in the residential portion of
19   this property.
20   Q.  Okay.  So if I could borrow Government's Exhibit --
21            THE COURT:  You're muttering.  You're muttering.
22            MR. RODRIGUEZ:  I'm sorry.  I just need the government's
23   picture exhibit.  Where did you put your exhibits at?
24            THE COURT:  It's not over there.  Nobody leaves the
25   room.
```

1    BY MR. RODRIGUEZ:

2    Q.  Let's remember the picture that was put up for a moment.

3    You're telling the jury that in portions of this development,

4    overnight rentals were allowed because it was a commercial

5    portion?  I'm going to show you what's been marked as 15.04 in

6    evidence already.  And it's very blurry.

7         THE COURT:  It's not when you auto focus it.

8         MR. RODRIGUEZ:  I pushed the button.  There it is.

9    BY MR. RODRIGUEZ:

10   Q.  Sir, can you -- on your screen, I believe if you touch your

11   screen, can you show us the commercial portion of Cay Clubs?  I'm

12   going all the way back here of this development?  If you can see

13   it on there.  Right there.

14        So you're telling us where you pointed the arrow or line

15   to, that could be overnight rentals.

16        THE COURT:  The bottom of the line or the top of the

17   line?

18        THE WITNESS:  That line is in error.  I don't know how

19   to delete the line.

20        THE COURT:  It's because I have to delete it.  It's

21   deleted.

22   BY MR. RODRIGUEZ:

23   Q.  Now, you want to try again?

24   A.  I don't believe this shows the commercial portion of the

25   property.  This is existing residential portion of the

1    construction.  I believe that the commercial portion would lie to

2    the west of the residential piece.

3    Q.  Can you draw an arrow to the direction that you would find

4    this commercial?

5    A.  Now my arrow doesn't stay.

6    Q.  There you are.

7              THE COURT:  Down to the bottom left.

8              MR. RODRIGUEZ:  Down to the bottom left.

9              THE WITNESS:  If you match those two things that would

10   make an arrow.

11       BY MR. RODRIGUEZ:

12   Q.  So in the front of this area you can put overnight rentals.

13   Is that fair to say?

14   A.  The commercial general zoning district would allow for hotels.

15   Q.  Now, isn't it true that officials from Clearwater came to this

16   development on numerous occasions at the behest of Mr. Clark to

17   try to convince them to allow a change in the zoning?

18   A.  No, I don't recall that happening.

19   Q.  Well, is it because you didn't go there or because you just

20   don't recall?

21   A.  I think because you're not asking me the right question.

22   Q.  Okay.  What question should I ask you?

23              MR. WATTS-FITZGERALD:  Objection to the form of the

24   question, Your Honor.

25              THE COURT:  No.  Obviously it's a matter of

```
 1   nomenclature.  So tell him what nomenclature he should be using.
 2       BY MR. RODRIGUEZ:
 3   Q.  Did officials go out to Cay Clubs.  Let's start it that way.
 4   A.  Say that again?
 5   Q.  Did officials from the city of Clearwater go out to Cay Clubs
 6   meeting with Mr. Clark?
 7   A.  You know, I don't recall going to Ca Clubs and meeting with
 8   Mr. Clark, so there could have been city officials there but it
 9   was not me.  And by the time this discussion occurred, I was the
10   director of the entire department.
11           You made reference to Ms. Terapini, she was no longer
12   there.  So I did not go out to the development to meet with
13   Mr. Clark.  I met with him in the office.
14   Q.  In your experience dealing with municipal governments, is it
15   fair to say, sir, that it's common for a developer to bring city
16   officials to the project to convince them to change a rule or to
17   petition for a change?
18   A.  It's not uncommon for -- when you say city officials
19   administrative staff, it is not unusual for administrative staff
20   to visit sites.
21   Q.  And part of the way government works is it's appropriate to
22   try to convince city officials to change rules and laws; is that
23   fair to say?
24   A.  People often petition us for change to the city's land
25   development regulations.
```

