<pre>
1                   UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
2                        KEY WEST DIVISION
            CASE NO.  13-10034-CR-MARTINEZ/SNOW
3

4

5   UNITED STATES OF AMERICA,

6                   Plaintiff,

7        vs.

8                                    Miami, Florida
                                     July 15, 2015
9   FRED DAVIS CLARK, JR., and       Pages 1-120
    CRISTAL R. CLARK,
10
                    Defendants.
11   _____

12

13                   TRANSCRIPT OF JURY TRIAL
                    TESTIMONY OF PRITAM SINGH
14          BEFORE THE HONORABLE JOSE E. MARTINEZ
                  UNITED STATES DISTRICT JUDGE
15

16
    APPEARANCES:
17
    FOR THE PLAINTIFF:
18
                         United States Attorney's Office
19                       BY:  JERROB DUFFY,  A.U.S.A.
                         BY:  THOMAS WATTS-FITZGERALD, A.U.S.A.
20                       99 N.E. 4th Street
                         Miami,  Florida 33132
21
                         United States Department of Justice
22                       Criminal Division Fraud Section
                         BY:  MICHAEL PADULA, A.U.S.A.
23                       Bond Building
                         1400 New York Avenue, NW
24                       Washington, DC 20530

25
</pre>

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1   FOR DEFENDANT FRED DAVIS CLARK, JR.:

2                         *Todd Foster Law Group*
                          BY:  TODD FOSTER, ESQ.
3                         BY:  ASHLEY RECTOR, ESQ.
                          BY:  CLAUDIA PASTORIUS, ESQ.
4                         1881 West Kennedy Boulevard
                          Tampa, Florida 33606
5
                          *Law Offices of Valentin Rodriguez, P.A.*
6                         BY:  VALENTIN RODRIGUEZ, JR., ESQ.
                          120 South Dixie Highway
7                         Suite 204
                          West Palm Beach, Florida  33401
8
    FOR DEFENDANT CRISTAL R. CLARK:
9
                          *Federal Public Defenders Office*
10                        BY:  MANUEL A. ARTEAGA-GOMEZ, A.F.P.D.
                          BY:  AIMEE A. FERRER, A.F.P.D.
11                        150 West Flagler Street
                          Suite 1700
12                        Miami, Florida 33130

13  REPORTED BY:          DAWN M. WHITMARSH, RPR
                          Official Court Reporter
14                        400 N. Miami Avenue, 10S03
                          Miami, Florida  33128
15                        Telephone:  305-523-5598

16  _____

17                          P-R-O-C-E-E-D-I-N-G-S

18          PRITAM SINGH, GOVERNMENT WITNESS, SWORN.

19              THE COURT:  Please be seated.  Pull your chair up, get

20  close to the microphone, tell us your name and spell it.

21              THE WITNESS:  My name is Pritam Singh, P R I T A M, S I

22  N G H.

23              THE COURT:  You're kind of soft spoken, so do your best

24  to speak loudly.

25              THE WITNESS:  All right.  I will, sir.

```
 1              THE COURT:  All right.  Thank you.  You may proceed sir.
 2                             DIRECT EXAMINATION
 3         BY MR. WATTS-FITZGERALD:
 4    Q.   Mr. Singh, can you tell the ladies and gentlemen of the jury
 5    what you do for a living?
 6    A.   A real estate developer and hotel and property manager.
 7    Q.   And is there a particular geographic locality where you have
 8    engaged in this business?
 9    A.   Well, over my career I've engaged in it all over the country.
10    But for the last 25 plus years, I've concentrated in the Florida
11    Keys.  Key West and the Florida Keys.
12    Q.   And in your 25 years in the Florida Keys, approximately how
13    many properties have you developed and managed?
14    A.   A lot.  A few million square feet of properties.
15    Q.   I'm not sure that's going to translate.  Can you give that to
16    us in either projects or housing units or something that we can
17    relate to?
18    A.   Well, the first project I did was the Truman Annex which was
19    the renovation and rehabilitation of the military base in Key
20    West.  That was a 10-year project, that's about 1.2 million square
21    feet.  That included about 500 residences, hotel, museums,
22    renovation of the Little White House which is where Harry Truman
23    used to spend his winters.  Commercial marina, etcetera.
24              And then after that, I did 390 units in the renovation
25    of the Key West Golf Club, 275 and village at Hawk's Cay,
```

1    etcetera.  So which is in the middle Keys.

2    Q.  So your projects have not been confined just to Key West.

3    A.  No.  We did a lot of projects in the middle Keys also.

4    Marathon and Hawk's Cay.

5    Q.  And that's all Monroe County, Florida?

6    A.  All Monroe County, yes.

7    Q.  And in the course of your activities, have you acquired former

8    hotels and rental properties and converted them to resort homes

9    and condos?

10   A.  Yes.  That's been one of our specialties for the last 15

11   years.

12   Q.  Let's focus on the last 10 to 15 years.  Has it been difficult

13   in the Florida Keys to build new properties from scratch?

14   A.  Well, it's almost impossible.  The Florida Keys have a special

15   zoning provision, planning provision both from the state and from

16   the county and from the local community which restricts the amount

17   of development that can be done.  And used to be called rate of

18   growth ordinance and effectively you can only develop, redevelop

19   existing hotels into new hotels.  So you can tear them down, but

20   effectively to get new ones, you can do a little bit of it, but

21   very, very little.

22   Q.  And in circumstances where you buy a preexisting facility and

23   tear it down or simply renovate it, can you build to a higher

24   density on the location?

25   A.  Not usually.  Not very much.  There are exceptions, but as a

1   general rule, most of the hotel sites in the Florida Keys are

2   currently over-dense, meaning that according to current zoning you

3   couldn't build what's on there.  But they're grandfathered for the

4   density that they have.

5           So to give you an example, if you took the -- in the

6   center of Key West, there's a hotel called the La Concha.  If you

7   tore it down and you weren't re-permitted to build it already, you

8   couldn't build that there because it's over-dense.  But you got

9   grandfathered for renovation and potentially rebuilding as long as

10  you meet certain criteria.

11  Q.   Okay.  How do you locate properties for this sort of

12  renovation or rebuilding?

13  A.   I'm not sure I understand the question.

14  Q.   You indicated that the only practical way to engage in this

15  sort of development is to find a preexisting property.  How do you

16  find that property and acquire it?

17  A.   Well, since we're there for a long time, we actually made a

18  master list of all of the properties in the Florida Keys that were

19  permitted to have transient rentals, that were hotels and we

20  basically keep track of ownership and where they are and, you

21  know, they come into the market or we've approached them.        A

22  number of times, we've gone and approached owners.  A number of

23  times, they've just been in the market.  But there's a very finite

24  list and you know which ones might be available.  You know, for

25  instance, if it's owned by, you know, a large national company,

```
 1   like Hyatt Hotels, it's probably not going to be available.  On

 2   the other hand, if it's owned by -- if it's a timeshare, for

 3   instance, we did one project which was a timeshare which was

 4   coming -- it was coming out of timeshare and so we knew it was

 5   going to be for sale, so we went and approached the owners.

 6   Q.   You mentioned as one of the factors whether it's authorized

 7   for transient rental in The Keys?

 8   A.   Yes.

 9   Q.   Can you explain what a transient rental authorization is?

10   A.   Yes.  So if you buy a house in The Keys, there are -- or

11   property in The Keys, the zoning and permitting allows for most of

12   the houses or much of the houses in The Keys to only be used for a

13   person to live in full-time or to be a monthly rental.  Some

14   properties are designated as you can rent them nightly.  Some

15   properties are also designated you can rent them weekly.  And the

16   idea is that to try to limit the amount of transient rentals,

17   because they change the characters of neighborhoods.

18          So for instance, there are certain sections of each area

19   of the county that are not allowed to have transient rentals

20   because they don't want people coming in and out, they want

21   permanent residents who live there so that they have a better

22   quality of life, you know, so they don't have people changing

23   every day in terms of who is staying there.

24   Q.   Is a transient rental authorization a valuable commodity?

25   Does it increase the attractiveness of the unit?
```

1  A.   Yes.  In fact, in certain areas -- yes, very much so.  It

2  completely changes the valuation.  Because the rentals in Key West

3  are high and in the whole of Monroe County are high, there's a

4  high demand, so therefore you if you have a transient capacity to

5  rent, you can get a lot more income.  So you might be a rent for,

6  you know, $300 a night, 30 days, that's $9,000.  Or you might be

7  able to rent for 2,500 or $3,000 if it's a monthly rent.  So from

8  a cash flow perspective it's much, much more valuable to have a

9  transient rental, yes.

10 Q.   Can you readily convert a location that does not have that

11 transient rental authorization and acquire that authorization?

12 A.   It's difficult.

13 Q.   Lengthy?

14 A.   I can't make a general statement, but it is always a major

15 issue that you have to look at and you have to see.  But it can be

16 done, but it's troublesome and only in certain areas and with

17 certain rules.  And you have to meet certain criteria.  So the

18 reason it's valuable is it's highly restrictive.

19 Q.   So it travels with the title of the property.

20 A.   Well, generally.

21 Q.   Okay.

22 A.   The problem is not always.

23 Q.   So a developer has to pay attention to that issue and be

24 prepared to deal with the zoning departments if it does not have

25 that authorization and you want it?

1   A.  Oh, yeah.

2   Q.  Is it a lengthy process to convert?

3   A.  It's not only lengthy, it's expensive and troublesome and not

4   necessarily going to happen.

5   Q.  Did there come a time in recent years when you met a gentleman

6   or an individual by the name of David Clark?

7   A.  Yes.

8   Q.  Do you see David Clark in the courtroom here today?

9   A.  I do.

10  Q.  Can you just describe in brief what he's wearing and where

11  he's sitting, for the record?

12  A.  He's waving to me, and he's wearing a suit jacket and I think

13  it's a white shirt.

14          MR. WATTS-FITZGERALD:  Your Honor, may the record

15  reflect that the witness has identified the defendant Fred Davis

16  Clark, Junior.

17          THE COURT:  The record may so reflect.

18      BY MR. WATTS-FITZGERALD:

19  Q.  How did you happen to meet Mr. Clark in The Keys?

20  A.  I met him, I believe, in Marathon.  He was purchasing a number

21  of properties in Marathon area and in the Florida Keys area and

22  someone introduced us.  I can't remember exactly who.

23  Q.  Prior to meeting him, had you ever heard the name Cay Clubs?

24  A.  I had because it was in the newspaper.

25  Q.  Okay.  And had you, at that point, ever had business dealings

1   with Cay Clubs prior to meeting Mr. Clark?

2   A.   No.

3   Q.   Did there come a time when you realized you were both bidding

4   on or interested in the same property in Marathon?

5   A.   Yes.   There was an auction for the Sombrero Resort and Dave

6   was there and I was there and -- yeah.

7   Q.   And what type of property was the Sombrero Resort?

8   A.   Well, my recollection is that it was 99 condominiums in, I

9   think, two buildings, maybe three buildings.   And then there was

10   20-ish townhouses and some dockage, and there were actually two

11   locations of dockage, I believe.   One right there at the property

12   where the condos and townhouses were, and another piece that was

13   down the canal from there.

14   Q.   Do you recall if the marina areas actually were part of the

15   property or were they owned by the county?

16   A.   So I'm not sure, again -- my understanding is that they were

17   part of the property, but I don't know if the bay bottom was part

18   of the property which is another issue.

19   Q.   Is that significant in valuing a property?

20   A.   Oh, yeah.   Sure.

21   Q.   Why is that?

22   A.   Well, if you own the bay bottom, you can do -- the ability to

23   transfer ownership as opposed to the ability to transfer the right

24   to use the lease of the bay bottom, is a different kind of

25   valuation.   People will pay more and are more inclined to buy a

1   property that has owned a bay bottom than leased bay bottom.

2   Q.   What was your assessment of the Sombrero property when you

3   looked at it with an eye toward acquiring it?

4   A.   Well, I thought it was an interesting property but had a lot

5   of challenges.

6   Q.   What were the challenges?

7   A.   The first challenge was that there was 99 condos.  Again, I

8   could be wrong on that number, so that's my recollection.

9   Remember, I didn't buy it so I didn't -- so...

10  Q.   Were those condos privately owned?

11  A.   Yeah, there were 99 condos of which they were selling like

12  half of them or something like that, and half of them were already

13  owned by different individuals, which means that when you dealt

14  with the renovation or the repositioning of the property, you are

15  going to have to deal with all these other people.  And that's

16  always a problem.

17  Q.   Instead of dealing with one facility owner, you're dealing

18  with potentially dozens of owners?

19  A.   Yes.  I mean -- so as opposed to I buy a piece of property and

20  I can go in and do what I want with it, if I buy a piece of

21  property and, you know, the jury owns half and I own half, then,

22  you know, I got to go talk to the jury about everything I do and

23  they may or may not like what I do.  Right.

24  Q.   They have rights as owners?

25  A.   Yes.

1  Q.  And did you evaluate the property as someplace that could be

2  readily renovated or were you thinking tear down, gut?  What was

3  your notion that you might do with this?

4  A.  Well, you know, there are three parts, right, maybe four.

5  There are actually four parts.  The first part is the condominiums

6  we just discussed.  Those needed to be renovated for sure.  And

7  then your problem is how do you deal with the owners and how do

8  you get them to join in, and you have to persuade them that what

9  you want to do will add value to them and that they should help

10  pay for it because they own part of it.

11        The second part of it was there was a commercial area

12  out front.  It had, I believe, a restaurant, some tennis courts, a

13  swimming pool, etcetera.  And what do you do with that.

14        And then the third part is the 22 condominiums or -- not

15  condominiums, excuse me, townhouses.  And then there, I felt that

16  probably tearing it down was the best thing to do because they

17  were pretty rough, but I wasn't 100 percent sure because I didn't

18  get in that deeply because we didn't -- and then the last one was

19  the dockage.

20        And as I said, as I remember, there were two pieces of

21  dockage.  One down the canal, the idea there was to sell that one

22  off, and then the one around the property had some serious

23  structural problems.  So that was going to also have to be dealt

24  with.

25  Q.  And precisely when was it that you were looking at purchasing

1    the property or went to, I think you said it was --

2    A.  I'm sorry.  I don't remember.

3    Q.  Okay.  Did you buy the property?

4    A.  No.

5    Q.  Were you there when it was sold?

6    A.  When the auction took place, I was there, yeah.

7    Q.  Who won the property?

8    A.  Mr. Clark.

9    Q.  Do you know how much he paid for it?

10   A.  I don't remember.

11   Q.  Okay.  Were you willing to pay as much?

12   A.  No.

13   Q.  Why not?

14   A.  Because my estimation was that the costs of doing all of the

15   work that was going to have to be done didn't justify that price

16   at the time.  That was my opinion at the time.

17   Q.  What condition were the, I think you called them the

18   commercial facilities out front, the tennis court, the restaurant

19   and the pool.  Were they in acceptable condition?

20   A.  I would have torn it all down and scraped the site.

21   Q.  Did there come a time you actually did some business with

22   Mr. Clark thereafter regarding this furnishings and equipment?

23   A.  Yes.  I sold him some furniture, I bought the Hampton Inn in

24   Key West which I then tore down and built a resort there.

25   Q.  What was the name of the resort that you built on that

1  location?

2  A.   Parrot Key.

3  Q.   We'll come back to that.

4          What type of material did you sell from the ham ton into

5  Mr. Clark?

6  A.   I sold him some furniture and bedding and lamps and pictures

7  and tables, things like that.   The furnishings in the room.

8  Q.   Out of the Hampton Inn?

9  A.   Out of the Hampton Inn.

10 Q.   Why didn't you just retain them and use them in your parrot

11 key development?

12 A.   Well, you know, there are different levels of hotels, right.

13 So there's, you know, there's Holiday Inns and there's Hampton

14 Inns and then there's Marriotts, and then there's Hyatt and then

15 there's Four Seasons and then there's Ritz Carltons and, you know,

16 different levels.   So you have different furnishings for different

17 ones.   And what I was building there was a top, top luxury resort

18 and so...

19 Q.   Can we say five star?

20 A.   Well, the thing about stars is like, for instance, we can't

21 get five stars because we don't do room service.   So maybe a four

22 store resort.   And it's a luxury resort.

23 Q.   And what was the star equivalent, if you will, of the Hampton

24 Inn property or furnishings that you were selling to Mr. Clark?

25 A.   Maybe one.

1    Q.   They're all used?

2    A.   Oh, yeah.  It had been used furniture.  It was used furniture.

3    Q.   Were any television sets included in this?

4    A.   They might have been, yeah.

5    Q.   Let me show you what's marked as Government's Exhibit 2.07 for

6    identification.  Ask you to take a moment, examine the document,

7    tell me if you recognize it.

8            MR. WATTS-FITZGERALD:  I'm sorry.  That's 20.07, Your

9    Honor.  I may have said 2.07.

10           THE COURT:  20.07?

11           MR. WATTS-FITZGERALD:  Yes, Your Honor.

12           THE COURT:  Okay.

13           THE WITNESS:  Yes.  I believe I do.

14           THE COURT:  Yes, he recognizes it.

15       BY MR. WATTS-FITZGERALD:

16   Q.   How do you recognize it?

17   A.   Well, this is a fax from my attorney and on the bottom before

18   he sent it, he sent me a note that said do you -- is this the

19   correct list for what we're selling to Cay Clubs.

20   Q.   Do you recognize that as the correct list of what you sold?

21   A.   I believe it is, yes.

22           MR. WATTS-FITZGERALD:  Government moves 20.07 into

23   evidence, Your Honor.

