```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
                         KEY WEST DIVISION
              CASE NO.  13-10034-CR-MARTINEZ/SNOW


  UNITED STATES OF AMERICA,

            Plaintiff,

      vs.
                                           Miami, Florida
                                           December 3, 2015
  FRED DAVIS CLARK, JR.                    Pages 1-186

            Defendant.
  _____



                    TRANSCRIPT OF JURY TRIAL
                TESTIMONY OF FRED DAVIS CLARK, JR.
              BEFORE THE HONORABLE JOSE E. MARTINEZ
                   UNITED STATES DISTRICT JUDGE



  APPEARANCES:

  FOR THE PLAINTIFF:

                      United States Attorney's Office
                      BY:  JERROB DUFFY,  A.U.S.A.
                      BY:  THOMAS WATTS-FITZGERALD, A.U.S.A.
                      99 N.E. 4th Street
                      Miami,  Florida 33132

                      United States Department of Justice
                      Criminal Division Fraud Section
                      BY:  MICHAEL PADULA, A.U.S.A.
                      Bond Building
                      1400 New York Avenue, NW
                      Washington, DC 20530
```

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

```
 1        BY MR. RODRIGUEZ:
 2   Q.   And how did Cay Clubs acquire this office building?
 3   A.   We purchased it with one of our financing partners.
 4   Q.   Why did you have an office building next to the resort?
 5   A.   It was part of the overall redevelopment plan for the
 6   community.
 7   Q.   Could you tell the jury where Cay Clubs expanded from
 8   Clearwater.  The next project.
 9   A.   The next project we did was Sarasota Cay Club, I believe, and
10   Las Vegas Cay Club.  They were almost simultaneously started along
11   with IMG Academy Cay Club.
12   Q.   Could you tell us what Sarasota -- where Sarasota Cay Clubs
13   was located?
14   A.   In Sarasota, Florida.
15   Q.   Was there any particular beach?
16   A.   Sarasota Cay Club was a former motel that was located on a
17   body of water with a deep water marina.
18   Q.   Why did you purchase a former motel or hotel?
19   A.   We were in the redevelopment hospitality business and that was
20   our target market.
21   Q.   Las Vegas, you told us about, what was that?
22   A.   That was an apartment complex that we got transient rental
23   rights for and converted to condominiums for short term stay.
24   Q.   Could you tell the jury what transient rental rights means?
25   A.   Nightly rentals.  You can rent it like a motel.
```

1  Q. Why would that be important?
2  A. That was our business model. We would acquire properties that
3  were in a good location for commercial or transient use and then
4  implement a short term stay program.
5  Q. Did you then move to The Keys?
6  A. We were also expanded development in The Keys, yes.
7  Q. Could you tell the jury the projects in The Keys.
8  A. We had a number of projects in The Keys. We had Key Largo Cay
9  Club, which was an assemblage around the Pilot House Marina. We
10 had Tavernier Cay Club, which was formally the Mangrove Marina
11 site and an assemblage of other properties around it. We had the
12 beginning of Islamorada in The Keys, an assemblage for the
13 Islamorada Cay Club. And then we went to Marathon, Florida. We
14 had the Marathon Marina and assemblage of properties for Marathon
15 Cay Club. We acquired all of Pritam Singh's developed projects in
16 The Keys; Tranquility Bay, Indigo Reef, Coral Lagoon.
17 Q. When you say Pritam Singh's properties, are you referring to
18 the testimony of Mr. Allison earlier in the trial?
19 A. Yes.
20 Q. Was there a joint venture agreement that you had entered into?
21 A. Yes.
22 Q. Could you tell us what your understanding is of that joint
23 venture agreement?
24 A. Pritam was, at the time, interested in retiring and was --
25         MR. DUFFY: Objection, hearsay.

BY MR. RODRIGUEZ:

Q. Just your understanding, sir. I'm sorry. What did the agreement mean to you.

A. We were being transferred the commercial areas and management rights for all of the properties and we took over selling the remaining units and them as well.