```
 1   Q.   And in fact, when we were discussing earlier this Beach by
 2   Design project, that's the result of a change taking place over a
 3   long period of time in rules?
 4   A.   Beach by Design was a small area plan that contained a host of
 5   public improvements --
 6   Q.   And those --
 7   A.   -- being implemented over time through a capital program.
 8   Q.   And those improvements required changes in rules and
 9   regulations; is that fair to say?
10   A.   To fully implement Beach by Design, the city of Clearwater did
11   adopt a very specific set of land development regulations and
12   design guidelines in order to facilitate the implementation of
13   Beach by Design.
14   Q.   Okay.  And so sir, it's fair to say that if you want to be
15   able to develop an area such as this Beach by Design, you have to
16   convince cities to change rules?
17   A.   That's correct.
18   Q.   And that's the American way, right?
19            MR. WATTS-FITZGERALD:  I think I object to that, Your
20   Honor.
21            THE COURT:  I'm not sure, but you know what, what's the
22   objection?  That it is the American way?
23            MR. WATTS-FITZGERALD:  This line of questioning has
24   reached the point of irrelevancy in the case, Your Honor.
25            THE COURT:  It's getting pretty close.  I would suggest
```

**PROCEEDINGS RECORDED BY MANUEL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
 1   that maybe you need to go to a different subject matter.  Before

 2   you do though, let's take a short break.  All right?  We'll be in

 3   recess for about 10 minutes.

 4           Mr. Witness, since you're on the stand, you're not

 5   permitted to discuss your testimony -- the jury can step out.

 6   You're not permitted to discuss your testimony with anyone, even

 7   the lawyers that called you.  Okay?

 8           We'll be in recess for about 10 minutes.

 9           (Brief recess)

10           (Jury out at 2:24 p.m.)

11           THE COURT:  We'll be in recess for about 10 minutes.

12           MR. WATTS-FITZGERALD:  I wanted to thank the court out

13   of presence of the jury for elevating me to feisty from uptight.

14           THE COURT:  It's a slow but logical progression.

15           (Brief recess)

16           (Jury in at 2:36 p.m.)

17           THE COURT:  Please be seated.  All right.  When we

18   broke, Mr. Watts-Fitzgerald was objecting to the American way if I

19   remember correctly; is that right?

20           MR. WATTS-FITZGERALD:  Typical kind of thing, Your

21   Honor.  Yes.

22           THE COURT:  Okay.  Well, let move on.

23           MR. RODRIGUEZ:  I'll move on.

24       BY MR. RODRIGUEZ:

25   Q.  Show you what's been marked as Exhibit F26 just for
```

```
 1   identification, sir.  If you can look at that, tell me if you
 2   recognize what is depicted there without telling us what it is.
 3   A.   Yes.
 4   Q.   And the thing that's depicted, have you seen it before?
 5   A.   Yes.
 6   Q.   And did you see it in the course of working as the planning
 7   director?
 8   A.   Yes.
 9   Q.   Okay.
10           MR. RODRIGUEZ:  I would move F26 into evidence.
11           MR. WATTS-FITZGERALD:  Can we get a time frame, Your
12   Honor?
13       BY MR. RODRIGUEZ:
14   Q.   Yes.  When do you think you saw the object that's in F26?
15   A.   That building was constructed when I came to work for the city
16   of Clearwater, so that would have been somewhere on or around
17   spring of 2005.
18   Q.   Thank you.  Your Honor, F26 says reserved on your list.
19           If you would just write corporate headquarters on there?
20   Thank you.
21           MR. WATTS-FITZGERALD:  Why don't we not have testimony
22   about the content of the exhibit before the court rules on my
23   objection, Your Honor?
24           MR. RODRIGUEZ:  Oh, I didn't hear an objection.
25           MR. WATTS-FITZGERALD:  Why do you think I'm standing up?
```

1          Beyond the scope, Your Honor.

2          MR. RODRIGUEZ:  I didn't hear that, Your Honor.  I'm

3    sorry.

4          THE COURT:  Come on over here and let's talk about it.

5          (SIDEBAR CONFERENCE:

6          MR. WATTS-FITZGERALD:  My objection --

7          THE COURT:  This is what you were talking about?

8          MR. RODRIGUEZ:  I'm trying to tie it in.

9          MR. WATTS-FITZGERALD:  There was no testimony about

10   this.  This building, there were no questions about a corporate

11   headquarters or where the company was located.  The company didn't

12   build this building and there were no questions about any permits

13   pulled on that property.

14         THE COURT:  What's it about?

15         MR. RODRIGUEZ:  This company is a part of this.  It's

16   located on this property.  They put in evidence this one picture

17   as if this is the entire scenario.  This is a part of this unit,

18   including he talked about the shopping center.  There's a shopping

19   center and everything down here that's not included.  I think the

20   jury gets to see the entire picture.

21         THE COURT:  Where is this in relationship to that?

22         MR. RODRIGUEZ:  My understanding is it's down here.

23         MR. WATTS-FITZGERALD:  He can develop it through.

24         MR. FOSTER:  Excuse me.  Judge, this is east.  This is

25   going to Tampa.  This is west going to Clearwater Beach.  This

PROCEEDINGS RECORDED BY MANUEL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    piece of property is west, US 19 is right here and I think he can

2    develop through this gentleman that the property.

3           THE COURT:  What does that have to do with what he was

4    asked on direct examination?

5           MR. RODRIGUEZ:  Commercial properties, Your Honor.

6    Commercial properties were brought up, whether anything was done

7    to develop this property.