24           THE COURT:  Hearing no objection, 20.07 is admitted in

25   evidence.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
 1              (Government's Exhibit 20.07 in evidence)
 2         BY MR. WATTS-FITZGERALD:
 3    Q.   Did Mr. Clark tell you what he wanted those furnishings for?
 4    A.   To use them at Sombrero Resort.
 5    Q.   And were they in fact delivered or trucked to Sombrero, if you
 6    know?
 7    A.   Yes, I believe they were.
 8    Q.   What were you going to do with them if you had not sold them
 9    to Mr. Clark?
10    A.   We were going to have a liquidator come in and have -- you
11    know, put a sign up on a Saturday and say, you know, come buy this
12    stuff and give us an offer.
13    Q.   Is that a developer's version of a yard sale?
14    A.   Yeah, that's it exactly.  It's a large yard sale.  Exactly.
15    Q.   If I can show you, this is an add-on in terms of numbers, Your
16    Honor, but has been shown to the defense, 20.07A.
17              Do you recognize what's depicted in the three pages of
18    20.07A, Mr. Singh?
19    A.   Yes.
20    Q.   How do you recognize them?
21    A.   I believe this is the furniture that's referred to in this
22    list here from the Hampton Inn.
23    Q.   All those years later, you actually remember what the
24    furniture looks like?
25    A.   Yes, I remember what the furniture looked like.  I believe
```

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

```
 1   this is the furniture.

 2            MR. WATTS-FITZGERALD:  Okay.  Your Honor, the government

 3   moves 20.07A into evidence.

 4            MR. RODRIGUEZ:  No objection.

 5            THE COURT:  All right.  Without objection, 20.07A is

 6   admitted in evidence.

 7            (Government's Exhibit 20.07A in evidence)

 8            MR. WATTS-FITZGERALD:  Your Honor, may I briefly publish

 9   that to the jury by ELMO?

10            THE COURT:  You may.

11       BY MR. WATTS-FITZGERALD:

12   Q.  Now 20.07A, we've got lamps, bedsteads, bedside table and

13   quilts?

14   A.  Yes.  Bedspreads, yeah.

15   Q.  Bedspreads.  Did you sell -- all that was part of the sale?

16   A.  Yes.  Uh-huh.  Everything.

17   Q.  Television, chairs, was that part of it?

18   A.  Yes.

19   Q.  Did you sell any wall mounting, LCD or plasma TVs to

20   Mr. Clark?

21   A.  I don't think so.

22   Q.  There's a close-up of the -- thank you.

23            Now, after meeting Mr. Clark at that time, do you

24   recognize the name Tracy Holder?

25   A.  Yes.  Tracy, yes, I do.
```

1    Q.   Who is Tracy Holder?

2    A.   Tracy Holder was a gentleman who lived in Marathon.  He

3    managed a hotel in Marathon.  He did some work for me

4    occasionally, and then he -- I believe he's the one who may have

5    introduced Dave and I.  And he eventually worked for Cay Clubs I

6    believe, and he passed away.

7    Q.   And through Mr. Holder, did you actually come to have a

8    meeting with Mr. Clark about further business ventures that you

9    might engage in together?

10   A.   Yes.

11   Q.   Do you recall approximately when that occurred?

12   A.   I think that occurred sometime in 2005.

13   Q.   Okay.  And what was the nature of that discussion?

14   A.   Well, you know, we had -- my company had been the largest

15   developer, certainly in the Middle Keys for many years.  We

16   started Hawk's Cay in 1996, so we had developed a number of

17   projects including Hawk's Cay, which is the largest development in

18   the Middle Keys from '96 to, you know, continuing and we continue

19   to this day.

20           And so Tracy said he had met Dave and thought that it

21   would be a really good idea and it would be a real benefit for

22   Dave and I to sit down and at least meet each other since we were

23   both doing business there, and potentially do business together.

24   Q.   Were you familiar with a development a little further up US

25   One called Mariner's Club?

1    A.   Very, very little.  I mean, other than just having driven by

2    it.  I've never been in it or anything like that.

3    Q.   And the meeting that you had with Mr. Clark, where did that

4    occur?

5    A.   You know, I think it might have actually occurred at my

6    property Tranquility Bay, but I'm not 100 percent positive.

7    Q.   And what was your property at Tranquility Bay?

8    A.   There had been a resort called The Buccaneer and a timeshare

9    project there on this property which is located in the middle of

10   Marathon.  It's about a 10 acre property.  And so we built -- at

11   that time, we had built 87 townhomes, restaurants, swimming pools,

12   gym, beach, tiki bar, all that sort of thing on the site.  And so

13   I think that's where I met Mr. Clark the first time.  But we

14   certainly met there, but I can't remember if we met other places.

15   Q.   Did Mr. Clark or Cay Clubs have any role in developing

16   Tranquility Bay?

17   A.   No.

18   Q.   What was its status at the time that you first met Mr. Clark?

19   Was the work complete?

20   A.   You know, I think the first time I met Mr. Clark it wasn't

21   complete.  I think -- and maybe the first time I met him was at my

22   office, which was just a mile away.  But I don't think Tranquility

23   Bay was complete the first time I met him.  I think I met him in

24   early 2005.  Something like that.

25   Q.   Did you complete it before you actually had business dealings

 1   with Mr. Clark?

 2   A.  Oh, yes.  Yeah.

 3   Q.  Did Cay Clubs, in any fashion, have any involvement with

 4   Tranquility Bay before subsequent activities?

 5   A.  Again, I'm not sure I understand the question.  I'm sorry.

 6   Q.  That wasn't -- yeah.  You said it may not have been complete

 7   in its development.  Did you complete the development?

 8   A.  Yeah, it was -- I have a recollection of meeting Dave when we

 9   were finishing the restaurant, meaning we were doing the final

10   trim-out on the restaurant.

11          And but if your question is what I think I understand it

12   to be, is was the project complete, up and running before I did

13   any business with Mr. Clark?  The answer is yes.

14   Q.  Thank you.  You answered a better question than I asked.

15          Where do you put Tranquility Bay in that continuum of

16   zero to five stars, if I can use that scale?

17   A.  Okay.  Well again, minus the room service, you can't get that

18   fifth star without the room service, I would say that Tranquility

19   Bay, in my opinion, is the top resort in Monroe County.

20   Q.  Okay.  Let's go beyond your personal opinion.  Is Tranquility

21   Bay the top resort in The Keys in terms of its nightly rental

22   rates?

23   A.  I believe it's number four.  And the other ones would be

24   Little Palm Island which is, you know, the most -- one of the most

25   expensive in Florida.  The second one would be the Casa Marina,

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1   which is built by Henry Flagler in 1911 in Key West.  The third

2   one, I believe, is Ocean Key House which is right on Mallory

3   Square, and then I believe we're the next, we're certainly the

4   highest in our area, by far.

5   Q.   Highest in Marathon?

6   A.   In the Middle Keys.

7   Q.   Middle Keys.

8   A.   For sure.

9   Q.   So it would be in the upper tier in any event?

10  A.   Oh, yeah.  We are considered one in everything.  Trip Advisor

11  and Hotels.com and all the ratings and everything.  We're

12  considered, yeah, the top.

13  Q.   By the way, do you track that kind of information?

14  A.   Oh, yes.

15  Q.   Because of the nature of your work?

16  A.   Oh, yes.

17  Q.   Are there subscription services or trade magazines or

18  something available that allows you to do that?

19  A.   Oh, everyone in the industry does it all the time.

20  Q.   And does that sort of rating reflect generally the quality of

21  the units?

22  A.   Oh, yes.

23  Q.   When you developed Tranquility Bay, did you engage in

24  pre-construction sales of the units?

25  A.   Yes.

1    Q.   Okay.  And how does pre-construction sales work in terms of

2    deposits, payments and closing on the units?

3    A.   Typically what happens is you sign -- we have a project, we

4    put it out for sale.  Person signs a contract.  Typically the

5    deposit is between ten and 20 percent.  The deposit is held in

6    escrow.  We build the project, we get our certificate of

7    occupancy, the final condominium or homeowner documents are filed

8    because you can't do that filing until you actually have the final

9    surveys and certificates, etcetera.  And then we sell the unit to

10   the person and they take occupancy after it's got a final

11   certificate of completion and signed off.

12   Q.   Are there ever instances where you haven't sold all of the

13   potential units or intended units in pre-construction sales and

14   you have to continue sales activity thereafter?

15   A.   Oh, yes.  Most of the time.

16   Q.   Okay.  When you engage in that type of development, do you

17   commit to certain amenities like pools, restaurants, etcetera, as

18   part of the project?

19   A.   Yes.

20   Q.   And how do you actually fund going vertical, the construction

21   of the project if you're only taking ten to 20 percent in deposits

22   from some of the future unit owners?

23   A.   Well, in our case, we never used the deposits for

24   construction.  So in our case, the deposits went into escrow and

25   then we borrow the money from the bank.  We put in -- so let's say

22

```
 1    a project is going to cost -- we're doing a project right now, $55
 2    million.  We have to put down 20 percent in the beginning up
 3    front.  We, the developer.  And then the bank will lend us the 44
 4    million, and but -- you'll always have to keep the loan in
 5    balance, which is to say that you have to have enough money there
 6    to finish all of the project, including the amenities, etcetera,
 7    so that you can deliver the product, you know, it's guaranteed the
 8    product will be delivered.
 9    Q.  Do you use marketing materials and promotional materials,
10    sales companies to sell those units for you?
11    A.  We had our own.  We had our own marketing company most of the
12    time.  As you know, we -- eventually we're using Cay Clubs to help
13    us sell some of our projects, but yes, we create marketing
14    materials and we have a sales force and, you know, we promote it
15    in various ways.
16    Q.  During your discussions with Mr. Clark, did he actually
17    propose doing business with you?
18    A.  Well, I actually think it was, as you said, Tracy Holder who
19    proposed that we do business.  Tracy knew Dave and liked Dave and
20    knew me and liked me, so he said I think you two guys should get
21    together and talk about doing some business.
22    Q.  Did you do that?
23    A.  Yes, we did.
24    Q.  Okay.  And what was the nature of the business discussions?
25    A.  It's very complicated.
```

```
1   Q.  In a nutshell.

2   A.  It's --

3   Q.  Well, let me do this the easy way.

4           Did you subsequently enter into a joint venture contract

5   with Cay Clubs or some entity thereof to pursue joint ventures?

6   A.  I did.  We did.

7   Q.  Who negotiated on behalf of Cay Clubs?

8   A.  Well, Dave and Chuck Phoenix.

9   Q.  And who is Chuck Phoenix?

10  A.  Chuck Phoenix is Dave's senior attorney.

11  Q.  He brought his lawyer.  Did you bring your lawyer?

12  A.  Oh, yeah.

13  Q.  Pretty standard?

14  A.  Pretty standard.

15          MR. WATTS-FITZGERALD:  May I approach, Your Honor?

16          THE COURT:  Sure.  Unless you're going to go try to slap

17  him around or something, you can get up there.

18          MR. WATTS-FITZGERALD:  Looks pretty tough, Judge.

19          THE COURT:  Well, I wouldn't let you.  I protect

20  witnesses and jurors.  Parties are on their own.  Somebody is

21  calling for you.

22      BY MR. WATTS-FITZGERALD:

23  Q.  Showing you what's marked as Government's 20.01 for

24  identification.

25          THE COURT:  Is that 20.01?
```

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

```
 1            MR. WATTS-FITZGERALD:  Yes, Your Honor.

 2            THE COURT:  Okay.

 3        BY MR. WATTS-FITZGERALD:

 4   Q.  Do you recognize that document?

 5   A.  Yes, I do.

 6   Q.  Is that the joint venture contract that we were just

 7   elliptically discussing?

 8   A.  It is.  And you can tell why when you asked if I could

 9   describe it in a nutshell, that was not possible.

10   Q.  Pretty dense?

11   A.  Pretty dense.

12            MR. WATTS-FITZGERALD:  Your Honor, the government moves

13   20.01 into evidence.

14            THE COURT:  Hearing no objection, it's admitted in

15   evidence as 20.01.

16            (Government's Exhibit 20.01 in evidence)

17        BY MR. WATTS-FITZGERALD:

18   Q.  When did you actually sign this agreement, Mr. Singh?

19   A.  Let me check the date, but I'm pretty sure it was March.

20   2006, I'm pretty sure.  Yes, March of 2006.

21   Q.  And on page 22, there is a signature for somebody for Cristal

22   Clear Contracting.  Do you see that signature?

23   A.  Yes.

24   Q.  And then further down to the right is yours?

25   A.  Yes.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.   Individually and as the sole shareholder of each company or

2    corporation.  And you list those corporations, do you not?

3    A.   Yes.

4    Q.   And were those all the corporations that you held at the time

5    that owned and managed real estate in The Keys?

6    A.   Pretty much.

7    Q.   Okay.  What were you doing with all of your holdings?

8    A.   Well, you know, I had been doing this for a long time in The

9    Keys, and my son had been working with me for a number of years,

10   and my son wanted to leave and go be a -- go to law school and

11   he's now a prosecutor and wanted to be a judge.  So he -- right?

12          So he wanted to leave and I was like oh, and Dave was

13   very enthusiastic and energetic and seemed to have a really

14   growing business.  So we basically entered into an arrangement

15   where he would effectively buy all of my assets and help me sell

16   them and buy them and he would -- you know, I would be -- I would

17   retire.

18   Q.   A few follow-up questions to what you just said.

19          Did your son become a lawyer and a prosecutor?

20   A.   Yes.

21          MR. RODRIGUEZ:  Objection, relevance.

22          THE COURT:  He's just asking.  He's just being cute.

23   Leave him alone.  You got a plan?  Okay.  Go ahead.

24          BY MR. WATTS-FITZGERALD:

25   Q.   He's not a federal prosecutor, is he?

1    A.   No.  No.  No.  No.  He's not.  He's -- he works for the State

2    Attorney Generals Office in New York.

3    Q.   You would not allow his position to affect your testimony

4    here, would you, today?

5    A.   Oh, no.  Absolutely not.

6    Q.   Okay.  Now, given those preferences and your own interests --

7            THE COURT:  He should have become a chiropractor.  He

8    would be better off.

9            BY MR. WATTS-FITZGERALD:

10   Q.   What was the value of the deal to you if it had been completed

11   as planned in joint venture contract?

12   A.   It was huge.  It was a total sales of $163 million.

13   Q.   That would have gone to you?

14   A.   Well, that would have been selling properties, etcetera.  You

15   know, a lot of it would have gone to the banks.  So -- but to me,

16   it would have been a lot of money, yeah.

17   Q.   So you largely planned to get out of the development business

18   in The Keys and leave the Keys?

19   A.   No, I wouldn't have left The Keys, but I have other interests

20   in my life and I would have spent more time on those.

21   Q.   And in the joint venture contract, did you list the properties

22   that you were conveying or that were covered by this agreement?

23   A.   Yes.  Uh-huh.

24   Q.   If I can invite your attention to page four in the middle of

25   the page, paragraph V as in Victor, I would like to talk to you

1    about that.  That list of one through ten in Roman numerals, were

2    those the properties you were conveying?  You see page four?

3    A.  Yes.  Well, those are the trademarks and then the -- yeah.

4    Yes.  Effectively.

5    Q.  Were there properties and the properties associated with those

6    trademarks?

7    A.  Yes.  Uh-huh.

8    Q.  Now, Parrot Key, I think you already described as the former

9    Hampton Inn?

10   A.  Yes.

11   Q.  Was that fully developed?

12   A.  No.

13   Q.  What was the state of that project when you entered into this

14   agreement in March of 2006?

15   A.  I think it -- I believe it was under construction.

16   Q.  Did you complete the construction?

17   A.  Yeah.

18   Q.  Did Cay Clubs complete the construction?

19   A.  No.  No.  Cay Clubs wasn't involved in the construction.

20   Q.  Okay.  What were they supposed to do with respect to Parrot

21   Key?

22   A.  Help me sell units.

23   Q.  They were going to act as a broker basically?

24   A.  Yes.

25   Q.  Indigo Reef, where was that located?

1   A.   Indigo Reef is in Marathon also.  It's a --

2   Q.   Type of property is that?

3   A.   It is 67 townhomes, 1,600 square feet each, three bedrooms,

4   three and a half baths, with an -- and each one of them had what

5   you call a mid-transient license so they could be rented for seven

6   days or more.

7   Q.   Is it easier to rent for seven days than 30 days?

8   A.   Yes.

9   Q.   Does it change the cash flow analysis for a developer?

10  A.   Oh, yeah.

11  Q.   What was the status of Indigo Reef at the time that you

12  executed this agreement in March of 2006?

13  A.   I believe it was done.

14  Q.   Tranquility Bay, you've already told us about.  The Boat House

15  Condominium.

16  A.   That was a dry storage barn, you know, where you put your

17  boats on racks.  That was under construction.

18  Q.   Condo for boats?

19  A.   Yeah.  It's a condo for boats.

20  Q.   Where is it located?

21  A.   Also in Marathon.

22  Q.   Fully complete at the time?

23  A.   No.

24  Q.   What was remaining to be done there?

25  A.   It was under construction.

1   Q.   Okay.  Who completed the construction on it?

2   A.   I did.

3   Q.   Okay.  Did Cay Clubs?

4   A.   No.

5   Q.   What was their role at the boat condos?

6   A.   They became, at one point, the manager.  It may have actually

7   even been finished at that time, that building.  The condominiums

8   may not have been finished, but that building may have been

9   finished.  But they became the managers of it and they -- yeah.

10  Q.   The next one says Boat House Marina Condominium.  How is that

11  different?