Q. Were these high scale or low scale units?

A. They were high-end, very good quality projects, yes.

Q. Were they built out or not?

A. They were built out.

Q. Okay. Regarding that agreement that was in evidence, do you recall the testimony about that agreement?

A. Pritam Singh agreement?

Q. Yes.

A. Yes.

Q. Did you reach a settlement with Mr. Singh at some point thereafter?

A. A settlement to turn the properties back to him?

Q. That's correct.

A. Yes.

Q. Okay. You were asked -- do you recall ever obtaining furniture for the Sombrero Unit, the Sombrero project?

A. We purchased some used furniture from Pritam in order to do a temporary rehab while we were planning the project.

Q. And when you say "while we were planning the project", what

```
 1  project were you referring to?
 2  A.  The Sombrero Cay Clubs.
 3  Q.  What were the plans for Sombrero?
 4  A.  We had acquired all of the remaining condominium units in
 5  Sombrero at an auction; we had acquired an adjacent marina that
 6  was nearby, it was under negotiations with the golf club to add
 7  golf amenities, and we were going to redevelop the existing
 8  entitlements on the site as well as renovate the entire facility.
 9  Q.  Did you ever employ any professionals to assist you in the
10  development stage of these projects?
11  A.  Yes.
12  Q.  Who were they?
13  A.  Internally, we had Tracy Holder.  Tracy was head of
14  development for our company in the Marathon area.  Tracy owned the
15  Ramada Inn in Marathon and was a long time Marathon --
16          MR. DUFFY:  Objection, relevance, nonresponsive.
17  Narrative.
18          THE COURT:  Yeah.  The question was who were they?  At
19  this point is names.
20          THE WITNESS:  Okay.  Just names, I'm sorry.
21          THE COURT:  That's what he asked you.
22      BY MR. RODRIGUEZ:
23  Q.  Could you tell us the names, sir?
24  A.  Tracy Holder was head of development and underneath Tracy was
25  a gentleman by the name of Jeff Pinkus.
```

1 hired him?
2 A. Mr. Callahan began work for us, I think in 1994 back in the
3 Coolidge days, even prior to Earthmark and he drafted contracts
4 and handled closings and was a --
5     MR. DUFFY: Objection, nonresponsive.
6     THE WITNESS: I apologize.
7     MR. RODRIGUEZ: I asked why, Your Honor.
8     THE COURT: I don't think it is responsive. I'll
9 sustain the objection.
10     BY MR. RODRIGUEZ:
11 Q. Was there any specialty for Mr. Callahan?
12 A. He was real estate lawyer.
13 Q. And did you seek the advice of counsel in the decisions in the
14 management decisions at Cay Clubs?
15 A. I always sought the advice of counsel on business activities,
16 yes.
17 Q. What about the advice of accountants? Did you actually ask
18 accountants for advice?
19     MR. DUFFY: Objection, relevance.
20     THE COURT: Sustain the objection.
21     BY MR. RODRIGUEZ:
22 Q. Mr. Schwarz was your one third partner?
23 A. Yes.
24 Q. Okay. Did you ever seek advice from Mr. Schwarz? Did you
25 seek advice from Mr. Schwarz?