8           MR. WATTS-FITZGERALD:  They didn't develop this.

9           MR. RODRIGUEZ:  They did too develop that.

10          MR. WATTS-FITZGERALD:  The question was about specific

11   -- I was very specific; a water park, a gondola and water stuff

12   and that's all he testified about.  There was no questions about

13   the corporate headquarters.

14          THE COURT:  Was this built before they got there?

15          MR. RODRIGUEZ:  This is the corporate headquarters that

16   they sought permits for.

17          THE COURT:  You keep telling me that, but that's not the

18   question I asked you.

19          MR. RODRIGUEZ:  They pulled permits to occupy and be a

20   part of this building.  They're giving this impression to the jury

21   that they've gotten no permits for nothing.

22          MR. WATTS-FITZGERALD:  They're construction permits.

23          THE COURT:  Did they go to the city for any permits of

24   this?

25          MR. RODRIGUEZ:  Of course.  They had to.

40

1          THE COURT:  Who had to?

2          MR. RODRIGUEZ:  Cay Clubs.

3          THE COURT:  Cay Clubs didn't build it.  They're renting

4  space, aren't they?  Did they change it?  They didn't do anything

5  with it, did they?

6          MR. RODRIGUEZ:  I was going to get into that with him,

7  what they went through the entire process.

8          MR. WATTS-FITZGERALD:  It wasn't part of the lease

9  operations or the sales operations, there was --

10          THE COURT:  I don't think it has anything to do with it.

11  I think it's at best misleading.  Sustained.

12          (END OF SIDEBAR)

13     BY MR. RODRIGUEZ:

14  Q.  Sir, did you ever have an opportunity to visit the Cay Clubs

15  headquarters?

16          MR. WATTS-FITZGERALD:  Your Honor, could I hear the

17  question again, please?

18          THE COURT:  Did he have an opportunity to visit the Cay

19  Clubs headquarters.

20          THE WITNESS:  No.

21     BY MR. RODRIGUEZ:

22  Q.  Did you have an opportunity to visit any of the commercial

23  properties you testified about in direct examination on the Cay

24  Clubs property?

25  A.  I had been into the old shopping center site.

**PROCEEDINGS RECORDED BY MANUEL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.   Any other sites around there?

2    A.   Venezia, I've been into Venezia, the residential portion.

3    Q.   And was that as a part of your job with the city of

4    Clearwater?

5    A.   I think I drove into Venezia the first time early on just to

6    look at the residential area.  So it was not part of my job.

7    Q.   Did you find --

8    A.   At the time that I first went in there.

9    Q.   Did you find -- you found it to be an attractive development,

10   you agree?

11          MR. WATTS-FITZGERALD:  Objection, Your Honor,

12   irrelevant.

13          THE COURT:  I don't see that it helps or hurts, but I'll

14   let him answer the question.

15          THE WITNESS:  I thought it was an attractive

16   development.

17       BY MR. RODRIGUEZ:

18   Q.   And likewise, sir, when you were given a presentation that you

19   discussed earlier -- well, strike that.

20          You met with Mr. Clark and you believed possibly an

21   architect.  Do you recall that testimony?

22   A.   You asked me if it was common to meet with those design

23   professionals, I answered that yes.  I don't recall who he brought

24   with him.

25   Q.   Do you recall a Power Point presentation being given to you

PROCEEDINGS RECORDED BY MANUEL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    along with other city officials?

2    A.   Vaguely.

3    Q.   Okay.  I understand it's ten years ago.  When you say vaguely,

4    are you trying to say that you kind of remember or don't?

5    A.   I remember some presentation, but I don't really recall the

6    specifics of that presentation.

7    Q.   Okay.  Video presentation?

8    A.   I don't remember a video.

9    Q.   Okay.  And is it not normal and common for you as a city

10   planner to receive presentations from developers?

11   A.   Yes.

12   Q.   Okay.

13   A.   And I'm not suggesting there wasn't necessarily a video, I

14   just don't --

15   Q.   You can't remember.  Okay.  And to this day, is this

16   development still there?

17   A.   The residential property remains.

18   Q.   And you do not have -- you agree you have no independent

19   knowledge as to why a water park wasn't put there, do you?

20   A.   I do not know why it was not put there.

21   Q.   In fact, you have no personal knowledge of what this Community

22   Development District was doing during these periods of time; is

23   that fair to say?

24   A.   Correct.

25   Q.   You weren't on the board of directors for that development

PROCEEDINGS RECORDED BY MANUEL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

43

1   were you; is that correct?

2   A.  Yes, that's correct.

3   Q.  Okay.  And isn't it true, sir, that these Community

4   Development Districts are public entities subject to the open

5   Sunshine laws?

6   A.  I'm not an attorney.  I can't speak to what their legal

7   obligations are.

8   Q.  Anything that comes before your city council is subject to

9   open government, correct?