12  A.   That's different because that's wet slips.  So you have dry

13  slips where you stack your boats up, and then wet slips and I

14  believe there were 65 wet slips.

15  Q.   Were the wet slips installed, you know, the piers, the --

16  A.   Yeah.

17  Q.   The Village at 12399 Overseas Highway, that's at Mile Marker

18  123?

19  A.   I forget what that is.  I'm sorry.

20  Q.   Do you recall if it was done at the time of the execution or

21  were you still working on it?

22  A.   It will come to me.

23  Q.   We'll come back to that one.

24  A.   Thank you.

25  Q.   The two Coral Lagoon resorts and marina entries, six and

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    seven.  First, why are there two?

2    A.   Well, first of all, I believe that The Village at 12399

3    Overseas is the condominiums at Coral Lagoon.  But what we did was

4    this is -- we did is we retained the rights to the name even

5    though we sell the condominiums, and the reason for that is we

6    don't want people who are not taking good care of the property to

7    be able to market it, and we want to be able to have control over

8    the marketing.  So we keep the trademark name.  And then so the

9    actual designation of the technical, legal entity, I believe, is

10   the 12399.  And I don't know why there's two -- I suspect it's

11   because one is spelled Coral Lagoon Resort and Marina spelled out,

12   and one is with the ampersand.  And legally, for trademark

13   purposes, that's actually two different things.

14   Q.   So it's protecting your trademark?

15   A.   Protecting the trademark.

16   Q.   On the patent registry in Washington.

17        MR. RODRIGUEZ:  Objection, leading, Your Honor.

18        THE COURT:  It is, but not important.  I'll let it go.

19   BY MR. WATTS-FITZGERALD:

20   Q.   The Singh Company.  What exactly is that?

21   A.   That would be my main operating company.  My development

22   staff, my secretarial staff, my IT staff, that sort of thing.

23   Q.   Were you actually handing over your staff as part of this

24   process?  Were they to go with the deal?

25   A.   Eventually, yes.  Eventually.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

```
 1    Q.   And finally, Marathon Resort Management.

 2    A.   Marathon Resort Management was my hotel management company.

 3    Q.   Is that often abbreviated in the agreement MRM?

 4    A.   Yes.

 5    Q.   And what exactly did your resort management group do?

 6    A.   Well, it did the actual management of the properties.  So the

 7    Singh Company was sort of the development entity, and then

 8    Marathon Resort Management actually -- you know, they had the

 9    front desk people work for them, the housekeepers work for them,

10    the maintenance staff worked for them, the people who did

11    reservations worked for them, the staff who worked in the

12    restaurant worked for them.  My general manager worked -- all

13    worked for Marathon Resort Management as a separate entity.

14    Q.   So they're not brick and mortar.  This is really human

15    resources?

16    A.   What's that?

17    Q.   The management company is really human resources?

18    A.   Well, no.  They also take care of the reservations, the IT

19    system, everything to do -- when you go to a hotel, there's a lot

20    of things going on that you don't see.  You know, for instance,

21    somebody has to process -- there has to be accounting staff that

22    processes your credit cards.  There has to be somebody who takes

23    your reservation.  There has to be somebody who sends you your

24    lost and found back.  There has to be somebody who cleans the

25    room.  There has to be somebody who makes sure that the A/C
```

1    systems are working and calls the A/C guy.  So it's the whole

2    management company.

3    Q.   What are protected employees on Exhibit D, page 23 of the

4    agreement?

5    A.   I don't see them here listed, but...

6    Q.   If you look at the screen in front of you, I've already put it

7    up.

8    A.   Yeah.  So the idea here was that we were going to do a kind of

9    a -- what's the right way to say it, training wheels turn-over.

10   Which is to say at some point when Cay Clubs had met certain

11   thresholds and had done certain things, they would be able to

12   manage the properties.  And then eventually they would pay me the

13   rest, and I would be able to get out of the management business.

14   And so -- but there were key employees of mine that I wanted to

15   make sure were there and stayed there.  Right.  And the idea is

16   that these key employees reported both to me and to Cay Clubs.

17   All right.  So I always knew what was going on and protected the

18   quality of the operation.

19        I mean, I didn't know Cay Clubs, so I assumed they would

20   do a great job but still, I wanted to make sure that my key

21   employees would be staying on.

22   Q.   Were you, in fact, able over the course of the existence of

23   this joint venture contract able to trust, but verify through

24   those employees?

25   A.   Yes.

1    Q.   And if I can go back for one moment, I think I omitted asking

2    you.  The Coral Lagoon locations under the multiple names

3    including The Village at 12399, what was the state of completeness

4    of those projects at the time in March of 2006 when you executed

5    the agreement?

6    A.   They were still under construction.

7    Q.   Did you complete the construction?

8    A.   Yes, I did.

9    Q.   Okay.  Did Cay Clubs have a role in completion of the

10   construction?

11   A.   No, they did not.

12   Q.   Now, under the agreement were there phases, time lines,

13   deadlines for the obligations being assumed by the purchaser, Cay

14   Clubs?

15   A.   Yes, there were many of them.

16   Q.   What were they required to do in order to meet their

17   performance requirements under the contract?

18   A.   Well, they had to have certain -- they had to meet certain

19   sales thresholds.  They had to pay us a certain amount of money,

20   then they would get certain management and rights and etcetera.

21   So it was an -- and by the way, it changed.  There was a number of

22   amendments because they didn't make the threshold.  So we adjusted

23   things.

24   Q.   Well, that's where I was going next.  Did they, in fact, meet

25   the deadlines?  For example, sales of the various properties they

1   had committed to market through their organization for you under

2   the agreement?

3   A.   No.  Well, they met some and they didn't meet a lot.  A lot of

4   them they didn't meet.

5   Q.   Okay.  Now, this is in mid or spring of 2006 roughly, March.

6   A.   Yes.

7   Q.   Did you have other facilities that you had not transferred to

8   them?

9   A.   Well, in March I hadn't transferred any facilities to them.

10  It was later that they took the management of Cay -- of the

11  properties.

12  Q.   Let me show you a page from a document that's in evidence,

13  I'll have the number in a moment.  Showing you it on the screen,

14  it's captioned Retire Rich and Young in Paradise, Cay Clubs

15  Wholesale Presents.  That's the cover page for the benefit of jury

16  and counsel.

17           And I'm going to go down to a page -- I'm sorry.  It's

18  13.28 for the record.

19      It's captioned Sombrero Cay Club Resort and Marina.  Do you

20  recognize the name?

21  A.   Yes.

22  Q.   And I think you mentioned something about 99 condo units

23  there?

24  A.   Yes.

25  Q.   Okay.  At the time you saw them, would you evaluate them as

1  being worth between 600,000 to a million dollars?

2  A.  No.

3  Q.  What was your sense, based on your activities in The Keys

4  during that time frame, of the value of the individual condo

5  units?

6  A.  Hundred.

7  Q.  Do you see the picture depicting the property?

8  A.  Yes.

9  Q.  Is that Sombrero Key?

10  A.  No, that's Indigo Reef.

11  Q.  That's your property at Indigo Reef?

12  A.  Yes.

13  Q.  A property that you developed.

14  A.  Yes.

15  Q.  Does it look anything like Sombrero looked at the time?

16  A.  I mean, it has a canal.

17  Q.  A canal.  Has water.

18  A.  It has water.

19  Q.  In 2005 or in 2006 March of 2006, did you have any concern

20  about the future of the development market in The Keys?

21  A.  No.

22  Q.  Were there any signs or -- let me rephrase that.

23          Had you had any difficulties marketing properties up

24  through March of 2006 when you entered into the joint venture

25  agreement with customers being unable to get bank loans?

36

1    A.   No.

2    Q.   Did there come a time when that happened?

3    A.   Yes.

4    Q.   Can you give us a time frame for when that became a serious

5    issue in The Keys.

6    A.   Well, it became a catastrophe in August of 2007.

7    Q.   Who collapsed in August of 2007?

8    A.   JP Morgan Chase.

9    Q.   Did anything happen to the Lehman Brothers?

10   A.   Well, so, JP Morgan Chase, you know, we called them upset

11   "hey, how is the loans coming".

12            MR. RODRIGUEZ:  Your Honor, could the witness speak up?

13   We can't hear over here.

14            THE COURT:  Yeah, speak up if you can.  I warned you

15   he's soft spoken.

16            THE WITNESS:  Sorry.  I'll try to.

17            THE COURT:  It's okay.  If you could please project.

18            THE WITNESS:  Happy to do it.  Sorry.

19            MR. RODRIGUEZ:  Thank you.

20            THE COURT:  Go ahead.  The question was did anything

21   happen to the Lehman Brothers.

22            THE WITNESS:  I don't remember the exact dates when

23   Lehman Brothers collapsed.

24            THE COURT:  There's two.  The front is to stop your Ps

25   from popping.  The other one is to amplify your voice.  So you got

```
 1    to talk through the first one.

 2                THE WITNESS:  All right.

 3                THE COURT:  Most of the people that come to be witnesses

 4    are not to speaking into microphones and don't know that you

 5    really can't talk directing into them if you're pronouncing

 6    certain words or letters.

 7                THE WITNESS:  Okay.  Thank you.

 8                THE COURT:  And I'm still mad at you for converting the

 9    administration building of the Naval Base without making a plaque

10    to where my office was.

11                MR. WATTS-FITZGERALD:  Never too late, Your Honor.

12                THE COURT:  And they knocked down the duplex where I

13    lived and they put no memorial or anything there.  Really annoyed.

14    But that's life.

15                THE WITNESS:  Sorry.

16                THE COURT:  That's okay.

17                MR. WATTS-FITZGERALD:  Your Honor, can I reconsider my

18    choice of witnesses?

19                THE COURT:  Yeah.  I don't know.  He doesn't have to do

20    anything for me.

21              BY MR. WATTS-FITZGERALD:

22    Q.  Just seeing in the course of your career developing properties

23    in The Keys, particularly the ones that you have been describing

24    that were in the joint venture contract, did you ever have

25    occasion to use leasebacks?
```

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

A.   Yes.

Q.   What's a leaseback, as you understand it?

A.   Well, the concept is this:  That when you open up a property,
now we're talking about properties that are transient rentals,
right, and effectively part of a resort pool program, right.  So
for instance, at Hawk's Cay we did this.  We have a program there
where we built 275 units.  One of you might purchase a unit and
then you give it to us to rent when you're not there.  We rent it
for you and we take care of everything.  We do the maintenance, we
do the cleaning, we do the marketing, we do the check-ins, the
check-outs, and you just get the money.  Then you tell us when you
want to come and you stay when you do, and the rest of the time
it's available for rent.  And that's very common actually.

          And so let's say we have a new project and that new
project is just starting up.  And there's a ramp-up period when
you have a new project. So you don't -- if the occupancy rates are
75 percent, the day you open the doors you're not going to have 75
percent because people don't know about you as much and it takes a
while to get the occupancy up.  So what we would do as part of our
-- and people would be concerned about that.  Well, if I buy a new
property, how long is it going to take to get up and running.  And
so we would say to them, okay, we assume, for instance, that
you're going to make 25,000 a year, 50,000, or 30,000 a year from
rentals when we get.  We have a very detailed analysis and we know
the market and we can come up with a pretty good number of what we

39

1     think that's going to be.

2          So then we say to you we'll tell what you we'll do.  For

3     the first year or 18 months, whatever it is, we'll guarantee that

4     you'll get that amount.  We'll take the amount in from the

5     customers, and give you the net.  And usually we take about -- we

6     give you -- we take 60 percent and give you 40 percent on a normal

7     contract because we pay for the marketing, which costs eight

8     percent and all that sorts of things, right.  The credit card

9     fees, all that kind of thing. The cleaning, etcetera.  And then we

10    give you the rest.  So we give you, roughly, 40, 42, 44,

11    something, sometimes as high as 50 percent.

12         Then what we do is we figure out what that is so you're

13    comfortable right away.  We say, okay, for the first period of

14    time, we'll guarantee that amount, and we do.  And we take the

15    income from the rentals and if it's short, we give it to you.  If

16    it in fact is more, we might give that to you too, depending on

17    how the contract is written, or we might take that and offset a

18    month where it's not as much.  For the first two years you get a

19    fixed fee and we take a risk, and we assume there will be a

20    ramp-up period, so that's what we do that.  Then after the year or

21    18 months or two years, whatever the period is, then you get

22    whatever you get and -- which we hope will be more, not less.

23    That's the concept.

24    Q.  Do you pay that --

25         THE COURT:  Hold on a second.  Hold that thought and

```
 1    we're going to have to take a break because either my house is

 2    being broken into or my alarm is broken.  So either way, I got to

 3    go deal with it.  So I apologize.  We're going to take a short

 4    break and then when we come back, I wanted you all to know that we

 5    have a group of youths, or as they said in My Cousin Vinnie

 6    "youtz", who are touring the courthouse and will be in here

 7    watching some of the proceedings a little bit later.

 8              Sir, since you are on the stand, you are not permitted

 9    to discuss your testimony with anyone, even the lawyers that

10    called you.  We'll be in short recess.

11              (Jury out at 10:59 a.m.)

12              (Brief recess)

13              (Jury in at 11:15 a.m.)

14              THE COURT:  Be seated, please.  You may proceed, sir.

15              MR. WATTS-FITZGERALD:  Thank you, Your Honor.

16         BY MR. WATTS-FITZGERALD:

17    Q.  Mr. Singh, did you market the leaseback offers as an

18    inducement to buyers at -- I think you were using Hawk's Cay as an

19    example?

20    A.  No.

21    Q.  Is this -- where in the time frame of somebody acquiring

22    closing on one of these units does the discussion of leasebacks

23    arise?

24    A.  When I met Dave.

25              THE COURT:  Keep your voice up again.
```

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1          THE WITNESS:  I'm sorry.  When I met Dave.

2      BY MR. WATTS-FITZGERALD:

3  Q.  You had not done leasebacks before that?

4  A.  I don't think we did.  We might have, but I don't think so.

5  Q.  Did you ever offer leasebacks as a way of meeting the mortgage

6  obligations of the owner on the unit?

7          MR. ARTEAGA-GOMEZ:  Objection, Your Honor.  Relevance as

8  to what he offered and lack of personal knowledge.

9          THE COURT:  What's the relevance?

10          MR. WATTS-FITZGERALD:  I'll move on, Your Honor.

11          THE COURT:  Sustained.

12          THE WITNESS:  Do you want me to answer the question?

13  Yeah, so --

14          MR. WATTS-FITZGERALD:  No.  No.  Don't answer the

15  question.  I'm going to ask a new one.  I'm just trying to think

16  of a good one.

17      BY MR. WATTS-FITZGERALD:

18  Q.  The leaseback payments, were they made in advance for a given

19  year?

20  A.  No.

21  Q.  As earned?

22  A.  No.

23  Q.  How were they made?

24  A.  Monthly.

25  Q.  And the leaseback payments, did you sign a separate contract

```
 1  specifying what the obligations of the parties would be?
 2  A.   Yes.
 3  Q.   Okay.  Was the ability to earn leaseback payments contingent
 4  on the quality of the unit and its condition?
 5  A.   Well again, I'm not sure what your question is.
 6  Q.   Were your units already constructed and in prime condition?
 7  A.   When we started -- the leasebacks started, yes.
 8  Q.   Did you ever offer leasebacks and retain control of the units
 9  so you could then renovate the units?
10  A.   No.
11  Q.   Would you expect to be able to earn rental on a unit that was
12  not rehabbed yet?
13           MR. RODRIGUEZ:  Objection, calls for speculation.
14           THE COURT:  No, I'll permit it.
15           THE WITNESS:  So the leaseback amount would have been
16  offset that I would have paid to one of you.  Would have been
17  offset by the income that I would have brought in from rentals.
18  The goal is to have it be offset 100 percent, and so the
19  reasonable amount that I could get from a leaseback from a rental
20  would be the amount that the leaseback should be in that range.
21  So certainly if I -- you know, if I said I was going to get you
22  $100,000 a month, and the reasonable rent from it was $10,000 a
23  month, then there's no correlation.  Is that what you're asking
24  me?
25           BY MR. WATTS-FITZGERALD:
```

43

```
 1    Q.   Yes.  And you wouldn't do that deal, would you, if you're
 2    crunching the numbers showed you that was going to be the result?
 3    A.   Well, then a lot of things don't make sense then.
 4    Q.   Economically?
 5    A.   Right.
 6    Q.   What inducements to purchase, if any, did you offer at your
 7    properties?
 8    A.   Well, we believed that we were building a superior product,
 9    that we had a long track record of producing cash flow from those
10    projects.  That people would buy them understanding that these
11    projects had a certain income potential that within the
12    marketplace is reasonable.  And we built a quality product that
13    had done well in the market for years, and so that was the basis
14    of our marketing.
15    Q.   Did you ever over furniture packages?
16    A.   Yes.
17    Q.   Were the furniture packages identified in the sales contract?
18    A.   Oh, yeah.  They're very specific, exactly.  Here's exactly
19    what it is, this, this, this, this, this, this, this, this, this
20    chair from this manufacturer, brochures, all the details down to
21    everything.  Sure.
22    Q.   And in those instances, did you meet your contractual
23    obligations and build and furnish to the specs in the contract?
24         MR. RODRIGUEZ:  Objection, Your Honor, leading.
25         THE COURT:  That is leading.
```

```
 1        BY MR. WATTS-FITZGERALD:
 2   Q.   Did you live up to your representations?
 3   A.   Yes.
 4   Q.   And did you ever have occasion to build properties or to sell
 5   properties that were not yet complete other than pre-construction
 6   sales that you've already described?
 7   A.   No.  We always did pre-construction sales the way we did it,
 8   the way we discussed it, yes.
 9   Q.   Did there come a time when problems arose with the execution
10   of a joint venture contract obligation on the part of Cay Clubs?
11   A.   Yes.
12   Q.   How did that come to your attention?
13   A.   In the summer of 2007, we got notices that some of the
14   accounts for our property, Tranquility Bay and other properties,
15   were being terminated for nonpayment.  Like for instance, I
16   believe Home Depot.  We got calls from owners who had been -- sent
17   checks for the money collected for them at Tranquility Bay that
18   their checks had bounced.
19            MR. RODRIGUEZ:  Objection, hearsay.
20            MR. WATTS-FITZGERALD:  Present sense impression, Your
21   Honor.
22            THE COURT:  Yeah, I'll permit it.
23            THE WITNESS:  We got notice that, I mean, the bills
24   weren't being paid and the money wasn't there.  I was told by my
25   managers who are also working for Cay Clubs that the money was not
```

1    there to make hundreds of thousands of dollars worth of payments

2    to the owners from the money that we had collected from them.