1           (Jury out at 10:56 AM)
2           THE COURT:  Be in short recess about ten, 15 minutes.
3    You want to walk him around, that's fine.
4           Please answer the questions to the best of your ability.
5           THE DEFENDANT:  Yes.
6           (Brief recess)
7           THE COURT:  Yes, sir.
8           MR. FOSTER:  Judge, thank you.
9           Judge, this morning I've asked the attorneys for Chuck
10   Phoenix and for Scott Callahan to come to court.  We had
11   subpoenaed both of those gentlemen as witnesses, and I've spoken
12   to both of their attorneys who have told me that if either one of
13   those lawyers, Callahan or Phoenix, were called as a defense
14   witness, they would invoke the 5th Amendment.        Last trial,
15   the way we put that on the record is through the attorneys coming
16   forward to the court to put that on the record and I would like to
17   do that now.  I've asked Mr. Rothman and Mr. Tannenbaum to come
18   forward to advise the court.
19          THE COURT:  Okay.
20          MR. FOSTER:  May they come forward now?
21          THE COURT:  Sure.  If you make them wait here, they get
22   paid by the hour, you know that.  You're cutting them short.
23          MR. ROTHMAN:  By the minute, Judge.
24          THE COURT:  I know.  And the second.
25          Mr. Rothman, who do you represent?

```
1         MR. ROTHMAN:  My client's name is Scott Callahan, Judge.
2         THE COURT:  All right.  And if he were called to the
3   witness stand, what would he do?
4         MR. ROTHMAN:  First I would like to note, Judge, in
5   honor of Yogi Berra, this really is deja vu all over again.
6         THE COURT:  This sounds very familiar but I think I
7   probably need a new record anyway.
8         MR. ROTHMAN: Our position is unchanged.  Mr. Callahan
9   would take the 5th Amendment.
10        THE COURT:  Okay.  Counsel?
11        MR. TANNENBAUM:  Good morning, Your Honor.  Brian
12  Tannenbaum on behalf of Charles Phoenix, and my position is the
13  same as the last trial.  If he was called to testify by the
14  defense, he would invoke his 5th Amendment right to remain silent.
15        THE COURT:  All right.
16        Government, do you have any questions?
17        MR. DUFFY:  No, Your Honor.  Thank you, Your Honor.
18        THE COURT:  All right.  Thank you all very much.  Have a
19  nice day.
20        MR. FOSTER:  Thank you both.  Thank you.
21        THE COURT:  We're done there?  Can we bring the jury in?
22  Wait.
23        We need to have the defendant on the stand.  Now you can
24  bring the jury in.
25        (Jury in at 11:12 a.m.)
```

1  A.   Yes.
2  Q.   Okay.  Did you communicate directly with Scott Callahan about
3  individual loan transactions?
4  A.   Yes.
5  Q.   What about with Mr. Phoenix?  Did you indicate directly with
6  Mr. Phoenix about individual loan applications?
7  A.   Yes.
8  Q.   Did you authorize your lawyers to sign your name?
9  A.   Yes.
10 Q.   Did your lawyers sign your name?
11 A.   Yes.
12 Q.   Do you know approximately how many times you had to sign your
13 name while you worked at Cay Clubs.
14         MR. DUFFY:  Objection, relevance.
15         THE COURT:  I'll permit it.
16         THE WITNESS:  Approximately how many times?
17         THE COURT:  The question was do you know approximately
18 how many times you had to sign your name?  That question calls for
19 a yes or no.
20         THE WITNESS:  No.
21         THE COURT:  Okay.  Move on.
22    BY MR. RODRIGUEZ:
23 Q.   Do you know how many signatures were required per loan
24 application or loan file that you were involved with?
25 A.   I can guess, but I do not know the exact number.

```
 1  But that's besides the point at the moment.
 2          Here, the issue is the economy, and this is an attempt
 3  to get in front of the jury the economy is responsible for what
 4  happened and the charges -- somehow related to the charges, and
 5  the economy is not related to the charges in the indictment.
 6          MR. RODRIGUEZ:  The jury gets to know why Cay Clubs
 7  ended?  I mean, I think that's part of the whole story.  I mean,
 8  that's kind of -- you know, they're saying oh, he committed this
 9  fraud and he only paid payments for a year.
10          MR. DUFFY:  Your Honor, I suppose -- if I may, I suppose
11  one way that the court could rule is you could allow a limited
12  amount of the economy.  The government has already submitted an
13  instruction to the jury, we've requested that the jury be
14  instructed directly.
15          THE COURT:  I don't think this witness is capable of
16  doing a limited amount of anything is the problem, and that's --
17  you know, I'm telling you, I'm going to shut him down.
18          MR. RODRIGUEZ:  I'm trying to be very direct, Your
19  Honor.
20          THE COURT:  I'm going to shut him down if he keeps
21  blabbing.
22          MR. RODRIGUEZ:  Would you give us permission at lunch to
23  tell him to just --
24          THE COURT:  I have not stopped you from talking to him.
25          MR. RODRIGUEZ:  We're not allowed to.
```