10          MR. WATTS-FITZGERALD:  Objection, Your Honor, relevancy.

11          THE COURT:  I'm not sure, but I'll permit it at this

12   point.  But don't go too far unless you tie it in in some way.

13          THE WITNESS:  With a very few exceptions, everything

14   that comes before the city council is public.

15          BY MR. RODRIGUEZ:

16   Q.  So if someone brings a presentation before the city council,

17   the public sees it?

18   A.  Yes, it is public.

19   Q.  And you were present at the time that the city commission

20   approved this CDD, this Community Development District?

21   A.  I was.

22   Q.  And you were -- that was in a public forum, meaning a council

23   meeting; is that correct?

24   A.  It was.

25   Q.  And all the council members voted and it was passed?

1    A.   It did pass.

2    Q.   And then it became the law?

3    A.   It was created.

4         MR. RODRIGUEZ:   Thank you.

5         MR. ARTEAGA-GOMEZ:   No questions, Judge.

6                    REDIRECT EXAMINATION

7    BY MR. WATTS-FITZGERALD:

8    Q.   When, chronologically, was Beach by Design?

9    A.   We adopted Beach by Design, I think around 2003, somewhere in

10   that time frame.

11   Q.   Did it have anything to do with Cay Clubs?

12   A.   No, sir.

13   Q.   Did it have anything to do with Mr. Clark?

14   A.   No, sir.

15   Q.   The CDD, you recall all of the questions about the CDD?

16   A.   Yes.

17   Q.   You were asked a lot about it.

18   A.   Yes.

19        MR. RODRIGUEZ:   Objection form of the question.

20        MR. WATTS-FITZGERALD:   I'll change the form of the

21   question.

22        BY MR. WATTS-FITZGERALD:

23   Q.   Do you remember answering many, many, many questions about the

24   CDD?

25   A.   Yes, sir.

1   Q.   What it could do and could not do?

2   A.   Yes, sir.

3   Q.   What services it performed and did not perform?

4   A.   Yes, sir.

5   Q.   Does the CDD have to submit permits to your department for

6   construction projects?

7   A.   Development review approval and permit applications would both

8   come before our department to be administered.

9   Q.   That does not go to the CDD when they are established?

10   A.   The local jurisdiction would still administer land development

11   regulations.

12   Q.   Did the CDD come to your department to build out those

13   features we discussed earlier, a water park, the canal features

14   and a big shopping center?

15   A.   No, sir.

16   Q.   Was any permit for short term rentals at the Bellagio and

17   Venezia property ever submitted by Cay Clubs or the CDD?

18   A.   No permit was submitted.  We wouldn't have accepted it.

19   Q.   How about --

20   A.   It was not submitted.

21   Q.   Same question with respect to any application to change the

22   law to allow for that activity at the Bellagio and Venezia.

23   A.   There was no requested change in the zoning land use or the

24   zoning district that would have permitted short-term rental for

25   the residential portions of the property.

1    Q.   Okay.  Now, you recall the questions about the industrial

2    portion of the property and the ability to do overnight rentals in

3    that area because it was zoned differently?

4    A.   I would characterize that area based on our nomenclature as a

5    commercial portion of the property, not industrial.

6    Q.   Let me use your term so you're comfortable.  In the commercial

7    portion of the property, did the commercial portion of the

8    property include the Venezia and Bellagio housing units?

9    A.   The commercial portion of the property is a separate parcel of

10   record as I recollect.

11   Q.   Was there a hotel there?

12   A.   There is no hotel on --

13   Q.   At the time?

14   A.   At the time.  I believe that it was just a strip commercial

15   shopping center.

16   Q.   Did Cay Clubs or the CDD ever build rental units for overnight

17   rental in that area?

18   A.   No.

19   Q.   Did they ever apply to do so?

20   A.   No.

21        MR. WATTS-FITZGERALD:  Thank you, Your Honor.

22        THE COURT:  Thank you, sir.  You are excused.

23        (Testimony concluded)

24                         *  *  *  *  *

25

**PROCEEDINGS RECORDED BY MANUEL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1
         **C E R T I F I C A T E**
I certify that the foregoing is a correct transcript from the
2
record of proceedings in the above-entitled matter.

3

4

5

6    _____          /s/ Dawn M. Whitmarsh
     Date                      DAWN M. WHITMARSH, RPR
7
                       I N D E X
8
                       WITNESSES
9
All Witnesses:                                    Page
10
         Michael Delk for Government
11   Direct Examination by Mr. Watts-Fitzgerald        3:8
     Cross-Examination by Mr. Rodriguez              17:2
12   Redirect Examination by Mr. Watts-Fitzgerald    44:6

13                      EXHIBITS

14              15.04
     In Evidence                                     6:2
15
              15.02 & 15.03
16   In Evidence                                   14:11

17

18

19

20

21

22

23

24

25