3           MR. ARTEAGA-GOMEZ:  Your Honor, objection, hearsay, move

4    to strike.

5           THE COURT:  I'm not -- you know, I need you all to

6    understand it's not coming in for the truth of the fact that they

7    didn't pay or that it wasn't paid, it's coming in for the fact

8    that he was told that and he acted as a result of what was told to

9    him.

10          MR. WATTS-FITZGERALD:  I'll move on to that.

11   BY MR. WATTS-FITZGERALD:

12   Q.   As a result of the information that you were receiving, did

13   you conduct an investigation into these various allegations to

14   determine if in fact there were real problems?

15   A.   Yes.

16   Q.   Showing you what's marked as Government Exhibit 20.04.

17   Please take a moment and examine the document and tell me if you

18   recognize it.

19   A.   Yes.

20   Q.   How do you recognize it?

21   A.   I believe this was part of letters and communications and

22   maybe even the settlement agreements between Cay Club entities and

23   my companies.

24   Q.   Now, to jump ahead just for a second, you mentioned settlement

25   agreement.  Did there come a time when you terminated the joint

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

```
 1   venture contract with a joint venture settlement agreement?

 2   A.   Yes, in September.  So as I said, in August of 2007, these

 3   issues arose, and then we notified Cay Clubs they were in default

 4   and took back control of the properties.  And as this outlines,

 5   there was lots of payments that we had to make and things like

 6   that.

 7           MR. WATTS-FITZGERALD:  Your Honor, the government moves

 8   Government Exhibit 20.04 into evidence.

 9           THE COURT:  Hearing no objection, 20.04 is admitted in

10   evidence.

11           (Government's Exhibit 20.04 in evidence)

12       BY MR. WATTS-FITZGERALD:

13   Q.   Now, what is this entry with owners checks written and not

14   signed to replace lost checks?

15   A.   Well, those were checks which Cay Clubs wrote, but then didn't

16   sign so therefore, they were not -- you know, you couldn't cash

17   them.  Owners couldn't cash them.

18   Q.   What do you mean by absconded deposits of $165,000?

19   A.   Those were amounts which Cay Clubs took.  So what happens when

20   you have a turn over of one property to another, is that you have

21   people who are putting their credit cards in and it takes a couple

22   of days for that money to show up in your accounts.  Or people are

23   paying checks and it takes a couple days to actually transfer the

24   flow of cash that's coming in through credit cards into a hotel.

25   And so in any hotel purchase, there's always this period where
```

1    there's an adjustment a few days later.

2          So this was like a purchase in that we were taking back

3    control, and -- but they took the money from those few days and

4    didn't give it to us.  So that's what that's referring to.

5    Q.   These were funds owed to you under the agreement?

6    A.   Yeah, these were operating monies coming in each day as people

7    were staying in the hotel, and then it took a day or two for the

8    money to get from point A to point B.  Except it didn't go to us,

9    it went to them.

10   Q.   And the summary we're looking at, for which of your properties

11   or facilities over what time period does this apply?

12   A.   Well, the vast majority, if not all of it -- let me just look

13   at it -- is Tranquility Bay.  But it involves some other

14   properties too.  So if you look at this, which one are you looking

15   at?  You're looking at that one.  So, you know, the owners'

16   checks, I think for the most part, are Tranquility Bay.  But I

17   would have to look at the actual to see if it was maybe from one

18   of the other properties.

19   Q.   And the $354,000 figure at the top of the first page of the

20   exhibit, actual owners' check amount not paid by Cay Clubs, what

21   do those check amounts represent?

22   A.   Those are monies that would have been -- so again, if we

23   manage one of your units, we collect the money for you.  So $100

24   comes in from somebody, we're supposed to give you $42 or $50 of

25   that.  So we hold that money for you, and then we send that out

1     the next month to you.  So this was money which was collected.

2           MR. ARTEAGA-GOMEZ:  Excuse me, Your Honor.  I have an

3     objection to if counsel could remove that part of the document

4     momentarily, you can remove that part of the document momentarily,

5     I have an objection to portions of this document, if I may be

6     heard sidebar.

7           THE COURT:  What is the document?  What's the number of

8     it?

9           MR. WATTS-FITZGERALD:  Your Honor, it's 20.04.

10          THE COURT:  I thought it was offered.  It's in evidence

11    without objection.  What's the problem?

12          MR. ARTEAGA-GOMEZ:  There is a portion that I would like

13    to discuss, Your Honor.

14          THE COURT:  Now?  Why don't you wait until tomorrow?

15    All right.  We'll hold off.  Come on up.  Let's talk about it.

16          (SIDEBAR CONFERENCE:

17          MR. ARTEAGA-GOMEZ:  Judge, I apologize, Judge.  There

18    are portions of this document -- I understand they're business

19    records --

20          THE COURT:  Okay.

21          MR. ARTEAGA-GOMEZ:  They're mathematical.

22          THE COURT:  What's your objection?

23          MR. ARTEAGA-GOMEZ:  My objection is to the sentence on

24    the Bates label PS-112 where it says Cay Clubs misappropriated the

25    automatic credit card deposits for operations for the period of

```
1   9-1 to 9-15 in the amount of $165,180.44.  I think that's
2   prejudicial.  It's a conclusion that's being reached by someone,
3   not by Mr. Singh.  This is not a document that was prepared by him
4   individually.
5           THE COURT:  Who prepared this?
6           MR. WATTS-FITZGERALD:  It was prepared by his people.
7   He reviewed it and as he testified, it became part of the
8   settlement.  He will testify, Your Honor, that that is his
9   assessment and that's cross-examination.  That doesn't -- it's not
10  hearsay.
11          MR. ARTEAGA-GOMEZ:  He can say that.  I believe that.
12          THE COURT:  You can cross-examine him on that.  I'll
13  overrule your objection.
14          (END OF SIDEBAR)
15          MR. WATTS-FITZGERALD:
16  Q.  So Mr. Singh, in the conclusion of your last answer, that same
17  $354,000 appears down below?
18  A.  Yeah.
19  Q.  Who actually covered that obligation to all of the homeowners?
20  A.  I did.
21  Q.  And then further there's some discussion of the nonsufficient
22  funds checks.  Do you see that in the next paragraph?
23  A.  Yes.
24  Q.  You paid those as well?
25  A.  Yes.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    Q.   And finally, there's the indication that there was

2    misappropriation of automatic credit card deposits.  Were those

3    the ones you were discussing earlier?

4    A.   Yes.

5    Q.   And why do you characterize it as misappropriated?  Where

6    should they have gone?

7    A.   They should have gone to us.  To -- you know --

8    Q.   So that's your word.

9    A.   What's that?

10   Q.   That's your word for it.  Misappropriation?

11   A.   Yeah.

12           MR. RODRIGUEZ:  Objection, leading.

13           THE COURT:  It is leading.

14           MR. WATTS-FITZGERALD:  I'll rephrase it.

15           THE COURT:  I'll permit it.  I'll permit it.

16           MR. WATTS-FITZGERALD:  I think we actually got the

17   answer already, Your Honor.  Thank you.

18       BY MR. WATTS-FITZGERALD:

19   Q.   The second page captioned Agreement Terms Met or Amended, and

20   then there on, there are indications finally of adjusted money due

21   and owing to Singh Company.  Did you receive that money?

22   A.   Well again, as you can see, I mean this was a process and Cay

23   Clubs was struggling.  And, you know, so there was agreements and

24   then they couldn't make some of them and so we would have to make

25   certain payments and we had offsets so...

```
 1   Q.   Were they meeting the requirements of the joint venture

 2   contract in terms of making sales of units?

 3   A.   No.  By this time, things were -- by September of 2007, the

 4   relationship was being terminated.

 5   Q.   Okay.  So you were not --

 6   A.   No.

 7   Q.   Okay.  There's reference to 8,000 a month times seven months

 8   at 6805 Overseas Highway.  What was at that location?

 9   A.   That was my offices which they had purchased from us which we

10   then took back, and we had owed them some rent for those period of

11   months.  So we were giving them a credit for that against what

12   they owe us.

13   Q.   Was there any mention in the joint venture contract of your

14   private residence?

15   A.   Yes.

16   Q.   And what was the nature of the agreement with respect to your

17   private residence?

18   A.   We sold that too.

19   Q.   Who was occupying it, if you know?

20   A.   I think Dave was occupying it.

21        MR. RODRIGUEZ:  Objection, speculation.

22        THE COURT:  Sustained.  Don't guess.  If you know, you

23   know.  If you don't...

24        BY MR. WATTS-FITZGERALD:

25   Q.   Did you ever discuss with Dave Clark why he wanted to acquire
```

1    your private residence?

2    A.   I don't remember the discussion.

3    Q.   Did you ever meet Cristal Clark Coleman?

4    A.   Yes.

5    Q.   Or Cristal Coleman Clark.  I think I got that backwards.

6    A.   Yes.

7    Q.   How did you come to meet her?

8    A.   You know, not in a business context.

9    Q.   What other context did you have?

10   A.   I think we went to Dave and Cristal's house once for the

11   afternoon.

12   Q.   Do you recall where that was at the time?

13   A.   In Islamorada.

14   Q.   Was that before or after you concluded the joint venture

15   contract deal?

16   A.   I believe it was after.

17   Q.   Okay.  And did you have any occasion, either during the

18   negotiation of the joint venture contract or thereafter, to have

19   business dealings with Cristal Coleman?

20   A.   None that I remember.

21   Q.   Do you remember whether or not she was ever represented to you

22   by Mr. Clark to be the owner/operator of any of the companies you

23   were dealing with under the Cay Clubs banner?

24   A.   No.

25   Q.   Do you recall ultimately having to enter into a joint venture

1   settlement agreement with respect to Cay Clubs and the deal that

2   you had cut with them some time earlier?

3   A.   Yes.

4   Q.   Okay.  I'm going to show you what's marked as Government's

5   Exhibit 20.05.  Take a moment to examine the document and tell us

6   if you recognize that document.

7   A.   Yes.

8   Q.   How do you recognize it, sir?

9   A.   Well, it has my signature.  And, you know, I'm pretty familiar

10  with it.

11          MR. WATTS-FITZGERALD:  Your Honor, the government moves

12  20.05 into evidence.

13          MR. ARTEAGA-GOMEZ:  No objection.

14          THE COURT:  Without objection, 20.05 is admitted in

15  evidence.

16          (Government's Exhibit 20.05 in evidence)

17      BY MR. WATTS-FITZGERALD:

18  Q.   What is the document, Mr. Singh?

19  A.   This was the final settlement agreement to terminate all of

20  the relationships between ourselves, my various companies, and Cay

21  Clubs.

22  Q.   Did you take your properties back?

23  A.   Yes.

24  Q.   Did you take your house back?

25  A.   Yes.

54

1    Q.   Did you lose on this deal?  Let me rephrase that.

2         THE COURT:  Did you lose what?

3         BY MR. WATTS-FITZGERALD:

4    Q.   Were you ever made economically whole for the amounts that you

5    had to pay from your companies that were identified in the

6    previous exhibit by Mr. Clark or Cay Clubs?

7    A.   Well, you asked me two questions.

8    Q.   Let's answer the first one.  Were you made whole by Mr. Clark?

9    A.   So if you took the complete balance sheet of everything that I

10   ever received from them and everything that I had to pay back?

11   The answer is yes, I was.

12   Q.   How is that?

13   A.   Because in the end, I got -- they did sell a lot of things for

14   me.  And in the end, they did pay me a bunch of money and a number

15   of millions of dollars.  And in the end, I had to give back a lot

16   of it which was not what I expected to do.  And in the end, I had

17   a problem with my hotel going off track and that cost me a lot of

18   money to get it on track.  So overall, if you took it all

19   together, maybe.  But I also lost all that period of time dealing

20   with this.

21        But if you actually took the dollars and plus'd and

22   minused them in my particular case, you know, now if you took and

23   draw a line in the sand and say as of the time you did the fifth

24   or sixth amendment with them and all the money they paid you and

25   all the sales you got, and then you went forward from that, no, I

1    wasn't made whole.  I had to put out millions of dollars to get

2    whole.

3           But if you took the whole thing in my case in the whole

4    relationship, I probably did.  I probably was.  But you know,

5    again, if you took it from the time that document was written,

6    when I already had what I had, and then they started to lose money

7    on this and took this money and didn't pay me back that, and the

8    business went down and I had to rebuild the business and bring in

9    new managers and all that, yes, I lost millions from that point

10   on.

11   Q.   Thank you.  Now, if I can invite your attention in that

12   document .05, to the one yellow tab I put there.

13   A.   Yes.

14   Q.   If you look at that?

15   A.   Oh, yeah, yeah.  I got it.  Yep.

16   Q.   Can you tell the jury when this agreement was executed?

17   A.   29th of April, 2008.

18   Q.   Okay.  Looking at the page that is Bates stamped at the

19   bottom, P.S., Pritam Singh, 000136, do you recognize the

20   signatures on that page?

21   A.   Yes.

22   Q.   How do you recognize them?

23   A.   Well, I know the names.  Cristal Coleman and Dave Clark are

24   the signatures.

25           THE COURT:  Is it your intention that people can see

```
 1    that?  Because they can't.
 2              MR. WATTS-FITZGERALD:  I can see it just fine.
 3              THE COURT:  Yeah.
 4         BY MR. WATTS-FITZGERALD:
 5    Q.   Why is Cristal Coleman signing?
 6              THE COURT:  How the heck does he know?
 7              MR. RODRIGUEZ:  Objection, speculation.
 8         BY MR. WATTS-FITZGERALD:
 9    Q.   If you know.  Do you recall my earlier question, have you ever
10    had any business dealings with Cristal Coleman up through the
11    negotiations of the agreement and the running of the agreement?
12    A.   The answer is I don't remember having any direct business
13    dealings with her.  I suspect that my attorney --
14              MR. ARTEAGA-GOMEZ:  Objection, calls for speculation.
15              THE COURT:  Sustained.
16         BY MR. WATTS-FITZGERALD:
17    Q.   Do you know what role she had in any of these companies for
18    which Dave Clark is signing as authorized agent, manager or
19    manager being Cristal Clear contracting, Cay Clubs International,
20    LLC or DC-770 Joint Venture, LLC?
21    A.   I don't.
22    Q.   Do you know what CCH Marathon was?
23    A.   I don't.  I mean, if I read the document, it might remind me
24    what it is.  But as of this particular moment, I don't know
25    specifically.
```

```
1   Q.   And if you can go to the final page of the document where

2   there are the notice requirements?

3   A.   Yes.

4   Q.   Do you see that one of the people to be notified for Cay Clubs

5   International the consulting and/or DC 770?

6   A.   Yes.

7   Q.   Is Cristal Coleman?

8   A.   Yes.

9   Q.   Going back for a moment, Your Honor, the last page of the

10  exhibit, Cristal Coleman, if notice must be given to Cay Clubs,

11  correct?

12  A.   Yes.

13          MR. WATTS-FITZGERALD:  That might not have been visible.

14      BY MR. WATTS-FITZGERALD:

15  Q.   In the execution of the settlement agreement, was that done

16  face to face?

17  A.   I don't think so.

18  Q.   Okay.  Is it uncommon in your business to execute documents

19  like that with multiple signature pages?

20  A.   No, it's quite common.

21          MR. WATTS-FITZGERALD:  One moment Your Honor.  I tender

22  the witness Your Honor.