1  Q.  Did you get permission from them to have your assistants sign
2  their name on this application?
3  A.  Yes.
4  Q.  Okay.  On this particular application when you had your
5  assistant have them sign their name, did you intend to defraud
6  Chase Bank in any way?
7  A.  Absolutely not.
8  Q.  This particular loan has an application on here, I'm going to
9  go through it real quick so we can see it, and it also has a name.
10 Could you tell us who the name of the person who took this
11 application is.  If you can see.
12 A.  Ross Pickard.
13 Q.  Ross Pickard.  Okay.  Is that -- was he with Chase at the
14 time?
15 A.  He was the Chase Bank officer.
16 Q.  Okay.  And it says a check, telephone.  Do you know what
17 telephone interview means?
18 A.  Ross would call --
19       MR. DUFFY:  Objection, calls for hearsay.
20       THE COURT:  No, he's asking does he know what a
21 telephone interview means, yes or no.
22       MR. DUFFY:  But then the answer, Your Honor.
23       THE COURT:  Yeah.  Well, the answer is, as usual, not
24 the slightest bit responsive to the question.
25       BY MR. RODRIGUEZ:

```
 1            MR. DUFFY:  Objection, relevance.
 2            THE COURT:  I'll sustain that objection.
 3       BY MR. RODRIGUEZ:
 4   Q.   What does copyright 2006 by Phoenix Law Partners, why is that
 5   there?
 6            MR. DUFFY:  Objection, relevance.
 7            MR. RODRIGUEZ:  It's on the document, Your Honor.
 8            THE COURT:  I'll sustain the objection.
 9       BY MR. RODRIGUEZ:
10   Q.   Do you know what this document means?  Do you have any idea
11   what this document means?
12   A.   It's a -- I'm sorry.  Could you put it back up?  That's the
13   joint venture agreement that we reached for me to acquire Pritam's
14   properties.
15   Q.   Okay.  Why did you settle and end the joint venture agreement?
16   A.   Our business had collapsed and I wanted to make sure that the
17   project continued forward unimpeded and settle in a fair manner.
18   Q.   Why didn't you just walk away?
19   A.   Do what?
20   Q.   Why didn't you just walk away?
21   A.   It was the best thing to do at the time for the projects.
22   Q.   Why didn't you just file for bankruptcy?
23   A.   I didn't see a solution to the real estate crisis at the time.
24   Q.   Mr. Schwarz --
25            MR. DUFFY:  Objection.  Nonresponsive, move to strike.
```

```
 1              THE COURT:  I'll sustain the objection.
 2         BY MR. RODRIGUEZ:
 3    Q.   Did you actually have to work with any auditors yourself
 4    personally?
 5    A.   I had very, very limited interaction with the auditors.
 6    Q.   Okay.  Now, I want to take you to the cash to close issue that
 7    has been discussed in this case.
 8              Sir, did you have money directed from your due to-due
 9    from account to be used for the benefit of Anne Marie Drebenstedt,
10    for example, in a real estate transaction?
11    A.   Yes.
12    Q.   What about for Cristal Coleman?
13    A.   Yes.
14    Q.   What about for your mother and father?
15    A.   Yes.
16    Q.   Okay.  Did you inform your counsel that this was your money
17    that was being used from Cay Clubs for these transactions?
18              MR. DUFFY:  Objection, foundation.  Vague.
19              THE COURT:  No, I'll permit it.
20              THE WITNESS:  Of course.
21         BY MR. RODRIGUEZ:
22    Q.   And did you ever receive any advice that you could not do
23    that?
24              MR. DUFFY:  Objection, calls for hearsay.
25              MR. RODRIGUEZ:  State of mind, Your Honor.
```

1                MR. DUFFY:  Leading.

2                THE COURT:  I don't know that state of mind is relevant,

3    is it?

4                MR. RODRIGUEZ:  Yes, Your Honor.  Good faith.

5                THE COURT:  All right.  I'll permit it.

6                THE WITNESS:  I'm sorry.  Say the question one more

7    time.

8          BY MR. RODRIGUEZ:

9    Q.   The question is did you ever receive any advice from any of

10   your lawyers that your method of cash to borrower, the way I just

11   described it, from you for the benefit of your relatives, was

12   improper?