23          THE COURT:  All right.  You may proceed, sir.

24          MR. RODRIGUEZ:  Thank you, Your Honor.

25          May I approach, Your Honor?  I just want to get the
```

1    exhibits back.

2          THE COURT:  You may.

3          MR. RODRIGUEZ:  Thank you, sir.

4                        CROSS-EXAMINATION

5    BY MR. RODRIGUEZ:

6    Q.  Good afternoon, Mr. Singh.  My name is Val Rodriguez, I

7    represent Mr. Clark who waved to you earlier.

8          You've known him for a while; is that fair to say?

9    A.  As I said, I think I met him in early 2005.

10   Q.  2005.  So at least ten years.

11   A.  Yes.

12   Q.  When was the first time you met with any of these prosecutors

13   or any government agent about your testimony in this case?

14   A.  A few months ago.

15   Q.  You never talked to any government agent, any prosecutor

16   before that regarding this transaction?

17   A.  That's correct.

18   Q.  And so that would have been approximately nine years after

19   this transaction initially occurred?  Is that fair to say?

20   A.  Yes.

21   Q.  And did they come to you or did you come to them?

22   A.  No, they contacted my -- contacted us, yes.

23   Q.  Did they contact your lawyer?

24   A.  Contacted my attorney.

25   Q.  Okay.  Then your lawyer, in turn, arranged for you to have a

1    meeting.

2    A.   Right.

3    Q.   And you've never met me or talked to me in the past, have you?

4    A.   No.

5    Q.   Now, I wanted to talk for a moment about a few things you

6    said.  You started to answer a question that was asked to you

7    about what happened as a result of or what was occurring in 2007

8    as Cay Clubs defaulted on the agreement they had with you.  And

9    you started to say something regarding the catastrophe regarding

10   JP Morgan Chase.  What did you mean by that?

11   A.   Well, that was the beginning of the real estate catastrophe in

12   the United States and worldwide was because of the mortgage

13   default situation and --

14   Q.   What did JP Chase Morgan do?

15   A.   They issued mortgages.  They were our main source of

16   mortgages.  One of them.  One of three or four.

17   Q.   And the problem is they were issuing mortgages they should not

18   have?

19   A.   I don't, I'm not -- that's not my for me to say.  But they

20   weren't available is what I'm saying.  As of -- I got a phone call

21   from my staff in August of 2007 saying that they called the

22   mortgage office of JP Morgan Chase and the phones were

23   disconnected.

24   Q.   So basically they just stopped issuing mortgages?

25   A.   Right.

1   Q.   And in the industry, you know the bank's ability to fund

2   mortgages for developments is critical for the success of the

3   development?

4   A.   Absolutely.

5   Q.   And in fact, you personally have experienced a major in

6   downfall in your life with a bank failing to fund a project?

7   A.   Absolutely.

8   Q.   And that would go back to your Truman Annex in about 1990; is

9   that fair to say?

10  A.   That is fair to say.

11  Q.   And at that time, isn't it true that there was one event

12  historically that caused a Japanese bank to fail to fund your

13  project down there in The Keys?

14  A.   That's correct.

15  Q.   And it was the invasion of a country?

16  A.   That's right.

17  Q.   The Japanese banks decided not to commit to you with the

18  promise of the money for your project.

19          MR. WATTS-FITZGERALD:  Objection, Your Honor. 1990 is

20  irrelevant to this case.

21          MR. RODRIGUEZ:  I'll tie it in, Your Honor.

22          THE COURT:  Yeah, I'll give you two, three minutes.

23          MR. RODRIGUEZ:  Yes, I will tie it in in two or three

24  minutes.

25      BY MR. RODRIGUEZ:

```
 1   Q.   And so as a result of that failure, you went completely broke?

 2   A.   Yeah, that would be a safe way to characterize it.

 3   Q.   You went from having millions to nothing, because you had

 4   personally put your own money on that project?

 5   A.   That is correct.

 6   Q.   And hundreds of millions of dollars of other loans from other

 7   banks were also called on you?

 8   A.   Well, I don't know if it was hundreds of millions, but was

 9   certainly tens of millions.

10   Q.   Tens of millions.  In fact, personally in your life it was so

11   tough that after that, you couldn't even get a credit card?

12   A.   Correct.

13   Q.   In your own name?

14   A.   That's correct.

15   Q.   And you felt it necessary at some point in the early 90s to

16   continue your business.  You had to actually put some of the

17   corporations in your second wife's name Anne Johnston; is that

18   correct?

19   A.   If what your question is is did I put ones in my wife's name,

20   the answer is yes.

21   Q.   For example, Key West Country Club?

22   A.   Yes.

23   Q.   Key West Utilities Corp?

24   A.   Yes.

25   Q.   PL Associates of Key West?
```

62

1   A.   Yes.

2   Q.   Admiral Lanes Homeowners Association?

3   A.   I don't remember about Admiral's Lane.

4   Q.   And the problem was individually you were completely brought

5   to the ground as a result of that bank not funding the loan and

6   you then went to the person you trusted the most, your wife,

7   right?

8   A.   Yes.

9   Q.   In fact, you said in the past you trusted your wife with your

10  children, of course you trust your wife with your business.

11  A.   Yes.

12  Q.   And you were able to come back out of that crash in 1991 and

13  become a successful developer in The Keys; is that fair to say?

14  A.   Yes.

15  Q.   But you've also been known as the one of the most notorious

16  developers in The Keys; is that also true?

17  A.   I don't know if I would say that or not say that.

18  Q.   Have you been called that before?

19       MR. WATTS-FITZGERALD:  Objection, Your Honor, relevance.

20       THE COURT:  I'm not real sure what that means, but I

21  think this question is fairly easy and that is to your knowledge,

22  have you been known -- have you been called that before?

23       THE WITNESS:  Yes.

24       THE COURT:  Okay.

25       THE WITNESS:  Yes, Your Honor, I have.

```
 1        BY MR. RODRIGUEZ:
 2   Q.  And so would it be fair to say that at some point you were
 3   introduced to Mr. Clark through a third party, the owner of a, you
 4   said it was a Hampton Inn?
 5   A.  No.  No.
 6   Q.  Mr. Lane?
 7   A.  No.  No.  It was Tracy Holder.
 8   Q.  Tracy Holder?
 9   A.  He was the manager of -- I don't remember what it was.  It was
10   a motel in Marathon, yeah.
11   Q.  Did Tracy Holder's motel ultimately become something big?
12   A.  No.  It was bought and closed and has remained closed.
13   Q.  And that's oftentimes what happens in this business, right?
14   A.  It certainly happens in this business, yes.
15   Q.  At one time in the past, you've said that development is the
16   longest four letter word in the English language; is that not
17   true?
18   A.  That is absolutely true.
19   Q.  That's because this is a very, very tough business?
20   A.  Correct.
21   Q.  And there are ups and downs that are based on factors that you
22   necessarily can't control; is that correct?
23   A.  Absolutely.
24   Q.  Just like that Japanese bank what they did, you had no idea
25   that would happen to you?
```

1   A.   Correct.

2   Q.   Now, when it came time to join forces with Cay Clubs, you were

3   excited about that, would that be fair to say?

4   A.   Yes.

5   Q.   In fact, you felt that it was sort of like a marriage?

6   A.   Yes.

7   Q.   And you needed some time to make sure though that the marriage

8   would work, so you had this agreement.

9   A.   Yes.

10  Q.   Fair to say?

11  A.   That's very fair to say.

12  Q.   And the marriage didn't work, did it?

13  A.   No.

14  Q.   And that's why we had this settlement agreement we've just

15  talked about quite a bit.

16  A.   Yes.

17  Q.   And the settlement agreement, in essence, is a give and take

18  between your entities and Cay Clubs.

19  A.   Correct.

20  Q.   And the government asked you -- well, they actually put the

21  settlement agreement in.  I'll just show you a few portions of it

22  and ask you about them.  I'm showing you what's been marked as a

23  government's exhibit, it's the joint purchase settlement agreement

24  that's already in evidence if you don't mind.  And I'll make it so

25  we can all see it.