13   A.   No.

14   Q.   Did you ever intend to commit bank fraud by providing the cash

15   to borrower in this method?

16   A.   No.

17   Q.   Likewise on the signature issue, did you advise your counsel

18   that you were having your personnel, Ms. Smith or Ms. Priday, sign

19   names on applications for the benefit of other persons such as

20   your family and friends?

21               MR. DUFFY:  Objection, vague.  Form of the question.

22               THE COURT:  No, I'll permit the question.

23               THE WITNESS:  I regret doing that.

24               THE COURT:  No, no, no, yes or no.

25               THE WITNESS:  I'm sorry?

1       THE COURT:  Did you advise them or did you not advise
2  them?
3       THE WITNESS:  Yes.
4     BY MR. RODRIGUEZ:
5  Q.  And did you give your lawyers all the details of how you had
6  set up these particular loans in order to satisfy the Orion
7  curtail payment?
8  A.  Yes.
9  Q.  Okay.  And when I say details, I mean also the cash to close.
10 A.   We met to discuss the different things that we needed to do
11 in order to meet our short term obligations during this time when
12 we had a cash crunch.  And this was one of the ways that we were
13 dealing with the payment that needed.
14      MR. DUFFY:  Objection, nonresponsive.
15      THE COURT:  I'll sustain that objection.  Jury will
16 disregard the answer so far.
17    BY MR. RODRIGUEZ:
18 Q.  Did you regularly meet with lawyers to discuss these types of
19 transactions?
20 A.  Yes.
21      MR. DUFFY:  Objection, vague as phrased.
22      THE COURT:  I'll permit it.
23    BY MR. RODRIGUEZ:
24 Q.  These real estate transactions.
25 A.  Yes.

```
 1        BY MR. DUFFY:
 2   Q.   You talked about the time period that Cay Clubs ended during
 3   your direct examination, right?
 4   A.   Yes, sir.
 5   Q.   And in your view, what was the date of when Cay Clubs ended?
 6   A.   In hindsight, I guess the middle of October 2007.
 7   Q.   During 2007 after that period of time, you were still selling
 8   units, right?
 9   A.   They weren't my units.  The option contracts were cancelled.
10   I had no ability to deliver a title.
11   Q.   That's not my question.
12   A.   Oh.
13   Q.   After October of 2007, you were still selling units, right?
14   A.   No.  How could I be selling units?  I didn't have the ability
15   to deliver title.  Somebody else did.
16   Q.   You didn't sign any closing documents for the Orlando property
17   after October 2007?
18   A.   No.  I'm sure I did.  I was trying to assist the partners that
19   took back the property with doing the closings they wanted to
20   complete.
21   Q.   And we've -- you were sitting in the courtroom and we all
22   looked at your e-mails with Ricky Stokes concerning leaseback
23   amounts in January of 2008, right?
24   A.   I'd love to look at those e-mails again if you would show the
25   whole string, please.
```

```
 1   Q.   Well, we will.
 2   A.   Good.
 3   Q.   In 2008, you were engaged in selling Cay Clubs assets, right?
 4   A.   I was handling the final disposition of assets for the benefit
 5   of the people that had positions on my properties.  We were going
 6   out of business.
 7   Q.   My question is, in 2008, you were engaged in selling Cay Clubs
 8   assets, correct?
 9   A.   Again, I take exception to the way you're wording the
10   question.
11   Q.   Let me come back to that Government's Exhibit 21S.  This is
12   the Cay Clubs entity structure chart that was introduced earlier
13   in this trial.  Do you see that on the screen?
14   A.   Yes, sir.
15   Q.   And you see that there was this e-mail from David Schwarz to
16   you and others on November 15, 2006, right?
17   A.   Yes, sir.
18   Q.   You would agree that this is an accurate organization
19   ownership structure as of approximately November 15, 2006, right?
20   A.   I don't know the date on that organizational structure.  Is
21   there a date?
22   Q.   Let me ask you the question before I ask you a separate
23   question.
24        Do you agree, yes or no or you don't, that this
25   organizational structure attached to the Schwarz e-mail was an
```