```
 1            Now sir, like with all settlement agreements, you took
 2   several things back from Cay Clubs as you told us; is that
 3   correct?
 4   A.   Yes.
 5   Q.   And you agreed that Cay Clubs was unable to meet the sales
 6   required under the joint venture contract and that's right in this
 7   agreement, correct?
 8   A.   Yes.
 9   Q.   And then you lay out the legal language for the settlement
10   which was, of course, written by lawyers, right?
11   A.   Yes.
12   Q.   And then if we go through these other pages of it, Cay Clubs
13   had to forfeit all their deposits back, including $1.7 million; is
14   that correct?
15   A.   I'm paying the 1.7 million.
16   Q.   I'm sorry.  All deposits made by Cay Clubs under this joint
17   venture are hereby acknowledged to have been forfeited?
18   A.   Right.
19   Q.   Okay.  So Cay Clubs' deposits had been forfeited.
20   A.   Correct.  The deposits they made to me agreed that they have
21   no claim on them.
22   Q.   Okay.  And then there's a Big Pine.  Could you tell us what
23   Big Pine is?
24   A.   That was the residence in Big Pine.
25   Q.   Now in fact, this was your personal residence; is that
```

1    correct?

2    A.   It was one of my personal residences.

3    Q.   One of your personal residences.  And to make this deal work,

4    originally you had required Mr. Clark to purchase this residence?

5    A.   Yeah, the deal was everything.

6    Q.   Okay.  So it wasn't as if he asked to purchase it; your deal

7    was you got to purchase it if you want to make this deal work.

8    A.   Correct.

9    Q.   Just so we understand, it was you telling him you got to

10   purchase this.

11   A.   Correct.

12   Q.   Okay.  And then there's a mention here of termination of

13   Parrot Key contracts?

14   A.   Yes.

15   Q.   I'm sorry.  I'll move it up.  And Coral Lagoon contract?

16   A.   Yes.

17   Q.   The Marathon office is mentioned?

18   A.   Yeah, they're giving me back the Marathon office.

19   Q.   So basically everything is given back to you.

20   A.   Correct.

21   Q.   So when you were testifying a few minutes ago about how you

22   were made whole, you were basically made whole in the end through

23   the settlement agreement?

24   A.   Again, with all due respect to you and the government, the

25   words "made whole" is a little difficult to --

67

1   Q.  Well, I'm sorry.  I'll strike the question and ask it this

2   way.

3           You were satisfied with this agreement.  It was a civil

4   agreement that you settled?

5   A.  Absolutely.

6   Q.  Okay.  No qualms, it settled and it's part of business.  Is

7   that fair to say?  Yes?

8   A.  I was satisfied when I signed the agreement that it was in my

9   best interest to do so, absolutely.

10  Q.  And in fact, sir, in your career, you've had to sign similar

11  settlement agreements where you've had to default on properties;

12  is that fair to say?

13  A.  Yes.

14  Q.  So it's nothing out of the ordinary about a developer

15  defaulting and signing a settlement agreement?

16  A.  Well, it's always out of the ordinary when you have to

17  default, but it happens.

18  Q.  And in your life, it's happened.  You agree?

19  A.  Yes.

20  Q.  Now, in fact, when you had to cut your ties to Cay Clubs, it

21  was not the best thing for Marathon, was it?

22  A.  No.  I don't think it was the best thing for any of us.

23  Q.  You knew that Mr. Clark had a vision for Marathon and that

24  part of the middle keys.  Is that fair to say?

25  A.  You know, again, I don't know exactly what you mean by

1    "vision".

2    Q.   Okay.  Well, let's talk about it this way.  You've had visions

3    for properties, right?

4    A.   You mean do I envision?

5            THE COURT:  The problem is with the word "vision".

6            MR. RODRIGUEZ:  I'll give you another word.  I'll try it

7    this way.

8        BY MR. RODRIGUEZ:

9    Q.   You ended up at this Truman Annex just out of the blue one

10   day.  You went down to The Keys and you decided that this was

11   going to be something you were going to do, right?

12   A.   I read about the auction, I went down, bid at the auction and

13   won the auction, yes.

14   Q.   And you had a thought in your mind as were heading down to Key

15   West that this is something that might work.  You weren't sure of

16   the thought, but you had a thought.

17   A.   I actually had almost no idea.

18   Q.   You just kind of went in it blindly?

19   A.   I know it was a great piece of property in an extraordinary

20   area and that was pretty much it.  For that particular property.

21   Q.   And it's fair to say, sir, people have criticized you about

22   the way you developed it, right?

23   A.   Yes.

24           THE COURT:  You mean besides me?

25           MR. RODRIGUEZ:  Yes.  I'm sorry.  Besides the Honorable

1    Judge Martinez.

2        BY MR. RODRIGUEZ:

3    Q.   Other people have criticized you, right?

4    A.   Sure.  I'm a real estate developer.  I get criticized all the

5    time.

6    Q.   People wanted more green space, for example.  They didn't like

7    the way you did your green space?

8    A.   Yes, that's correct.

9    Q.   They thought maybe it should have been a different design for

10   Key West.

11       MR. WATTS-FITZGERALD:  Objection, Your Honor, what other

12   people may have thought.  I think is a bit speculative.

13       THE COURT:  Well, I'll permit it.  I think I know where

14   he's going and I don't see it as harmful.  I'll permit it.

15       BY MR. RODRIGUEZ:

16   Q.   Is that fair to say, sir?

17   A.   Oh yes, I'm criticized constantly.

18   Q.   And that as a developer you learn to take?

19   A.   Yeah.  That doesn't mean I like it.

20   Q.   Right.  You've subjected yourself to magazine articles and

21   talked about your life and -- is that fair to say?

22   A.   Yeah.

23   Q.   So you're out there in the public?

24   A.   Yeah.

25   Q.   Okay.  You knew Dave Clark had an airport operation in

1   Marathon, did you not?

2   A.  Yes.

3   Q.  And that airport operation brought persons on commercial

4   airlines into that airport; is that fair to say?

5   A.  Yes.

6   Q.  And would you agree that Marathon has always had spotty

7   commercial airline service.

8        MR. WATTS-FITZGERALD:  Objection, Your Honor, beyond the

9   scope.  Relevance.

10        THE COURT:  I'll sustain that objection.  I don't see it

11   as relevant at all.

12     BY MR. RODRIGUEZ:

13   Q.  At the time that Mr. Clark came to you or you all came

14   together for the projects you entered into that's been the subject

15   of your direct examination, did Mr. Clark discuss with you what he

16   wanted to do in Marathon?

17   A.  Yes.

18   Q.  Was part of that trying to bring more tourists to Marathon,

19   perhaps diverting them from Key West?

20        MR. WATTS-FITZGERALD:  Objection, Your Honor.  Calls for

21   hearsay, party opponent rule.

22        THE COURT:  It is.  Sustained.

23     BY MR. RODRIGUEZ:

24   Q.  Did you recall what Mr. Clark discussed with you for Marathon?

25        THE COURT:  Without telling us what it was, do you

1   recall it?

2       BY MR. RODRIGUEZ:

3   Q.  Do you recall?

4   A.  I'm sorry.  Could you say the question?

5   Q.  I'm asking you simply do you recall Mr. Clark discussing with

6   you his ideas for Marathon, Florida.

7           THE COURT:  That's a yes or a no.  Not what he said but

8   --

9           THE WITNESS:  Yes.

10          THE COURT:  -- do you recall what he said.

11      BY MR. RODRIGUEZ:

12  Q.  Based upon what he said to you, without telling us what you

13  said, did you feel comfortable entering into this contract with

14  Cay Clubs?

15  A.  When I entered into the contract as you had asked me before

16  was I hopeful, yes, I was very hopeful.

17  Q.  In fact, you had publicly said that you had a lot of respect

18  for Cay Clubs?

19  A.  Yes.

20  Q.  And that you felt that they really -- they had a really highly

21  developed marketing and promotion team.  Is that correct?

22  A.  Yes.

23  Q.  And that they have a really successful national and

24  international marketing program?

25  A.  That was my understanding, yes.

72

1    Q.   Now, the government showed you an exhibit that's in evidence

2    called Cay Clubs Wholesale Presents.  Is that fair to say?  Do you

3    recall this exhibit?

4    A.   Yes.

5    Q.   Do you know who created this exhibit?

6    A.   I have no idea.

7    Q.   Do you even know who Cay Clubs Wholesale is?

8    A.   No.

9    Q.   You were shown a particular page off the exhibit, I believe it

10   was that page.  Do you have any idea who put that picture on this

11   particular exhibit?

12   A.   No, I don't.

13   Q.   The last page of the exhibit has an address in Fort Myers.  Do

14   you even know whose address that is?

15   A.   I have no idea.

16   Q.   Do you know what www.cayclubswholesale.com is?

17   A.   No.

18   Q.   Had you ever heard of the wholesale operations division

19   before?

20   A.   No.

21   Q.   Can you independently remember receiving exactly this

22   document?

23   A.   No.

24   Q.   But of course the government showed you this document when you

25   met with them, right?

73

1   A.   Yes.

2   Q.   And they asked you to look at that particular picture and ask

3   you if that accurately portrayed what it was.

4   A.   Yes.

5   Q.   When you entered into this agreement with Cay Clubs, you had

6   an attorney working for you named John Allison; is that not right?

7   A.   Yes.

8   Q.   And Mr. Allison had to contact your bank, Orion Bank, to make

9   sure your bank was okay with this agreement with Cay Clubs?

10  A.   Yes.

11  Q.   Because your bank held a substantial interest in these

12  projects; is that fair to say?

13  A.   Yes.

14  Q.   You were not the complete owner?

15  A.   Oh no, I was the complete owner, they had mortgages.

16  Q.   Excuse me.   Good terminology.   So you were using other

17  people's money such as Orion Bank's money to finance this project.

18  A.   I mean, we all use banks' money to finance projects whether

19  it's our house or our car or our credit card for whatever.   So in

20  that sense, I was using their money as debt, but I wasn't -- it

21  was my money as the equity in the projects.

22  Q.   I understand that.   So there's nothing out of the ordinary for

23  you or a developer to go to like Orion Bank and seek funds for

24  your development?

25  A.   No, it's completely normal.

1   Q.   In fact, these developments cannot be done typically on a

2   large scale by an individual.  Most individuals.

3   A.   It is quite common among developers to go to banks to finance.

4   Q.   And in your career that's what you've been able to do?

5   A.   That's correct.

6   Q.   I'm going to show you what the government also showed you as

7   an exhibit, sir.  It was listed as 20.04 and there was a page here

8   -- of course, this document is not a document that you typed up.

9   This is something your lawyer created; is that fair to say?

10  A.   Yeah, I believe this was prepared with -- between the

11  attorneys.

12  Q.   Between the attorneys.  And in here it actually lists things

13  that you owe.  Actually, go to the last page of it.  It says here

14  you owe Cay Clubs $56,000.  Do you see that part right there?

15  A.   Yes.

16  Q.   And an additional $50,000 as deposit credit for sale of Unit

17  51.

18  A.   Right.

19  Q.   So why did you owe Cay Clubs $106,000?

20  A.   Well, so I -- the building, the office building I was in was

21  -- at that point had been conveyed to Cay Clubs.  And my agreement

22  was I would pay them rent.  So this is the rent which I had

23  withheld because they owed me hundreds of thousands of dollars.

24  And so at the end we said okay, I owe you this and you owe me

25  that.

1   Q.   And would you agree that's common within the industry,

2   disputes of this nature, one person may hold off and not pay,

3   another person may hold off and not pay until there's an

4   agreement?

5   A.   In that kind of case, yes.

6   Q.   Okay.  So this wasn't a situation where Cay Clubs simply owed

7   you all the money; you had agreed that you would owe Cay Clubs

8   some money as well.

9   A.   Yeah, we were settling all the accounts between us, yes.

10  Q.   And the realization came to you in late 2007, September 2007,

11  that it's just not going to work with Cay Clubs.

12  A.   Yes.

13  Q.   And you understood Cay Clubs was having a cash crunch problem;

14  is that fair to say?

15  A.   That was my assumption.

16  Q.   And you also knew, and you told us, JP Chase stopped writing

17  mortgages?

18  A.   Yes.

19          MR. WATTS-FITZGERALD:  Objection, Your Honor.  Asked and

20  answered.

21          THE COURT:  That's all right.  Move along.

22          THE WITNESS:  Yes.

23      BY MR. RODRIGUEZ:

24  Q.   And the business model required people to seek mortgages

25  perhaps or buy the units with cash.

1     MR. WATTS-FITZGERALD:  Objection, Your Honor.  That also

2  is asked and answered.

3     MR. RODRIGUEZ:  I didn't ask that question.

4     THE COURT:  I believe it was.  Move on. Sustained.

5  BY MR. RODRIGUEZ:

6  Q.  Could you explain in layman's terms to the jury when you

7  turned over your interest to Cay Clubs, what was Cay Clubs

8  supposed to do with your properties?

9  A.  Well, it was different on each one.  So it was various things.

10  So for instance you mentioned the office building, we sold them

11  the office building, then we leased back the office building.

12  Q.  Let's use Sombrero as an example because we'll get to that in

13  a minute.

14  A.  I had no relationship to Sombrero.

15  Q.  So Sombrero you had no relationship with?

16  A.  No.

17  Q.  But you were shown pictures.

18  A.  I'm sorry?

19  Q.  Were you shown pictures of Sombrero?

20  A.  By who?

21  Q.  Just a few minutes ago.

22  A.  No.  I don't think I was shown a picture.  That picture was a

23  picture of Indigo Reef and it had Sombrero sales information on

24  it.

25  Q.  Okay.  You don't recall -- you never went to Sombrero?

1    A.   Oh no, I've been to Sombrero many times.  They had a really

2    good pizza place there, so I used to go there all the time.

3    Q.   Good restaurant, right?

4    A.   Yeah.

5    Q.   It's a good stop when you're heading south, right?

6    A.   Well, when you're in Marathon, it's pretty limited and they

7    had --

8    Q.   Only so many choices?

9    A.   Yeah.  It was a -- we used to go there all the time.

10          THE COURT:  Home Depot has a terrible restaurant.

11          MR. RODRIGUEZ:  The hot dog cart at Home Depot is not

12   good, is it?  Okay.

13       BY MR. RODRIGUEZ:

14   Q.   So the point is, sir, you were asked questions about Hampton

15   Inn.  And you sold items to Mr. Clark from the Hampton Inn; is

16   that fair to say?

17   A.   Yep.  Uh-huh.

18   Q.   You felt this was a win-win for both of you.  Fair to say?

19          MR. WATTS-FITZGERALD:  Objection, Your Honor.  The

20   witness can't speculate.

21          THE WITNESS:  Yeah, it was.

22          THE COURT:  What is the objection?

23          MR. WATTS-FITZGERALD:  Asking the witness to speculate

24   on what Mr. Clark thought about the purchase.

25          THE COURT:  Yeah, that's true.  Sustained.

1      BY MR. RODRIGUEZ:

2   Q.   Did Mr. Clark talk to you about why he wanted these items?

3   A.   To put in Sombrero.

4           MR. WATTS-FITZGERALD:   Objection, Your Honor.   Party

5   opponent, calling for hearsay.

6           THE COURT:   Sustained.

7      BY MR. RODRIGUEZ:

8   Q.   Did he talk to you about it?   I don't want to know what --

9   A.   Yes.

10  Q.   So you had a communication and as a result of that

11  communication, this memo that we've seen in evidence was

12  generated; is that fair to say?

13  A.   Yes.

14  Q.   And then you received money from Mr. Clark for these items?

15  A.   Well, from Cay Clubs.

16  Q.   From Cay Clubs?

17  A.   Some Cay Clubs entity.

18  Q.   And you weren't trying to sell them something that was fake or

19  false, were you?

20  A.   No.

21  Q.   Real items out of a Hampton Inn?

22  A.   Yeah.

23  Q.   And Hampton Inn was what you called a one star?

24  A.   It was not just that it was a Hampton Inn, it was a Hampton

25  Inn that was about to be de-Hampton Inn'd because it wasn't even

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1   up to even Hampton Inn's standards.  So it was a pretty one-star

2   property that needed to be demolitioned.

3   Q.  You agree in The Keys there's all sorts of properties, one

4   star to five star?

5   A.  Yeah, which is a good thing.

6   Q.  Because it makes opportunity for people who don't have money

7   to be able to stay there?

8   A.  Absolutely.

9   Q.  But you would also agree that the prices in The Keys are

10  already inflated by the fact that it's a resort destination?

11          MR. WATTS-FITZGERALD:  Objection, Your Honor.

12  Irrelevant.

13          THE COURT:  I'll permit it.  Just move on.

14          THE WITNESS:  Well, I would never suggest that the

15  prices in The Keys are inflated.  I would always suggest that they

16  are appropriate for the market, is my opinion.

17          THE COURT:  Since you're the one that's --

18          THE WITNESS:  I'm the one who is selling them.  So I

19  don't want to go on the record here saying my prices are inflated.

20      BY MR. RODRIGUEZ:

21  Q.  And sir, I did not mean it to go that way.  Okay.  So what you

22  mean by appropriate for the market is that that market generates a

23  higher rental than, say, Homestead?

24  A.  Yes.

25  Q.  Okay.  Or even the Upper Keys?

1    A.   Yes.

2    Q.   And as you move down The Keys, the further south you get, the

3    more expensive it gets?

4    A.   It skips about.  So for instance if you go south of Marathon,

5    it goes down before it goes up in Key West.

6    Q.   I see.  And it's all based upon all sorts of factors in the

7    economy; is that fair to say?

8    A.   It's based on a lot of factors, period.  Economy is one,

9    location is another.  The product you build is another.  The

10   current demand at that time.  You know, it's a lot of factors.

11   The economy, the general economy is one of them.  But it can be

12   many factors.

13   Q.   You were asked a few questions on direct, if I can focus you

14   on the projects that you talked about.  You're asked questions

15   about higher density.  Do you recall those questions?

16   A.   Yeah.

17   Q.   And you said that it's very difficult to make a unit or --

18   excuse me, a property into a higher density project?

19   A.   That's correct.

20   Q.   But the goal would be if you could, to try to do that?

21   A.   Depends.  Sometimes you're better off having lower density.

22   You get more per unit and sometimes you want higher density.

23   That's one of those questions that's not as simple as a yes or a

24   no.

25   Q.   And density is -- simply refers to the number of people in one

1    area.  How many people you can put into one spot, for example,

2    this courtroom.

3    A.   How many residential or hotel rooms you can put in this

4    particular case, yes.

5    Q.   Now, you talked about your Truman Annex project.  You agree

6    that took you ten years to complete.

7    A.   Yes, but I permitted it in three months.

8    Q.   Three months.  And then, what, took you ten years?

9    A.   The Japanese bank problem.

10   Q.   So that stopped you?

11   A.   Losing all my money.

12   Q.   Losing all your money.  In fact, you had to move into one of

13   the units, right?

14   A.   Well, I was already there.  I had to move from one to another.

15   Q.   And you had lost your farm up in Vermont and everything?

16   A.   I was down to minus.

17   Q.   Minus.  But you were able to come out of that?

18   A.   Yes.

19   Q.   Now, you had talked to us about the nature of marinas.  Would

20   you agree, sir, that marinas are difficult to get permitting for?

21   A.   Yeah.

22   Q.   And you have to go to local authorities; is that fair to say?

23   A.   You have to go to local authorities, you have to go to the

24   DEP, you have to go to South Florida Water Management and you have

25   to go to Army Corps.

1    Q.   So you go to federal, state, Department of Environmental

2    Protection, the Army Corp of Engineers is a federal organization.

3    What was the other state organization?

4    A.   DEP and South Florida Water Management.   And you also have to

5    go to the Department of Economic Opportunity.

6    Q.   Economic Opportunity.   And then you also have to get the

7    county or city, if you're in a city as well, to agree?

8    A.   Correct.

9    Q.   Would you agree that this is a very expensive process?

10   A.   Yes.

11   Q.   And lawyers aren't cheap, are they?

12   A.   No.

13   Q.   And you had mentioned Mr. Phoenix.   You saw Mr. Phoenix's name

14   on this agreement with Mr. Clark.   You understood he was a senior

15   counsel for Mr. Clark?

16   A.   Yes.

17   Q.   And you felt it was appropriate that your documents would go

18   from lawyer to lawyer to make sure they're all correct?

19   A.   Yes.

20   Q.   And all your dealings with Mr. Clark were in writing, would

21   you agree?

22   A.   No.

23   Q.   I mean, the financial dealings.   Did you have handshakes?

24   A.   No.   I'm sorry.   If your question is did we document

25   everything we agreed to in written documents?   The answer is yes.

1   But you asked me if all my dealings with him were in writing,

2   so...

3   Q.   Now, you were asked some questions about leaseback on direct

4   and I want to focus you on that.  Are you familiar with the Cay

5   Clubs' leaseback program?

6   A.   Yes.

7   Q.   And you understand that a certain percentage is given after

8   closing at some point of the -- if the person decides to enter

9   into the leaseback.  Is that your understanding?

10  A.   Vaguely.

11  Q.   But money is given to the consumer.  Is that the way you

12  understand it?  You know, up front after closing?

13  A.   Well, we didn't do that.

14  Q.   You did not do that.  You had a different model, did you not?

15  A.   We had a different model.

16  Q.   And you explained that in detail that your model gives back

17  money, but it's based upon rental?

18  A.   Right.

19  Q.   And your model is designed to make sure that you can get the

20  rental income?

21  A.   Right.  Right.

22  Q.   So a person buying at Hawk's Cay, for example, won't get that

23  big check up front.

24  A.   Right.  Correct.

25  Q.   And you said at Hawk's Cay there is built-in developmental

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1   costs, that you said the person is a 60/40 split, I believe?

2   A.   On the management?

3   Q.   Yes.

4   A.   It's around 40, 42, as much as 50/50.  It depends.  It has to

5   do with which expenses comes out and who pays for what, that sort

6   of thing.

7   Q.   So a consumer who has purchased at Hawk's Cay unit and rents

8   out, you're saying, gets, at maximum, 50% of whatever the rental

9   income is.

10  A.   That's correct.

11  Q.   And in change for that, they release their property to the

12  management there to rent it out to people like us who want to come

13  in and rent it for the weekend.

14  A.   Right.  They sign a management contract with us and they

15  notify us when they want to come down with certain notice

16  provisions, and then we set it aside for them, otherwise we make

17  it available on our reservation systems for folks like these to

18  come, and yourself, to come down and stay there.

19  Q.   Did you have the unfortunate circumstance to start any

20  projects in 2004?

21  A.   Starting projects in 2004?

22  Q.   Yes.

23  A.   Did you say unfortunate?

24  Q.   Unfortunate circumstances starting in 2004.

25          MR. WATTS-FITZGERALD:  Objection to the form of the

```
 1   question, Your Honor.

 2            MR. RODRIGUEZ:  I'll ask it a different way.

 3            THE COURT:  Just ask did you start any projects in 2004.

 4            THE WITNESS:  I think I started -- Tranquility Bay was

 5   under construction in 2004.  I think.

 6            THE COURT:  Speak into the microphone.

 7            THE WITNESS:  I'm sorry.  I think there may have been a

 8   number of projects.  I have to go look at my schedule.

 9        BY MR. RODRIGUEZ:

10   Q.   Tell us how many years it took you to complete Tranquility

11   Bay.

12   A.   Well again, the problem is, you know, we would buy a project

13   and we might run it as what it was for a bit while we're doing the

14   permitting and developing.  But I'm pretty sure we bought

15   Tranquility Bay maybe in 2003, 2002 and finished it in 2005.

16   Q.   And that would predate the crash?  You finished it predating

17   the crash?

18   A.   Right.

19   Q.   Did you buy any properties that you were developing during the

20   crash?

21   A.   Well, we finished Parrot Key in early 2008.  And we finished

22   Coral Lagoon in around the same time.

23   Q.   Were you able to complete those projects the way you had

24   originally intended them when you started?

25   A.   No.
```

1    Q.   That's because the economy governed the way you would have to

2    complete your project; is that fair to say?

3    A.   The lack of mortgages for my buyers at Parrot Key made it so

4    that I did not sell as many units as I would have liked and I had

5    under contract.  And so I decided to make it into a hotel.  Focus

6    on cash flow as opposed to focus on sales.

7    Q.   Okay.  So you were able to shift your model to a cash flow

8    model.

9    A.   That's right.

10   Q.   And did that help you make the project successful?

11   A.   Oh, yeah.  All the projects became very successful with that

12   model.

13   Q.   And would you agree you had to have flexibility at this period

14   in time.

15   A.   Yes.

16   Q.   And you didn't intend for this crash to happen in late '07,

17   did you?

18           MR. WATTS-FITZGERALD:  Objection, Your Honor.

19           MR. RODRIGUEZ:  I'll state it another way.  I'll strike

20   the question.

21        BY MR. RODRIGUEZ:

22   Q.   Did you predict it to happen in he 2007?

23   A.   No.

24   Q.   Had you known it would happen, would you have taken other

25   actions beforehand?

1    A.   Oh, yes.

2    Q.   I want to get back to you for a moment on your discussion with

3    -- you talked about the marina, I believe, and whether the marina

4    -- the property was the bay was owned or not.

5    A.   Yeah.

6    Q.   Do you recall during your acquisitions of these properties,

7    did the properties actually own the bay or did they lease the bay?

8    A.   You mean all the properties I bought?

9    Q.   Yes.

10   A.   Both.

11   Q.   So you had varying models on whether you could do certain

12   things with marinas?

13   A.   Right.

14   Q.   And would you agree that this was one of the concerns you had

15   for the properties that you joined in with Mr. Clark and Cay

16   Clubs?

17   A.   I'm not sure I understand your question.

18   Q.   I'm sorry.  I'll ask it to you this way:

19         When you joined Cay Clubs, had this merger, this

20   agreement to sell products, were all the properties completed that

21   you turned over to Cay Clubs' control?

22   A.   Well, so the question is kind of a little confusing.  The

23   venture agreement with Cay Clubs, right, so and we had certain

24   properties that they would be taking over the management of and

25   doing the sales of.  So Tranquility Bay, I already had a full team

88

 1    managing Tranquility Bay and they came in and we changed some

 2    staff, but some of the key staff stayed and -- etcetera.  So it

 3    was kind of a joint management almost but it was -- you know.

 4            And then Parrot Key, I was under construction, that was

 5    my project.  Indigo Reef, we were done with Indigo reef

 6    construction and they were doing the management as they were doing

 7    the management at Tranquility Bay, but the project was done.

 8            Coral Lagoon, I was still finishing up some construction

 9    there, that was my responsibility but they were running the marina

10    portion.  So it depended on each one, how it happened.

11    Q.  Was it at Coral Lagoon that Cay Clubs redid the docks or was

12    it at another property?

13    A.  I'm not sure I understand.

14    Q.  Did Cay Clubs ever get tasked with the job of redoing docks at

15    any of these properties?

16    A.  You mean doing construction?

17    Q.  Yes.

18    A.  No.

19    Q.  What about creating docks in marinas?

20    A.  I don't recall that they managed the docks there.

21    Q.  Would management require reconstruction?

22    A.  I don't think so.

23            MR. RODRIGUEZ:  One moment, Your Honor.

24        BY MR. RODRIGUEZ:

25    Q.  You were asked a few questions about transient property.  Do

1    you know whether Sombrero was a transient property?

2    A.    I think it was.

3    Q.    Okay.  And certain -- you'd agree that transient rental

4    authorizations are more valuable than not having them?

5    A.    Considerably.

6    Q.    Because -- so explain to the jury.  You can make more money?

7    A.    A lot more.

8    Q.    And quickly.

9    A.    Well, the quickly part, I mean, remember, you can make more

10   money, but you also have to have a management company and you have

11   to have housekeepers and you have to have marketing and you have

12   to have licenses and you have to have the fire department.  So

13   it's not like you just turn the spigot on and if you get this

14   permit, all of a sudden it's that.  There's things to do.  But the

15   answer is cash flow-wise, it is a lot more valuable to have.

16          Now, there are cases in instances where it's a lot more

17   valuable not to have it because you're looking at a different

18   buyer.  The buyer who wants cash flow is going to -- but a buyer,

19   say, who wants a big house that has got five bedrooms and a

20   docket, etcetera, he doesn't want any transient near him and so

21   the value will go down.

22          But for cash flow purposes, certainly transient is

23   better than not transient.

24   Q.    Okay.  So in plain language, are you -- you're telling us that

25   a transient property may bring quicker -- more cash flow, excuse

1    me, to the purchaser of the unit because of the rental ability.

2    A.   It has the capacity to do that, yes.

3    Q.   Okay.  And were you familiar with docks being redone at

4    Sombrero?

5    A.   Not really.

6    Q.   Okay.  And so, sir, you've had projects that have taken, on

7    the average, seven to eight years to complete; is that not true?

8    A.   Well, I mean, I had some very large projects and they took a

9    number of years, yes.

10   Q.   And you would agree that development is a slow process at

11   times?

12   A.   Yes.

13   Q.   Is that correct?

14   A.   Yes.

15   Q.   And ultimately, you talked to us about Parrot Key.  That was

16   the transient rental property as well?

17   A.   Yes.

18   Q.   But that was a higher rated transient rental property?

19   A.   Yes.

20   Q.   You converted what type of hotel?

21   A.   Hampton Inn.

22   Q.   Hampton Inn, into this unit and you were ultimately able to

23   sell it for $105 million?

24   A.   102.

25   Q.   Oh.  Excuse me.  I was close.

```
1    A.   Yeah.  That was right.

2    Q.   So you made quite a bit of money on that transaction?

3    A.   Well, I didn't -- I mean, so here's -- yeah, so I actually

4    brought in a partner at some point, sold it, I sold my interests

5    for 70 million.  And kept the 20 percent interest and then we sold

6    it for 102 a couple years later.

7    Q.   And when you say a partner, is that common to have a partner

8    to come in on projects of this nature?

9    A.   It was the only time I did it.

10   Q.   Okay.  And oftentimes do partners help reduce the risk?

11   A.   Yes.

12   Q.   And do the banks help you out in that regard when they loan

13   you money as well?

14         THE COURT:  I don't know what that means "help you out".

15       BY MR. RODRIGUEZ:

16   Q.   Help you with risk?  Well, I'll strike that question and ask

17   it this way.

18         When you borrow from a bank for a project say, for

19   example, like Parrot Key, you're able then to go on to other

20   endeavors as well.  You don't have to put all your money up front.

21   A.   Again, I'm not sure what your question is.

22   Q.   I'll ask it this way.  You would agree the developer, the more

23   money you have from banks, the greater expansion you can do or

24   projects you can take on.

25   A.   Ostensibly, yes.
```

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1     MR. RODRIGUEZ:  Your Honor, that's all I have on my

2  cross-examination.  I don't know if you want to break.

3     THE COURT:  No, I think I'll start.  Go ahead.  He's not

4  going to take long.  He's even going to do it from there.  That's

5  how short it's going to be.  Maybe not.

6     MR. ARTEAGA-GOMEZ:  It's not the first time I've been

7  accused of being short, Judge.

8     THE COURT:  I don't do short jokes.  I'm on a podium

9  here, but I don't do short jokes.  I was the tallest person in my

10 family by far, and that will tell you I don't do short jokes.

11                         CROSS-EXAMINATION

12  MR. ARTEAGA-GOMEZ:

13 Q.  Sir, do you remember -- I apologize.

14     Sir, my name is Alex Arteaga-Gomez and I represent

15 Cristal Clark.

16     Do you remember being asked on direct examination about

17 the joint venture settlement agreement which was exhibit --

18 Government Exhibit 2.05?  Do you remember that when

19 Mr. Watts-Fitzgerald was asking you about?

20 A.  Yes.

21 Q.  This document, joint venture settlement agreement?

22 A.  Yes.

23 Q.  And in plain terms, this document was intended to wind up the

24 relationship between yourself and Mr. Clark; is that correct?

25 A.  Well, myself and all of the various entities that -- and all

1    the people involved.  Because there's not just Mr. Clark, not even

2    just Cay Clubs.  There's all kind of other people in here.  Any

3    peripheral relationship to any of them.

4    Q.   So but it is like a winding up agreement?

5    A.   Yes.

6    Q.   Okay.  And do you recall that Mr. Watts-Fitzgerald pointed out

7    that there was a line here for a signature and the name underneath

8    the signature says Cristal Coleman?  Do you remember he asked you

9    about that?

10   A.   Yes.

11   Q.   Now, there's also some entities listed on that same page.  And

12   the various entities, the mark for the signature, it's Dave Clark,

13   Dave Clark, Dave Clark, Dave Clark, Dave Clark, right?

14   A.   Yes.

15   Q.   Now, some of these entities we know they're entities because

16   their names end with an LLC, right?

17   A.   Yes.

18   Q.   And LLC means limited liability company?

19   A.   Yes.

20   Q.   So those are companies?

21   A.   Yes.

22   Q.   And do you know whether Cristal Coleman, my client, was ever

23   an officer, director, owner, shareholder of any of the companies

24   listed on that page?

25   A.   I have no idea.

```
1    Q.   Do you know if my client, Cristal Coleman, ever had control or

2    power or decision-making authority with respect to any of those

3    entities on that page?

4    A.   I have no idea.

5    Q.   Okay.  And do you recall that in another part of this page,

6    Mr. Watts-Fitzgerald asked you questions about the notices page?

7    A.   Yes.

8    Q.   And the notices page, that is intended for the purpose of --

9    there's letters or documents or things that need to be sent after

10   this agreement, there's an agreement as to where it has to go.

11   Correct?

12   A.   Say that again?

13   Q.   Forget it.  There's a notice -- there's a list for where if

14   nothing has to be sent for any purpose, there's an address, right?

15   A.   Correct.

16   Q.   Okay.  And the -- and it says Cristal Coleman, right?

17   A.   Yes.

18   Q.   Okay.  And the e-mail address that's associated with that name

19   is Dave Clark@CayClubs.com, right?  Right?

20   A.   I assume.

21   Q.   That's what it says right?

22   A.   Yeah.

23   Q.   That's the document you signed?

24   A.   That's what it says, right.

25   Q.   And that's the same e-mail address that's associated with the
```

1  various Cay Clubs, Cristal Clear and DC entities listed on that

2  page, right?  It's the same e-mail address, right?

3  A.  Yes.

4  Q.  Now, that physical address, 94500 Overseas Highway, Key Largo,

5  Florida, 33037, do you know what that address is?

6  A.  I have no idea.

7  Q.  Never been there?

8  A.  Not that I know of.

9  Q.  Do you know the name Deanna Priday?

10  A.  I've heard the name before, sure.

11  Q.  She's an assistant for Mr. Clark?

12  A.  Yes.

13  Q.  Do you know whether she works out of that office?

14  A.  I have no idea.

15  Q.  Okay.  Now, there's a portion of this agreement,

16  Mr. Watts-Fitzgerald asked you a question about why you think

17  Cristal Coleman would be signing this document.  Do you remember

18  that question by Mr. Watts-Fitzgerald?

19  A.  I do.

20  Q.  Okay.  I think that was one of the times where I stood up.  Do

21  you remember that?

22  A.  Vaguely.

23  Q.  Okay.  And do you recall this page, which is PS 122 of

24  Government Exhibit 20.05.  It's a portion -- do you remember this

25  page?  The portion of the joint venture settlement agreement?

1   A.   Yes.

2   Q.   Okay.  And Mr. Watts-Fitzgerald didn't ask you about this

3   page, did he?  No.  Correct?

4   A.   I don't remember him asking me about this particular thing you

5   have the arrow on.  That's for certain.

6   Q.   Okay.  I don't remember it either.  And he didn't ask you any

7   questions about paragraph seven, right?

8   A.   I don't believe so.

9   Q.   And paragraph seven is entitled termination of Parrot Key

10   contracts, correct?

11   A.   Correct.

12   Q.   And I'm not going to read the whole thing because I know we're

13   hungry.  But there is a mention that it says CCH Keys, LLC and

14   Cristal Coleman hereby agree to terminate all purchase agreements

15   together with any interests that they may have in Parrot Key

16   units.  Do you see that?

17   A.   Yes.

18   Q.   And then it lists lots 23 and 61 at The Village located on

19   Roosevelt located on Key West, Florida, the Coleman units.  Do you

20   see that?

21   A.   Yes.

22   Q.   So at the time of this joint venture settlement agreement,

23   there was a pending contract to purchase real estate, correct?

24   A.   With Cristal, yes.

25   Q.   And various other entities, right?

1    A.    Yes.

2    Q.    Okay.  And as part of the winding up process -- this is part

3    of your winding up agreement, right?

4    A.    Right.

5    Q.    And winding up means you're terminating different things that

6    are under contract with Mr. Clark and his related entities, right?

7    A.    Correct.

8    Q.    So as a legal matter, this Parrot Key, these Parrot Key real

9    estate contracts were part of this deal you had pending with

10   Mr. Clark and his related entities, right?

11   A.    Yes.

12   Q.    And so those purchase and sale contracts at Parrot Key, they

13   had to be terminated too, right?  Correct?

14   A.    Yes.

15   Q.    And it appears that two of those contracts were in the name of

16   Cristal Coleman, correct?

17   A.    Yes.

18   Q.    So as a legal matter, there needed to be something signed,

19   something purportedly signed by Cristal Coleman agreeing that

20   those contracts are terminated, right?

21          MR. WATTS-FITZGERALD:  Objection, Your Honor, calls for

22   a legal conclusion.

23          THE COURT:  Sustained.

24      BY MR. ARTEAGA-GOMEZ:

25   Q.    As far as you know, the reason why her name is on that

1   signature line is because real estate contracts had to be

2   terminated as part of your agreement with Mr. Clark, right?  Is

3   that your understanding?

4   A.   Reading this paragraph, I think from my perspective, if I'm

5   reading this paragraph, that certainly indicates that.

6   Q.   Okay.  And this paragraph, like the rest of the agreement, is

7   prepared and reviewed by attorneys, correct?

8   A.   That's correct.

9   Q.   Not something you sat and typed up, right?

10  A.   Absolutely not.

11  Q.   Okay.  But it's something you signed, right?

12  A.   Oh absolutely, yes.

13  Q.   Okay.  Now sir, you talked on direct examination, we talked --

14  you spoke with Mr. Watts-Fitzgerald a bit about your background,

15  right?  And your success in the real estate business, correct?

16  A.   Yes.

17  Q.   I mean it's okay.  You've been successful, correct?

18  A.   Yes.

19  Q.   And you've been in the real estate business essentially since

20  the late 1970s, right?

21  A.   Yes.

22  Q.   And in 1986, I mean -- and back in the 70s you were involved

23  in real estate projects outside of the state of Florida, right?

24  A.   Yes.

25  Q.   And the Truman Annex that you discussed, that you began

1    developing in as far back as 1986, right?

2    A.   Right.

3    Q.   It's a 43 acre waterfront parcel, right?

4    A.   Yes.

5    Q.   And it grew into a $200 million mixed use project, right?

6    A.   Yes.

7    Q.   It encompasses 525 resort units.

8    A.   Yes.

9    Q.   It encompasses 60,000 square feet of commercial space.

10   A.   Yes.

11   Q.   You went on to develop the Key West Golf Club?

12   A.   Right.

13   Q.   After Truman Annex, right?  That was in --

14   A.   Yeah.  You can say that.  I started doing the Key West Golf

15   Club while I was finishing Truman Annex.

16   Q.   In the early 90s, you finished Key West Golf Club?

17   A.   Late 90s, yeah.

18   Q.   Late 90s.  That's a $118 million resort community.

19   A.   Yes.

20   Q.   You developed the Roosevelt Annex, right?

21   A.   Yes.

22   Q.   That's separate from the Truman Annex.

23   A.   Right.

24   Q.   That's also in Key West.

25   A.   Yes.

```
1   Q.   That's an enclave of single family homes?

2   A.   Yes.

3   Q.   You were responsible for that?

4   A.   Right.

5   Q.   You developed The Village at Hawk's Cay in the late 90s,

6   right?

7   A.   Starting in '96.

8   Q.   That's about 275 upscale vacation homes, correct?

9   A.   Yes.

10  Q.   It's a vibrant resort community?

11  A.   Yes.

12  Q.   And then you developed Tranquility Bay?

13  A.   Yes.

14  Q.   You dropped Tranquility Bay, that's 87 beachfront homes?

15  A.   Right.

16  Q.   That's 12 acres that are landscaped?

17  A.   Right.

18  Q.   That have units there have sold from $575,000 to over a

19  million dollars.

20  A.   Correct.

21  Q.   You developed Indigo Reef Marina and Homes?

22  A.   Right.

23  Q.   67 units there.

24  A.   Right.

25  Q.   There's an experienced dock master there.
```

1    A.   Not anymore.

2    Q.   Not anymore.  But there once was, right?

3    A.   Right.

4    Q.   Okay.  And then we have Coral Lagoon?

5    A.   Yes.

6    Q.   We have The Boat House Marina?

7    A.   Yes.

8    Q.   We have the condominium for the boats that you discussed on

9    direct examination.

10   A.   Yes.

11   Q.   And, I mean, you're well-known.  You're a public figure in The

12   Keys, right?

13   A.   Yes.

14   Q.   And you're a public figure in The Keys because of the success

15   you have had developing real estate?

16   A.   Right.

17   Q.   And that public reputation as a successful real estate

18   developer, that predates 2006 when you met Dave Clark?

19   A.   Yes.

20   Q.   And it continued during the time you did business with Dave

21   Clark?

22   A.   Yes.

23   Q.   So if anybody was to look you up in the news, Google you, look

24   you up online, they would easily see the accomplishments that you

25   have.

```
 1              MR. WATTS-FITZGERALD:  I'm going to object.

 2              THE COURT:  Don't get any ideas.

 3              MR. WATTS-FITZGERALD:  That issue aside, Your Honor, I'm

 4   going to object.  This is largely irrelevant.

 5              THE COURT:  I will sustain the objection.  I think

 6   you've gotten as much as you need to get there.

 7              MR. ARTEAGA-GOMEZ:  Your Honor, it is relevant to Ms.

 8   Clark's good faith.

 9              THE COURT:  But it's also repetitive.  You know, you've

10   made the point.  If there's a point to be made, you've made it.

11        BY MR. ARTEAGA-GOMEZ:

12   Q.  Okay.  And you've appeared in the news.

13              MR. WATTS-FITZGERALD:  Objection, Your Honor.

14              THE COURT:  Sustained.

15        BY MR. ARTEAGA-GOMEZ:

16   Q.  And so you perform -- it's important, sir, that when you do

17   business with someone, that you do business with the right people,

18   right?

19   A.  Yes.

20   Q.  It could affect your reputation if you do business with the

21   wrong people?

22   A.  That's correct.

23   Q.  Okay.  So you're involved in the projects.  Right?

24   A.  Yes.

25   Q.  You're involved in the due diligence?
```

1    A.   Yes.

2    Q.   And you entrusted -- you went into business with Dave Clark

3    over these businesses as part of a plan for you to retire.  That

4    was your plan.

5    A.   That was my plan.

6    Q.   So you were looking to Dave Clark and entrusting him with a

7    sort of long-term retirement plan for yourself?

8    A.   I wouldn't quite say that.  I would say, as I said, the goal

9    here was if this arrangement worked out, then I would be able to

10   wrap up my affairs.  But I wouldn't call it a retirement plan.

11   Q.   But it was part of your plan for getting out of the

12   development business, correct?  That's what you said on direct,

13   right?

14   A.   Well, it was -- I think the way I characterized it is that

15   when this opportunity arose with Dave and the way we worked it out

16   and if it had happened, it would have allowed me to do other

17   things and not run the day-to-day affairs of my development

18   business because I have other interests in my life.

19   Q.   And you had certain key employees that you specifically

20   focused on when you went into business with Mr. Clark, right?

21   A.   Protected employees that I wanted to make sure were there,

22   yes.

23   Q.   You wanted to make sure they were there at the property?

24   A.   Yes.

25   Q.   Because it was important for you to have some sort of

1    involvement and oversight, right?

2    A.   Yes.

3    Q.   Okay.  Now, when it came to Tranquility Bay and your

4    properties, you had no business relationship with Ms. Coleman.

5    A.   I never dealt -- my recollection is I don't remember ever

6    discussing any business matters.

7    Q.   And she didn't negotiate with you the terms of this joint

8    venture agreement?

9    A.   No.

10   Q.   And she didn't negotiate the terms of that settlement

11   agreement?

12   A.   No.

13   Q.   And she wasn't involved in -- one of the property managers at

14   these developments, Indigo Reef and Tranquility Bay, correct?

15   A.   Not that I'm aware of.

16   Q.   Okay.

17          MR. ARTEAGA-GOMEZ:  No further questions, Judge.  Thank

18   you.

19          THE COURT:  All right.  Are you going to be long?

20          MR. WATTS-FITZGERALD:  A bit of time, Your Honor.

21          THE COURT:  Well, I'll tell you what.  We're going to

22   break for lunch now and you're going to work on making it not

23   long.

24          MR. WATTS-FITZGERALD:  If I have more time, I can make

25   it shorter.

```
 1              THE COURT:  Sir, since you're on the witness stand,

 2   you're not permitted to discuss your testimony with anyone.  We'll

 3   be in recess until -- what is it, an hour and let's go until 2:00.

 4   An hour an 15 minutes.  And the food down here is worse than at

 5   the Home Depot in Marathon.  Good luck.

 6              COURT SECURITY OFFICER:  All rise.

 7              THE COURT:  Seventh floor.  At least you won't starve,

 8   but you may drop dead.  It's there and it's raining, so you guys

 9   might want to go to the seventh floor.  Thank you.  We'll be in

10   recess.

11              You know all the warnings.  Don't talk, don't listen,

12   don't research, don't nothing.  Just eat and come back.  Healthy.

13   2:00.

14                           * * * * *

15              THE COURT:  Please be seated.  You may proceed, sir.

16              MR. WATTS-FITZGERALD:  Thank you, Your Honor.

17              Want to give the witness the warning, Your Honor?

18              THE COURT:  I think he probably remembers.

19                         REDIRECT EXAMINATION

20      BY MR. WATTS-FITZGERALD:

21   Q.  Mr. Singh, the notorious Mr. Singh.

22              MR. RODRIGUEZ:  Objection, argumentative.

23              THE COURT:  Yeah, I don't think he meant it though.

24              MR. WATTS-FITZGERALD:  I'll rephrase it.

25      BY MR. WATTS-FITZGERALD:
```

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1   Q.   Do you recall being accused of being notorious in The Keys?

2   A.   Yes.

3   Q.   And you were asked questions about, or quoted excerpts of many

4   things you apparently have said at some time.  Do you recall that?

5   A.   Yes.

6   Q.   Have you widely been reported in the media in The Keys over

7   the years?

8   A.   Oh yeah, I have thousands of articles.

9   Q.   Was it always accurate?

10  A.   Oh, no.

11  Q.   And with regard to your reputation being a man on campus in

12  The Keys, did you ever discuss with Mr. Clark or did he raise with

13  you the fact that your reputation for the quality of product and

14  long history in The Keys would be an advantage to Cay Clubs if

15  they could take over and manage your property?

16          MR. RODRIGUEZ:  Objection to form of the question.

17          THE COURT:  What is the objection?

18          MR. RODRIGUEZ:  Form of the question.

19          THE COURT:  Form of the question.

20          MR. RODRIGUEZ:  It's an argument.

21          THE COURT:  Sustained.

22      BY MR. WATTS-FITZGERALD:

23  Q.   Did you ever have a conversation with Mr. Clark regarding your

24  stature and your brand in The Keys?

25  A.   Yes.  Sure.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1   Q.   Did he ever express an interest in taking advantage of that as

2   part of his effort to increase his presence and activities in The

3   Keys?

4   A.   I mean, it was pretty clear to me that from his perspective

5   and the things that he said to me, that being able to have a

6   partnership with us because of the reputation we had for

7   successful and quality developments was a plus, and that he felt

8   he could sell our product well because it had such good

9   reputation.

10  Q.   With regard to some of the bank issues that were brought up,

11  did you ever sell and leaseback any units during the time period

12  post August of 2007?

13  A.   I may have.

14  Q.   In your business practice up to the time of your association

15  with Mr. Clark, did you ever sell, sell and take into income, if

16  you will, a customer's or purchaser's money for the complete

17  purchase of the unit before delivering the unit?

18  A.   No.

19  Q.   You answered in cross-examination that bank loans are a

20  routine part of your development business and that you have to

21  apply for them to do construction work and other things.  Is that

22  correct?

23  A.   Bank loans, yes.

24  Q.   Do you have to take bank loans once the project is complete in

25  order to have operating expenses for the hotel side or the leasing

1  management operation?

2  A.  It is done to have lines of credit for operations.  So you

3  might have income that's coming in over a few months, like for

4  instance when you get paid from, let's say, an Expedia or

5  Hotels.com or, you know, Travelocity or Priceline or something

6  like that, you'll give the room out, but they don't pay you for a

7  month or two later.  So we didn't do it, but...

8  Q.  It could happen?

9  A.  Some people do do it, and have it against -- it's considered a

10  line of credit against receivables.  But it's specifically against

11  receivables.

12  Q.  It's not a mortgage loan?

13  A.  No.  No.  It's against receivables.

14          MR. RODRIGUEZ:  Leading, Your Honor.

15          THE WITNESS:  Because the cash flow --

16          THE COURT:  You are leading.  Don't.

17      BY MR. WATTS-FITZGERALD:

18  Q.  The question would be how is that different from a mortgage

19  loan?

20  A.  Well, a mortgage loan is against the property and this is

21  against receivables for your operating business.

22  Q.  The projects, once complete, when they reach that stage, are

23  they financially self-sustaining thereafter?

24  A.  Hopefully.

25  Q.  Okay.  And with regard to bank loans for development and

1    renovation work, do banks require you to take the loan or -- let

2    me ask it this way.

3           Are the loans project-specific?

4    A.   Yes.  Usually.

5    Q.   And what is the bank's security when they give you a loan on a

6    specific project?

7    A.   Well, so there are different types of loans.  So let's -- are

8    you asking me about a construction loan or are you asking me when

9    the project is finished?

10   Q.   Let's start with the construction loan.

11   A.   I'll give you an example of a project we're doing right now.

12   So we -- the bank will give you X dollars on a project, usually 75

13   or 80 percent, 65 percent, 75 percent, 80 percent tops, on

14   construction of a project.  So you're going to buy the land, say

15   -- just use the number, you're going to buy the land for $10

16   million.  It's going to cost you $40 million to build it, $50

17   million.  The bank requires you to put up ten.  But the bank

18   requires you to put 100 percent of the construction funds aside so

19   that there's 100 percent of the money there to build the project,

20   so the bank knows they're going to get a finished project because

21   their mortgage is the finished project.

22          Is that what you're asking me?

23   Q.   Yes.  Will a bank make that loan if the property in project is

24   not sufficient security?

25          MR. RODRIGUEZ:  Speculation, Your Honor.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
 1              THE COURT:  Say again please?

 2              MR. RODRIGUEZ:  Speculation.

 3              THE COURT:  Sustained.

 4       BY MR. WATTS-FITZGERALD:

 5  Q.   In your experience, have you been able to secure such loans if

 6  the property in project doesn't measure up for the bank?

 7  A.   In my experience, my personal experience, no.

 8  Q.   Do you recall me showing you Government's Exhibit 20.07, the

 9  inclusions, the sale items for --

10  A.   Yes.

11  Q.   Do you recall how much you were paid for those items, for the

12  159 room --

13  A.   I don't.

14  Q.   Would it have averaged out to anything like $35,000 a room?

15  A.   Oh, no.  No.  No.  No.  No.  No.  It was more like hundreds of

16  dollars a room.

17  Q.   Hundreds of dollars.  Thank you.  And that's the furniture for

18  which facility?  Where was it going?

19  A.   Sombrero.

20  Q.   You testified that you used to go get pizza regularly at

21  Sombrero.  Had you done that before the auction in 2005?

22  A.   I had gone over to Sombrero before the auction in 2005.  I

23  don't remember when the good pizza place came in and when the bad

24  pizza place was there.

25  Q.   Did you continue to visit the Sombrero after David Clark
```

1   acquired it through the Cay Clubs organization?

2   A.   I think, yeah.   I think I did, I think the pizza thing was

3   there after that, yeah.

4   Q.   Did you ever see any construction work begin after the auction

5   in 2005 through the time in March of 2006 when you entered into

6   your joint venture contract?

7   A.   No.

8   Q.   Did you ever see any adjustments to the condos in back?

9   A.   No.

10  Q.   How about after you entered into your joint venture agreement

11  in March of 2006?  Did you visit the Sombrero after that as well?

12  A.   Yes.   And no, I saw no work.

13  Q.   Put an end date on it.   When was the last time you were there?

14  A.   Well, I drove by it to go somewhere else in the last few

15  years.

16  Q.   Do you recall the defense asking you about the duration of

17  some of your projects, and I think Mr. Rodriguez even suggested an

18  average of seven years, although you did not necessarily agree

19  with that.   Do you remember those questions?

20          MR. RODRIGUEZ:   Objection, form of the question.

21          MR. WATTS-FITZGERALD:   I'll rephrase it, Your Honor.

22      BY MR. WATTS-FITZGERALD:

23  Q.   Do you remember being asked about how long projects can last?

24  A.   Yes.

25  Q.   Ten years, seven years, different durations, correct?

1    A.   Yes.

2    Q.   And in your experience, how long does it actually take to

3    renovate one room in a project?

4    A.   Oh, I mean, we built -- we just finished a hotel in Key West

5    in December.   Took us 16 months to build the whole hotel from

6    ground up.

7    Q.   So to go vertical, ready for occupancy?   To certificate of

8    occupancy?

9    A.   Yeah, we opened in December.

10   Q.   If you had preexisting structures that you're only going to

11   superficially renovate, and by superficial for the sake of my

12   question, think new countertops, some stainless steel, a nice

13   plasma TV, some pretty furniture.   How long does it take to move

14   in $35,000 worth of furniture?

15        MR. RODRIGUEZ:   Objection, calls for speculation, Your

16   Honor.

17        THE COURT:   I'll permit him to testify based upon his

18   experiences.

19        THE WITNESS:   Months.

20   BY MR. WATTS-FITZGERALD:

21   Q.   Did you ever see any work of that type as opposed to ground-up

22   construction at the Sombrero in all the times you were visiting it

23   over those years?

24        MR. RODRIGUEZ:   Objection.

25        THE WITNESS:   I didn't go in the units so...

1          THE COURT:  What is the objection?  Hold on.  Hold on.

2          MR. RODRIGUEZ:  Objection, assumes facts not in

3     evidence, Your Honor.

4          THE COURT:  Well, the jury will be the best judges of

5     that.  Overruled.

6     BY MR. WATTS-FITZGERALD:

7     Q.  You recall being asked about the involvement of attorneys in

8     preparing some of these documents and reviewing things and

9     transmitting them?

10    A.  Yes.

11    Q.  Do the attorneys make the business decisions for you?

12    A.  No.

13    Q.  Did you understand that the attorneys were making the business

14    decisions for Mr. Clark in entering into the joint venture

15    agreement with you?

16         MR. RODRIGUEZ:  Objection, Your Honor, speculation.

17         THE COURT:  I'll sustain the objection.

18    BY MR. WATTS-FITZGERALD:

19    Q.  By the way, in the meetings early on when you were discussing

20    the transaction that you might enter into with Mr. Clark, did

21    everybody have their attorneys at those preliminary discussions?

22    A.  Yes.

23    Q.  When you went into the deal in March of 2006, and in the

24    preceding discussions, what representations did Mr. Clark make to

25    you about his experience as a developer?

1  A.  The impression I had was he was a very experienced developer.

2  Q.  He told you that?

3  A.  Yes.

4  Q.  Did he cite projects that he had been involved in?

5  A.  The main one he cited was Mariner's.

6  Q.  Do you know what company was the actual developer at

7  Mariner's?

8  A.  I have a vague idea that has Earthmark.  Something like that.

9  Michael Rosen.

10 Q.  You're familiar with Michael Rosen, Earthmark?

11         THE COURT:  You got to speak up a little bit, sir.

12         THE WITNESS:  I'm sorry.  Maybe.  I may have met Michael

13 Rosen.

14         BY MR. WATTS-FITZGERALD:

15 Q.  At the time of the discussion of the deal, did Mr. Clark make

16 any representations to you about his financial circumstances and

17 resources that he could bring to the table?

18 A.  My impression was it was unlimited.

19 Q.  Okay.  Did he indicate whether he had partners and investors?

20 A.  I had the impression he had partners and investors, yes.

21 Q.  Was that or did that strike you as unusual in your business?

22 A.  No.

23 Q.  When you entered the deal and transferred control of the

24 various projects we discussed, that list one through ten in Roman

25 numerals, did any of those require Cay Clubs or any of its

```
 1   entities to take out construction loans to complete work?

 2   A.  No.

 3   Q.  Were you obligated to do that?

 4   A.  It was already being done.

 5   Q.  Do you recall counsel asking you, and this was a discussion

 6   towards the end, the settlement agreement, that there was nothing

 7   out of the ordinary in balancing out the funds due and owing each

 8   side.  Do you recall this conversation?

 9   A.  Yes.

10   Q.  Do you recall the testimony about withholding the rent?

11   A.  Yes.

12   Q.  Your company withheld the rent.

13   A.  Yes.

14   Q.  Was Cay Clubs already in default at the time you did that?

15   A.  Yes.

16   Q.  In fact, they -- the settlement agreement was in August of --

17            MR. RODRIGUEZ:  Objection, Your Honor, leading.

18            THE COURT:  Yes.  You are leading.

19       BY MR. WATTS-FITZGERALD:

20   Q.  When was the settlement agreement actually signed?

21   A.  April of 2008.

22   Q.  When did Cay Clubs actually go in default and you start making

23   demands upon them?

24   A.  August of 2007.

25   Q.  And prior to that, had they missed any of their deadlines or
```

1    requirements?

2    A.   Yes.  And we had done amendments to --

3    Q.   Are you familiar with the term "cure"?

4    A.   Yeah.

5    Q.   What's that mean to you?

6    A.   Well, let's say that, you know, you and I have an agreement

7    that on Tuesday you're going to bring ten lawnmowers to my house,

8    you only bring five.  We write another agreement that says okay,

9    we accept you brought five lawnmowers and next week you'll bring

10   the other five.  Something like that.

11   Q.   Now, in addition to that settlement agreement, did there come

12   a time after the agreement was complete when defendant David Clark

13   approached you and asked you to make further payments to an

14   investor of his?

15   A.   Are you talking about the investment entity that he was --

16            MR. RODRIGUEZ:  Objection, Your Honor, the question --

17            THE COURT:  Hold on a second.

18            MR. WATTS-FITZGERALD:  I can't answer questions.

19            THE WITNESS:  I'm sorry.

20            THE COURT:  What's the objection?

21            MR. RODRIGUEZ:  The objection was he's asking questions

22   and there's a dialogue between the two.

23            THE COURT:  Okay.

24            MR. WATTS-FITZGERALD:  Do you need me to rephrase the

25   question?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1          THE COURT:  Yeah.  Obviously.  Rephrase the question.

2      BY MR. WATTS-FITZGERALD:

3  Q.  After you signed the settlement agreement in early 2008, did

4  there come a time when Mr. Clark approached you to assist him in

5  paying off one of his investors?

6  A.  Yes.

7  Q.  Can you explain that to us.

8  A.  Do you have the agreement?

9          MR. RODRIGUEZ:  Your Honor, this is beyond the scope of

10  cross.

11          THE COURT:  I think it may be.

12          MR. WATTS-FITZGERALD:  I'll leave it at that, Your

13  Honor.

14          THE COURT:  All right.

15          MR. RODRIGUEZ:  And move to strike the answer and

16  question.

17          THE COURT:  What?  You asked him a question, he didn't

18  answer it.  What are you leaving it at?  You're moving on.

19          MR. WATTS-FITZGERALD:  I'm moving on.

20          THE COURT:  Okay.  Let's do that.

21      BY MR. WATTS-FITZGERALD:

22  Q.  Do you recall the question about the ordinary course of

23  business in working out a deal that basically did not come to

24  fruition.

25  A.  Yes.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1   Q.   Was it part of your ordinary course of business to have your

2   business partners divert funds due to your companies or abscond

3   with some of your funds?

4           MR. RODRIGUEZ:  Objection, Your Honor.  Argumentative.

5           THE COURT:  It is argumentative.

6       BY MR. WATTS-FITZGERALD:

7   Q.   Do you recall the exhibit I showed you with the recitation of

8   actions that constituted the defaults of Cay Clubs?

9   A.   Yes.

10  Q.   Was one of those characterized as absconding?

11          MR. RODRIGUEZ:  Objection, Your Honor, argumentative.

12          THE COURT:  No, I don't know that's -- I think he's

13  asking him.  I'll permit the question to be asked.  Was one of the

14  actions that constituted default characterized as absconding?  In

15  the agreement?

16          THE WITNESS:  Yes, sir.

17          THE COURT:  Okay.

18      BY MR. WATTS-FITZGERALD:

19  Q.   Did you ever fail, during the time you were managing the

20  various, I'll call them the Singh entities, to make the required

21  payments due and owing your owners as a result of a leaseback?

22          MR. RODRIGUEZ:  Objection, beyond the scope of cross.

23          THE COURT:  Hold on.  No, I don't think it is.  I'll

24  permit it.  The question is did you ever fail, during the time you

25  were managing the various entities, to make the required payments

1   due and owing your owners as a result of a leaseback?

2           THE WITNESS:  Never.  We always paid everything.

3           MR. WATTS-FITZGERALD:  No further questions, Your Honor.

4   Thank you.

5           THE COURT:  Thank you, sir.  You are excused.

6           THE WITNESS:  Thank you.

7           THE COURT:  For being here.  Not for not putting my name

8   up on the wall of the building.  I was on the first floor, the

9   back, away from the water, as you're facing the front from the

10  back of the building on the left-hand side if you want to put a

11  plaque there.  That's where I was.  At the base legal office.

12  Thank you.

13          Call your next witness, please.

14                         * * * * *

15          (Testimony concluded)

16                  C E R T I F I C A T E
    I certify that the foregoing is a correct transcript from the
17  record of proceedings in the above-entitled matter.

18  _____         /s/ Dawn M. Whitmarsh
    Date                     DAWN M. WHITMARSH, RPR

19

20                      I N D E X

21                      WITNESSES

22  All Witnesses:                                    Page

23          Pritam Singh for Government
    Direct Examination by Mr. Watts-Fitzgerald       3:1
24  Cross-Examination by Mr. Rodriguez            105:19
    Cross-Examination by Mr. Arteaga-Gomez         92:10
25  Redirect Examination by Mr. Watts-Fitzgerald  105:18

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

120

```
 1                        EXHIBITS
 2                  20.01
      In Evidence                              24:15
 3
                    20.04
 4    In Evidence                              46:11

 5                  20.05
      In Evidence                              24:16
 6
                    20.07
 7    In Evidence                              15:1

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**