```
 1                   UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2
                     CASE NO. 4:13-CR-10034-JEM-1
 3


 4
     UNITED STATES OF AMERICA            Miami, Florida
 5
                                         Tuesday
 6          vs.                          November 10, 2015

 7

     FRED DAVIS CLARK, JR.
 8                                       Scheduled 9:30 a.m.
                                         9:41 a.m. to 4:47 p.m.
 9   --------------------------------------------------------

10                           JURY TRIAL
                           (PAGES 1 - 232)
11             JURY VOIR DIRE, OPENING STATEMENTS

12           BEFORE THE HONORABLE JOSE E. MARTINEZ
                  UNITED STATES DISTRICT JUDGE
13


14
     APPEARANCES:
15


16
     FOR THE GOVERNMENT:       THOMAS AUSTIN WATTS-FITZGERALD, ESQ.
17                             JERROB DUFFY, ESQ.
                               United States Attorney's Office
18                             99 Northeast 4th Street
                               Miami, Florida  33132
19

20                             MICHAEL D. PADULA, ESQ.
                               U.S. Department of Justice
21                             Criminal Division Fraud Section
                               Bond Building
22                             1400 New York Avenue NW
                               Washington, D.C.  20530
23

24

25
```

```
 1   APPEARANCES (continued):

 2

 3   FOR THE DEFENDANT:        VALENTIN RODRIGUEZ, JR., ESQ.
                               Law Offices Valentin Rodriguez, P.A.
 4                             120 S. Dixie Highway, Suite 204
                               West Palm Beach, Florida  33401
 5
                               TODD FOSTER, ESQ.
 6                             ASHLEY NICOLE RECTOR, ESQ.
                               Todd Foster Law Group
 7                             1881 West Kennedy Boulevard
                               Tampa, Florida  33606
 8

 9                             LINDA MORENO, ESQ.
                               Doughty Street Chambers
10                             Post Office Box 10985
                               Tampa, Florida  33679
11

12

13   STENOGRAPHICALLY:         GLENDA M. POWERS, RPR, CRR, FPR
     REPORTED BY:              Official Federal Court Reporter
14                             United States District Court
                               400 North Miami Avenue
15                             Miami, Florida 33128

16

17

18

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2

 3                                                    PAGE

 4

 5   PROSPECTIVE JURORS VOIR DIRE (continued)

 6      By The Court                                    7

 7

 8   CHALLENGES FOR CAUSE                              97

 9

10   JURY PANEL SWORN                                 121

11

12   PRELIMINARY INSTRUCTIONS TO THE JURY             134

13

14   GOVERNMENT'S OPENING STATEMENT

15      By Mr. Watts-Fitzgerald                       149

16

17   DEFENDANT'S OPENING STATEMENT

18      By Mr. Rodriguez                              186

19

20

21

22

23

24

25
```

```
 1                        E X H I B I T S

 2

 3    EXHIBIT                                    RECEIVED IN EVIDENCE

 4    Government's Exhibits 1A - 1H                       225

 5    Government's Exhibits 2A - 2N                       227

 6    Government's Exhibits 3A - 3G                       227

 7    Government's Exhibits 4A - 4K                       227

 8    Government's Exhibits 5A - 5M                       227

 9    Government's Exhibits 8A & 8B                       227

10    Government's Exhibit 9A                             227

11    Government's Exhibit 10A                            227

12    Government's Exhibit 11A                            227

13    Government's Exhibits 12I -12K                      227

14    Government's Exhibits 13A -13K                      227

15    Government's Exhibits 14A - 14Z                     227

16    Government's Exhibits 15A - 15T                     227

17    Government's Exhibits 16A - 16L                     227

18    Government's Exhibits 17A - 17D                     227

19    Government's Exhibits 18A - 18E                     227

20    Government's Exhibit 20A                            227

21    Government's Exhibits 20C - 20I                     227

22    Government's Exhibits 23A & 24E                     227

23

24

25
```

1          (Call to order of the Court:)

2          COURTROOM DEPUTY:  All rise.  The United States

3   District Court, Southern District of Florida is now in session;

4   the Honorable Jose Martinez presiding.

5          THE COURT:  Please be seated.

6          COURTROOM DEPUTY:  Case 13-10034-CR-Martinez, United

7   States of America versus Fred Davis Clark.

8          Counsel, please state your appearance.

9          MR. DUFFY:  Good morning, Your Honor.  Jerrob Duffy,

10  Thomas Watts-Fitzgerald, Michael Padula for the United States,

11  and our case agent, David Capizola.

12         THE COURT:  Good morning, gentlemen.

13         MR. RODRIGUEZ:  Good morning, Your Honor.  Val

14  Rodriguez, along with Todd Foster, Claudia Pastorius, Linda

15  Moreno and my client.

16         THE COURT:  Good morning.  We're still trying to line

17  up jurors, but I thought I'd wait for them in here.  We may

18  have three jurors missing but we may not.  It's hard to tell

19  because sometimes they don't answer when you call their names.

20  Very frustrating.  You all can be seated.  It will be a couple

21  minutes, I'm sure, before --

22         MR. RODRIGUEZ:  Your Honor, I meant to say Ashley

23  Rector.  This is Ashley Rector, I called her the wrong name, so

24  I'm in trouble.

25         THE COURT:  I've been keeping track of you calling her

 1    the wrong name, but that's all right, don't worry, I'm not

 2    concerned.  She might be, but I'm not.

 3            No, that's fine, thank you.

 4            MR. FOSTER:  Judge, did the lady come back today who

 5    went to pick up her child yesterday?

 6            THE COURT:  I do not know.  I will find out.

 7            Yes, sir, Mr. Watts-Fitzgerald.

 8            MR. WATTS-FITZGERALD:  I'm not smart, Your Honor.

 9            THE COURT:  I thought you were going to talk to me

10    about crawfish or something; you usually do.

11            MR. WATTS-FITZGERALD:  You mean Florida spiny lobster?

12            THE COURT:  That's exactly what I meant.  I actually

13    prefer them to Maine lobster.  I don't like Maine lobster all

14    that much.

15            (Discussion held off the record.)

16            MR. DUFFY:  Your Honor, in this time period, would the

17    Court be inclined to take up the issue of referring to certain

18    individuals referenced in the indictment as co-conspirators

19    and --

20            THE COURT:  No, I will do that later.  I'm not in the

21    mood.

22            MR. DUFFY:  All right.  Understood.

23            THE COURT:  Mr. Rodriguez, tell Wanda to stick her head

24    here, please.

25            Mr. Restrepo, Juror 38, has seen fit to honor us with

1   his presence, so he's on his way up.

2          COURTROOM DEPUTY:  So I will just wait.

3          THE COURT:  Please.

4          COURTROOM DEPUTY:  All right.

5          COURT SECURITY OFFICER:  All rise for the jurors.

6          (Prospective jurors entered courtroom at 9:48 a.m.)

7          THE COURT:  Be seated, please.  Look to your right and

8   look to your left, see if the same people are there.  If not,

9   let me know because it's a lot easier for you to remember one

10  or two people than us.

11         We didn't want to move anybody over, the juror that was

12  sitting there had been excused so I didn't want to move things

13  around and confuse things anymore.  We're going to continue

14  with our questioning, there really aren't that many more to go,

15  but I wanted to welcome you again to our courtroom, and please

16  be on time.  When you're late, everybody has to wait for you

17  and there are a lot of people involved.

18         This next question involves your service on what's

19  called a "petit jury" as opposed a "Grand Jury."

20         A "petit jury" is a trial jury.  This is what a "petit

21  jury" is.  This is a selection process for a trial, petit, or a

22  "petit jury."

23         So let me tell you the question I'm going to ask you,

24  listen to the whole thing:

25         Have you previously served on a petit jury?

1          That question -- you're not serving on a jury now.

2     You're being asked questions to consider -- you are being in

3     the jury selection process.

4          What I mean by "serving on a jury" is, if you were to

5     be selected as one of the jurors and then at the end of the

6     case you were told, you know what, we've decided you're one of

7     the alternates, so you can go home.  That's not serving on a

8     jury.

9          If you actually went back into the jury room and

10    started deliberating and then we called you out and said, you

11    know what, we settled the case, so we don't need you, thank you

12    so much for your service, go home, have a good day, have a

13    great life, that's not serving on a jury.

14         What I mean by serving on a jury is going through this

15    process, hearing the opening statements, hearing the evidence,

16    hearing the closing arguments, hearing the instructions, being

17    sent back into the jury room to deliberate, deliberating and

18    either reaching a verdict or not reaching a verdict.

19         And what we want to ask you about your jury service is

20    very limited.  What happens in your jury room is generally your

21    own business.  It's none of ours.  So I'm going to ask you is,

22    if you did, was it state or federal, was it criminal or civil,

23    was the jury able to reach a verdict, were you the foreperson.

24    That's the only questions we ask you.

25         So starting with the front row here, have you ever

1    previously served on a trial petit jury, anybody there?

2            Anybody in the front row of the jury box?

3            Anybody in the back row?

4            All right.  Pass the microphone over, we'll start with

5    the first gentleman and then we'll -- right here, all right,

6    and then pass it over.

7            PROSPECTIVE JUROR:  My name is --

8            THE COURT:  Yes, sir, please tell us your name again.

9            PROSPECTIVE JUROR:  My name is Sergio Herrera.  I

10   served on a criminal case about two years ago.

11           THE COURT:  Was it the state or federal?

12           PROSPECTIVE JUROR:   I believe it was the state.

13           THE COURT:   The state would be over near Jackson

14   Hospital.

15           PROSPECTIVE JUROR:   Yes.

16           THE COURT:   The federal would be within a block of

17   here.

18           PROSPECTIVE JUROR:   No, it was state.

19           THE COURT:   Was it criminal?

20           PROSPECTIVE JUROR:   It was criminal.  We reached a

21   verdict.

22           THE COURT:   Were you the foreperson?

23           PROSPECTIVE JUROR:   And I was the foreperson.

24           THE COURT:   That's one case you've been on?

25           PROSPECTIVE JUROR:   One case.

1            THE COURT:   Thank you.  Pass the microphone to your

2    right, please.  Yes, sir, please tell us your name.

3            PROSPECTIVE JUROR:   Gerardo Pesina.

4            THE COURT:   And how many times have you served on a

5    jury?

6            PROSPECTIVE JUROR:   One time.

7            THE COURT:   And was it state or federal?

8            PROSPECTIVE JUROR:  State.

9            THE COURT:   Was it civil or criminal?

10           PROSPECTIVE JUROR:   Criminal.

11           THE COURT:   And was the jury able to reach a verdict?

12           PROSPECTIVE JUROR:   Yes, they were.

13           THE COURT:   And were you the foreperson?

14           PROSPECTIVE JUROR:   Yes.

15           THE COURT:   Okay.  Thank you.

16           Yes, sir, please tell us your name.

17           PROSPECTIVE JUROR:   My name is Juan Carballo.

18           THE COURT:   How many times have you served on a jury?

19           PROSPECTIVE JUROR:   One time.

20           THE COURT:   Was it state or federal?

21           PROSPECTIVE JUROR:   Federal.

22           THE COURT:   Was it in this area right here?

23           PROSPECTIVE JUROR:   Yeah.

24           THE COURT:   Was it criminal or civil?

25           PROSPECTIVE JUROR:  It was criminal.

1            THE COURT:   Was the jury able to reach a verdict?

2            PROSPECTIVE JUROR:   Yes, sir.

3            THE COURT:   Were you the foreperson?

4            PROSPECTIVE JUROR:   Yes, sir.

5            THE COURT:   You were the foreperson, you were elected

6    foreperson of the jury?

7            PROSPECTIVE JUROR:   In the jury, no.

8            THE COURT:   That's what I'm asking, I will ask all of

9    you, were you elected to be the foreperson of the jury.  Let

10   me -- you were and you were?

11           PROSPECTIVE JUROR:  Yes.

12           THE COURT:  Okay.  All right.  Thank you, sir.  Pass

13   the microphone.  Anybody in the front row of the audience?

14   There you go.  Please tell us your name again.

15           PROSPECTIVE JUROR:  My name is Cassandra Lord.  I

16   served twice, and both times I serve --

17           THE COURT:  Let's go twice.  Were they both federal or

18   both state or one of each?

19           PROSPECTIVE JUROR:   State, and they were civil.

20           THE COURT:   Over here, on Flagler Street?

21           PROSPECTIVE JUROR:   Uh-huh.

22           THE COURT:   And so on each of those was the jury able

23   to reach a verdict?

24           PROSPECTIVE JUROR:   Yes.

25           THE COURT:   Were you the foreperson in either case?

1          PROSPECTIVE JUROR:   No, I was not.

2          THE COURT:   Okay.  Thank you very much.

3          Anybody else in that row?  If not, pass it back to the

4    row behind you.

5          Yes, sir, tell us your name again, please.

6          PROSPECTIVE JUROR:   My name is Ronnie Britton.

7          THE COURT:   And, sir, how many times have you served

8    on a jury?

9          PROSPECTIVE JUROR:   One time.

10         THE COURT:   Was it state or federal?

11         PROSPECTIVE JUROR:   It was state.

12         THE COURT:   Was it civil or criminal?

13         PROSPECTIVE JUROR:   Civil, sir.

14         THE COURT:   Was the jury able to reach a verdict?

15         PROSPECTIVE JUROR:   Yes, sir.

16         THE COURT:   Were you the foreperson?

17         PROSPECTIVE JUROR:  Yes, I was.

18         THE COURT:   Thank you, sir.  Let me see, anybody else

19   in that row?  If not, pass it back to the row behind you.

20         Okay.  Pass the microphone over, please.

21         Yes, sir.  Tell us your name again.

22         PROSPECTIVE JUROR:   Olavo Gouveia.

23         THE COURT:   And sir, how many times?

24         PROSPECTIVE JUROR:   Just once.

25         THE COURT:   And was it state or federal?

```
 1              PROSPECTIVE JUROR:  State.

 2              THE COURT:   Was it civil or criminal?

 3              PROSPECTIVE JUROR:   Civil.

 4              THE COURT:   Pardon me?

 5              PROSPECTIVE JUROR:   Civil.

 6              THE COURT:   And was the jury able to reach a verdict?

 7              PROSPECTIVE JUROR:   Yes, we did.

 8              THE COURT:   Were you the foreperson?

 9              PROSPECTIVE JUROR:   No.

10              THE COURT:  Thank you, sir.  Anybody else back there?

11    Yes, sir, tell us your name.

12              PROSPECTIVE JUROR:   My name is Sergio Jiron.

13              THE COURT:   And Mr. Jiron, how many times?

14              PROSPECTIVE JUROR:   One.

15              THE COURT:   Was it state or federal?

16              PROSPECTIVE JUROR:  Federal case.

17              THE COURT:   And was the jury able to reach a verdict?

18              PROSPECTIVE JUROR:   Yes, we did.

19              THE COURT:   Were you the foreperson?

20              PROSPECTIVE JUROR:   No, sir.

21              THE COURT:   Okay.  Thank you.  Anybody else back

22    there?  Pass it back, please.

23              Yes, sir, tell us your name again.

24              PROSPECTIVE JUROR:   Jean Rubio.

25              THE COURT:   And Mr. Rubio, how many times have you
```

1   served on a jury?

2             PROSPECTIVE JUROR:   Once.

3             THE COURT:   And was it state or federal?

4             PROSPECTIVE JUROR:   State.

5             THE COURT:   Was it criminal or civil?

6             PROSPECTIVE JUROR:  Civil.

7             THE COURT:   Was the jury able to reach a verdict?

8             PROSPECTIVE JUROR:   Yes, sir.

9             THE COURT:   Were you the foreperson?

10            PROSPECTIVE JUROR:   No, sir.

11            THE COURT:   Thank you.  Pass it back.  Anybody else?

12   Okay.

13            Now hold the microphone, give it to the court security

14   officer.

15            Next question:

16            Have you previously served on a Grand Jury; and if you

17   don't know what a Grand Jury is, you obviously haven't served

18   on one.  Okay.

19            This case involves a company called Cay Clubs

20   International and some of its affiliates.  Have you heard, read

21   or seen anything about that company or its affiliates?

22            Let's start with the back row back there.  Have you or

23   any family members ever owned a business?  In the back row,

24   please stand and tell us your name.  Actually, I thought you

25   already were standing.  You're a big man.

1                   PROSPECTIVE JUROR:   Omar Bailey.

2                   THE COURT:   Yes, sir.  Mr. Bailey, who owned the

3       business?

4                   PROSPECTIVE JUROR:   My father.

5                   THE COURT:   What type of business was it?

6                   PROSPECTIVE JUROR:   It was a barber shop, cosmetology

7       business.

8                   THE COURT:   Is that the only business in your

9       family -- or you and your family?

10                  PROSPECTIVE JUROR:   My friend, I don't know if that

11      applies.

12                  THE COURT:   No, not really.  We will just do family

13      this time.

14                  PROSPECTIVE JUROR:   Yeah, that would be just my

15      father.

16                  THE COURT:   Okay, great.  Next -- pass it over there,

17      there's somebody over there.  Oh, there you go.

18                  Yes, ma'am.  Tell us your name again.

19                  PROSPECTIVE JUROR:   Wendy Morhaim.

20                  THE COURT:   Ms. Morhaim, what's your response to that

21      question?

22                  PROSPECTIVE JUROR:   My father and my brother both were

23      clothing manufacturers.

24                  THE COURT:   Where?

25                  PROSPECTIVE JUROR:   New York.

1           THE COURT:   Okay.  And thank you very much.  Pass the

2    microphone.

3           Yes, ma'am.  Tell us your name again.

4           PROSPECTIVE JUROR:   Sara Fornos.

5           THE COURT:   And what's your response?

6           PROSPECTIVE JUROR:   I have my own business.

7           THE COURT:   What is that business again?

8           PROSPECTIVE JUROR:   Sales, I'm a sales contractor.

9           THE COURT:   Okay.  And what -- tell me again, what do

10   you sell?

11          PROSPECTIVE JUROR:   I'm a representative, I represent

12   different factories, so --

13          THE COURT:   Okay, so you sell whatever you can sell?

14          PROSPECTIVE JUROR:  Yes.

15          THE COURT:   Whatever's legal to sell, you sell?

16          PROSPECTIVE JUROR:  Yep, pretty much.

17          THE COURT:   Thank you.  Pass the microphone.

18          Yes, ma'am.

19          PROSPECTIVE JUROR:   Milagro Mena.

20          THE COURT:   Yes, ma'am.

21          PROSPECTIVE JUROR:   I own a fashion design boutique

22   and I own a hair salon.

23          THE COURT:   Any other members of your family own

24   businesses?

25          PROSPECTIVE JUROR:   No.

1           THE COURT:   Thank you.  Pass it to the row up front --

2    in front of you.  Is there somebody else over there?

3           Who else in the row in front?

4           Don't be shy.  Come on.

5           PROSPECTIVE JUROR:   Good morning.  Ivette Ruiz.

6           THE COURT:  Yes, Ms. Ruiz.

7           PROSPECTIVE JUROR:   My father and my two sisters and

8    my brother own freight forwarding.

9           THE COURT:  Freight forwarding company.  Anybody else

10   in that row?  Let's see, pass it to your right.  There you go.

11   Yes, sir.

12          PROSPECTIVE JUROR:   Ross Holdahl, and my family owns a

13   building supply business.  And I owned a roofing company.

14          THE COURT:   All right.  Thank you, sir.  Anybody else?

15          PROSPECTIVE JUROR:   Barry Wulwick.

16          THE COURT:   Yes, sir.

17          PROSPECTIVE JUROR:   I owned a beer distributorship in

18   the early '90s, an executive gift business in the late '90s, I

19   was a licensed lender from 2006 to 2011 in Florida, I guess

20   that's a business, and that's about it.

21          THE COURT:   Okay.  Anybody else in that row?

22          PROSPECTIVE JUROR:   Berta Rios.

23          THE COURT:   Yes, ma'am.

24          PROSPECTIVE JUROR:   My late grandfather, he owned,

25   like, wholesale in the '60s, '50s.  I don't remember much, I

1    was too young.

2              THE COURT:   Wholesale what?

3              PROSPECTIVE JUROR:   Like, to supermarkets, products.

4              THE COURT:   Produce, okay.

5              PROSPECTIVE JUROR:   Produce, canned goods, but I was

6    really -- '60s, '50s.

7              THE COURT:   Thank you, ma'am.  Anybody else in that

8    row?  If not, let's pass it to the row in the front.  There's a

9    lady, pass it down there, please.

10             Yes, ma'am.

11             PROSPECTIVE JUROR:   Armelle Hosty.

12             THE COURT:   Yes, sir.

13             PROSPECTIVE JUROR:   My father.

14             THE COURT:   Your father?

15             PROSPECTIVE JUROR:   Yes, install shoes, he was selling

16   shoes.

17             THE COURT:   He owned a store that sold shoes?

18             PROSPECTIVE JUROR:   Back home in Haiti.

19             THE COURT:   Back home.  Anybody else?  Pass it over.

20   There you go.  Hello.

21             PROSPECTIVE JUROR:   Miriam Quintero.  My uncle owned a

22   clinic.

23             THE COURT:  Medical clinic?

24             PROSPECTIVE JUROR:   Medical clinic.

25             THE COURT:   Pass it over, please.  Yes, ma'am.

 1            PROSPECTIVE JUROR:   Ynes Pedroso.

 2            THE COURT:   Yes, ma'am.

 3            PROSPECTIVE JUROR:   My sister owns a transportation

 4   for workers' comp patients.

 5            THE COURT:   Okay.  She transports them to and from

 6   wherever they need to go for medical, or what?

 7            PROSPECTIVE JUROR:   Correct, any medical appointments.

 8            THE COURT:   Thank you, ma'am.

 9            PROSPECTIVE JUROR:   You're welcome.

10            THE COURT:   Anybody else?

11            PROSPECTIVE JUROR:   Fred Deno.

12            THE COURT:   Yes, sir.

13            PROSPECTIVE JUROR:   I owned a self-service gas

14   station, Key Largo.  Also, parents owned a real estate business

15   for 30, 40 years.

16            THE COURT:   All right.  Where?

17            PROSPECTIVE JUROR:   Where?  Here in Miami, Miami

18   Springs.

19            THE COURT:   Okay.

20            PROSPECTIVE JUROR:   Highland.

21            THE COURT:   All right.

22            PROSPECTIVE JUROR:   Brother-in-law's owned numerous

23   shopping centers down in Homestead, Florida City.  A hotel,

24   Florida hotel.

25            THE COURT:   Who owned the hotel?

```
 1              PROSPECTIVE JUROR:   My brother-in-laws.

 2              THE COURT:   Your brother-in-law?

 3              PROSPECTIVE JUROR:   Yes.

 4              THE COURT:   Okay.

 5              PROSPECTIVE JUROR:   Numerous businesses down there

 6   they owned.

 7              THE COURT:   Thank you, sir.  Pass the microphone.

 8              PROSPECTIVE JUROR:   Ronnie Britton.

 9              THE COURT:   Yes, sir.

10              PROSPECTIVE JUROR:   We had a landscaping and lawn

11   service.

12              THE COURT:   Company?

13              PROSPECTIVE JUROR:   Yes, sir.

14              THE COURT:   Okay.  Who's "we"?

15              PROSPECTIVE JUROR:   My brothers and I.

16              THE COURT:   Oh, okay.  All right.  Thank you, sir.

17   Pass the microphone.

18              All right.  Next row up.  Yes, ma'am.

19              PROSPECTIVE JUROR:   Therese Lambert.  My son-in-law

20   has a video-type company.  He does lots of music videos.  He

21   actually has done some videos for courts and lawyers.

22              THE COURT:   Okay.

23              PROSPECTIVE JUROR:   And my son, the artist, also has a

24   business involving art.

25              THE COURT:   Okay.  Thank you, ma'am.  Pass the
```

1   microphone.

2            Yes, ma'am.

3            PROSPECTIVE JUROR:  My son-in-law owns a --

4            THE COURT:   Tell us your name again, please.

5            PROSPECTIVE JUROR:   Rebeca Castro.

6            THE COURT:   Yes, Ms. Castro.

7            PROSPECTIVE JUROR:   My son-in-law just opened a

8   pharmacy.  He's a pharmacist.

9            THE COURT:   Okay.  Thank you.

10           Yes, ma'am.

11           PROSPECTIVE JUROR:   Milagros Corvo.

12           THE COURT:   Yes, ma'am.

13           PROSPECTIVE JUROR:   I own my own adult toy novelty

14  E-commerce website.

15           THE COURT:   Okay.  Anybody else in your family that

16  owns a business?

17           PROSPECTIVE JUROR:   No.

18           THE COURT:   Okay.  Thank you.  Pass the microphone.

19           PROSPECTIVE JUROR:   Neil Mooloo.

20           THE COURT:   Yes, sir.

21           PROSPECTIVE JUROR:   My father and brother has a used

22  car dealership and they do used equipment, and I just opened my

23  own business for used car dealership.

24           THE COURT:   Thank you.  Pass the microphone.

25           Yes, sir.

```
1              PROSPECTIVE JUROR:   Edgar Restrepo.  My dad owns real
2    estate in Colombia rented by different businesses.
3              THE COURT:   But his business is renting real estate?
4              PROSPECTIVE JUROR:   Yeah.
5              THE COURT:   Okay.  Thank you.
6              All right.  Did we do it over here already?
7              COURT SECURITY OFFICER:  No, sir.
8              THE COURT:   Start with the back row then.  You or any
9    family members owned a business.  Pass the microphone down,
10   please, whoever wants to talk first.
11             PROSPECTIVE JUROR:  My name is Gerardo Pesina.  Me, my
12   wife and daughters have a small nursery in Homestead for
13   landscape plants.
14             THE COURT:  Thank you, sir.  Pass the microphone.
15             PROSPECTIVE JUROR:   Sergio Herrera, own a State Farm
16   insurance agency for 25 years.
17             THE COURT:   Thank you, sir.
18             PROSPECTIVE JUROR:   Joshua Cardona, my parents used to
19   own a bar and grill here in Miami and my brother currently owns
20   karate and martial arts academies.
21             THE COURT:   Thank you, sir.
22             Anybody else in the front row?
23             PROSPECTIVE JUROR:   Raymond Roger.  My wife and I own
24   a company.
25             THE COURT:   What type of a company?
```

```
 1          PROSPECTIVE JUROR:   Import/export company?

 2          THE COURT:   Import/export company.

 3          PROSPECTIVE JUROR:   Yes.

 4          THE COURT:   Thank you, sir.  Pass the microphone.

 5          Yes, ma'am.

 6          PROSPECTIVE JUROR:   Alexi Richards.  My brother owns

 7    an event company, like music and events, for private and

 8    corporate.

 9          THE COURT:   All right.  Thank you, ma'am.  Pass the

10    microphone.

11          PROSPECTIVE JUROR:   Roberto Mieses-Robleto.  One of my

12    uncles owns a tiling company in The Keys, and another one owns

13    a gas station by Old Cutler.

14          THE COURT:   What is a "timing" company?

15          PROSPECTIVE JUROR:   They do like flooring and they

16    sell other, like, tiles and stuff.

17          THE COURT:   Oh, tiling.  I thought you said "timing."

18          PROSPECTIVE JUROR:  No, no, no.

19          THE COURT:   I was thinking, how do you get paid to keep

20    time on people?  That's good.  There's not a lot of effort.

21    That's great.  Thank you.

22          Pass the microphone, please.

23          PROSPECTIVE JUROR:   Casandra Pastrana.

24          THE COURT:   Go ahead.

25          PROSPECTIVE JUROR:   My grandfather on my dad's side
```

```
 1   owned a plumbing company and my grandparents on my mom's side

 2   own clothing manufacturing.

 3          THE COURT:   Okay.  Thank you, ma'am.  Now, anybody out

 4   here?  All right.  Here we go.

 5          PROSPECTIVE JUROR:   Good morning.  Deborah

 6   Cross-Williams.  My oldest son owns a computer repair shop.

 7          THE COURT:   Okay.  Thank you.

 8          PROSPECTIVE JUROR:   Joseph Simpson, I own a consulting

 9   firm.  Fiance, fiance owns -- previously owned a law practice,

10   civil.  Sister-in-law, accounting firm.  Brother, roofing

11   company.  And father, former -- formerly owned a real estate

12   company.

13          THE COURT:   Okay, thank you, sir.  Pass the

14   microphone.  Anybody else there?  All right.

15          Next question, and we'll start with the front row here.

16          Have any of you ever purchased any real estate?

17   Anybody in the front row?  Purchased real estate?  House,

18   business; anything?  Okay.  Start with there.

19          Tell us your name again.

20          PROSPECTIVE JUROR:   My name is Megan Noicely-Moulton.

21          THE COURT:   How many times have you purchased real

22   estate?

23          PROSPECTIVE JUROR:   Once.

24          THE COURT:   Once?

25          PROSPECTIVE JUROR:   Yeah.
```

```
 1              THE COURT:   And was it made primarily -- was the

 2    purchase done by you or primarily another member of your

 3    household?

 4              PROSPECTIVE JUROR:   By me.

 5              THE COURT:   Did you take out a mortgage?

 6              PROSPECTIVE JUROR:   Yes.

 7              THE COURT:   And have you ever had any real estate that

 8    you owned go through foreclosure?

 9              PROSPECTIVE JUROR:   No.

10              THE COURT:   Okay.   Thank you.

11              Pass the microphone to the lady to your right.

12              Yes, ma'am, tell us your name again.

13              PROSPECTIVE JUROR:   Deborah Cross-Williams.

14              THE COURT:   And, yes, ma'am, would you tell us how

15    many times you've purchased real estate?

16              PROSPECTIVE JUROR:   Once.

17              THE COURT:   And when did you do that?

18              PROSPECTIVE JUROR:   Back in 1992.

19              THE COURT:   And did you -- were you the one that

20    primarily made the purchase or someone else?

21              PROSPECTIVE JUROR:   Yes, I made the purchase.

22              THE COURT:   Did you take out a mortgage?

23              PROSPECTIVE JUROR:  Yes.

24              THE COURT:   Have you ever had any real estate that you

25    owned go through foreclosure?
```

1          PROSPECTIVE JUROR:   No.

2          THE COURT:   Pass the microphone back.  I forgot to ask

3    the lady one thing, the lady next to you.

4          Yes, I forgot to ask you, when did you purchase that

5    real estate?

6          PROSPECTIVE JUROR:   Twenty years ago.

7          THE COURT:   About 20 years ago, that's good enough.

8    Thank you.  Pass the microphone over here.  Somebody else has a

9    response.

10         Yes, sir, tell us your name.

11         PROSPECTIVE JUROR:   Good morning.  My name is Antonio

12   Reyes.

13         THE COURT:   How many times have you purchased real

14   estate?

15         PROSPECTIVE JUROR:   Once.

16         THE COURT:   How long -- when was it?

17         PROSPECTIVE JUROR:   Two years ago.

18         THE COURT:   And were you the one primarily involved or

19   did somebody else in your household primarily do it?

20         PROSPECTIVE JUROR:   Only me.

21         THE COURT:   Did you take out a mortgage?

22         PROSPECTIVE JUROR:  Yes.

23         THE COURT:   And did you -- have you ever had any real

24   estate that you owned go through foreclosure or short sale?

25         PROSPECTIVE JUROR:   No.

1          THE COURT:   Okay.  Thank you, sir.

2          Let's start with the first row in the jury box.

3    Purchase of real estate?  Yes, sir.  What's your name?

4          PROSPECTIVE JUROR:   Raymond Roger.

5          THE COURT:   How long ago was it?  How long ago did

6    this happen that you purchased real estate?

7          PROSPECTIVE JUROR:   Twenty years ago, and the second

8    one was ten years ago.

9          THE COURT:   So you've purchased real estate twice?

10         PROSPECTIVE JUROR:   Twice, yeah.

11         THE COURT:   Once about 20 years ago, once about 10

12   years ago?

13         PROSPECTIVE JUROR:   That's right.

14         THE COURT:  And on both of those, were you the primary

15   purchaser or was someone else in your household the primary

16   purchaser?

17         PROSPECTIVE JUROR:   Yes, sir.

18         THE COURT:   "Yes, sir," what?  I asked you to --

19         PROSPECTIVE JUROR:   I was the primary.

20         THE COURT:   You were the primary, okay.  And did you

21   have -- did you take out a mortgage on each occasion?

22         PROSPECTIVE JUROR:   Yes, I did.

23         THE COURT:   And did either of those pieces of property

24   ever go through foreclosure or short sale?

25         PROSPECTIVE JUROR:   Just one, for short sale.

```
 1              THE COURT:   Which one?

 2              PROSPECTIVE JUROR:   The second one.

 3              THE COURT:   The one, most recent one, the most recent

 4   purchase?

 5              PROSPECTIVE JUROR:   Yes.

 6              THE COURT:   Okay.  Thank you, sir.

 7              PROSPECTIVE JUROR:  Good morning.  Alberto Leal.

 8              THE COURT:   Yes, sir.  How many times have you

 9   purchased real estate?

10              PROSPECTIVE JUROR:   I bought a condo in Naples, 2005.

11              THE COURT:   And is that the only time you purchased

12   real estate?

13              PROSPECTIVE JUROR:   Yes.

14              THE COURT:   And was the purchase primarily made by you

15   or another member of your household?

16              PROSPECTIVE JUROR:   Yes, my wife and I.

17              THE COURT:   And did you take out a mortgage?

18              PROSPECTIVE JUROR:   Yes.

19              THE COURT:   And have you ever had that -- did that go

20   through a foreclosure or short sale?

21              PROSPECTIVE JUROR:   I don't know the legal term, but

22   we lost it.  We didn't pay anymore the mortgage in 2009.

23              THE COURT:   So as far as you know, it went through a

24   foreclosure?

25              PROSPECTIVE JUROR:   I guess.
```

```
1              THE COURT:   Okay.  Did you happen to owe any money
2    afterward?
3              PROSPECTIVE JUROR:   No, we were under the water.  We
4    were -- we paid a lot of money and when we were going to sell,
5    it was half of the price that we pay.
6              THE COURT:   Okay.  Did they -- somebody get a judgment
7    against you that you owed money?
8              PROSPECTIVE JUROR:   Not that I know.
9              THE COURT:   Okay.  Thank you, sir.  Pass the
10   microphone to the next response.  Nobody else?  All right.
11   Then the next row back.
12             PROSPECTIVE JUROR:   My name is Ruben Rodriguez.
13             THE COURT:   How many times have you purchased real
14   estate?
15             PROSPECTIVE JUROR:   Once.
16             THE COURT:   And when was that?
17             PROSPECTIVE JUROR:   In 2000.
18             THE COURT:   And was it made primarily by you or
19   another member of your household?
20             PROSPECTIVE JUROR:   Me and my wife.
21             THE COURT:   Did you take out a mortgage?
22             PROSPECTIVE JUROR:   No.
23             THE COURT:   And have you ever had any real estate go
24   through a foreclosure or short sale?
25             PROSPECTIVE JUROR:   No.
```

```
 1              THE COURT:   Thank you.  Pass the microphone.

 2              PROSPECTIVE JUROR:   Sergio Herrera.

 3              THE COURT:   Yes, sir, how many times?

 4              PROSPECTIVE JUROR:   Six properties.

 5              THE COURT:   And tell me when they were, start with the

 6     first one, if you can, more or less.

 7              PROSPECTIVE JUROR:   Oh, wow, 25 years ago, the last

 8     one, two years ago.

 9              THE COURT:   Okay.  Let's just -- kind of generalize

10     then.

11              PROSPECTIVE JUROR:   Okay.

12              THE COURT:   Have they all been residential?

13              PROSPECTIVE JUROR:   Except one, all residential.

14              THE COURT:   Let's talk about all the residential ones.

15              PROSPECTIVE JUROR:   Okay.

16              THE COURT:   Are you the primary purchaser or --

17              PROSPECTIVE JUROR:  Yes, sir.

18              THE COURT:  -- you and your wife or --

19              PROSPECTIVE JUROR:   Myself.

20              THE COURT:   Yourself.  And did you take out a mortgage

21     on each of them?

22              PROSPECTIVE JUROR:   Yes, except one.

23              THE COURT:   Did any of those go through foreclosure or

24     short sale?

25              PROSPECTIVE JUROR:   No, sir.
```

```
 1              THE COURT:   Let's talk about the commercial property
 2    then.
 3              PROSPECTIVE JUROR:   Okay.
 4              THE COURT:   Was that -- were you the primary
 5    purchaser?
 6              PROSPECTIVE JUROR:   Yes.
 7              THE COURT:   When did that take place?
 8              PROSPECTIVE JUROR:   2007.
 9              THE COURT:   And did you take out a mortgage on that?
10              PROSPECTIVE JUROR:   Yes, sir.
11              THE COURT:   And did that property go through a
12    foreclosure or short sale?
13              PROSPECTIVE JUROR:   No, sir.
14              THE COURT:   Thank you, sir.  Pass the microphone.
15              Yes, sir?
16              PROSPECTIVE JUROR:   My name is Yosvani Suarez.  I own
17    two houses.
18              THE COURT:   Is that the only real estate that you ever
19    purchased, is the two houses that you still own?
20              PROSPECTIVE JUROR:   Yes.
21              THE COURT:   And when did you purchase the first one?
22              PROSPECTIVE JUROR:   Five years ago.
23              THE COURT:   And when did you purchase the second one?
24              PROSPECTIVE JUROR:   Three.
25              THE COURT:   Three years ago?
```

```
 1              PROSPECTIVE JUROR:   Yes.

 2              THE COURT:   Okay.  Were you the primary purchaser or

 3    did somebody else in your household?

 4              PROSPECTIVE JUROR:  Yes, sir, me and my wife.

 5              THE COURT:   You and your wife?

 6              PROSPECTIVE JUROR:   Yes.

 7              THE COURT:   And did you take out a mortgage on both of

 8    them?

 9              PROSPECTIVE JUROR:   No.

10              THE COURT:  No mortgage on either one of them?

11              PROSPECTIVE JUROR:   Yeah, yeah, I'm sorry, yes, on

12    both.

13              THE COURT:   On both of them, you took out a mortgage?

14              PROSPECTIVE JUROR:  Yes, yes.

15              THE COURT:   All right.  Did either of them go through

16    foreclosure or short sale?

17              PROSPECTIVE JUROR:   No.

18              THE COURT:   Thank you.  Pass the microphone.

19              Yes, sir?

20              PROSPECTIVE JUROR:   Gerardo Pesina.  We have two

21    houses.

22              THE COURT:   When did you purchase -- are those two the

23    only ones that you -- the only real estate purchase you ever

24    made?

25              PROSPECTIVE JUROR:   No, I have also a five-acre lot in
```

1   Homestead.

2          THE COURT:   Okay.  Are those three the only purchases

3   of real estate you ever made?

4          PROSPECTIVE JUROR:   Yes, sir.

5          THE COURT:   Which was the first one?

6          PROSPECTIVE JUROR:   First one was the house that I

7   live on 1984.

8          THE COURT:   Were you the primary purchaser or was it

9   you and your wife?

10         PROSPECTIVE JUROR:   Me and my wife, yes.

11         THE COURT:   And did you take out a mortgage?

12         PROSPECTIVE JUROR:   Yes.

13         THE COURT:   And has it been through foreclosure --

14         PROSPECTIVE JUROR:   No, sir.

15         THE COURT:   -- or short sale?

16         PROSPECTIVE JUROR:  No.

17         THE COURT:   All right.  Let's talk about the second

18   property.  Is it a house?

19         PROSPECTIVE JUROR:   A house in Orlando, 2006.

20         THE COURT:   All right.  Who was the primary purchaser?

21         PROSPECTIVE JUROR:   Both of us.

22         THE COURT:   And did you take out a mortgage?

23         PROSPECTIVE JUROR:   Yes, sir.

24         THE COURT:   And was it ever -- did it ever go through

25   a foreclosure?

```
 1              PROSPECTIVE JUROR:   No, sir.

 2              THE COURT:   How about the real estate, the lot?

 3              PROSPECTIVE JUROR:   The real estate, probably, was

 4    1998.

 5              THE COURT:   And who purchased that?

 6              PROSPECTIVE JUROR:   Both of us, sir.

 7              THE COURT:   And did you take out a mortgage?

 8              PROSPECTIVE JUROR:   Yes, I did.

 9              THE COURT:   And were you -- was it ever -- go through

10    foreclosure or short sale?

11              PROSPECTIVE JUROR:   No, sir.

12              THE COURT:   Thank you, sir.  Pass the microphone,

13    please.  Anybody else in that row?  Pass it all the way then.

14              Yes, ma'am.

15              PROSPECTIVE JUROR:   Debra Browning.

16              THE COURT:   Can you hold that up a little bit closer?

17              PROSPECTIVE JUROR:   Debra Browning.

18              THE COURT:   How many times have you purchased real

19    estate?

20              PROSPECTIVE JUROR:   Once.

21              THE COURT:   And when was that?

22              PROSPECTIVE JUROR:   1992.

23              THE COURT:   And did you purchase it by yourself or

24    with someone?

25              PROSPECTIVE JUROR:   My husband and I.
```

1           THE COURT:   Okay.  Did you take out a mortgage?

2           PROSPECTIVE JUROR:   Yes, sir.

3           THE COURT:   Has it been through foreclosure or short

4    sale?

5           PROSPECTIVE JUROR:   No, sir.

6           THE COURT:   Thank you.  Pass the microphone to the

7    court security officer.

8           Let's start at the front row of the audience.

9           Yes, ma'am, tell us your name again.

10          PROSPECTIVE JUROR:   My name is Cassandra Lord.

11          THE COURT:   How many times have you purchased real

12   estate?

13          PROSPECTIVE JUROR:   Twice.

14          THE COURT:   Twice.  Let's talk about the first one,

15   when was that?

16          PROSPECTIVE JUROR:   1996, that was in Cutler Bay.

17          THE COURT:   You purchased a house in 1996 in

18   Cutler Bay?

19          PROSPECTIVE JUROR:   And I sold it, yes.

20          THE COURT:   Did you purchase it or a member of your

21   household participate?

22          PROSPECTIVE JUROR:   Myself and my husband.

23          THE COURT:  And did you take out a mortgage on it?

24          PROSPECTIVE JUROR:   Yes, I did.

25          THE COURT:   And did it ever go through foreclosure or

1    short sale?

2              PROSPECTIVE JUROR:   No, it did not.

3              THE COURT:   Now, the second property that you

4    purchased, when did you purchase that?

5              PROSPECTIVE JUROR:   In '05.

6              THE COURT:   And did you -- was it you and your husband

7    again?

8              PROSPECTIVE JUROR:   Yes, we did.

9              THE COURT:   And did you take out a mortgage?

10             PROSPECTIVE JUROR:   Yes, we did.

11             THE COURT:   And has that been through foreclosure or

12   short sale?

13             PROSPECTIVE JUROR:   No.

14             THE COURT:   All right.   Thank you, ma'am.   Anybody

15   else in that row?

16             Yes, ma'am.

17             PROSPECTIVE JUROR:   Therese Lambert.

18             THE COURT:   How many times have you purchased real

19   estate?

20             PROSPECTIVE JUROR:   Three.

21             THE COURT:   All right.   Let's start with the first

22   one.   When was that, more or less?

23             PROSPECTIVE JUROR:   That would have been in about

24   1980.  In Cleveland.

25             THE COURT:   And did you -- were you the primary

1   purchaser?

2           PROSPECTIVE JUROR:   My ex-husband and I.

3           THE COURT:   Okay.  And did you take out a mortgage?

4           PROSPECTIVE JUROR:   Yes.

5           THE COURT:   And did that property go through

6   foreclosure or short sale?

7           PROSPECTIVE JUROR:  No.

8           THE COURT:   Let's talk about the second one.  When was

9   that?

10          PROSPECTIVE JUROR:   That would have been 1984.

11          THE COURT:   And were you the primary purchaser?

12          PROSPECTIVE JUROR:   My ex and myself.

13          THE COURT:   Okay.  And did you take out a mortgage?

14          PROSPECTIVE JUROR:  Yes.

15          THE COURT:   And did that go through foreclosure or

16   short sale?

17          PROSPECTIVE JUROR:   No.

18          THE COURT:   How about the third property?

19          PROSPECTIVE JUROR:   Third property was bought in

20   2000 -- around 2006.

21          THE COURT:   Okay.

22          PROSPECTIVE JUROR:   And that's my current residence.

23          THE COURT:   And were you the primary purchaser?

24          PROSPECTIVE JUROR:   Yes.

25          THE COURT:   And did you take out a mortgage?

1          PROSPECTIVE JUROR:   Yes.

2          THE COURT:   And has it been through foreclosure or

3    short sale?

4          PROSPECTIVE JUROR:   No, Your Honor.

5          THE COURT:   Okay.   Thank you very much.   Anybody else

6    in that row?   If not -- let's go.   There you go.   Yes, ma'am,

7    tell us your name again.

8          PROSPECTIVE JUROR:   Rebeca Castro.

9          THE COURT:   And Ms. Castro, how many times have you

10   purchased real estate?

11         PROSPECTIVE JUROR:   Two times.

12         THE COURT:   Tell us about the first one, when was

13   that, more or less?

14         PROSPECTIVE JUROR:   1990.

15         THE COURT:   And were you the primary purchaser or was

16   there someone else that was the primary purchaser?

17         PROSPECTIVE JUROR:   My ex-husband.

18         THE COURT:   And did you take out a mortgage?

19         PROSPECTIVE JUROR:   I don't know.   I don't remember

20   what he did.

21         THE COURT:   He dealt with it; it wasn't your doing?

22         PROSPECTIVE JUROR:   Yes.

23         THE COURT:   And do you know if that house went through

24   foreclosure or short sale?

25         PROSPECTIVE JUROR:   No, sir.

1          THE COURT:   Now, the second time --

2          PROSPECTIVE JUROR:   It's an apartment.

3          THE COURT:   Okay.  The second time that you purchased

4    real estate, when was that?

5          PROSPECTIVE JUROR:   In 1993.

6          THE COURT:   And was the -- when was the first one,

7    ma'am.

8          PROSPECTIVE JUROR:   1990, I live in the house.

9          THE COURT:   Were you the primary purchaser of the

10   second one?

11         PROSPECTIVE JUROR:   No, sir.

12         THE COURT:   And who was?

13         PROSPECTIVE JUROR:   He was.  My ex-husband.

14         THE COURT:   Okay.  Do you know if he took out a

15   mortgage?  If you don't know, you don't know.

16         PROSPECTIVE JUROR:   It was a rough time, so I don't

17   know.

18         THE COURT:   And do you know if the house ever went

19   through foreclosure or short sale?

20         PROSPECTIVE JUROR:   Never.  Never.

21         THE COURT:   Thank you, ma'am.  Pass the microphone.

22         PROSPECTIVE JUROR:   Thank you.

23         THE COURT:   Anybody else in that front row?  If not,

24   the second row.

25         Anybody in the second row?  There you go.

1          PROSPECTIVE JUROR:  Hello.

2          THE COURT:  Hello.

3          PROSPECTIVE JUROR:   Luz Osio.

4          THE COURT:   And how many times have you purchased real

5     estate?

6          PROSPECTIVE JUROR:   One time.

7          THE COURT:  And when was that?

8          PROSPECTIVE JUROR:   October 2000.

9          THE COURT:   And did you -- were you the main purchaser

10    or was someone else?

11         PROSPECTIVE JUROR:   My ex-husband and I.

12         THE COURT:   Did you take out a mortgage?

13         PROSPECTIVE JUROR:   Yes, we did.

14         THE COURT:   And did it go through foreclosure or short

15    sale?

16         PROSPECTIVE JUROR:   No.

17         THE COURT:   All right.  So thank you.  That is one

18    time; right?

19         PROSPECTIVE JUROR:   Yes.

20         THE COURT:   Next?  Somebody else?  Anybody else?

21         Pass the microphone, please.

22         PROSPECTIVE JUROR:   Fred Deno.

23         THE COURT:  Yes, sir, how many times?

24         PROSPECTIVE JUROR:   Five homes, one land, two

25    commercial.

```
1              THE COURT:   Let's talk about the land first, it will
2    be easier to get that subject out of the way.
3              When did you purchase the land?
4              PROSPECTIVE JUROR:   I knew you were going to ask me
5    that.   1980, early 80's, '82, '83, I don't know.
6              THE COURT:   Were you the primary purchaser?
7              PROSPECTIVE JUROR:   Me and my wife.
8              THE COURT:   And did you take out a mortgage on it?
9              PROSPECTIVE JUROR:   No.
10             THE COURT:   And do you know if it ever went through a
11   foreclosure or short sale?
12             PROSPECTIVE JUROR:   No.
13             THE COURT:   Let's talk about the two commercial
14   properties.   When was the first commercial property?
15             PROSPECTIVE JUROR:   1984.
16             THE COURT:   All right.   And who was the primary
17   purchaser?
18             PROSPECTIVE JUROR:   Me and my wife.
19             THE COURT:   And did you take out a mortgage?
20             PROSPECTIVE JUROR:   Yes, we did.
21             THE COURT:   And was that -- did that property ever go
22   through foreclosure or short sale?
23             PROSPECTIVE JUROR:   No.
24             THE COURT:   How about the second commercial property?
25             PROSPECTIVE JUROR:   Second commercial --
```

```
1              THE COURT:   Were you the primary purchaser?

2              PROSPECTIVE JUROR:   Yes, I was.

3              THE COURT:   And when was it, more or less?

4              PROSPECTIVE JUROR:   '89, I want to say.

5              THE COURT:  All right.  Did you take out a mortgage?

6              PROSPECTIVE JUROR:   Yes, we did.

7              THE COURT:   Did that property ever go through

8    foreclosure or short sale?

9              PROSPECTIVE JUROR:   No, it did not.

10             THE COURT:   Let's talk about the houses.

11             When is the first house you purchased?

12             PROSPECTIVE JUROR:   '77.

13             THE COURT:   Were you the primary purchaser?

14             PROSPECTIVE JUROR:   Me and my wife.

15             THE COURT:   And did you take out a mortgage?

16             PROSPECTIVE JUROR:   Yes, we did.

17             THE COURT:   And did that house ever go through

18   foreclosure or short sale?

19             PROSPECTIVE JUROR:   No.

20             THE COURT:   Second house you purchased, when was that,

21   more or less?

22             PROSPECTIVE JUROR:   1991, I'd say, somewhere in the

23   early '90s.  I don't know exactly.

24             THE COURT:   Were you the primary purchaser?

25             PROSPECTIVE JUROR:   Me and my wife.
```

```
 1              THE COURT:   Did you take out a mortgage?

 2              PROSPECTIVE JUROR:   Yes, we did.

 3              THE COURT:   Well, let me ask you about all the rest of

 4      them.  What were the other dates?  You got 1991.

 5              PROSPECTIVE JUROR:   '91, the other one was in the

 6      '90s, then the last one was in 2006.

 7              THE COURT:   Any of those properties did you buy

 8      without a mortgage?

 9              PROSPECTIVE JUROR:   No.

10              THE COURT:   So you took out a mortgage on all of them?

11              PROSPECTIVE JUROR:   Yes, I did.

12              THE COURT:   You and your wife were the primary

13      purchasers?

14              PROSPECTIVE JUROR:  That's correct.

15              THE COURT:   And did any of them go into foreclosure or

16      short sale?

17              PROSPECTIVE JUROR:   I have one right now, the latest

18      one down in The Keys, we're going through mitigation right now.

19      I have a date, December 3rd, for mitigation.

20              THE COURT:   And what type of property is that in

21      The Keys?

22              PROSPECTIVE JUROR:   A house.

23              THE COURT:   A house?

24              PROSPECTIVE JUROR:   Yes.

25              THE COURT:   Okay.  All right.  Sir, where is it
```

1    located in The Keys?

2              PROSPECTIVE JUROR:   Ramrod Key, Florida.

3              THE COURT:   Thank you, sir.  Pass the microphone.

4              Hi.

5              PROSPECTIVE JUROR:   Hi, Ynes Pedroso.

6              THE COURT:   Yes, ma'am.  Tell us, how many times have

7    you purchased property?

8              PROSPECTIVE JUROR:   Once.

9              THE COURT:   Approximately, when was it?

10             PROSPECTIVE JUROR:   Twelve years ago.

11             THE COURT:   And who was the primary purchaser?

12             PROSPECTIVE JUROR:   Me and my father.

13             THE COURT:   Did you take out a mortgage?

14             PROSPECTIVE JUROR:   Yes.

15             THE COURT:   And did the property ever go through

16   foreclosure or short sale?

17             PROSPECTIVE JUROR:   No.

18             THE COURT:   All right.  Thank you, ma'am.  Pass the

19   microphone.  Anybody else in that row?

20             If not, how about the row behind?

21             Yes, sir.

22             PROSPECTIVE JUROR:   Sergio Jiron.

23             THE COURT:   And how many times have you purchased

24   land?

25             PROSPECTIVE JUROR:   Once.

```
 1              THE COURT:   Who was the primary purchaser?

 2              PROSPECTIVE JUROR:   Me and my wife.

 3              THE COURT:   And what -- did you take out a mortgage?

 4              PROSPECTIVE JUROR:   Yes.

 5              THE COURT:   And did the property ever go into

 6    foreclosure or short sale?

 7              PROSPECTIVE JUROR:  No.

 8              THE COURT:   Thank you very much.  Pass the microphone.

 9              Yes, sir.

10              PROSPECTIVE JUROR:   Olavo Gouveia.

11              THE COURT:   How many times have you purchased real

12    estate?

13              PROSPECTIVE JUROR:   Four times.

14              THE COURT:   Twelve times?

15              PROSPECTIVE JUROR:   No.  Four.

16              THE COURT:   One time?

17              PROSPECTIVE JUROR:   No.  Four.  I wish, 12.

18              THE COURT:   I thought we'd be here awhile.

19              Were they all homes?

20              PROSPECTIVE JUROR:   Yeah, two apartments and two

21    house.

22              THE COURT:   Okay, but they're all residential?

23              PROSPECTIVE JUROR:   Yes.

24              THE COURT:   Okay.  Who was the primary purchaser on

25    all of them?
```

1            PROSPECTIVE JUROR:   Myself.

2            THE COURT:   You, alone?

3            PROSPECTIVE JUROR:   Yeah.

4            THE COURT:   And did you take out a mortgage on all of

5    them?

6            PROSPECTIVE JUROR:   Just the first one, and when my

7    father passed away in 2006, I paid that mortgage and I bought

8    two more.  Five years ago, I bought something cash.

9            THE COURT:   Okay.  The one that you took a mortgage

10   out on, did it ever go through foreclosure or short sale?

11           PROSPECTIVE JUROR:   No, I paid off like in five years.

12           THE COURT:   Okay.  So you purchased four residential

13   properties?

14           PROSPECTIVE JUROR:   Yes.

15           THE COURT:   Two apartments, two homes, you were the

16   primary purchaser, you only took a mortgage out on the first

17   one, and you paid it off early so none of them have ever had

18   foreclosures or short sales?

19           PROSPECTIVE JUROR:   No.

20           THE COURT:   Is that correct?

21           PROSPECTIVE JUROR:   Yeah.

22           THE COURT:   Thank you, sir.  Pass the microphone.  I'm

23   not trying to cut you short but, you know, we've all got lives,

24   so I want to keep moving on.  Thank you.

25           Yes, ma'am.

1           PROSPECTIVE JUROR:   Armelle Hosty.

2           THE COURT:   And how many times have you purchased real

3    estate?

4           PROSPECTIVE JUROR:   Once.

5           THE COURT:   And when was that?

6           PROSPECTIVE JUROR:   2002.

7           THE COURT:   And was it -- were you the primary

8    purchaser?

9           PROSPECTIVE JUROR:   Yes, and my mother-in-law.

10          THE COURT:   You and your mother-in-law?

11          PROSPECTIVE JUROR:   My husband.

12          THE COURT:   And did you take out a mortgage?

13          PROSPECTIVE JUROR:   Yes.

14          THE COURT:   Did that property ever go into foreclosure

15   or short sale?

16          PROSPECTIVE JUROR:   No.

17          THE COURT:   Thank you, ma'am.  Pass the microphone,

18   please.

19          PROSPECTIVE JUROR:   Ivette Ruiz.

20          THE COURT:   Yes, ma'am.  How many times have you

21   purchased real estate?

22          PROSPECTIVE JUROR:   Twice.

23          THE COURT:   Talk about the first one, a home?

24          PROSPECTIVE JUROR:   In 1990, home, yes.

25          THE COURT:   Were you the primary purchaser?

1              PROSPECTIVE JUROR:   Me and my husband.

2              THE COURT:   And did you take out a mortgage?

3              PROSPECTIVE JUROR:   Yes.

4              THE COURT:   And did the house ever go into foreclosure

5    or short sale?

6              PROSPECTIVE JUROR:   No.

7              THE COURT:   Let's talk about the second one.

8              When was that?

9              PROSPECTIVE JUROR:   2000.

10             THE COURT:   And who was the primary purchaser?

11             PROSPECTIVE JUROR:   Me and my husband.

12             THE COURT:   And did you take out a mortgage?

13             PROSPECTIVE JUROR:   Yes.

14             THE COURT:   And did it ever go into foreclosure?

15             PROSPECTIVE JUROR:   No.

16             THE COURT:   Thank you, ma'am.  Pass the microphone,

17   please.

18             Hello.

19             PROSPECTIVE JUROR:   Hello.  Good morning.  My name is

20   Maria Pedreno.

21             THE COURT:   How many times have you purchased real

22   estate, Ms. Pedreno.

23             PROSPECTIVE JUROR:   Twice.

24             THE COURT:   Let's talk about the first one.

25             When was that, more or less?

1          PROSPECTIVE JUROR:   The first one was in 2000.

2          THE COURT:   Were you the primary purchaser.

3          PROSPECTIVE JUROR:   My ex-husband and myself.

4          THE COURT:   Okay.  And did you take out a mortgage?

5          PROSPECTIVE JUROR:   Yes.

6          THE COURT:   And did that house ever go into

7   foreclosure or short sale?

8          PROSPECTIVE JUROR:   No.

9          THE COURT:   Let's talk about the second one.

10         When was that?

11         PROSPECTIVE JUROR:   The second one was in 2005, I

12  believe it was, with my ex-boyfriend and myself.

13         THE COURT:   So this second time, it was you and your

14  boyfriend?

15         PROSPECTIVE JUROR:   Yes.

16         THE COURT:   And this is the guy you got a restraining

17  order against; right?

18         PROSPECTIVE JUROR:   Yes, that's correct.

19         THE COURT:   Okay, good.  Did you take out a mortgage?

20         PROSPECTIVE JUROR:   Yes.

21         THE COURT:   And did that house ever go into

22  foreclosure or short sale?

23         PROSPECTIVE JUROR:   No.

24         THE COURT:   Okay.  Thank you, ma'am.  Pass the

25  microphone, please.

1          Yes, sir, tell us your name.

2          PROSPECTIVE JUROR:   Ross Holdahl.

3          THE COURT:   And what is -- how many times have you

4  purchased property?

5          PROSPECTIVE JUROR:   Numerous.  Starting in 1980.

6          THE COURT:  Starting in 1980, many, many?

7          PROSPECTIVE JUROR:   Many, many.

8          THE COURT:   Residential and what?

9          PROSPECTIVE JUROR:   Commercial.

10          THE COURT:   Both residential and commercial.  Give me

11  a ballpark of which way it goes?  I mean, half residential,

12  half commercial, or what?

13          PROSPECTIVE JUROR:   Apartments, condos, house.

14          THE COURT:   Did you take out mortgages on all of them?

15          PROSPECTIVE JUROR:   Yes.

16          THE COURT:   And were you the primary purchaser?

17          PROSPECTIVE JUROR:   Yes.

18          THE COURT:   And did any of them go into foreclosure or

19  short sale?

20          PROSPECTIVE JUROR:   Yes.

21          THE COURT:   How many of them?

22          PROSPECTIVE JUROR:   The whole batch.

23          THE COURT:   All of them?

24          PROSPECTIVE JUROR:   Yeah.

25          THE COURT:   Was this like a one-package deal, you

1   bought a whole bunch at one time?

2           PROSPECTIVE JUROR:   No, grew too fast and

3   over-leveraged.

4           THE COURT:   I'm not sure we need to know anymore.  I

5   appreciate it.  Thank you very much.

6           Yes, sir, tell us your name.

7           PROSPECTIVE JUROR:   Barry Wulwick.

8           THE COURT:   And how many times have you purchased real

9   estate?

10          PROSPECTIVE JUROR:   I bought two houses.

11          THE COURT:   And tell me about who was the primary

12  purchaser?

13          PROSPECTIVE JUROR:   My wife and myself.

14          THE COURT:   And did you take out a mortgage?

15          PROSPECTIVE JUROR:   Yes, 1994, in New York, and 2001,

16  in North Miami Beach.

17          THE COURT:   And did any of them ever go through

18  foreclosure?

19          PROSPECTIVE JUROR:   No, sir.

20          THE COURT:   Thank you, sir.  Pass the microphone,

21  please.

22          Hello.

23          PROSPECTIVE JUROR:   Berta Rios.

24          THE COURT:   Ms. Rios, how many times have you

25  purchased real estate?

1           PROSPECTIVE JUROR:   Once.

2           THE COURT:   When was that?

3           PROSPECTIVE JUROR:   2004.

4           THE COURT:   Were you the primary purchaser?

5           PROSPECTIVE JUROR:   Yes.

6           THE COURT:   And did you take out a mortgage?

7           PROSPECTIVE JUROR:  Yes.

8           THE COURT:   Did the property go into foreclosure or

9    short sale?

10          PROSPECTIVE JUROR:   No.

11          THE COURT:   Thank you.  Pass the microphone.

12          Back row.  Hello.

13          PROSPECTIVE JUROR:   Hi, Wendy Morhaim.

14          THE COURT:   Yes, ma'am.

15          How many times have you purchased real estate?

16          PROSPECTIVE JUROR:   Two houses and some land.

17          THE COURT:   All right.  How many times have you

18   purchased land?

19          PROSPECTIVE JUROR:   Once.

20          THE COURT:   Vacant land.  Once, okay.  So let's talk

21   about the land first.  When did you purchase that?

22          PROSPECTIVE JUROR:   Somewhere near Naples, I have no

23   idea.  My husband did --

24          THE COURT:   No.  When?

25          PROSPECTIVE JUROR:   Oh, when?

```
1              THE COURT:   Yes.

2              PROSPECTIVE JUROR:   Maybe ten years ago.

3              THE COURT:   Were you the primary purchaser of it?

4              PROSPECTIVE JUROR:   My husband.

5              THE COURT:   And what -- was a mortgage taken out?

6              PROSPECTIVE JUROR:   No.  Cash.

7              THE COURT:   And so it wouldn't have gone into

8     foreclosure.  Let's talk about the houses.

9              When was the first one?

10             PROSPECTIVE JUROR:   Okay.  The first house was in

11    1979, we bought it together, we took out a mortgage, sold that

12    house.

13             THE COURT:   All right.  Did you -- did the house ever

14    go into foreclosure or short sale?

15             PROSPECTIVE JUROR:   No.

16             THE COURT:   How about the second one?

17             PROSPECTIVE JUROR:   The second house, I think, was

18    around 2007, my husband and I, mortgage; no foreclosure, we

19    still own it.

20             THE COURT:   Okay.  Thank you, ma'am.

21             Pass the microphone to your left.

22             PROSPECTIVE JUROR:   I have a question.

23             THE COURT:   Yes, ma'am, I have an answer, maybe, but

24    what is the question?

25             PROSPECTIVE JUROR:   I hope so.  Cemetery plots, do you
```

1   consider that real estate?

2        THE COURT:   No.  Try to sell them and you'll find out.

3   It really is kind of strange, they have a funny feeling that

4   they still own it even though you paid for it.

5        Yes, ma'am.  Please tell us your name.

6        PROSPECTIVE JUROR:   Sara Fornos.

7        THE COURT:   And how many times have you bought?

8        PROSPECTIVE JUROR:   Twice.

9        THE COURT:   And let's talk about the first one.

10       When was that, more or less?

11       PROSPECTIVE JUROR:   2000.

12       THE COURT:   And were you the primary purchaser?

13       PROSPECTIVE JUROR:   My husband and I.

14       THE COURT:   And did you take out a mortgage?

15       PROSPECTIVE JUROR:   Yes.

16       THE COURT:   And did the house ever -- did the property

17   ever go into foreclosure or short sale?

18       PROSPECTIVE JUROR:   No.

19       THE COURT:   When was the second one?

20       PROSPECTIVE JUROR:   In 2004.

21       THE COURT:   And were you the primary purchaser?

22       PROSPECTIVE JUROR:   My husband and I.

23       THE COURT:   And did you take out a mortgage?

24       PROSPECTIVE JUROR:   Yes.

25       THE COURT:   Same question, did it go into foreclosure

1    or short sale?

2              PROSPECTIVE JUROR:   No.

3              THE COURT:   Anybody else?  Yes, sir.

4              PROSPECTIVE JUROR:   Jean Rubio.   Three properties.

5              THE COURT:   Let's start with the first one, when was

6    that, more or less?

7              PROSPECTIVE JUROR:   It was around 2000.

8              THE COURT:   And what did you -- were you the primary

9    purchaser?

10             PROSPECTIVE JUROR:   Yes, sir, in all three.

11             THE COURT:   And in all three, did you take out a

12   mortgage?

13             PROSPECTIVE JUROR:   All three, I took out a mortgage.

14             THE COURT:   Any of them go into foreclosure or short

15   sale?

16             PROSPECTIVE JUROR:   One went into short sale.

17             THE COURT:   Which one?

18             PROSPECTIVE JUROR:   The last one that I purchased in

19   2008.

20             THE COURT:   So the latest one?

21             PROSPECTIVE JUROR:   The latest one, correct.

22             THE COURT:   All right.  Thank you.  Pass the

23   microphone, please.

24             Anybody else?

25             PROSPECTIVE JUROR:   Deborah Del Valle.

```
 1              THE COURT:   Yes, ma'am, how many times?

 2              PROSPECTIVE JUROR:   Two properties.

 3              THE COURT:   Were you the primary purchaser?

 4              PROSPECTIVE JUROR:   My husband and I.

 5              THE COURT:   And were they both the same?

 6              In other words, did you have mortgages on both of them?

 7              PROSPECTIVE JUROR:   Yes.

 8              THE COURT:   And did you -- did either one of them go

 9      into foreclosure or short sale?

10              PROSPECTIVE JUROR:   No.

11              THE COURT:   And what was the date?  You told me but I

12      forgot.

13              PROSPECTIVE JUROR:   2001 and 2003.

14              THE COURT:   Okay, thank you.  Pass the microphone,

15      please.

16              Anybody else?  Okay, pass it back.

17              All right.  Next question.

18              If you already told us this, you don't have to tell us

19      again, but have you or any of your family members ever lost

20      money in a real estate investment?

21              Start with the back row.  As I said, if you already

22      told us, you don't have to repeat it.  Last row.

23              Okay.

24              PROSPECTIVE JUROR:   Wendy Morhaim.

25              THE COURT:   Yes, ma'am.
```

1          PROSPECTIVE JUROR:   On the land my husband bought.

2          THE COURT:   He lost money on that?

3          PROSPECTIVE JUROR:   Everything, yeah, whatever he

4    invested.

5          THE COURT:   Okay.  Thank you, ma'am.

6          Pass it that way, please.

7          PROSPECTIVE JUROR:   Jean Rubio.

8          THE COURT:   Yes.

9          PROSPECTIVE JUROR:   My parents invested in some

10   apartments back in 2009, and the same thing, they lost

11   everything, pretty much.

12         THE COURT:   Okay.  Thank you.

13         PROSPECTIVE JUROR:   Milagro Mena, my mother had a

14   condominium in New York and she lost it.  She just moved.

15         THE COURT:   Okay, she just moved out and left it?

16         PROSPECTIVE JUROR:   She moved and she left it.

17         THE COURT:   How did she lose money on it then?

18         PROSPECTIVE JUROR:   Because there was, like, a fire in

19   the apartment, and then she didn't claim it.

20         THE COURT:   Okay.  Thank you, ma'am.

21         PROSPECTIVE JUROR:   So I think they got -- the

22   treasurer has the money, I don't know.

23         THE COURT:   Anybody in the next row up?  Yes, sir.

24         PROSPECTIVE JUROR:   Ross Holdahl.

25         THE COURT:   And what did you lose money on?

```
 1              PROSPECTIVE JUROR:   The investment.

 2              THE COURT:   All the stuff, all the investment that you

 3    made?

 4              PROSPECTIVE JUROR:   Right.

 5              THE COURT:   Like I said, if you already told us, you

 6    don't need to tell us again.   I'm not meaning to say anybody in

 7    particular but, anybody else?

 8              PROSPECTIVE JUROR:   In Minnesota.

 9              THE COURT:   Thank you, sir.  Anybody else?

10              PROSPECTIVE JUROR:   Ivette Ruiz.

11              THE COURT:   Yes, ma'am.

12              PROSPECTIVE JUROR:   My two brothers lost two houses

13    and my sister.

14              THE COURT:   Okay.  What do you mean, they lost the

15    houses?

16              PROSPECTIVE JUROR:   Well, they couldn't pay -- afford

17    it.

18              THE COURT:   I thought they went out drinking one night

19    and couldn't find their house.  They didn't lose it that way.

20    Two brothers and a sister?

21              PROSPECTIVE JUROR:   Yes.

22              THE COURT:   Through foreclosure?

23              PROSPECTIVE JUROR:   Yes.

24              THE COURT:   Thank you.  Anybody else?

25              PROSPECTIVE JUROR:   Armelle Hosty.
```

 1          THE COURT:   Yes, ma'am.

 2          PROSPECTIVE JUROR:   My father was putting some money,

 3     I remember, in some bank, and I think the banker left Haiti and

 4     went to another country.

 5          THE COURT:   That wouldn't be property, lost money on

 6     property.

 7          PROSPECTIVE JUROR:   It's money, it's money.

 8          THE COURT:   I know it's money; don't misunderstand me,

 9     I'm not minimizing that, but it's not -- what I'm talking about

10     is lost money on a real estate transaction, okay?

11          PROSPECTIVE JUROR:   No.

12          THE COURT:   Anybody else?  All right.  Row up -- the

13     next row up.  Yes, sir?

14          PROSPECTIVE JUROR:   Fred Deno.

15          THE COURT:   Yes, sir.

16          PROSPECTIVE JUROR:   Yes, I lost on two of my

17     investments, the land and one in the commercial pieces, not

18     foreclosure, just sold it for a loss.

19          THE COURT:   Okay.  Thank you, sir.

20          Yes, sir.

21          PROSPECTIVE JUROR:   My brother-in-law and family this

22     last go-around lost a whole lot of money.

23          THE COURT:   All right.  Thank you, sir.  Anybody else?

24     Anybody in the front row?

25          Anybody in the row?  All right.  Pass it over here.

1          PROSPECTIVE JUROR:   Therese Lambert.  I don't know

2    whether this counts, but two of my siblings own property

3    together and one ended up suing the other over --

4          THE COURT:   That's always a shame but -- it happens.

5          PROSPECTIVE JUROR:   -- over the exchange of money.

6          THE COURT:   Thank you, ma'am.  Okay.  Anybody else?

7          PROSPECTIVE JUROR:   Edgar Restrepo, and my parents

8    lost the property due to foreclosure.

9          THE COURT:   And they lost money on the deal?

10         PROSPECTIVE JUROR:   Yes.

11         THE COURT:   Okay.  Thank you, sir.  All right.

12   Anybody in the back row of the jury box lost money on a real

13   estate transaction?  A real estate investment?

14         The front row of the jury box?

15         Outside the jury box?

16         Okay.  Next question:

17         Have any of you taken any courses in accounting,

18   bookkeeping, banking or finance?  Starting with the front row,

19   if you already told us about it, you don't need to tell us

20   again.

21         For example, the tax preparer doesn't need to say that

22   she took -- but if you had not mentioned it and you had courses

23   in accounting, bookkeeping, banking or financing.

24         Front row?  There you go.  Yes, sir?

25         PROSPECTIVE JUROR:   Ricardo Rubio, and I mentioned

1    that I'm a bank teller for TD Bank, so I had to take courses on

2    fraud detection, transactions, tellers, financial service

3    representatives and customer service representatives.

4              THE COURT:   Okay.  Thank you, sir.

5              PROSPECTIVE JUROR:   No problem.

6              THE COURT:   Anybody else?  Anybody in the back row?

7    Yes, sir.

8              PROSPECTIVE JUROR:   Sergio Herrera.  I'm a Series 6

9    broker and State Farm banking certified.

10             THE COURT:   Okay.  Thank you, sir.

11             Anybody in the front row out there?

12             Second row?  All right, there you go.  Get these

13   security officers fit as a fiddle.   Make them walk around.

14             PROSPECTIVE JUROR:  Eric Barrios, in between being a

15   supervisor and a facility manager --

16             THE COURT:   At BankUnited Center, I know.

17             PROSPECTIVE JUROR:   Yeah, but prior to that, just

18   prior to that, I was the regional bookkeeper for a month, you

19   know, so I got to do a lot of auditing for a little while.

20             THE COURT:   Thank you, sir.  Anybody else in that row.

21   There you go.

22             PROSPECTIVE JUROR:   Berta Rios.

23             THE COURT:   Yes, ma'am.

24             PROSPECTIVE JUROR:   I took managerial accounting and

25   financial accounting when I was doing my Master's degree.

1          THE COURT:   Anybody else in that row?

2          PROSPECTIVE JUROR:   Barry Wulwick.  I took a lot of

3     finance courses in college.  Like I said, I was a licensed

4     lender, so I had to take the -- to keep my license, the 14

5     hours every couple of years.

6          THE COURT:   Did your finance teachers have any basic

7     knowledge?  Mine were all esoteric stuff, I don't think they

8     could buy their way out of -- I don't think they could work in

9     a 7-Eleven.

10         Go ahead.

11         PROSPECTIVE JUROR:   Ross Holdahl, and I took economics

12    in business college, accounting.

13         THE COURT:  All right.  Thank you, sir.  Anybody else

14    in that row?  All right, if not, pass it back.

15         Pass it to the row behind you, please.  We will get it

16    over there.  We're going to get you your own microphone.

17         PROSPECTIVE JUROR:   Milagro Mena.  I did took a

18    bookkeeping course and I work as a credit manager.

19         THE COURT:   Thank you.  Anybody else in that back row?

20    There you go.

21         PROSPECTIVE JUROR:   Jean Rubio.  I took a lot of -- in

22    college, I took a lot of accounting classes as well.

23         THE COURT:   Okay, great.  Thank you.

24         Pass the microphone.

25         PROSPECTIVE JUROR:   Sara Fornos.  I'm a business

1    major, so I've taken accounting.

2              THE COURT:    Thank you.

3              PROSPECTIVE JUROR:  Omar Bailey.

4              THE COURT:    Yes, sir.

5              PROSPECTIVE JUROR:    I took Accounting I and II in

6    college and economics.

7              THE COURT:    Thank you, sir.  Pass microphone back to

8    the court security officer.

9              Last question -- I shouldn't say that because every

10   time a lawyer says that I get -- I laugh at them because they

11   always have more than one, and I do, too, but I only have a

12   couple more.

13             Do any of you have any physical, emotional or language

14   problems that would make it difficult for you to participate as

15   a juror?  If you do, I need to hear about it now.

16             Pass the microphone to the lady in the back row.

17             PROSPECTIVE JUROR:    Maria Diaz.

18             THE COURT:  Yes, ma'am.

19             PROSPECTIVE JUROR:    I don't understand everything that

20   you say.

21             THE COURT:    Do you know what, I don't understand

22   everything that I say, so... I don't think that that's

23   necessarily bad.

24             You're better off not understanding everything that I

25   say.  You understand pretty well.

1          PROSPECTIVE JUROR:   Not only you, I understand --

2          THE COURT:   I will tell you, you have a heavy accent.

3    My father had a heavier accent and he managed to put me through

4    private schools and the University of Miami undergraduate and

5    law school, which were not cheap.

6          I think you probably would do all right, but I

7    appreciate your bringing that to my -- besides which, you

8    understood my question when I said, do you have any physical,

9    emotional or language problems, which is a clue.

10          PROSPECTIVE JUROR:   I understand a lot, maybe 50

11    percent, not 100 percent.

12          THE COURT:   I appreciate that, thank you for telling

13    us, though.

14          Anybody else in that back row?   There's a couple.

15          Okay.   Anybody in the row in front of that?   There you

16    go.   That's where I saw the hands.

17          Yes, ma'am.

18          PROSPECTIVE JUROR:   Maria Pedreno.

19          THE COURT:   Yes, ma'am.

20          PROSPECTIVE JUROR:   Well, I have a major heart

21    operation in 2001, and I have atrial fibrillation, which is

22    taking very high-risk medication, that's how I can still pay

23    bills, so I have to be checked every two weeks by my

24    cardiologist because I -- this kind of Coumadin and stuff like

25    that.

```
 1                THE COURT:   Where do you go to be checked?

 2                PROSPECTIVE JUROR:  For the blood, blood check, the

 3     Coumadin.

 4                THE COURT:   Where do you go?

 5                PROSPECTIVE JUROR:   To my cardiologist.

 6                THE COURT:   Where?

 7                PROSPECTIVE JUROR:   In Alhambra.

 8                THE COURT:   Alhambra Circle in Coral Gables?

 9                PROSPECTIVE JUROR:   Yes, that's correct.  My doctor is

10     Fernando Hernandez.  He's taking care of me from my operation.

11                THE COURT:   Don't worry, we will work it out.

12                I've had open heart surgery, too.  I don't have to go

13     every two weeks.  They've ruined my chest-modeling career.

14                PROSPECTIVE JUROR:  That's the reason why I joined the

15     program from the Federal Government, the tele-work, I work from

16     home, and that's the reason.

17                THE COURT:  Unfortunately, we don't allow tele-working

18     for jurors, it doesn't work.  Thank you, ma'am.

19                PROSPECTIVE JUROR:   Ivette Ruiz.

20                THE COURT:   Yes, ma'am.

21                PROSPECTIVE JUROR:   After I had my employees steal

22     from me, I was very emotional and I'm taking medication, high

23     blood pressure, and I've been going every month-and-a-half to

24     see my doctor.

25                THE COURT:  We will work around that, we can arrange
```

1   that.  We can work around that.

2          Yes, ma'am.

3          PROSPECTIVE JUROR:  Armelle Hosty.

4          THE COURT:   Yes, ma'am.

5          PROSPECTIVE JUROR:   It's the language barrier.

6          THE COURT:   You're Haitian?

7          PROSPECTIVE JUROR:   I'm Haitian.

8          THE COURT:   So is Wanda, and she does really well.

9          PROSPECTIVE JUROR:  I have a strong accent, like a

10  French accent.

11         THE COURT:   We're not going to ask you to make any

12  speeches, and you are understanding pretty well, but I

13  appreciate you bringing it to our attention.

14         Thank you very much.

15         PROSPECTIVE JUROR:   Sometimes it's hard for people to

16  understand me.

17         THE COURT:   Do you know what, if you're in the jury

18  room with your fellow jurors and you're talking and they're not

19  understanding you, I promise you, they will ask you to repeat

20  and they will find out exactly what you're saying; because it's

21  your responsibility as a juror to listen to all of the other

22  jurors and if you can't understand them, you ask them to slow

23  down and tell you again.

24         But thank you for bringing it to our attention.  Thank

25  you, ma'am.  Anybody else?

```
 1          PROSPECTIVE JUROR:   Okay.

 2          THE COURT:   Yes, ma'am.

 3          PROSPECTIVE JUROR:   Mayra Delgado.

 4          THE COURT:   Yes, Ms. Delgado.

 5          PROSPECTIVE JUROR:   I am not fluent English.  All this

 6    is very hard for me.

 7          THE COURT:  I appreciate that, Ms. Delgado.  We will

 8    take that into consideration.  Thank you very much.

 9          Next?

10          PROSPECTIVE JUROR:   Eric Barrios.  Well, I guess this

11    is a particularly distressing time emotionally for me and my

12    family, because my father just passed away in September right

13    after my mom got laid off of her job, and my presence here is

14    creating a considerable financial burden on my family, since

15    I'm the highest-earning individual, since only me and my

16    brother work, and he's just a waiter, he doesn't really make

17    much money at all.

18          THE COURT:   Just a waiter, you don't want to say that

19    about your brother.  Come on.

20          PROSPECTIVE JUROR:   He's going to school.

21          THE COURT:   He's a waiter at Joe's Stone Crab and

22    makes $800 an hour.

23          PROSPECTIVE JUROR:   We're trying, you know.

24          THE COURT:   I appreciate that.  I'm not minimizing

25    your problem; I'm just saying, probably ought not be mean to
```

1   your brother.  But thank you, Mr. Barrios.  I will take that

2   into consideration.  Thank you.

3            Yes, ma'am.

4            PROSPECTIVE JUROR:   My name is Sonia.  I feel because

5   I understand nothing.  Almost nothing.

6            THE COURT:   Sonia what, what is your first name?  What

7   is your last name?

8            PROSPECTIVE JUROR:   Aguirre.

9            THE COURT:   Sonia Aguirre.

10           PROSPECTIVE JUROR:   Thank you, ma'am.

11           THE COURT:   Next.  Yes, ma'am.

12           PROSPECTIVE JUROR:   Therese Lambert.  This past

13   summer, I was involved in a serious medical error and I'm

14   undergoing therapy for that, and the outcome of that is still

15   pending.

16           THE COURT:   All right.  And when do you do the therapy

17   for that?

18           PROSPECTIVE JUROR:   When do I see the therapist?

19           THE COURT:   Yes.

20           PROSPECTIVE JUROR:   As often as I can.

21           THE COURT:   Okay.  Well, I promise you that we will

22   make all necessary accommodations to you.  Thank you.

23           Anybody else?

24           PROSPECTIVE JUROR:   My name is Rebeca Castro.

25           THE COURT:   Yes, ma'am.

1          PROSPECTIVE JUROR:   I'm a very nervous person and

2    sometimes I get panic attacks.

3          THE COURT:   I can promise you that your problem during

4    the trial of this length will not be nerves, it will be

5    boredom.  It will be falling asleep.

6          You know, there's not a lot of hyperactivity going on

7    during the trial.  You'll get into a routine and you will see

8    that it's not really nerve-racking.  I can understand your

9    concern, but it's not nerve-racking.

10          PROSPECTIVE JUROR:  Just being in here yesterday while

11    you were talking, I had to take medication because I was

12    very -- my heart was...

13          THE COURT:   I appreciate that, ma'am.  Thank you.

14          PROSPECTIVE JUROR:   Thank you.

15          THE COURT:   Hi.

16          PROSPECTIVE JUROR:   Hi.  Miriam Quintero.  I don't

17    know, because I thought you were asking about the language

18    barrier.  But if you're --

19          THE COURT:   Well, I asked about language, physical or

20    emotional.

21          PROSPECTIVE JUROR:   Okay.  Because I don't want to

22    lose the opportunity to tell you, I'm going on vacation next

23    week, I take medication during the day and I also go to therapy

24    for carpal tunnel.  These little things may get in the way with

25    me attending, that's all.

1            THE COURT:   We're not going to ask you to type

2    anything.

3            PROSPECTIVE JUROR:  No, not because of that, because of

4    the pain.  I'm actually -- I'm not saying that.  I'm just

5    saying that I go to therapy, that's all.

6            THE COURT:   Tell me your name again, please.

7            PROSPECTIVE JUROR:   Miriam Quintero.

8            THE COURT:   Thank you, Ms. Quintero.   Okay.

9            We're going backwards.  I already went to that row.

10   Too late.  Go ahead, I'm just teasing.

11           PROSPECTIVE JUROR:  Maria Diaz.

12           THE COURT:   Yes, ma'am.

13           PROSPECTIVE JUROR:   I have a problem.  I have two

14   child.  One my daughter is 16 and my son is 13.  They was

15   waiting for me yesterday in the McDonald near the school until

16   6:20 that I --

17           THE COURT:   What time do they get out of school?

18           PROSPECTIVE JUROR:   Three.

19           THE COURT:   Okay.

20           PROSPECTIVE JUROR:   Okay.  Also, my daughter, she have

21   problem, emotional problems, she has been hospitalized four

22   times.  When she is stressful, she cut herself.  I think I

23   cannot be here emotionally, completely concentrate in this,

24   because I have to take care of my children, nobody can do for

25   me.

```
 1              THE COURT:   All right.   Thank you, Ms. Diaz.   Thank

 2    you.

 3              Back row in the jury box.   Yes, sir.

 4              PROSPECTIVE JUROR:   My name's Juan Carballo.

 5              Are you prepared to call 911?   I am --

 6              THE COURT:   I don't need 911.   I have a button under

 7    here.

 8              PROSPECTIVE JUROR:   I have a heart surgery, but I feel

 9    some stress sometimes and I feel arrhythmia again, you know,

10    but I can.   That is my point, and my other point --

11              THE COURT:   Every floor has a defibrillator and we

12    have --

13              PROSPECTIVE JUROR:   That's correct.

14              THE COURT:   I have a button under here.

15              PROSPECTIVE JUROR:   Many times before the surgery

16    what's that, immediately put the defibrillator and thanks to

17    God, I'm here.

18              THE COURT:   I'm not suggesting that I would do that.

19              PROSPECTIVE JUROR:   I need to feel good with myself.

20    First of all, that is a very important trial, I want to be

21    honest with you.   I live in Hialeah.   My English is very limit

22    to the computer and medical fields, and many of the words that

23    maybe that is in that case, I don't understand.

24              But it's my duty, it is my responsibility as a United

25    States citizen, and I stay here.   I serve the last time, when
```

1    the lawyer select me, I feel very stressed, but they was

2    correct because the case -- in that case, was in Spanish, like

3    Spanish, you know.  It was the people that speak Spanish, and

4    they prove and some things was in Spanish and I feel good at

5    that time, but I need to be honest with you, it's very limit,

6    my English --

7         THE COURT:  Thank you very much, sir.

8         Anybody else in the back row?  Yes, sir.

9         PROSPECTIVE JUROR:   Yosvani Suarez.

10        THE COURT:   You've got a language problem, too?

11        PROSPECTIVE JUROR:   No.

12        THE COURT:   What's your problem?

13        PROSPECTIVE JUROR:   My problem is the language,

14   maybe --

15        THE COURT:   What do you mean?

16        PROSPECTIVE JUROR:   Maybe some things you say, I don't

17   hear.

18        THE COURT:   You mean the language because it's

19   technical or because it's areas that you're not familiar with?

20        PROSPECTIVE JUROR:   Maybe.  Maybe I don't understand.

21        THE COURT:   Honestly, you know what, that's their

22   problem.  Their problem is to communicate with you in a

23   language that each of you understands because each of you has

24   to make a finding in this case.

25        So, you know, I appreciate your bringing it up, but

 1    that's really the lawyers' responsibility to communicate to you

 2    in a way that you understand.

 3         But I think your language is more than adequate.

 4    You're language is pretty good.

 5         PROSPECTIVE JUROR:   I don't get -- most of stuff you

 6    say, I don't get.

 7         THE COURT:   I understand.  Thank you, sir.

 8         PROSPECTIVE JUROR:   Sergio Herrera.  I have a prepaid

 9    vacation with my wife to New Orleans next week.

10         THE COURT:   When did that come up -- when did -- I

11    thought -- you didn't see that on the form?

12         PROSPECTIVE JUROR:   I thought I would be done with my

13    two weeks jury duty service in time.

14         THE COURT:   The questionnaire that we sent out has

15    eight weeks in it and, you know, we had 67 people say, I can't

16    do eight weeks, some of which were for trips that they had.

17         PROSPECTIVE JUROR:   I've been to several jury duties,

18    and they have all been done within days, and I thought by two

19    weeks I would be done and it wouldn't interrupt with my

20    vacation, so I didn't think it would be a problem.

21         I wanted to serve, I just didn't think --

22         THE COURT:   Where's your vacation?

23         PROSPECTIVE JUROR:   New Orleans.

24         THE COURT:   How are you getting there?

25         PROSPECTIVE JUROR:   Airfare.  I have the information.

1    I prepaid the airfare and the hotel rooms and packages.

2            THE COURT:   Okay.

3            PROSPECTIVE JUROR:  I apologize, I thought I would be

4    done with the jury duty for two weeks in time.

5            THE COURT:   Well, the part that I don't understand is

6    that you were given a questionnaire yesterday that said, this

7    trial is expected to last eight weeks.  If you have a reason

8    that you can't be here for that long, let us know if this is

9    going to cause a hardship to you.

10           And we had, like I said, 47 or 57 people that said, I

11   got a plane ticket to so-and-so, I got to go there, I got to go

12   that, how could you miss that?  It's not like a --

13           PROSPECTIVE JUROR:   Again, in the past, I've been

14   involved in jury duties and they have all been done within days

15   and weeks.

16           THE COURT:   I heard you say that and you've said it

17   now more than once, but --

18           PROSPECTIVE JUROR:   My failure, my failure.

19           THE COURT:  That works unless we give you a piece of

20   paper that says --

21           PROSPECTIVE JUROR:   Yes.

22           THE COURT:   -- this trial is going to last eight

23   weeks.  If that causes a problem for you, tell us now.  And now

24   you tell me?  I don't understand.  That's the part I don't

25   understand.

1          I hear what you're saying, but it doesn't make any

2    sense to me.  I'd like to see the airline ticket then.

3          PROSPECTIVE JUROR:   Yes, sir.

4          THE COURT:   Do you have the airline ticket with you?

5          PROSPECTIVE JUROR:   Yes, sir.

6          THE COURT:   Give it to the court security officer,

7    please.  I'm afraid this doesn't tell me when this reservation

8    was made.  That's the problem, that's what I'm looking for.

9    This doesn't say anything on it as to when it was made.

10         I will need to see something that shows me when the

11   reservation was made.

12         I'm going to excuse you on the basis of your trip, but

13   I want to see something that shows the date the ticket was made

14   and the date the reservation was made and whether you bought

15   this ticket -- because if it was yesterday, it's going to cost

16   you a lot more than a ticket.

17         PROSPECTIVE JUROR:   This was done several months ago.

18         THE COURT:   I believe you, and that's why I'm letting

19   you go, but I need to see something that proves that.

20         PROSPECTIVE JUROR:   Yes, sir.

21         THE COURT:   All right.  We got somebody in the back

22   that just thought of something that might work.

23         The back over there.

24         COURT SECURITY OFFICER:  First back there?

25         THE COURT:  Yeah.

1          PROSPECTIVE JUROR:   Maria Pedreno.

2          THE COURT:   Yes, ma'am.

3          PROSPECTIVE JUROR:   I didn't realize the court is

4    going to last too long neither.  Sorry, it was my mistake, but

5    I have -- I am traveling to California -- to Palo Alto, to see

6    my daughter, she just get pregnant -- from the 23rd to the 28th

7    of December.  I already had my ticket, too.

8          THE COURT:   I can promise you, from the 23rd to the

9    28th of December, it will probably be just fine for you to go

10   to Palo Alto.

11         PROSPECTIVE JUROR:  I want to make the point because --

12   thank you.

13         THE COURT:  I don't plan on being here Christmas Eve or

14   Day either.

15         Yes, sir.

16         PROSPECTIVE JUROR:  I'm afraid to talk to you, but --

17         THE COURT:  No, feel free.

18         PROSPECTIVE JUROR:   Fred Deno.  I have a court date.

19         THE COURT:  Where?

20         PROSPECTIVE JUROR:   It got set yesterday.

21         THE COURT:  Where is it?

22         PROSPECTIVE JUROR:  Where's it at?  At the lawyer's

23   office for the mitigation for the loan modification.

24         THE COURT:   When is that?

25         PROSPECTIVE JUROR:   December 1st and 3rd.

```
 1              THE COURT:   Both days?

 2              PROSPECTIVE JUROR:   Well, one or the other, they just

 3     e-mailed yesterday while I was in here and I responded back

 4     early this morning, and I don't have my phone on me.

 5              THE COURT:   I can promise you -- this is in a State

 6     Court case?

 7              PROSPECTIVE JUROR:  Excuse me, State?

 8              THE COURT:   This is a State Court case that you're

 9     looking for mediation?

10              PROSPECTIVE JUROR:   Yes.

11              THE COURT:   I can promise you that I can get you out

12     of any State Court jail.  I can promise you that the State

13     Judge cannot get you out of mine; okay?

14              PROSPECTIVE JUROR:  I'm more than welcome to that,

15     believe me.

16              THE COURT:   I'm confident that most judges over

17     there -- we have an agreement with the State, if there's a

18     conflict, we work it out.

19              PROSPECTIVE JUROR:   I don't want to lose this property

20     so --

21              THE COURT:   No, I could understand that.

22              PROSPECTIVE JUROR:   I will give you three days in

23     jail; I don't want to lose the property.

24              THE COURT:   You're going to be there all day?

25              PROSPECTIVE JUROR:   It goes lengthy.
```

1          THE COURT:  Yeah, we'll work on that.  We will come up

2     with a day that you can do that, all right, and we'll work it

3     out.  All right.  Thank you.

4          Somebody else to your -- okay.  Yes, sir.

5          PROSPECTIVE JUROR:  Ronnie Britton.  Judge, this has

6     probably nothing to do with the question you're asking, I did

7     see the six to eight weeks on the questionnaire.

8          THE COURT:  I hope so.

9          PROSPECTIVE JUROR:  Yes, sir.  And I apologize.  But

10    as a pastor, I cannot be down here six to eight weeks.  I would

11    love to serve on the jury but I cannot do my pastoral

12    responsibilities, be here, I can't do it.  I can't give my

13    undivided attention when I got, you know, congregation and

14    funerals.

15         THE COURT:  Do you have meetings during the week?

16         PROSPECTIVE JUROR:  Well, I have meetings, the

17    meetings, yes, but death comes when the Angel knocks on the

18    door and --

19         THE COURT:  I understand that, and I can promise you

20    that if something happens, we will work -- we will accommodate

21    you.

22         PROSPECTIVE JUROR:  Well, something has already

23    happened, and Friday is the day.

24         THE COURT:  Not a problem.  We're off Friday.

25         PROSPECTIVE JUROR:  At twelve noon, I got to --

```
 1              THE COURT:   We'll work with you, Friday is fine.
 2    We're going to take a day off every week, so we'll do -- I
 3    appreciate you bringing it to my attention, but I'm not
 4    excusing you at this time.
 5              There's somebody back there that needs to talk to me.
 6              Yes, sir.
 7              PROSPECTIVE JUROR:   My name is Sergio Herrera, and I
 8    read the questionnaire, the questions and everything, but I
 9    asked the lady, is this going to be six or eight weeks and she
10    told me, no, no, that's the regular paper they give to
11    everybody, because I got --
12              THE COURT:  Who's "that lady?"
13              PROSPECTIVE JUROR:   The one downstairs -- I don't know
14    her name -- the one that checks you in.  I asked her if --
15              THE COURT:  She's pretty good.  I would be shocked if
16    she said something like that.  She knew very well that this was
17    a six to eight-week trial --
18              PROSPECTIVE JUROR:  I saw that.
19              THE COURT:  -- and that's why she's handing -- hold it.
20    Hold it.
21              PROSPECTIVE JUROR:  And I said to her, I asked her --
22              THE COURT:  Hold it.  Stop.  Please.  There's one rule:
23    If I'm talking, you're not.  Okay?
24              PROSPECTIVE JUROR:  I'm sorry.
25              THE COURT:  That's okay.  It's hard, she can't write it
```

1    down if both people are talking at the same time.

2         So what I'm saying to you is that it is very hard for

3    me to figure because everybody in the jury room knew that we

4    were going to pick a jury for the six to eight-week trial.

5    They had a special extra piece of paper that they handed to all

6    of you which said this trial is liable to take six to eight

7    weeks and we need to know if you have a hardship.

8         I can't conceive that anybody down there -- unless you

9    asked the janitor -- could tell you, no, this is just a normal

10   trial, don't worry about it, it's two or three days.  That

11   doesn't make any sense.

12        I mean, those people do this all day every day, they do

13   it thousands of times of a year.  I can't believe that they

14   would say something like that.

15        I'm not suggesting that you're making that up, but I

16   think you are mistaken because I can't believe that they would

17   do that.

18        So, anyway, what's the story now?  Now that we have

19   been here for two days talking about six to eight weeks, what

20   has -- what bulb has lit up in your head to tell you now?

21        PROSPECTIVE JUROR:  I got reservations for

22   Thanksgiving, the day after Thanksgiving, I got to go see my

23   daughter in North Carolina.

24        THE COURT:  Not a problem, I'm going to be gone, too.

25        PROSPECTIVE JUROR:  I'm just letting you know.

```
 1          THE COURT:  I told you before, we're breaking Wednesday
 2   at noon of Thanksgiving.
 3          PROSPECTIVE JUROR:  I got reservations right here.
 4          THE COURT:  What part of "we're going to be out that
 5   day" are you having a problem with?  I'm not planning on being
 6   in court on Wednesday afternoon; Thursday, all day; Friday, all
 7   day; Saturday, all day; and Sunday, all day.
 8          When is your reservation for?
 9          PROSPECTIVE JUROR:  Thursday, Friday, Saturday.
10          THE COURT:  Okay, not a problem.  We're not going to be
11   here.  I mean, if you want to come, we can arrange to have the
12   courtroom open for you but --
13          PROSPECTIVE JUROR:  I got this.
14          THE COURT:  I don't need the reservation because we're
15   not open those days.  Thank you.  Okay.
16          Somebody else?
17          PROSPECTIVE JUROR:  Deborah Del Valle.  I was also a
18   little confused with the questionnaire, thinking about a
19   hardship had something to do with my health or something like
20   that.  My oldest daughter graduates from college in
21   North Carolina December 18th.
22          THE COURT:  December 18th.  I'm confident that we can
23   work something out.  Don't worry.  If you are selected, we will
24   work something out, but you can't wait until the 17th to tell
25   me.  You need to tell Wanda and then Wanda --
```

1          PROSPECTIVE JUROR:  I have to be driving by the 17th,

2   actually, to get there.

3          THE COURT:  We will work something out.  Don't worry.

4   We will get something done.  All right.  Thank you.

5          PROSPECTIVE JUROR:  Thank you.

6          PROSPECTIVE JUROR:  Jean Rubio.

7          THE COURT:   Yes, sir.

8          PROSPECTIVE JUROR:  I put on the form that I filled

9   out that I had some training to go for my company.  I have the

10   proof of the airplane ticket.  I'm leaving on Sunday, and I put

11   it down in the form yesterday.  And I'm not sure -- I guess, I

12   was a little confused, as well, with the hardship question.

13          THE COURT:  Didn't I talk to you about that when --

14          PROSPECTIVE JUROR:  No, sir, no, not to me.

15          THE COURT:  Why wasn't he one of the -- Wanda, wasn't

16   he one of the ones that said --

17          COURTROOM DEPUTY:  Jean Rubio?

18          THE COURT:  Yeah.

19          COURTROOM DEPUTY:  Yeah.

20          THE COURT:  Okay.  I got it.  You told us and I

21   believed you.  I didn't ask you -- I believed you when you told

22   me that you had it.  We'll deal with that, let's not worry

23   about that.  Okay.  All right.

24          Next.  Yes, sir?

25          PROSPECTIVE JUROR:  Barry Wulwick.  Sorry, I just

1    remembered I'm a Shabbat observer so I need to be home by

2    sundown on Friday.

3           THE COURT:  Not a problem.  So do I.  I'm not a Shabbat

4    observer, but I need to be home or I turn into a pumpkin.

5           Yes.  Somebody else?

6           PROSPECTIVE JUROR:  Fred Deno.  You said this goes on

7    Saturday, too, the case?

8           THE COURT:  No, I did not.

9           PROSPECTIVE JUROR:  Okay.

10          THE COURT:  That was the simplest way I could answer

11   that.  I did not say that.  I will not say that.  They get

12   really uptight if they have to pay overtime to have people come

13   in and support us.  They don't care about me because I get paid

14   the same amount, no matter.

15          Yes, ma'am.

16          PROSPECTIVE JUROR:  Ivette Ruiz.  I was also a little

17   confused with the questionnaire, I apologize.  I do work in a

18   car dealership, I'm the controller, and I have ten employees

19   under me, so it would be hard for me to be out for a length

20   period of time.

21          THE COURT:  You work for Potamkin?

22          PROSPECTIVE JUROR:  Potamkin.  Yes, sir.

23          THE COURT:  They're huge.  They've got lots of people.

24   I understand.  Thank you.

25          Okay.  Next.  Thank you.  All right, let's see what's

1    come up now.

2           PROSPECTIVE JUROR:   Raymond Roger.

3           THE COURT:   Yes, sir.

4           PROSPECTIVE JUROR:  My problem is a language barrier.

5           THE COURT:  I'm sorry, say that again.

6           PROSPECTIVE JUROR:  Language barrier.

7           THE COURT:   Language barrier.

8           PROSPECTIVE JUROR:   Yes, sir.

9           THE COURT:   You talk pretty good.  What is it you

10   think, you don't understand or you don't speak it; which is it?

11          PROSPECTIVE JUROR:   My accent.

12          THE COURT:   Your accent?

13          PROSPECTIVE JUROR:  Yes, sir.

14          THE COURT:   No public speaking required.  Your accent

15   is fine.  I might have to ask you to repeat something, but I

16   have no trouble following you at all.  Your brain is a lot

17   better than your accent and you don't have a problem with that.

18          PROSPECTIVE JUROR:   Thank you.  And my son will

19   graduate on December 14th.

20          THE COURT:   Where?

21          PROSPECTIVE JUROR:   Here, in Miami, FIU.

22          THE COURT:   Yeah, we'll work something out.

23          PROSPECTIVE JUROR:   All right.  Thank you.

24          THE COURT:   Thank you.

25          PROSPECTIVE JUROR:   Ricardo Rubio, and it's nothing

1    major, but I have finals from FIU, since I'm a full-time

2    student.  It's at my professor's discretion, either the last

3    week of November or the first week of December.

4         THE COURT:  You know, I will tell you that I believe

5    that I could reach out to somebody at FIU and have you tested

6    at an appropriate time.  If you're here, you're here.  I'm not

7    going to worry about that.  I've never had a problem.

8         Actually, that's not true.  I had a problem with

9    Nova Southeastern, and they were so sorry that they decided

10   that jury duty wasn't important after the fact.

11        We'll take care of it.

12        PROSPECTIVE JUROR:  Yeah, I wouldn't mind, like,

13   taking my finals at night after everything.

14        THE COURT:  After you have a chance to talk to your

15   fellow students?  No, I'm just teasing you.

16        PROSPECTIVE JUROR:  My classes are in the morning, so

17   I can go to work at the bank in the afternoon or at night.

18        THE COURT:  Got you.  We'll work it out.

19        PROSPECTIVE JUROR:  Okay.  No problem.

20        THE COURT:  Thank you.  Appreciate you bringing it up.

21   You see.  There's got to be an end to this.  We're done.  No

22   more.  No more.

23        I mean, every time somebody gets up, somebody else

24   thinks of something and gets up.  No, no.  If you didn't talk

25   to us about it already, enough.  Thank you.

1            Give the microphone back.

2            I mean, I'm patient, but I'm not that patient.  I mean,

3     there's a bunch of people sitting in here listening to this and

4     they've had enough.

5            PROSPECTIVE JUROR:  Because, Your Honor, I'm so sorry,

6     but yesterday I --

7            THE COURT:  Give her the microphone.

8            PROSPECTIVE JUROR:  Megan Noicely-Moulton.

9            THE COURT:  Wait until you get a microphone, please.

10           PROSPECTIVE JUROR:  Yesterday, I put my hardship, to

11    tell you the truth, in the past, my career or my job has always

12    excused me from this.  Like I told you before, I work with

13    veterans, very mental illness, PTSD, TBI, schizophrenia.  I am

14    their clinical case manager.  I have a caseload of 20 veterans

15    that I do everything for.  That was my hardship.  I can't do

16    this for eight weeks, and I've said that yesterday.

17           Again, it wasn't important, I guess, enough to be

18    excused.  But that was my hardship.  I never thought of my

19    travel to see my sister as a hardship because I thought my work

20    with my veterans was a hardship because they depend on me for

21    everything.

22           THE COURT:  What are you telling me?

23           PROSPECTIVE JUROR:  I have -- we're going to Texas --

24    this was made from June -- from May 13th.  I never thought of

25    this as a hardship when the question was asked yesterday.  I

1    thought of the service to my patients as a hardship.

2         So it never even dawned on me about my travel to see my

3    sister, not until yesterday in the afternoon when this

4    gentleman back here said something about travel, and I said, oh

5    my, God, I'm going to go see my sister because, to me, this

6    didn't surface as a hardship.

7         I saw hardship as not being able to serve my vets, that

8    was my hardship.  My hardship was never to go see my sister.  I

9    never -- it never dawned on me because it just was not in my

10   frame of reference.

11        My frame of reference was thinking, oh, I have to

12   cancel two appointments yesterday for my vets and today I have

13   to cancel two; and tomorrow, I have seven vets to take to

14   Golden Corral because it's Veterans' Day and I might not be

15   able to take them.

16        THE COURT:   Why not?

17        PROSPECTIVE JUROR:   Because I didn't know the whole

18   gamut of how this works.

19        THE COURT:   Well, I mean, I understand you're upset,

20   but the bottom line is --

21        PROSPECTIVE JUROR:   I'm not upset, really.

22        THE COURT:   You sure sound like it.  I'd hate to see

23   you when you are upset then.

24        PROSPECTIVE JUROR:   Sorry.

25        THE COURT:   The bottom line is that while your job is

1  very important, there are many people here whose jobs are very

2  important.

3          PROSPECTIVE JUROR:  Oh, of course.

4          THE COURT:  And I do understand that you're frustrated

5  about, you know, not being able to serve your veterans, but the

6  bottom line is, I heard you, I listened to you.

7          PROSPECTIVE JUROR:  Yeah.

8          THE COURT:  I am confident that the -- you know, that

9  there's got to be -- if you, God forbid, if you were to drop

10  dead right now, I bet you they would find somebody to take

11  those vets places, I bet you that they would find a way to deal

12  with it.  I bet that there would be someplace -- I'm sorry, but

13  you think this is very important to those veterans; this is

14  very important to the parties in this case, too, very

15  important.

16          PROSPECTIVE JUROR:  I agree.

17          THE COURT:  And I can't really be --

18          PROSPECTIVE JUROR:  I agree.

19          THE COURT:  I can't really be judging whose job is

20  more important than anybody else's job.  I do appreciate what

21  you do.  As a veteran, I'm very appreciative, but the bottom

22  line is I heard you, I consider this like, you know --

23          PROSPECTIVE JUROR:  I understand.

24          THE COURT:  And you'll hear me say this to the people,

25  you know, I'm really sorry I don't always rule in your favor;

1   but once I've ruled, I don't want to hear about it again

2   because I can't.  I mean, I can't do that or else I would be

3   like one of those hamsters in the wheel, I would just keep

4   going over and over the same things again.

5        So I appreciate what you said, but I had no idea about

6   your trip.  Do you have tickets already?

7        PROSPECTIVE JUROR:   Yes, Your Honor.  I never thought

8   of it yesterday.  To be honest, it never crossed my mind.

9        THE COURT:   That's not important.  Tell me about your

10  trip.

11       PROSPECTIVE JUROR:   Right here, everything is there.

12       THE COURT:   Okay.  All right, ma'am.  Thank you.

13  We'll take that into consideration.

14       PROSPECTIVE JUROR:   Thank you, Your Honor.

15       THE COURT:  All right.  The last question -- it is the

16  last question.

17       Does everyone agree that if you're selected you will

18  render a verdict based solely on the evidence and the law and

19  be fair to all concerned?  If you're mad at me, don't take it

20  out on either of the parties.  All right?

21       I will ask you to please go into the hallway; take your

22  stuff because some of you may not be coming back, and we will

23  talk among ourselves and we will get back to you.

24       So go back out into the lobby.

25       COURT SECURITY OFFICER:  All rise for the jury.

1          (Prospective jurors exited courtroom at 11:10 a.m.)

2          THE COURT:  Be seated, please.  That last lady, despite

3    her histrionics, has a ticket that she bought in May, which is

4    long before the notices for this hearing went out.  So I -- is

5    that Juror Number 7, Wanda?  Megan Noicely-Moulton?

6          COURTROOM DEPUTY:  On this paper, she's Number 7.

7          THE COURT:  Yeah.  Any objection to excusing her for

8    that reason?

9          MR. DUFFY:  Not from the Government, Your Honor.

10         MR. FOSTER:  No.

11         THE COURT:  Let's talk about the ones that we have that

12   remain.  We have 30 more remaining downstairs if we need them.

13   I hope we don't.

14         Let's talk about Number 24, Suarez.  I don't remember

15   why I wrote a note about her job.  What is it that she was

16   saying?  It's really hard for me to read my questions and take

17   notes, so all I wrote down was "job."

18         Yosvani Suarez, Number 24.

19         MR. WATTS-FITZGERALD:  Judge, I think they were a film

20   installer, Your Honor, window film installer.

21         THE COURT:  What's that?

22         MR. WATTS-FITZGERALD:   Window film installer.

23         THE COURT:  Oh, that's the guy.  Why are you hiding

24   all your microphones so you're not talking into any

25   microphones?  Get a couple.  Put one in front of each of you,

1    there's microphones all over the place.

2         MR. WATTS-FITZGERALD:  My teammates are doing that to

3    me, Your Honor.

4         THE COURT:  Yeah, I know, I can understand that.

5         Yes, sir.

6         MR. FOSTER:  Judge, Mr. Suarez his complaint was

7    language, that he did not understand.  I wrote that in my

8    notes.  He is -- as Mr. Watts-Fitzgerald pointed out, he is a

9    window-tint installer, but we have him down as one of the

10   handful of people who claimed that they were not understanding

11   everything that was being said in the courtroom.

12        THE COURT:  All right.  Well, first let's go with 21,

13   Herrera, that's the gentleman in the back row.  I definitely

14   want to see his ticket because if he bought his ticket

15   yesterday, he's in contempt of court and he's in trouble.  But

16   if he didn't, I think, to be consistent, we need to excuse him.

17        Any objection?

18        MR. FOSTER:  No, sir.

19        MR. WATTS-FITZGERALD:  Agreed.

20        COURTROOM DEPUTY:  What's his name again?

21        THE COURT:  Herrera, Sergio.  He finally decided that

22   this was a long trial today.  I have no idea how he could sit

23   through yesterday and not realize that this was a long trial.

24   It boggles the mind.

25        What about 24?  I don't remember anything serious about

1   24, but I made a note of it, so I thought I'd ask about it.

2        How about -- 44, Sonia Aguirre?  I think that her

3   language is really seriously lacking.

4        MR. FOSTER:  I was going to move to strike her for

5   cause, sir.

6        THE COURT:  Any objection, Government?

7        MR. DUFFY:  No objection, Your Honor.

8        THE COURT:  So 44 is excused.

9        Eric Barrios.  He's a charming chap, he mentions things

10  and then kind of laughs about it, but, you know, I don't know,

11  I don't have a strong feeling about him.  Let's go back to him

12  later.

13        Fifty-two, Mayra Delgado, language.  I think her

14  language is very weak.

15        MR. FOSTER:  I agree.  I was going to move to strike

16  her, sir.

17        THE COURT:  Any objection?  All right, we will get rid

18  of Number 52.

19        Ms. Morhaim, and who is the other one, Jean Rubio --

20  not Rubio, is it Rios and Morhaim?  There were two ladies up in

21  the front row that, apparently, due to the closeness of Mr.

22  Watts-Fitzgerald, were in tears the whole time.

23        MR. WATTS-FITZGERALD:  That would be Ms. Castro, I

24  think, Your Honor, Juror Number --

25        THE COURT:  I know one of them was Wendy Morhaim.

1          MR. WATTS-FITZGERALD:  Number 40.

2          THE COURT:  Is that where that is, okay?  Number 40?

3          MR. WATTS-FITZGERALD:  Yes, Rebeca Castro, Your Honor.

4    She was in the front row here, right behind me, so the

5    proximity may have been a problem.

6          THE COURT:  The first and the third ladies in that

7    front row were both blubbering for no apparent reason.  I don't

8    think we had put them under any kind of stress.  I really

9    question their ability to sit in a jury.

10          Does anybody disagree with that?  I just want to make

11    sure I got the right ladies.  I don't want to excuse two --

12          MR. FOSTER:  Judge, I understood that from Ms. Castro,

13    she was a little bit emotional today.  She's the one who's

14    son-in-law is the pharmacist, but I'm unclear as to who the

15    second lady is.

16          THE COURT:  Two of them; one apart, there was a person

17    between them.

18          MR. WATTS-FITZGERALD:  Your Honor, it was Sonia

19    Aguirre.

20          MR. DUFFY:  You just indicated based on language, 44.

21          MR. WATTS-FITZGERALD:  That was 44.

22          MR. DUFFY:  For language, you excused her.  And the

23    third juror, Your Honor, is Ms. Castro, and she's the one that

24    indicated she's a very nervous person and said she has panic

25    attacks.

```
 1              THE COURT:  I would ask that Ms. Castro be excused.

 2              Is there any objection?

 3              MR. DUFFY:  Not from the Government, Your Honor.

 4              MR. FOSTER:  Judge, I think she's in the same position

 5     as the gentlemen Mr. Carballo, who talked about the heart

 6     surgery.

 7              THE COURT:  He's holding it together; she's not, so

 8     far.

 9              MR. DUFFY:  Which juror is this?

10              MR. FOSTER:  He is Number 26, Mr. Duffy.

11              THE COURT:  Number 26, Juan Carballo, I didn't have any

12     notes -- that's the gentleman that brought it up now.

13              MR. DUFFY:  He said he had served on a federal jury

14     before.

15              THE COURT:  Yeah, and he said that he thought it was

16     great because they spoke Spanish, even though the instructions

17     are that you are not to consider your version of their Spanish

18     so that they could all be considering the same evidence.  Go

19     figure.

20              And I know all of our judges give that because we're

21     familiar with Spanish-speakers on the jury.  You're supposed to

22     tell them -- and we do tell them -- that they have to rely on

23     the interpreter because, otherwise, people would be considering

24     different evidence.  I always wondered how they could do that.

25              What's the story on Carballo?
```

1          MR. FOSTER:  Judge, that's the gentleman that had the

2     heart surgery.  I don't know when his heart surgery was.

3          THE COURT:  I'm not real sure that he really did have

4     heart surgery.  Somebody else -- that lady had open heart

5     surgery.  I don't know what he meant by "heart surgery,"

6     because he was kind of -- that last bit of everybody jumping up

7     and coming up with -- I've never seen that happen before, and

8     it's very frustrating to me.

9          It's pretty obvious to me that a large number of the

10    people were just hopping up in an effort to get the heck out of

11    here; and if we let all of them go, then we're not going to

12    have anybody left and we're going to be taking weeks to try

13    this case, to get a jury.

14         MR. WATTS-FITZGERALD:  Your Honor, he didn't -- he

15    responded to your question, is there any medical or other

16    issues that might be an issue.  He didn't say he wanted off.

17         In fact, he said he thought it was his duty to serve.

18         THE COURT:  I'm not going to excuse Mr. Carballo.  If

19    you want to get rid of him, you will have to use a challenge.

20    I'm not going to excuse him.

21         We will get to your challenges in a moment.

22         So the two ladies that we are talking about, Rebeca

23    Castro and Sonia Aguirre, those are the two ladies that were in

24    the front that were crying; correct?

25         MR. FOSTER:  Yes, Your Honor.

```
1            THE COURT:  Does everybody agree we have the right

2   people?

3            MR. WATTS-FITZGERALD:  Yes, Your Honor.

4            THE COURT:  I'm going to excuse both of them.

5            Now, what else was there -- I think that's about it, as

6   far as my -- oh, Eric Barrios, I kind of feel for him on the

7   money.  I'm wondering if he can concentrate, that's one thing

8   he finally did say.

9            MR. FOSTER:  Judge, and he was becoming emotional in

10  describing that his father had just passed away.

11           THE COURT:  I know he was.

12           MR. FOSTER:  I would move to strike him for cause.

13           THE COURT:  Any objection, Government?  That's the big

14  guy, straight behind you, third row, three up from the aisle.

15           MR. DUFFY:  Your Honor, we don't think that that issue

16  that was raised by him was the same level as the other with the

17  jurors that was raised.  He did raise that at some degree

18  today, but he didn't yesterday.

19           THE COURT:  Let's see where it goes.  I might excuse

20  him, but I'm not going to do it right now.

21           All right.  Let's start with challenges for cause by

22  the Government.

23           MR. FOSTER:  Judge, may we have some time to confer,

24  because there was a lot of new information that came out since

25  last evening.  I haven't had a chance to talk with co-counsel.
```

1           THE COURT:  Let's take ten minutes.  We will start at

2    11:30.  I would like to get this part done so we know how far

3    we have to go.  I have to be somewhere at noon.  I have to be

4    somewhere at noon.

5           MR. FOSTER:  May we stay in the courtroom?

6           THE COURT:  Yes, you may.

7           (Recess taken from 11:21 a.m. to 11:30 a.m.)

8           THE COURT:  Please be seated.  Government, challenges

9    for cause on any of the people on the panel?

10           MR. DUFFY:  Yes, Your Honor.  Your Honor, the first

11    person that we would like to challenge for cause is Juror 44 --

12    excuse me -- Juror 49, Mr. Britton.  He was the pastor who

13    indicated he would have a hard time concentrating during the

14    course of such a long trial because of his pastoral duties and

15    he also was -- we observed, we thought, laughing at the Court

16    in a way that was not necessarily during the time that the

17    Court was making jokes.

18           THE COURT:  I'm always making jokes, I don't think

19    that's a fair observation, but --

20           MR. DUFFY:  He did emphasize a few times and then he

21    muttered when the Court said, no, I'm not going to,

22    essentially, right there, and then, excuse him.

23           THE COURT:  Do you have an objection to excusing him?

24           I don't feel strongly about it one way or the other,

25    but I don't think he's going to pay attention.  I think he's

1  prepared to be -- there's some very important people on this

2  jury panel.  I mean, this lady drives 20 veterans around,

3  that's very important.  He's a pastor, that's very important.

4  I appreciate all of that, but I think some people are -- I

5  don't know.

6          MR. FOSTER:  Judge, I did not interpret the gentleman's

7  conduct or reactions in any way as disrespectful to this Court.

8          THE COURT:  Honestly, that doesn't bother me at all.  I

9  don't care if he's disrespectful to me.  I don't care one way

10  or the other, but I just thought that he had made it very clear

11  that he wasn't going to be a happy camper, that he was going to

12  come up with every possibility of -- I think if we have him,

13  within a matter of days, he's going to come up with some reason

14  why he has to be at his church instead of here; that's my

15  concern with him, and I think he really will do that.

16          I got the clear impression that he has his priorities

17  and this isn't one of them.

18          MR. FOSTER:  I think that's right, I think that is

19  going to happen.  The question is whether those excuses that he

20  propounds to you at whatever point is going to be sufficient

21  for him to be excused, and I think that's almost a wait and see

22  because --

23          THE COURT:  See, the problem with that is I'm probably

24  going to have other things to deal with in this trial without

25  worrying about a juror who really doesn't want to be here and

1   who is basically a good person, just doesn't want to be here.

2   What's his number again?

3          MR. DUFFY:  Number 49, Your Honor.

4          THE COURT:  Ronnie Britton, I'm going to excuse

5   Mr. Britton.  I will probably be sorry, but I'm going to.

6          What else do you got?

7          MR. FOSTER:  For the record, sir, may we reserve an

8   objection?

9          THE COURT:  Got you.

10         MR. DUFFY:  Your Honor, our next juror that we'd like

11  to raise for cause is Number 66, Mr. Wulwick.  The first thing

12  about Mr. Wulwick, I would like to point out for the Court, is

13  that on his questionnaire he did say that he had a hardship and

14  he was not called in yesterday during the Court's individual

15  voir dire of the hardship candidates.

16         The reason he put on his form that he had a hardship

17  was that he was recently laid off, and we learned -- from his

18  job one week ago -- and he's trying to find work, and he did,

19  in a response to the Court's questions later, indicated that he

20  had -- I can't remember now, if it's five or six children, a

21  number of which were minors.

22         THE COURT:  A bunch.

23         MR. DUFFY:  He also, during the course of his

24  questions, Your Honor, indicated that he had been dissatisfied

25  with how the Securities and Exchange Commission dealt with the

1    matter in New York, and the Court didn't follow-up on that, we

2    didn't really get a chance to do that.

3         But I would say, Your Honor, that he indicated he was a

4    victim of a Ponzi scheme, his father-in-law was the defendant

5    who then stayed at his house.  Which way that cuts, I don't

6    know, strategically.

7         I'm not suggesting that the cause should be for that

8    reason, but in combination with his claim of hardship, his

9    number of children, his financial circumstances, and the fact

10   that he raised dissatisfaction with the SEC -- who is a victim

11   in this case of Count 12 -- we would recommend or request that

12   he be excused for cause.

13        THE COURT:  You know, I don't know why he was not one

14   of the people, he clearly did mark on his questionnaire that he

15   did have a hardship and the hardship is that he was laid off

16   last week, last Friday, and he has five dependents at home to

17   support.

18        MR. FOSTER:  But none of that was raised anew here and

19   the microphone was circulated several times.

20        THE COURT:  Yeah, but the problem is that I'm not sure

21   that he thought -- I think he thought he'd shot his wad doing

22   that, you know, he'd taken his best shot by putting it down

23   there, and I'm sorry that we didn't get him in here because I

24   think it would have been appropriate to discuss it with him.

25        MR. FOSTER:  We object to him being stricken for cause

1    based upon the record as it exists now.  I think the gentleman

2    clearly stated --

3            THE COURT:  Yeah, I'm not going to strike him for cause

4    at this point.  What else do you got?

5            MR. DUFFY:  And, Your Honor, we also -- one moment,

6    Your Honor -- Ms. Milagro, Number 78, I apologize, but did the

7    Court already strike Ms. Milagro?

8            THE COURT:  No, I did not.

9            MR. DUFFY:  Number 78.

10           THE COURT:  Ms. Mena.

11           MR. DUFFY:  Ms. Mena, excuse me.  The reason is that

12   she indicated in response to the Court's questioning just now

13   that yesterday her children had to stay at McDonald's, 13 and

14   16 years old.

15           THE COURT:  Yeah, I forgot that for a moment.

16           MR. DUFFY:  And --

17           THE COURT:  First, let me ask, is there any objection?

18           MR. FOSTER:  No, she also said one of the children has

19   a cutting problem.

20           THE COURT:  Let's get rid of her without making a big

21   deal about it.  Let's move on.  Milagro Mena is excused.

22           MR. DUFFY:  And finally, Your Honor --

23           MR. WATTS-FITZGERALD:  Your Honor, the Government would

24   respectfully move to strike for cause Juror Number 69, Wendy

25   Morhaim.

1        THE COURT:  Okay.  Why?

2        MR. WATTS-FITZGERALD:  We looked at her on a hardship

3   issue; based on memory, she was the one that has been referred

4   but hasn't followed up.

5        THE COURT:  The one in the back row?

6        MR. WATTS-FITZGERALD:  Yes, Your Honor.  As the Court

7   may recall, throughout the course of the questioning she was up

8   on virtually every question or an answer or a complaint of some

9   sort.  She evidences to us, between the claimed medical

10  deficiencies and concerns, a high likelihood that she would be

11  unable to focus on the case, concentrate.

12       And I know that we discussed this a little bit when it

13  was decided to bring her forward into the second round; but the

14  notion that notes would help her, whether the Court -- assuming

15  the Court allows --

16       THE COURT:  I am going to permit notes, too.

17       MR. WATTS-FITZGERALD:  The notes, no one is in a

18  position in a trial like this to take notes of a stenographic

19  quality.  She doesn't seem to have any of those skills.

20       She certainly didn't indicate it.

21       THE COURT:  I will tell you, for somebody with no

22  memory, she responded probably more clearly than most people as

23  to her former property transactions and everything else, so I

24  don't know when it is that she has her memory problems, but

25  they weren't evident today in our questioning, or yesterday or

1    today.

2         MR. WATTS-FITZGERALD:  Your Honor, I think that may be

3    endemic.  Her problem, as she explained it, was short-term

4    memory.  Nothing she described, the three pieces of property

5    are all quite historical -- and that is common in people, I

6    would say, not because of her age because I'm getting a little

7    too close there myself, but that really is not much in the way

8    of comfort to us.

9         If she would have to rely on notes, she can't take

10   full, adequate notes.  She can't rely on her notes to persuade

11   others.  She renders herself ineffective as a juror.  And to

12   start out with an ineffective juror, even if nothing else

13   materialized as, unfortunately, we saw happen in the last

14   trial, leaves us very uncomfortable of having her go forward,

15   and we move to strike for cause.

16        MR. FOSTER:  And we object, Judge.  She clearly

17   demonstrated her ability to function, and as the Court points

18   out, she was articulate and had no problem recounting events

19   and voicing her statements, so we object.

20        THE COURT:  I'm going to deny that motion.

21        What else you got?

22        MR. DUFFY:  That's all for cause, Your Honor.

23        THE COURT:  Defense, challenge for cause.

24        MR. FOSTER:  I do.  Judge, we would move to strike

25   Juror Number 12, which was Ms. Richards.

 1          THE COURT:  Let me go back and make sure I have it.

 2    The Government, challenge for cause Number 78, Milagro Mena, so

 3    she is excused.

 4          And what other ones were there?  Were there any other

 5    ones?

 6          MR. FOSTER:  Oh, yes, Mr. Britton.

 7          THE COURT:  Ronnie Britton, Number 49 is excused, also,

 8    Wanda; you got that?

 9          COURT SECURITY OFFICER:  Thank you, Judge.

10          THE COURT:  Is there anyone else that was stricken

11    while Wanda wasn't in the room?  I don't think so.

12          MR. WATTS-FITZGERALD:  Those two, Your Honor.

13          THE COURT:  Okay.  All right.

14          Let's go ahead.  I apologize for interrupting you.

15          MR. FOSTER:  No.  Thank you, Judge.  It helped me

16    clarify those as well.

17          Juror Number 12, Alexi Richards, she is the one who

18    works for Lennar, she went to law school and her husband is an

19    attorney.  She says that her very best friend is a prosecutor

20    in Western Massachusetts and she talks with her friends

21    about --

22          THE COURT:  Granted.  Excused for cause.  I don't think

23    she wanted out, but I think she said all the right things to

24    get out.

25          MR. FOSTER:  Judge, the other one I would raise, I

1   would re-urge the Court on this gentleman, Mr. Barrios.

2          THE COURT:  What number?

3          MR. FOSTER:  Sir?

4          THE COURT:  Number?

5          MR. FOSTER:  Mr. Barrios is 48, sir.

6          THE COURT:  Four-eight?

7          MR. FOSTER:  Yes.  Forty-eight.

8          THE COURT:  Eric Barrios.  Okay.  Yes.

9          MR. FOSTER:  Mr. Barrios, he was also --

10         THE COURT:  Let's ask, do you have an objection to

11  excusing him?

12         MR. WATTS-FITZGERALD:  Your Honor, we just covered this

13  five minutes ago.  Maybe my short-term is going, but the Court

14  said him in for now.  He is the parking attendant.

15         THE COURT:  Right, but they hadn't moved for it.  It

16  was on mine.  It was on my --

17         MR. WATTS-FITZGERALD:  We do object for the reasons we

18  stated earlier, for the purposes of keeping him on.

19         THE COURT:  I didn't remember if you had objected or

20  just not taken a position on it.

21         Go ahead with your argument then.

22         MR. FOSTER:  Yes, Judge.  He was here, he talked about

23  he suffered a significant family tragedy, he described the

24  death of his father, he described that his mother is not doing

25  well, that his brother is employed in an occupation where he's

1    not making much money, and the family is depending upon him

2    financially and emotionally and for his presence, and he -- I

3    thought his voice was quivering during the time he was making

4    that statement, and that he didn't think that he could pay

5    attention and do what he needed to do for his family and I

6    think that's a hardship.  The man's hurting, he's in pain and I

7    think he deserves to be with his family during this period of

8    time.

9            THE COURT:  You know, I don't consider this one of the

10   people that was just trying to get out.  I think that he -- I

11   think he does have a problem, I'm going to grant the motion.

12   I'll excuse Number 48.

13           All right.  Next?

14           MR. FOSTER:  Judge, the -- may I have a moment, please.

15           Judge, we had a couple of jurors who stated on the

16   record that they could only understand 50 percent of what was

17   being said.  I don't know, I don't practice here regularly, so

18   I don't know how you typically deal with those things.

19           I saw a couple of the people, it was clear, and we have

20   agreed on those.  But these other people, when they say they

21   don't understand but 50 percent, I thought that was Ms. Diaz,

22   number --

23           THE COURT:  Well, let me just say that in the Southern

24   District of Florida, or in South Florida, Miami-Dade County, I

25   go to -- I don't exempt myself.  I go to State Court to serve

1    as a juror and I'm constantly amazed at the number of people

2    that are sitting there reading the newspaper in English; and

3    when they are asked in English if they have any difficulty

4    understanding English, they immediately jump and go to the

5    front.

6            And then when they are excused in the English language,

7    they immediately leave and usually leave behind their

8    English-language newspapers, because that is the way to get out

9    of jury duty.

10           When somebody tells me that they don't understand

11   English, I really do rely more on how they have reacted during

12   the questioning.  If they have, in fact, answered the questions

13   that were pertinent to them, then I don't consider them to be

14   challenged in the area of language.

15           And that's really how I've gone with these, is the ones

16   that I thought were challenged, I brought to your attention and

17   I think that they have been excused.  The ones that I have not

18   excused, I think are maybe not the world's greatest linguists

19   but probably as good as anyone is.

20           So if you've got some specifically, tell me what you

21   think; otherwise, my judgment is that the ones that are left

22   understand reasonably well.  Tell me something, I could be

23   wrong, so tell me --

24           MR. FOSTER:  Yes, sir.  Judge, Number 73, Ms. Diaz, you

25   may recall her, she was the H&R Block preparer.

1         THE COURT:  Yeah, she's got two kids, too; doesn't she?

2         MR. FOSTER:  Yes.  I think you may have already struck

3    her.

4         THE COURT:  I didn't.

5         MR. FOSTER:  You struck Mena.  I misspoke.  I think

6    she's the one that may have said the children were at

7    McDonald's.

8         THE COURT:  I think you're right.

9         MR. FOSTER:  And she said that one of the children was

10   cutting the arm.

11        THE COURT:  Yeah, it was a cutter, she got --

12        MR. FOSTER:  Was a cutter, and she had the language

13   problem, as well, and she said she was 50 percent -- so I think

14   there's a myriad of items there involving this juror.

15        THE COURT:  Government, what's your position on that?

16        MR. DUFFY:  This is Juror 73, Your Honor.  We have no

17   objection.

18        THE COURT:  Maria Diaz, what's that?

19        MR. DUFFY:  We have no objection to that.

20        THE COURT:  All right.  Then we will excuse her.

21   Number 73 is excused.

22        Next?

23        MR. FOSTER:  Judge, we talked about this, Ms. Pedreno,

24   61, she indicated she had the heart condition that she has to

25   go weekly or biweekly for checkups.

1          THE COURT:  I have never in my life heard of anybody

2     that had to go every other week to have their blood work done,

3     although I suppose it's possible.  If she does, I will make

4     sure that she can have it done before court.

5          MR. FOSTER:  She may be on some sort of a thinner, I

6     don't know what she's doing, but that was the testimony.

7          THE COURT:  I'm sorry, I don't believe her.

8          MR. FOSTER:  That's all on the motion for cause.

9          THE COURT:  Okay.  I will deny any motion for her.

10          Then let's go to the first 12.

11          That would be Number 3, Reyes; Number 4, Simpson;

12     Number 8, Cross-Williams; Number 9, Pastrana; Number 10,

13     Walker; Number 11, Mieses-Robleto; Number 14, Leal; Number 15,

14     Ricardo Rubio; Number 17, Roger; Number 18, Rodriguez; Number

15     19, Cardona, and Number 23, Roper.

16          COURTROOM DEPUTY:  No, she was excused yesterday.

17          THE COURT:  She was excused yesterday.  I'm sorry, so

18     it would be Yosvani Suarez.  So Yosvani Suarez is Number 12.

19     We're going to go with 12 this time instead of the 14 I usually

20     do and we'll try to pick a jury of 12 and see what we do with

21     alternates afterward.  Okay.

22          So to the Government, those are the 12 that are

23     tendered to you, please give us any challenges that you have on

24     those 12.

25          MR. DUFFY:  Just one challenge at a time, Your Honor

 1  or --

 2            THE COURT:  Challenge the whole panel.

 3            MR. DUFFY:  All right, Your Honor.  The Government --

 4            THE COURT:  Use them up.  Once you finished and you

 5  tender those, whatever's left for them, you can't go back and

 6  challenge them again.

 7            MR. DUFFY:  Yes, Your Honor.  Your Honor, the

 8  Government challenges Juror 11, Ms. Robleto.

 9            THE COURT:  Government one is used on Mrs. Robleto.

10            MR. DUFFY:  And we challenge Number 24, Suarez.

11            THE COURT:  Government two on Yosvani Suarez.  Does

12  that mean that you tender the remainder to the defendant?

13            MR. DUFFY:  Would you give me one moment, Your Honor?

14            THE COURT:  Barely.

15            MR. DUFFY:  Yes, Your Honor.  We tender.

16            THE COURT:  All right.  So we add two to that.  We add

17  Gerardo Pesina and Juan Carballo to the Government -- I mean to

18  the defense.  Challenges, preemptory challenges, the Government

19  has used two of their six.

20            MR. FOSTER:  Yes, sir.  Judge, we will challenge Juror

21  Number 8.

22            THE COURT:  All right.  Juror Number 8, Cross-Williams,

23  is defense one.

24            MR. FOSTER:  Yes, sir.  Juror Number 10.

25            THE COURT:  Mamie Walker is defense two.

```
1              MR. FOSTER:  Juror Number 15.

2              THE COURT:  Ricardo Rubio is defense three.

3              MR. FOSTER:  Juror Number 17.

4              THE COURT:  Raymond Roger is defense four.

5              MR. FOSTER:  Juror Number 25.

6              THE COURT:  Gerardo Pesina is defense six.

7              MR. FOSTER:  And Juror Number 26.

8              THE COURT:  Juan Carballo is defense seven.

9              You tender the remainder?

10             MR. FOSTER:  Up through Mr. Carballo, yes, sir.

11             THE COURT:  That means that Juror Number One is Antonio

12   Reyes; Juror Number 2 is Joseph Simpson; Juror Number 3 is

13   Casandra Pastrana; Juror Number 4 is Alberto Leal; Juror Number

14   5 is Ruben Rodriguez; Juror Number 6 is Joshua Cardona.

15             MR. DUFFY:  Your Honor, may I just inquire.  The

16   defense six -- I mean, excuse me, defense one was

17   Cross-Williams; defense two was Walker; defense three, Rubio;

18   defense four, Roger; defense five --

19             THE COURT:  I guess I skipped five, didn't I?  So they

20   only have used six.  It's five and six.  Five is Pesina and six

21   is Carballo.

22             MR. DUFFY:  Yes.  Thank you, Your Honor.

23             THE COURT:  Okay.  So we now have six jurors.  Seven is

24   Samantha Godfrey, or seven, prospective Number 7; Manny Diaz;

25   Debra Browning.
```

1           MR. WATTS-FITZGERALD:  Manny Diaz is gone, Your Honor.

2           THE COURT:   He is gone?  Why did I get rid of him?

3           COURTROOM DEPUTY:  Yes, he's gone.

4           THE COURT:  Then Debra Browning, she's not gone; is

5      she?

6           MR. FOSTER:  No, Your Honor.

7           THE COURT:  Chris Morales; Cassandra Lord; Edgar

8      Restrepo and Neil Mooloo.

9           MR. WATTS-FITZGERALD:  Yes, Your Honor.  If I may, that

10     would be Juror Numbers 28, 30, 33, 35, 36, and 37.

11          THE COURT:  Correct.  Challenges for cause on the

12     Government on those six?

13          MR. DUFFY:  Your Honor, the Government will use a

14     challenge for Juror Number 28.

15          THE COURT:  I'm sorry, preemptory challenge.

16          I said "for cause."  I meant "preemptory challenges."

17          MR. DUFFY:  Juror Number 28.

18          THE COURT:  All right.  Government three.

19          MR. DUFFY:  For Juror 33.

20          THE COURT:  Government four, Mr. Morales.

21          MR. DUFFY:  And Juror 37.

22          THE COURT:  So you tender the remainder to the defense?

23          MR. DUFFY:  One moment, Your Honor.  Yes, Your Honor.

24          THE COURT:  All right.  Defense, to you.

25          MR. FOSTER:  Sir, we would strike Juror Number --

1          THE COURT:  Wait a minute.  I got to add something.

2     The Government used two challenges; correct?

3          MR. WATTS-FITZGERALD:  Three, Your Honor.

4          THE COURT:  Three challenges, three, four and five.

5     I'm going to add three more, which would be Milagros Corvo,

6     Therese Lambert and Felicia Jackson -- no, that's gone.

7     Christian Puyol; correct?

8          MR. WATTS-FITZGERALD:  Yes, Your Honor.  Jurors 39, 42

9     and 45.

10         THE COURT:  Okay.  So, to the defense, starting with

11    30.

12         MR. FOSTER:  Sir, we will strike Juror --

13         THE COURT:  35, 36, 39, 42 and 45.  Correct?

14         COURTROOM DEPUTY:  Yes.

15         THE COURT:  What -- who are you going to strike?

16         MR. FOSTER:  Number 30, sir.

17         THE COURT:  Defense six -- defense seven then.

18         COURTROOM DEPUTY:  Yes, sir.

19         THE COURT:  You're on Number 30, Debra Browning.

20         What else?

21         MR. FOSTER:  May I have one moment to confer with

22    co-counsel, sir?

23         THE COURT:  Yes.

24         MR. FOSTER:  Judge, we have three strikes left, sir?

25         THE COURT:  Say it again, please.

1          MR. FOSTER:  We have three strikes remaining?

2          MR. DUFFY:  You have 3, correct.

3          MR. FOSTER:  We will strike Number 30, Ms. Browning.

4          THE COURT:  You already did.  That was your seventh.

5     You have eight, nine and ten left.

6          MR. FOSTER:  We will strike Number 45, Mr. Puyol.

7          THE COURT:  All right.

8          MR. FOSTER:  Yes, sir.

9          THE COURT:  That's it?  Juror Number 7 is Cassandra

10    Lord.  Juror Number 8 is Edgar Restrepo.

11         So to the Government, we have Number 39, Number 42,

12    Number 47, and Number 50.

13         Come on, we're not adding any new people.

14         MR. DUFFY:  Your Honor, the Government will use its

15    preemptory for Number 50, Mr. Deno.

16         THE COURT:  All right.  So Government six is used on

17    Fred Deno.  Tendered back to the -- well, let's see, that means

18    that Corvo is Number 9; correct?

19         Lambert is Number 10; correct?

20         MR. FOSTER:  Yes, sir.

21         THE COURT:  And that means that to the defense, we have

22    Osio and Pedroso.  You have two challenges left.  Juror Numbers

23    47 and 51.

24         MR. FOSTER:  Judge, pardon me, but when we get to

25    alternates, do we get additional strikes for alternates?

1                THE COURT:  Not additional, you get separate strikes.

2                MR. FOSTER:  Thank you.

3                THE COURT:  I just didn't want you to think there was

4    extra, you could save any.

5                Let's go, Osio and Pedroso.

6                MR. FOSTER:  Sir, if we tender now, is that the jury?

7                THE COURT:  That is correct.

8                MR. FOSTER:  We tender, sir.

9                THE COURT:  All right.  So Juror Number 11 is Osio and

10   Juror Number 12 is Pedroso.  Now we will try to have four

11   alternates, but if we fall below four, I am not about to start

12   this whole process all over again, but I will go with three or

13   two if we end up with that.  But I think we could get four.

14               The four alternates at this point would be Number 55,

15   Number 56.

16               COURTROOM DEPUTY:  I'm sorry, what happened to 54,

17   Maryann Quintero?

18               THE COURT:  Yeah, I'm sorry, 54, Quintero, I didn't

19   excuse her; did I?

20               MR. WATTS-FITZGERALD:  No, Your Honor.

21               THE COURT:  I said she had a lot of excuses; I misread

22   that into the fact that I might have excused her.

23               First alternate, Quintero; second one is Jiron; third

24   is Gouveia; and fourth alternate is Hosty.

25               And we go to the defense first on this.

1            What do you have on four; two?

2            MR. FOSTER:  Yes, sir.

3            THE COURT:  Two each; correct?

4            MR. FOSTER:  Yes.

5            THE COURT:  You have two challenges to the alternates.

6            MR. FOSTER:  We're prepared, sir.

7            THE COURT:  Yes, sir.

8            MR. FOSTER:  We would strike 54, Quintero.

9            THE COURT:  The first alternate challenge by defense.

10           MR. FOSTER:  And the second, we would challenge, sir,

11   Ms. Hosty, 58.

12           THE COURT:  Okay.  All right.  So to the Government,

13   55, 56, 59, and 61.  You have two challenges.

14           MR. DUFFY:  Yes, Your Honor.  Numbers 55, 56, 59 and

15   61?

16           THE COURT:  You can't challenge all of them.

17           MR. DUFFY:  No, no, no, I'm sorry.  I just wanted to

18   confirm I have the right numbers, Your Honor, 55, 56, 59 and

19   61?

20           THE COURT:  That's correct.

21           MR. DUFFY:  The Government accepts, Your Honor.

22           THE COURT:  All right.  So, our first alternate is

23   Jiron, although he said something else, I don't know what

24   language he's talking in; second alternate is Gouveia; third

25   alternate is Ruiz; and the fourth alternate is Pedreno.

1          All right.  How about if we call them in, swear them in

2     and send them to lunch?  Do you want to do that, Wanda?

3          COURTROOM DEPUTY:  Yes.

4          THE COURT:  Quickly.

5          COURTROOM DEPUTY:  Do you want to go over the names?

6          THE COURT:  Let's go over the list and make sure

7     everybody agrees.  The jurors for the regular jury are Juror

8     Number 1 is original Juror Number 3, Reyes; Number 2 is 4,

9     Simpson; Number 3 is 9, Pastrana; Number 4 is 14, Leal; Number

10    5 is 18, Rodriguez; Number 6 is 19, Cardona, number 7 is --

11    wait a second -- Number 35, Lord; Number 8 is Number 36,

12    Restrepo; Number 9 is 39, Corvo; Number 10 is 42, Lambert;

13    Number 11 is 47, Osio; Number 12 is Number 51, Pedroso.

14         First alternate is Number 56, Jiron; second alternate

15    is -- Number 55, that was; and 56 is Gouveia, the second

16    alternate; the third alternate is Number 59, Ruiz; the fourth

17    alternate is Number 61, Pedreno.

18         Got them?  Wanda's going to go get them.

19         They don't have to be in any order when they come in.

20    They don't have to be in order.

21         COURTROOM DEPUTY:  No order.

22         THE COURT:  Break until quarter of two?

23         MR. FOSTER:  Yes, sir, that would be great.

24         THE COURT:  Is a quarter of two long enough?  How long

25    do you need for opening statements?

```
 1              MR. DUFFY:  Approximately, one hour, Your Honor.

 2              THE COURT:  Oh, come on.  You're killing me.

 3              An hour of listening to you two guys?

 4              MR. WATTS-FITZGERALD:  No, Your Honor.

 5              MR. DUFFY:  Yes, we do need an hour.

 6              MR. RODRIGUEZ:  Yeah, each side.  Yes, we do need an

 7    hour.

 8              THE COURT:  All right.

 9              MR. WATTS-FITZGERALD:  We intend to make it everything

10    that you want, Your Honor.

11              THE COURT:  Entertaining and fascinating, I'm sure.

12              MR. RODRIGUEZ:  I have a PowerPoint, so you can watch

13    it.

14              THE COURT:  Oh, good.  No, that's all right.

15              Do I have to?

16              MR. WATTS-FITZGERALD:  Your Honor, I'm bored already.

17              THE COURT:  I'm already bored.  I'm already nodding

18    off.

19              MR. DUFFY:  Your Honor, we did file a supplemental

20    filing in connection with the issue of referring to the

21    individuals as "codefendants" who were arrested in the

22    indictment.

23              THE COURT:  I will tell you what we will do, we will be

24    back at a quarter of two, the jury will come back at two, we

25    will talk for 15 minutes about anything that we need to talk to
```

1    about before openings.  How's that?

2          And then I will go into my preliminary instructions to

3    them and then you will have your opening statements, and I

4    suspect that that will take the rest of the day.  I don't think

5    we'll actually get to any -- and then we will let them go until

6    Thursday morning at 9:30.

7          And when -- Thanksgiving week, what I propose to do is

8    9:30 to 5:00 every day, except Wednesday, I would like to start

9    at 9:00 and go to noon and try to get three solid hours in.

10   Okay.

11         MR. FOSTER:  Yes, sir.

12         THE COURT:  And by the following week, they will have

13   taken me off to the nut hatch, and so you'll probably have a

14   new judge in here filling in; since I will be taken off -- that

15   lady was going to come get me in the VA van and take me over

16   there, for my nervous breakdown.

17         MR. WATTS-FITZGERALD:  She doesn't know you're a vet,

18   Your Honor.

19         THE COURT:  I told her I was, twice.

20         MR. WATTS-FITZGERALD:  Did you?

21         THE COURT:  Yes, I did.  I was trying to preempt her

22   whining about veterans.  Maybe she thought I meant I was a

23   veterinarian, I'm not sure.  I don't know.

24         MR. FOSTER:  So, Judge --

25         THE COURT:  All the jobs are important and her job is

1    very important, but for God's sake, that was a bit much.

2          MR. FOSTER:  So no evidence today, sir?

3          THE COURT:  I didn't say that.  I said it looks like we

4    will probably be by the end of the day at the time we finish.

5          If we have time, I will do it; I will turn and say,

6    call your first witness.  But I don't think there's any way

7    we'll get -- I don't think we'll get there.  But if we do, it's

8    certainly no more than one, so you can let everyone else go

9    home.

10          MR. DUFFY:  I would like to say we discussed with the

11   defense certain exhibits that we plan to move in at the outset

12   of the trial that they don't object to, bank records and sort,

13   so I just wanted to apprise the Court.

14          THE COURT:  Just move them; and if they don't object,

15   good.

16          COURT SECURITY OFFICER:  All rise for the jury.

17          (Prospective jurors entered courtroom at 12:09 p.m.)

18          THE COURT:  All right.

19          Ms. Holston, please swear the jury.

20          COURTROOM DEPUTY:  Members of the jury, please stand

21   and raise your right hand.

22          Do you and each of you do solemnly swear or affirm that

23   you will well and truly try the issues herein in the case

24   before the Court and a true verdict render according to the

25   evidence and the law given to you by the Court, so help you

1    God, do each of you take this solemn oath?

2          JURY PANEL (Collectively):  Yes.

3          THE COURT:  Please be seated.  Ladies and Gentlemen of

4    the Jury, you have now been sworn as the jury to try this case

5    and rather than start involving you an instruction and

6    everything else, it's lunchtime.

7          And you may have noticed, I haven't missed a lot of

8    lunches, and I don't intend to miss this one, because I

9    actually have the judge that shares my conference room is

10   bringing her chambers over and we're having a joint lunch in

11   our library.

12         But when you come back from lunch, we will have a -- we

13   will have the preliminary instructions and then the opening

14   statements and then we'll have evidence.

15         Now I want to just give you one preliminary

16   instruction; that is, you're not to discuss this case with

17   anyone or permit anyone to discuss the case with you.  Until

18   you retire to the jury room at the end of the case to

19   deliberate on your verdict, you're simply not to talk about the

20   case.

21         Also, remember that you're not to read or listen to

22   anything touching on this case in any way.  If anyone should

23   try to talk to you about the case, please bring it to my

24   attention immediately.  Keep in mind, you must not do any

25   research or make any investigation about the case on your own.

1            The only evidence in this case which you may consider

2     is the testimony of the witnesses that you hear from this stand

3     right here, or the evidence that is introduced during the

4     official proceedings in the courtroom or any stipulations that

5     the parties entered into.

6            Also, remember -- and this is very important -- you

7     must not have any contact with the attorneys, parties or

8     witnesses in the case.

9            What's -- you know, it's pretty obvious that there's

10    only one entrance to this building and that's for security

11    reasons, but everybody gets funneled through the same place.

12           If you see them and they hang back, they're not trying

13    to avoid you -- well, they are trying to avoid you, because I

14    have instructed them to avoid you.

15           And if you try to get on the elevator, there is only

16    one bank of elevators, and they see you on the elevator -- they

17    may not, but if they see you on the elevator, they're not

18    supposed to get on with you, they're supposed to wait until the

19    next one.  They're not being rude, they're just following

20    instructions.

21           Very important, because of that, don't use the public

22    bathrooms because they're the only bathrooms on the floor.

23    Don't hang around the lobby because that's the only lobby for

24    this floor.  Don't hang around the entrance because it's the

25    only entrance for the building.

 1          When you get here, come in.  First of all, wear your

 2     jury badges when you're in the building.  When you go outside,

 3     it would probably be better if you didn't wear them because

 4     there's a lot of weirdos walking around downtown and they might

 5     start haranguing you about the jury system or who knows what.

 6          There's a guy that's pushing a cart around, he's

 7     entitled to do that, and he has a loud speaker.  I have no idea

 8     what he's talking about, but don't get into conversations with

 9     people like that because they may tell you something that might

10     affect your ability to be a fair and impartial juror.

11          When you get here, come in, come in right away, come

12     upstairs, walk down the hall and, you know, you have to knock

13     out there and we have to let you in because it is a secured

14     hallway, and then we will let you into the jury room.

15          The jury room will be a little bit crowded because

16     there's so many of you, but there's two bathrooms in there,

17     there's sodas, there's water.  Come in there, if you're going

18     to hang around, hang around in there.  If you're not going to

19     hang around in there, walk over to the junior college or

20     something.

21          Lunch.  There's a cafeteria on the seventh floor.  It's

22     decent, not terrific, but decent; however, one block over that

23     way is a junior college, thousands of kids, where there's kids,

24     there's food.  There is a McDonald's, there are all sorts of

25     places within a block of that place.  There's some nice places

1   downtown.

2       If you go down to Flagler Street, there's a very nice

3   Italian restaurant called "La Loggia," there's other places

4   along there.  There's probably every decent franchise you ever

5   heard of, Jimmy John's, there's a Starbucks, even a Burger

6   King, there's all sorts of places.  There's one that really

7   looks like a Burger King, but if you look at it carefully, it

8   really isn't, it's some South American rip-off of a Burger

9   King.

10      There's all sorts of places around that you can find

11  and, you know, if you want to go that way, if you want to go

12  the tourist route, Bayside is about three blocks straight east

13  of here and they have all sorts of fast foods, so you can find

14  plenty of places to eat, and I urge you to do so.

15      We're going to break until 2:00.  At that time we're

16  going to come back and the reason we do that is because we have

17  some legal matters we have to talk about during the break and

18  then we'll be doing that while you're out to lunch and then

19  we'll get our lunch.

20      Finally, just very, very important.  Don't discuss this

21  case with anyone.  And one of the reasons for that is that you

22  must not form an opinion about this case until all of the

23  evidence is in.

24      In order for you to discuss this case with somebody,

25  you have to crystalize your thoughts.  You have to say, oh,

1    this case is about this.  You don't know what it's about yet.

2    We're not even going to tell you any more details than you've

3    already heard, which is very little.  So don't talk about the

4    case.  Don't put it on -- if somebody asks you while you're at

5    lunch, what's happening, oh, I was selected for a jury.

6            What's it about?

7            I don't know.  I will let you know later, or I can't

8    tell you, or, you know, whatever.  Just don't talk about it,

9    okay.  Don't post anything on -- I know that it's popular,

10   everybody wants to know whenever you wash your hands or brush

11   your teeth or whatever -- on social media.  Don't go on social

12   media to say, I just got selected for a jury in the case of

13   so-and-so.  Don't do that, because you're crystalizing your

14   thoughts, and it's not worth doing it.

15           Please, go have a nice lunch, enjoy yourselves for

16   lunch, go out this way and Wanda will meet you in the jury

17   room, she will show you how to get in, she will tell you

18   whatever other details.  She knows a lot more about what should

19   be -- what I should be telling you than I do.

20           So if you follow the court security officer, he will

21   take you in through there.

22           When you come out, you don't have to sit in the same

23   seats, it doesn't really matter, you will see every seat is

24   taken so you have to go all the way to the end if you're the

25   first one in.  But it doesn't matter if you sit here, there or

1    anywhere.

2              We will see you here at 2:00.

3              COURT SECURITY OFFICER:  All rise for the jury.

4              (Jury exited courtroom at 12:17 p.m.)

5              THE COURT:  Hold on.  Wait until the door closes.

6              You can be seated.  If you all would wait just a few

7    minutes before you leave so that the jury can clear the floor.

8    Actually, if you leave now, it doesn't matter because they're

9    still in there talking.  Yes, sir.  The door is closed.

10             MR. FOSTER:  We have this young lady, she's a law

11   student, she's going to be doing a little bit of work with us.

12   She was coming forward.  I just wanted you to know who it was.

13             THE COURT:  That's fine.  I don't usually complain

14   about ladies coming up and being at the table, it's your

15   business, not mine, as long as the Marshals are okay.

16             Anything else?  We will see you all at quarter of two

17   then.

18             (Lunch recess taken from 12:18 p.m. to 1:49 p.m.)

19             COURTROOM DEPUTY:  All rise.  Court is again in

20   session.

21             THE COURT:  Let's talk about what we were going to talk

22   about.  You got the pending Government's Motion in Limine to

23   Exclude Evidence of Alleged Improper Contacts Between the

24   Prosecution and Victims in This Case.

25             Is that going to be an issue?

1          MR. RODRIGUEZ:  That was the very last motion they

2     filed.  Your Honor, I think what the Government's trying to say

3     is that we don't have the right to claim that Mr. Zahn, who was

4     a witness in the first trial, struck a deal with Mr. Duffy in

5     order to testify, and also help Mr. Duffy.

6          THE COURT:  I don't think that's at all -- I think

7     you're allowed to cross-examine on that.

8          MR. RODRIGUEZ:  Right.

9          THE COURT:  But you're not allowed to argue that there

10    was some sort of improper contact.

11         You can ask questions about it, cross-examine.

12         MR. RODRIGUEZ:  Yeah, we've never alleged improper

13    contact.  We're alleging it's just bias contact, it's what

14    makes the witness biased, and it also makes him -- he's

15    informant A, so he's an informant, you know, he's a Government

16    agent, and I think we get to argue all of that during our

17    questioning of him.

18         In opening, I tend to bring up the historical fact of

19    what happened.  I'm not planning on arguing anything in

20    opening.

21         THE COURT:  Well, you're not supposed to.

22         MR. RODRIGUEZ:  Right, that's why I wasn't planning to.

23         THE COURT:  All right.  Well --

24         MR. DUFFY:  Your Honor, it's a little more than he

25    wants to do, though.  He wants -- as he just said, he wants to

1  suggest that there's some kind of "struck a deal."

2          There's no evidence of any deal, that's just not

3  accurate.  He doesn't have any basis of that, so the issue is

4  he can Cross if he wants whether the victim was biased, sure,

5  as any victim can be.  But there's no evidence of any deal

6  that's been struck, or otherwise.

7          THE COURT:  Can you pull that microphone over in front

8  of you, please?

9          MR. DUFFY:  Yes, Your Honor.  Thank you, Your Honor.

10         MR. RODRIGUEZ:  I think the evidence and the deal will

11 come out in the cross-examination of the witness.

12         THE COURT:  I'm going to tell you not to say that they

13 "made a deal" in your opening statement.

14         If you want to cross-examine on it, that's fine.

15         MR. RODRIGUEZ:  Thank you.

16         THE COURT:  Government's Supplemental Memorandum

17 Concerning Reference to a Former Co-Defendant.

18         What are you talking about?

19         MR. DUFFY:  Well, there's two issues, Your Honor.  The

20 one I think Your Honor ruled on is no co-conspirator statement

21 comes in until such time -- not to offer it until such time as

22 we have adduced enough evidence and brought the issue to the

23 Court's attention and the Court rules on it.

24         THE COURT:  I got to say, I'm concerned about that,

25 because the cases that you've cited do not relate to an

 1    acquitted co-defendant.

 2         They relate to -- or, excuse me, I shouldn't say that.

 3    They do not relate to testimony of an acquitted co-defendant in

 4    a subsequent trial.

 5         They are involving whether the statements could have

 6    come in during the trial in which the co-defendant was

 7    acquitted, and that is a totally different situation.

 8         I don't think that you reverse it or you say that they

 9    have a problem with that, if it's in the same trial.

10         But I think that it's a different matter once that

11    person has been acquitted, I think that you can use the

12    co-defendant's statement -- or excuse me -- the

13    co-conspirator's statement in any conspiracy for which she has

14    not yet been acquitted.

15         But if it was one that she has been acquitted for, I

16    think that the jury has spoken.  I may not agree with them, I

17    may think that their verdict was not, you know, accurate, but

18    that's not my place.  I don't deal with the facts.

19         They deal with the facts.

20         So I think that since the standard for permitting it in

21    testimony is preponderance of the evidence, I was perfectly

22    proper in permitting it in last time because I was, but since

23    the jury has found that beyond a reasonable doubt she did not,

24    you know, that you did not prove beyond a reasonable doubt, I'm

25    wondering how does that work?

1         It doesn't seem to me it's the same thing.

2         MR. DUFFY:  Your Honor, I don't think that -- I don't

3    think that is -- that is the law.

4         THE COURT:  All right.  Tell me what --

5         MR. DUFFY:  I would be happy to submit additional cases

6    for your consideration on the exact point.

7         THE COURT:  Until such time, no co-conspirator

8    statements except on the new conspiracy that wasn't charged the

9    first time, which I think you can allege that she is a co-

10   conspirator and if you prove it beyond a preponderance, then

11   that's fine.

12        MR. DUFFY:  Thank you.

13        THE COURT:  But on the acquitted conspiracy, unless you

14   can give me some different case law, I'm not buying it.

15        MR. DUFFY:  Thank you, Your Honor.

16        THE COURT:  Okay.

17        MR. DUFFY:  The other sort of -- I wouldn't say it's as

18   much of an issue, because I think I understand your ruling

19   clearly now, but in the indictment, of course, in Count 1 and

20   in Counts 2 through 7, co-conspirator number one is Cristal

21   Coleman Clark, as alleged.

22        And co-conspirator number one is, as alleged, then we

23   would want the opportunity to say what the evidence will show

24   in connection with that.

25        We've only referenced in the indictment co-conspirator

1    numbers one through four, and we have given those names to the

2    defense, because the Department of Justice policy requires us

3    to identify unindicted persons by some number or, you know,

4    some other form, but that is -- you know, what the evidence

5    will show, for example, is that there were mortgage loans and

6    the mortgage loans were false, or the evidence that we intend

7    to offer up.

8            But I would just say that we would like the opportunity

9    to, at least in our opening, indicate this is what the evidence

10   will show.  The evidence will show that the defendant conspired

11   with certain family members, including A, B and C, and this is

12   how it worked.

13           THE COURT:  Okay.  I don't understand what you're

14   asking me.  I heard all the words you said.  I understood all

15   the words.  What are you saying?

16           MR. DUFFY:  I just want to say we can refer, at least

17   in our opening, and say the evidence will show that the

18   defendant conspired with his then girlfriend or significant

19   other, and his sister and brother-in-law and his -- and

20   whomever else, and that's all.  I just wanted to make sure we

21   were clear on that because I didn't want to run afoul of any

22   court ruling.

23           THE COURT:  Okay.

24           MR. FOSTER:  Thank you, Judge.  Judge, the conspiracy

25   in the first trial is largely the same bank fraud conspiracy as

1    in the second trial.

2              THE COURT:  But not exactly the same.

3              MR. FOSTER:  But the overlap is so significant.  The

4    time frame, the individuals involved, the object, which is the

5    bank fraud.  And when we were on the conference call, we had

6    filed a motion in limine asking that the Government be confined

7    to this new-expressed theory -- which they also, by the way,

8    argued in the old case -- but the new express theory of nominee

9    loans, and the Government said that we should be able to argue

10   any and all theories that we want to.  And at that point on the

11   conference call, Judge, you did not tell them that they were

12   limited to simply the nominee loans.

13             So this conspiracy that's in this superseding

14   indictment is part and parcel, was included in the first

15   conspiracy.  So they're going to talk about the same loans

16   we've talked about in the -- in the trial, they're going to

17   talk about the same statements on the loan apps, they're going

18   to talk about the same money trail, they're going to talk about

19   the same exact things.  Their exhibits are the same as the

20   first trial, it's all the same.  There is no new conspiracy.

21   It's not like she conspired to rob Bank A and, in this case,

22   we're talking about she conspired to rob Bank D.  It's not.

23   It's the same facts.

24             MR. DUFFY:  Well, we previously argued this, but that's

25   not accurate.  But and the evidence over the next few days of

1    trial testimony will show the Court that that's not accurate,

2    but what we are intending to do is show -- as we said in our

3    pleadings and to the Court last week -- is show that the

4    defendant, Dave Clark, conspired with others, including

5    insiders and his family members, to do straw-buyer loans, and

6    those straw-buyer loans were for two purposes:

7          One, to line his own pockets; and two, to prop up

8    Cay Clubs, which was failing at the time, and to meet the

9    financial obligations of Cay Clubs, and so to the extent that

10   the indictment has been -- in Count 1 has been redrafted, we

11   agree.

12         But relevant evidence is not just what's in the

13   language of Count 1 as the Court's already ruled and ruled last

14   week.  You said -- in response to this motion that you denied,

15   you said, no, I'm not going to limit the Government; rather,

16   I'm going to wait until the evidence comes in and I'm going to

17   make a decision on a, you know, piece-of-evidence by

18   piece-of-evidence basis, if necessary, to determine if it's

19   relevant.  That's what the Court said last week.

20         THE COURT:  Yeah, the question is whether you can refer

21   to it.  You refer to it at your own risk.  If you don't prove

22   it, they're going to take it and they're going to raise heck

23   with it and they're going to bother you about it quite a bit, I

24   suspect, but I'm not going to tell you can't say it in your

25   opening statement.

1              But what I am telling you is that I'm not sure, I will

2      have to see the context and see whether you may be  proving

3      that and you may not be proving that, I don't know whether

4      you're going to prove that or not, we'll find out.  You do it

5      at your own risk.

6              MR. DUFFY:  Thank you, Your Honor.

7              THE COURT:  All right.  Can we call the jury in then --

8      are they all here?

9              COURT SECURITY OFFICER:  We were missing one last time

10     Wanda counted.

11             THE COURT:  Let's see.

12             COURT SECURITY OFFICER:  They're all here, Judge.

13             THE COURT:  All right.  Bring them in, please.

14             (Jury entered courtroom at 1:59 p.m.)

15             THE COURT:  Please be seated.

16             All right.  Members of the jury, you have now been

17     sworn -- and you see why I need Wanda badly.  I lose things all

18     the time.

19             You've now been sworn as the jury to try this case, and

20     I would like to give you some preliminary instructions at this

21     time.

22             By your verdict, you will decide the disputed issues of

23     fact, I will decide all questions of law that arise during the

24     trial, and before you retire to deliberate together on your

25     verdict and decide the case at the end of the trial, I will

1    instruct you again on the rules of law that you must follow and

2    apply in reaching your decision.

3           Because you will be called upon to decide the facts of

4    this case, you should give careful attention to the testimony

5    and evidence presented for your consideration during the trial,

6    but you must keep an open mind and should not form or state any

7    opinion about the case one way or the other until you have

8    heard all of the evidence and have had the benefit of the

9    closing arguments of the lawyers, as well as my instructions to

10   you on the applicable law.

11          During the trial, you must not discuss the case in any

12   manner, either among yourselves or with anyone else; and you

13   must not permit anyone to attempt to discuss it with you or in

14   your presence; and insofar as the lawyers are concerned, as

15   well as others whom you may come to recognize as having some

16   connection with the case, you're instructed that in order to

17   avoid even the appearance of impropriety, you should have no

18   conversations whatsoever with those persons while you are

19   serving on the jury.

20          Please use the restrooms located in the jury room.

21          You, as jurors, must decide this case based solely on

22   the evidence presented here within the four walls of this

23   courtroom.  This means that during the trial you must not

24   conduct any independent research about this case, about the

25   matters in the case, and the individuals or corporations

1    involved in the case.

2         In other words, you should not consult dictionaries or

3    reference materials.  You should not search the internet -- I

4    don't want to be giving you ideas, but I suspect most of you

5    have heard of most of these things -- you should not search

6    websites, blogs, or use any tools, electronic or otherwise, to

7    obtain information about this case or to help you decide this

8    case.  Please do not try to find out information from any

9    source outside the confines of this courtroom.

10        Until you retire to deliberate, you may not discuss the

11   case with anyone, even among yourselves.  After you retire to

12   deliberate, you may begin discussing the case with your fellow

13   jurors, but you cannot discuss the case with anyone else until

14   you have returned a verdict and the case is at an end.

15        I hope that for all of you this case is interesting and

16   noteworthy.  I know that many of you use cell phones,

17   Smartphones, Blackberries, the internet, other tools of

18   technology.  You also must not talk to anyone about this case

19   or use these tools to communicate electronically about the

20   case.  This includes your family and friends.

21        You may not communicate with anyone about the case on

22   your cell phone, through e-mail, Blackberry, iPhone, text

23   messaging, or on Twitter, through any blog or website, through

24   any internet chat room, or by way of any other social

25   networking websites, including, but not limited to, Facebook,

1   My Space, LinkedIn and YouTube, and I guess the list could get

2   a lot longer.

3          You must also avoid reading any newspaper articles that

4   might be published about the case now that the trial has begun.

5          And, you know, I sometimes do tell you, but I'm not

6   going to tell you this.  It says you must also avoid listening

7   to or observing any broadcast news program or other television.

8   I'm not going to do that to you, because 99.999 percent, it's

9   not going to be on television, it's not going to be on the

10  radio.

11         But if you are listening to the television news or the

12  radio and you hear anything saying "federal criminal case,

13  federal case," the name "Clark," anything -- I'm not saying

14  it's going to happen, I don't think it will -- put your fingers

15  in your ears and do whatever you used to do when you were a kid

16  and didn't want to hear it, hum, sing, do anything and walk out

17  of the room and tell me about it.

18         And I bet you when we look into it, we will find out it

19  had nothing to do with this case, but try to avoid all that.

20  I'm not going to tell you not to watch news programs, though.

21         The reason for these cautions, of course, lies in the

22  fact that it will be your duty to decide this case only on the

23  basis of the testimony and evidence presented during the trial

24  without consideration of any other matters whatsoever.

25         If you are reading the newspaper and you see something

1    that says "federal criminal trial," stop reading, tell us about

2    it, we'll see it -- probably didn't have anything to do with

3    this case.  But just stop reading.  If you hear news, stop

4    listening, get up and get out of the room and tell your

5    significant others, "I don't want to hear about it," and then

6    tell me about it the next day and I bet we will find that it

7    had nothing to do with this case.

8            From time to time during the trial, I may be called

9    upon to make a ruling of law on motions or objections made by

10    the lawyers.

11           I hope you do not infer or conclude from any ruling

12    that I may make that I have any opinions on the merits of the

13    case favoring one side or the other.  I don't.

14           And if I "sustain" an objection to a question that goes

15    unanswered by the witness, you should not speculate on what

16    answer might have been given, nor should you draw any inference

17    or conclusions from the question itself.

18           There used to be a television program -- it was a

19    really bad program, it was on for about two or three years --

20    where this guy was a lawyer and he owned a bowling alley,

21    too -- which is an interesting combination -- and he used to

22    have -- be in court every once in awhile and he'd stand up and

23    he's ask the most ridiculous question and then the other side

24    would object and the judge would look at him kind of funny and

25    he'd say, "withdrawn," and sit down like he really proved

1    something.

2         Well, you know what, if he did that in here, he'd

3    better bring his toothbrush because you're not allowed to do

4    that.  The question doesn't matter; it's the answer that

5    matters.

6         Please, if I sustain an objection, don't say, oh, I

7    wonder what the answer would have been to that.  It doesn't

8    work that way.  And these are good lawyers, I don't think

9    they'll do that.  But if they, by mistake, ask the wrong

10   question and I sustain an objection, don't try to speculate on

11   what the answer might have been.

12        Of course the preliminary instructions -- wait, hold

13   on.  All right.

14        During the trial it may be necessary for me to confer

15   with the lawyers from time to time out of your hearing

16   concerning questions of law or procedure that require

17   consideration by me alone, because it's a legal matter.  On

18   some occasions, I'll excuse you from the courtroom and we will

19   continue to talk the way we normally are.

20        We do have that, which is white noise, which I can put

21   on and what it does is it shuts off all the microphones in the

22   courtroom, except this little one that we have over here.

23   They'll come over here and they'll talk to me, but we will

24   whisper; but I was brought up that whispering in the presence

25   of others is rude, so I try not to do that.

1          On the other hand, if it's short and we need to

2    exchange a few words, I'll call them over and we'll do that.

3          Otherwise, I'll ask you to leave the room so that we

4    can continue to discuss the matters with the lawyers, if it's

5    going to take a couple minutes.  I don't like to waste your

6    time and if I can save time by doing that, I will do that.

7          Sometimes, however, I need to just ask you to go into

8    the other room.  I'll try to limit these interruptions as much

9    as possible, but I hope that you remember at all times the

10   importance of the matter that you're here to determine, and I

11   hope that you're patient, even though the case may seem to go

12   slowly.

13         In that regard, as you were told during the process of

14   your selection, we expect the case to last approximately six to

15   eight weeks, but I will make every effort to expedite the trial

16   whenever possible, and I will do my best and we might get it

17   less.

18         Now, in order that you might better understand at the

19   beginning of the case the nature of the decisions you will be

20   asked to make, how you should go about making them, I would

21   like to give you some preliminary instructions at this time

22   concerning some of the rules of law that will apply.

23         Of course, the preliminary instructions I will give you

24   now will not cover all of the rules of law applicable to this

25   case.   As I stated before, I'll instruct you fully at the end

1   of the trial just before you retire to deliberate upon your

2   verdict, and at that time I will restate some of the rules that

3   I'm going to tell you about now, but it's not going to be all

4   because I don't really know for sure what the evidence is going

5   to be at this time.  It depends.

6        In any event, you should not single out any one

7   instruction alone as stating the law, but you should consider

8   all of my instructions as a whole.

9        "The presumption of innocence."  An indictment in a

10  criminal case is merely the accusatory paper which states the

11  charge or charges to be determined at the trial, but it is not

12  evidence against this defendant or anyone else.

13        Instead, the defendant, having entered a plea of not

14  guilty, is presumed by the law to be innocent.

15        The Government has the burden of proving a defendant

16  guilty "beyond a reasonable doubt," and if it fails to do so,

17  you must find the defendant not guilty.

18        "The burden of proof.  Proof beyond a reasonable doubt"

19  is proof of such a convincing character that you would be

20  willing to rely and act upon it in the most important of your

21  own affairs.

22        "The order of proof."  Because the Government has the

23  burden of proof, it will go forward and present its testimony

24  and evidence first.

25        After the Government finishes or "rests" its case, what

1    we call its "case-in-chief," the defendant may call witnesses

2    and present evidence, if he wishes to do so.

3            However, you will remember that the law does not

4    require a defendant to prove his innocence or produce any

5    evidence at all, and no inference whatsoever may be drawn from

6    the election of a defendant not to testify in the event he

7    should so elect.

8            "The credibility of witnesses."  As you listen to the

9    testimony, you should remember that you will be the sole judges

10   of the credibility or believability of each witness and the

11   weight to be given to his or her testimony.

12           In deciding whether you believe or disbelieve any

13   witness, you should consider his or her relationship to the

14   Government or to the defendant; the interest, if any, of the

15   witness in the outcome of the case; his or her manner of

16   testifying; the opportunity of the witness to observe or

17   acquire knowledge concerning the facts about which he or she

18   testified; the candor, fairness and intelligence of the

19   witness; and the extent to which the witness has been supported

20   or contradicted by other credible evidence.  You may, in short,

21   accept or reject the testimony of any witness in whole or in

22   part.

23           You'll notice that the court reporter is making a

24   complete stenographic record of all that is said during the

25   trial, including the testimony of witnesses in case it should

1    become necessary at a future date to prepare printed

2    transcripts of any portion of the trial proceedings.

3            Such transcripts, however, if prepared at all, will not

4    be printed in sufficient time or appropriate form for your

5    review during your deliberations and you should not expect to

6    receive any transcripts.

7            You will be required to rely upon your own individual

8    and collective memories concerning what the testimony was.

9            On the other hand, any papers and other tangible

10   exhibits received in evidence during the trial will be

11   available to you for your study during your deliberations.

12           On some occasions during the trial exhibits may be

13   handed to you for brief inspection there in the jury box.

14   Others will not be shown to you.  But do not be concerned, as I

15   said, you will get to see and inspect at the end of the case

16   all the exhibits that are received in evidence.

17           You'll be permitted to take notes during this trial.

18           You must use your notes only as a memory aid during

19   deliberations.  You must not give your notes priority over your

20   own independent recollection of the evidence and you must not

21   allow yourself to be unduly influenced by the notes of others.

22           I don't want somebody to say, "Well, look, my notes are

23   neat, I have an outline, and you can read mine, so mine are

24   better."  Not necessarily.  That's why there's so many people

25   on the jury, because it's your individual and collective

1    memories that should govern this.

2         I emphasize that notes are not entitled to any greater

3    weight than your own memory or impression about the testimony.

4         The defendant is charged with 12 separate crimes called

5    "counts."  Each count has a number and refers to the defendant

6    in this case.

7         Count 1 charges the defendant with violating Title 18,

8    United States Code, Section 1349.  Section 1349 makes it a

9    Federal crime to knowingly and willfully conspire or agree with

10   someone to do something that, if actually carried out, would

11   result in the crime of bank fraud.

12        A defendant can be found guilty of this crime only if

13   all the following facts are proved beyond a reasonable doubt.

14        These are called "elements."

15        First, two or more persons, in some way or manner,

16   agreed to try to accomplish a common and unlawful plan to

17   commit bank fraud as charged in the indictment; and two, the

18   defendant knew the unlawful purpose of the plan and willfully

19   joined in it.

20        Counts 2, 3 and 4 charge the defendant with violating

21   Title 18, United States Code, Section 1344.  That section makes

22   it a Federal crime to carry out or attempt to carry out a

23   scheme to defraud a financial institution, or to get money or

24   property owned or controlled by a financial institution by

25   using false pretenses, representations, or promises.

1       A defendant can be found guilty of this crime only if

2  all the following facts are proved beyond a reasonable doubt:

3       First, the defendant knowingly carried out or attempted

4  to carry out a scheme to get money, assets, or other property

5  from a financial institution by using false or fraudulent

6  means -- excuse me -- using false or fraudulent pretenses,

7  representations or promises about a material fact.

8       I'll read that again because I messed it up.

9       The defendant knowingly carried out or attempted to

10 carry out a scheme to get money, assets, or other property from

11 a financial institution by using false or fraudulent pretenses,

12 representations, or promises about a material fact.

13      Second, the false or fraudulent pretenses,

14 representations or promises were material.

15      Third, the defendant intended to defraud the financial

16 institution.

17      And fourth, the financial institution was federally

18 insured.

19      Counts 5, 6 and 7 charge the defendant with violating

20 Title 18, United States Code, Section 1014.  That section makes

21 it a Federal crime to knowingly make a false statement or

22 report to a federally insured financial institution.

23      A defendant can be found guilty of this crime only if

24 all the following facts are proved beyond a reasonable doubt:

25      First, the defendant made a false statement or report.

1        Second, the defendant did so knowingly and with the

2   intent to influence an action of the institution described in

3   the indictment regarding an application, advance, commitment,

4   or loan, or a change or extension to any of those.

5        And third, the deposits of the institution were insured

6   by the FDIC, the Federal Deposit Insurance Corporation.

7        Count 8 charges the defendant with violating Title 18,

8   United States Code, Section 1349.  That section makes it a

9   Federal crime to knowingly and willfully conspire or agreed

10  with someone to do something that, if actually carried out,

11  would result in the crime of mail fraud or wire fraud.  A

12  defendant can be found guilty of this crime only if all the

13  following facts are proved beyond a reasonable doubt.

14       First, two or more persons, in some way or manner,

15  agreed to try to accomplish a common and unlawful plan to

16  commit mail fraud or wire fraud as charged in the indictment.

17       And second, the defendant knew the unlawful purpose of

18  the plan and willfully joined in it.

19       Counts 9, 10, and 11 charge the defendant with

20  violating 18, USC, Section 1341.  That section makes it a

21  Federal crime to use the United States mail or to transmit

22  something by private or commercial interstate carrier in

23  carrying out a scheme to defraud someone.

24       A defendant can be found guilty of this crime only if

25  all the following facts are proved beyond a reasonable doubt:

1          First, the defendant knowingly devised or participated

2     in a scheme to defraud someone, or obtain money or property,

3     using false and fraudulent -- or fraudulent pretenses,

4     representations, or promises.

5          Second, the false or fraudulent pretenses,

6     representations or promises were about a material fact.

7          Third, the defendant intended to defraud someone.

8          And fourth, the defendant used the United States Postal

9     Service by mailing or by causing to be mailed, or a private or

10    commercial interstate carrier by depositing or causing to be

11    deposited with the carrier, something meant to help carry out

12    the scheme to defraud.

13         Count 12 charges the Defendant with violating Title 18,

14    United States Code, Section 1512(c)(2).  That section makes it

15    a Federal crime to corruptly try to influence, obstruct, or

16    impede the due administration of the law under which a pending

17    proceeding is being conducted before an agency of the United

18    States, such as, the U.S. Securities and Exchange Commission.

19    A defendant can be found guilty of this crime only if all the

20    following facts are proved beyond a reasonable doubt:

21         First, that there was a proceeding being conducted by

22    the Securities and Exchange Commission, which is an agency of

23    the United States Government.

24         And second, the defendant knowingly and corruptly tried

25    to influence, obstruct or impede the due administration of the

1    law under which this proceeding was being conducted before the

2    United States Securities and Exchange Commission.

3         Now, we will begin the trial at this time by affording

4    the lawyers for each side an opportunity to make opening

5    statements to you in which they may explain the issues in this

6    case and summarize the facts they expect the evidence will

7    show.

8         After all the testimony and evidence has been

9    presented, the lawyers will then be given another opportunity

10   to address you at the end of the trial and make their

11   summations or final arguments in this case.

12        The statements that the lawyers make now, as well as

13   the arguments they present to you in the end of the trial, are

14   not to be considered by you either as evidence in the case,

15   which comes only from the witnesses and exhibits, or as your

16   instruction on the law which will come only from me.

17        Nevertheless, these statements or arguments are

18   intended to help you understand the evidence as it comes in and

19   the issues or disputes you will be called upon to decide, as

20   well as positions taken by both sides.

21        So I ask that you now give the lawyers your close

22   attention as I recognize them in turn for the purpose of making

23   an opening statement.

24        Mr. Duffy.

25        MR. WATTS-FITZGERALD:  Mr. Duffy's deferring,

1    Your Honor.  I will be making it.

2         THE COURT:  Then you, Mr. Watts-Fitzgerald.

3         MR. WATTS-FITZGERALD:  I will be using the Elmo as part

4    of the opening.

5         THE COURT:  Okay.  You don't have to take notes, but I

6    wanted you to have it if you wanted to.  You have the ability

7    to take notes.

8                   GOVERNMENT'S OPENING STATEMENT

9         MR. WATTS-FITZGERALD:  May it please the Court, counsel

10   and Ladies and Gentlemen of the Jury.

11        THE COURT:  Yes, sir.

12        MR. WATTS-FITZGERALD:  It's been quite a bit of time

13   passed -- it seems like a long time -- since we started

14   yesterday and we were all introduced, so I'd like to try that

15   again and also introduce another member of the Government's

16   team here who was not present when we did the initial

17   introductions Monday morning.

18        I'm Assistant U.S. Attorney Tom Watts-Fitzgerald.

19        My colleagues at counsel table with me are Assistant

20   U.S. Attorney Jerrob Duffy, Special Assistant U.S. Attorney

21   Mike Padula, and at the end of our table are our two

22   colleagues, Special Agent Joe Perera and Special Agent David

23   Capizola.

24        And you'll see one or more of them kind of moving in

25   and out of court at different times as we handle things outside

1    the court and prepare our presentation to you.

2              But thank you for your attention.

3              Dave Clark, as the Court has just explained to you, is

4    on trial in this case for 12 separate crimes; 12 separate

5    allegations, if you will, or assertions by the charging

6    instrument -- the indictment, which you will have later -- that

7    he violated the laws of the United States, and you heard

8    conspiracies and bank fraud, you've heard mail and wire fraud

9    and obstructing the SEC.

10             But to put it plainly, the evidence will show three

11   things:  Dave Clark -- sitting over here -- lied to get money,

12   he lied to keep money, and he lied to protect himself.

13             That's really what those counts are all about.

14             And so I'm going to take a little time and walk through

15   those counts and link it up with what I expect the evidence in

16   the case will show you as we proceed over the next several

17   weeks.

18             The oldest piece of evidence you're likely to see in

19   the case is a judgment from 1989.  In 1989, Fred Davis Clark,

20   Junior, the defendant in this case -- who you'll mostly hear

21   referred to by "Dave Clark," because that's how everybody knew

22   him, that's how everybody referred to him -- was in the

23   construction and development business.

24             And at that time he had a failed business.

25             That failed business was sued in court in the State of

 1    Florida and a judge in Florida found against him and posed a

 2    judgment of 6.1 million dollars that he was liable for to a

 3    bank.

 4          And that's very important because what happened next is

 5    a pattern that you'll see repeated in the evidence throughout

 6    the case right up through the end of the charges, which is in,

 7    approximately, 2013.

 8          The pattern that started in 1989 was, simply, run,

 9    avoid your financial obligations and prevent the people who

10    are -- the bank in this case -- who's entitled to that 6.1

11    million dollars without ever being able to collect it.  And he

12    did it through very devious means -- and the evidence will be

13    very clear on that -- because he admitted it to people that

14    will testify, and it permeates the other criminal conduct.

15          He did it by hiding his income, his salary, his assets,

16    which he always put in somebody else's name.  And the name

17    you'll hear most commonly linked to that conduct is a woman by

18    the name of "Cristal Coleman."

19          And Cristal is spelled C-R-I-S-T-A-L, and that's

20    important, too, because that name is going to show up again

21    repeatedly.

22          Cristal Coleman at the time that Dave Clark took up

23    with her in approximately the 2000-time range, eventually ends

24    up working for a company that he was working for as well.

25          He had that company -- a company called called

1    "Earthmark" -- pay his salary, the income and the earnings he

2    was entitled to for working everyday into her name.  Nothing

3    goes into his name.  And that's what the evidence will show.

4         Now, she became a real estate broker and was separately

5    working as an independent broker for Earthmark.  But she was

6    not entitled to his salary, that was his income, and he knew

7    it.  And his activities, as we will show you from there on,

8    will demonstrate he fully understood that and the implications

9    of hiding his assets in her name.

10        Now, I mentioned he was in the construction business

11   and that was his job history in the early 2000s.

12        I mentioned the Earthmark company.  It was in the

13   business of developing condo projects and housing developments

14   around Florida.

15        It was not Mr. Clark's company.

16        Earthmark was almost totally owned -- with some minor

17   shares elsewhere -- by a man named Mr. Rosen, and Earthmark has

18   been around awhile.  It was a very successful, well-respected

19   company.

20        Dave Clark worked for that company, he will have you

21   believe -- from the evidence you'll see -- and have everybody

22   believe he was working for free, because he was getting no

23   income or salary.

24        Now, what Dave Clark did was work on a series of

25   projects, including one at the end of his time with Earthmark

1    in, approximately, 2004 in the Florida Keys.  And that project

2    was called Mariner's Club, and it was an Earthmark project.

3         The other company that's going to crop up shortly

4    thereafter is called Cay Clubs, C.C.  You'll hear references to

5    "Cay Clubs Family," the "Cay Clubs Organization," because

6    Cay Clubs consisted of dozens of companies with almost exactly

7    identical names.  And those companies were all controlled --

8    according to his own statements -- to something you'll hear in

9    his own words on a telephone conversation that will be played

10   for you, he was the boss.  He directed everything that company

11   did.

12        On paper, in certain quarters he claimed or indicated

13   he was a two-thirds owner and controller, but he doesn't show

14   up on any of the corporate documentation for all those

15   companies that are registered corporations, mostly in the State

16   of Florida.

17        What he does show up as, occasionally, is a manager, a

18   director; never the owner, because remember, the evidence will

19   show he's hiding from that 1989 judgment.

20        In the summer of 2004 while he was working with

21   Mr. Rosen at Earthmark, Dave Clark proposed a new project and

22   Mr. Rosen was not comfortable with it.  It was a project over

23   in Clearwater, Florida, on the West Coast of Florida, and that

24   project preexisted.  It was a fairly nice condominium

25   development over on the West Coast.

1          The condos were all built, but there was -- in Dave

2     Clark's view -- opportunities there.  Mr. Rosen refused because

3     he already felt with ten other projects under completion at

4     some stage or another by Earthmark, they were overextended and

5     he said no, he was not interested.

6          Dave Clark left.  He left Earthmark late summer of

7     2004, and that's when Cay Clubs starts.

8          So Cay Club begins with the idea or the business plan

9     to develop a real estate empire.  The real estate empire is

10    supposed to be based on this business plan.

11         The business plan has several elements.

12         The concept that you will hear was that they would

13    market condos for the resort market but they would be a little

14    bit different because, to start with, they would take run-down,

15    preexisting condo units and properties and take them from one

16    star, two stars, up to five, and tremendously increase the

17    value.

18         And you'll hear this is during the real estate boom in

19    the early 2000s -- so this was pretty attractive to some people

20    and you'll see that a lot of people bought units, they sold a

21    lot of units over a few years -- and as they did it, there was

22    another element to the plan.

23         Because people needed -- the evidence will show -- to

24    get a mortgage, they needed to go to a bank to borrow the money

25    to buy these condo units.

 1              Bear in mind, the condo units at the time they're being

 2      sold, they're not five-star, in fact, they're being sold at a

 3      highly inflated value with some promises in hand.

 4              The promises from Dave Clark and from Cay Clubs in

 5      their marketing material and in every pitch they made was that

 6      we're going to turn it into a five-star, we're going to supply

 7      you an upgraded furniture package that will take these, in some

 8      cases, run-down, decrepid locations and turn them into

 9      something that you will be proud to own and rent out.  Because

10      to cover your mortgage payments Cay Club said we're going to do

11      two things for you:

12              We're going to lease these out once they're improved,

13      and those lease payments, the rents from people -- who will

14      want to go on vacation to these wonderful beach and

15      Florida Keys locations, Orlando locations -- will pay a lot of

16      money, because you're going to be a five-star, you will be at

17      the top of the market and you'll be able to cover your mortgage

18      payments.  What a great investment.  It will carry itself.  All

19      you need to do is get that first loan and we've got you

20      covered.

21              The second thing he promised was a leaseback payment.

22              Now, a "leaseback payment" simply meant that when you

23      closed on the property, you, as the investor bought the

24      property, within a certain short period of time Cay Clubs would

25      pay you, they would kickback to you a percentage of the

1    purchase price.

2           And it varied at different times and on different

3    properties.  A loan of about 10 percent, typically, 15, up to

4    even 20 late in the game.  And you would get that leaseback

5    payment and that was supposed to be enough to allow you to pay

6    your mortgage for the first year or two while they were fixing

7    up the property until all those renters starting beating down

8    the door to rent your condo and carry it for you.

9           And there's the investment out into the future; for

10   just a little money down and that loan that you take out from a

11   bank somewhere, you're going to have this wonderful property,

12   you can stay there yourself sometimes, if you like, and it will

13   carry itself.  You don't have to pay out-of-pocket year in and

14   year out.

15          So that was the Cay Clubs' concept, and it shows up

16   throughout the promotional material, and you'll hear witnesses

17   from inside Cay Clubs who worked for them at the time, who

18   marketed these properties that that was the pitch.

19          In order to make all that work they had to start

20   selling properties.  When Cay Clubs began in the late summer of

21   2004, Mr. Clark set up an arrangement to buy condominiums over

22   there in Clearwater and to sell them -- re-sell them,

23   typically, within a day of buying them, to people that he and

24   his staff - at his direction - had marketed these properties.

25          And you'll learn that the first seven properties he

1    sold -- actually sold, money on the table, deeds

2    transferring -- went to insiders in the Cay Club.  They went to

3    Cristal Clark, his girlfriend.  They went to a couple of other

4    insiders who were involved very closely in the company,

5    officers inside the Cay Clubs' family.

6         And there was a reason they closed those first seven

7    that way, because they wanted to raise the prices and get top

8    dollar, in fact, almost double the market for them, so that

9    they would set the benchmark for future buyers.

10        And they did something very interesting in the process.

11   They defrauded the banks.  It's part of Count 1 in the

12   conspiracy because what they did is they told the banks when

13   they went for the loans that borrowers, those seven -- on the

14   seven loans -- although it's really three people were truly the

15   borrowers -- and that they were doing something that the bank

16   looks at and demands.  They were paying the deposit and they

17   were paying the cash to close the deal.

18        You'll hear from bank underwriters and others that the

19   way these transactions worked was that an individual would file

20   a residential loan application to the bank.  The bank reviews

21   it, ultimately, it's approved.

22        In that loan application there's a lot of background

23   information on the individual, but that individual's assigned

24   as the borrower and they tell the bank, I'm putting down the

25   down payment and I'm ultimately going to pay the balance that's

1    due to make the deal close when everything else is done.

2         That's very important to the bank because a bank looks

3    at the risk that the borrower won't repay the money.

4         THE COURT:  Mr. Duffy, can you move that microphone

5    over if he's going to stand where he is.  Move it over.

6         Thank you.  I'm getting old, hard for me to hear.

7         MR. WATTS-FITZGERALD:  I'm not going to touch that one,

8    Your Honor.

9         THE COURT:  Good idea.

10        MR. WATTS-FITZGERALD:  So, let's see, where was I?

11        The loan.  And they're representing by their signature

12   on the loan application to the bank that, in fact, the money is

13   coming from them, but it wasn't.  The money was coming from

14   Dave Clark and Cay Clubs.

15        They were effectively financing their own sales.

16        And that's important to the bank, just like the

17   furniture package, you'll hear, or the leaseback arrangement;

18   because guaranteeing those, whether it be 50, 60, $70,000, what

19   the seller is saying is, you, as the borrower, I'm going to

20   give this to you right after we close, but we're going to tell

21   the bank you're paying 600,000 or 800,000, but you're not

22   because we're handing you back inducements of 60, 70, $80,000;

23   so you're not really paying 800,000 or 600,000, you're paying a

24   lot less.

25        And that puts the bank at risk because that means the

1    property's not really worth what the bank thinks.  And if the

2    bank knows the property's not worth what you're going to pay

3    for it, they're not going to give you the money because it puts

4    them at risk.

5            If something happens -- and, oh, it did -- you can --

6    the bank's at a loss, they can't get their money back and

7    things cave in, they crash, and the property is short-sold, the

8    property goes into foreclosure.  So there are a lot of problems

9    with that.

10           And that's how the bank protects against the risk.

11           The banks would also not close and lend the money if

12   they had known that at the closing the purchaser, the investor,

13   and the seller, Dave Clark, were going to sign another document

14   called a "closing statement."

15           The closing statement has another name, it's several

16   pages long, and it's put out by a Federal agency called

17   Housing & Urban Development, and we call it the HUD, H-U-D, 1,

18   multiple pages.

19           And you're going to see these documents in the loan

20   files, many of them, probably more than you're interested, and

21   witnesses are going to explain how they work and how they

22   affect the bank.  That document actually is required by the

23   banks; and if they don't get the document, there's no loan.

24           And at the closing, even though the bank may not be

25   there personally in many instances, there is a closing officer

1    or agent.  It might be a law firm.  It might be a paralegal.

2    It could be a bank representative, and they do the closing and

3    everything has to be signed.

4           And at the end that HUD goes back to the bank.  And

5    when the bank looks at it, if it's not signed and everything is

6    not accurate as they understood the deal, money comes back, the

7    money is not forwarded and the deal is canceled, essentially.

8           What you're going to hear is that on those HUD-1s, both

9    parties who are signing in this instance, and in the instance

10   of some of the counts I'm going to show you in a minute, signed

11   a false document that was submitted to the banks.

12          The false statement there was that the closing costs,

13   sometimes 150, $160,000, was not coming from the supposed

14   buyer, not from the person who applied for the loan.  It's

15   coming from Dave Clark -- over here -- and his companies.

16          And the evidence will show you the money, will show you

17   the money, because we have the accounts and we can trace all

18   that and we can show you the documents.

19          And this is important.

20          Do you remember the Court said, witnesses will testify

21   and you should think about their credibility:

22          Are they believable?  What's their demeanor on the

23   stand?  Does what they say make sense?  Are they corroborated?

24          The Government's witnesses are going to be corroborated

25   by the documents backing up what I'm suggesting to you the

1    evidence will be in this case.

2          So the units are overpriced and, as a footnote to that,

3    Cay Clubs never does what it's promised.  They don't do the

4    upgrades.  In all their years of operation -- and it basically

5    runs from 2004 to 2007, 2008, depending on where you want to

6    draw the line -- you'll hear the evidence on that -- they

7    succeed in building one thing, a fence.

8          They build a fence over in Fort Myers/Clearwater around

9    a lot where they knocked down an old shopping center.  For all

10   the money that moves through their accounts -- and you'll hear

11   on the order of 330 million dollars over the course of the

12   events we're describing -- they managed to build a fence.

13         What Dave Clark was doing was offering his investors --

14   and these are all hundreds and hundreds of outsiders who

15   accepted the representations, who accepted the promises and

16   bought and invested with them -- he offered them a porch and he

17   delivered a Volkswagen bug because they never upgraded, they

18   never did what they promised, and it goes downhill after 2004

19   and 2005.

20         In 2005 they sold quite a few units to investors and

21   promised all the things I've already described to you.  But by

22   2006, summer into the fall, there's already problems in the

23   real estate empire of Dave Clark.  They're not making the lease

24   payments.  The leaseback payments supposed to get within a

25   month, a couple weeks of closing, they're not making them.  The

1    evidence will show they weren't making those payments to the

2    people that had been promised them.

3          And this is summer and end of fall of 2006.  Dave Clark

4    and everyone at Cay Clubs knew that they were having a cash

5    crisis.  They didn't have enough money to do all the things

6    they were claiming because all the money flowing in from those

7    bank loans to the borrowers, to the investors, were being sent

8    out somewhere else, to buy more properties --

9          Don't do what you promised with it.

10          -- buy more properties, buy boats, planes, other real

11    estate, buy fancy homes, run a fishing tournament, buy a gold

12    mine that fails, buy a coal mine that fails, buy a rum

13    distiller that fails, all with the money derived from this

14    massive group of related companies.

15          So by then, even though in the summer of 2006 the real

16    estate boom is, you'll hear, is still going on, the problems

17    don't start until 2008.  This is years earlier and two years

18    into the life of Cay Club, but they haven't built anything yet.

19    They haven't kept any of their promises.

20          So what they do when they can't pay their bills, they

21    can't make good on the promises, they keep selling.  They keep

22    making the same promises and they keep selling.

23          And this is important because Counts 1, the conspiracy

24    count to commit bank fraud, and Counts 2 through 7 all relate

25    to those activities and that time frame.  Those counts run up

1    through, approximately, 2007, with some being very specific.

2         The conspiracy is longer -- it has a range of dates --

3    but the individual substantive counts of bank fraud, Counts 2

4    through 5, and the counts -- I'm sorry -- 2 through 4, and

5    Counts 5 through 7, which are false statements to a Federally

6    insured bank, all relate to certain specific transactions.

7         The conspiracy is broader, and it runs several pages in

8    the indictment.  It explains what they did, how they did it.

9    It defines the terms.  But when you get to Counts 2 through 7

10   it becomes much, much more specific.

11        Now, I told you that you'll see the evidence that

12   corroborates what we expect the witnesses to testify to.  Let

13   me show you a few examples and talk to you a little bit about

14   those counts because I want you to have a sense of where this

15   is going, so it's not surprising and makes it easier to follow,

16   we hope.  I'm showing you an e-mail -- if anyone's screen is

17   not working, would you put your hand up.

18        I'm going to zoom in a bit.

19        This e-mail is from Orion Bank in October of 2006, you

20   can see, it's Friday, the 13th, not a great day.  It is to Dave

21   Clark at Cay Clubs, and it's about Keys Marina Sombrero,

22   limited license -- or LLC, and then a code number, and that

23   will be explained.  That's a loan file from Orion Bank and Dave

24   Clark is the guarantor on them, indirectly.

25        And what are they telling him in the fall, October

1    13th, of 2006?  "We have not received your curtailment payment

2    of $1,354,000."  That was due more than a month ago -- two

3    weeks -- and that's bad.  Two weeks earlier when that was due.

4           And the sender goes on:

5           Please let us know when to expect it.

6           And it's from someone at Orion Bank.  They owe money.

7    They're late in their payments.  This is about as clear as you

8    need, besides the testimony you'll hear that there were

9    financial problems.

10          More telling, though, is Dave Clark's reaction.

11          That was Friday, the 13th.

12          This is October 18th, the following Wednesday.  Dave

13   Clark sends out an e-mail about the Orion curtailment payment

14   that was just mentioned in the Orion e-mail.

15          Now, you'll learn from the witness that a curtailment

16   payment is a little like a balloon payment on a mortgage, but

17   not exactly, because a balloon payment comes at the end of the

18   loan, and it means it's a shorter duration loan, you have to

19   pay it all at the end, and it's all due at once.

20          A curtailment payment is kind of the opposite.  You

21   borrow and you owe X amount of dollars and the contract says at

22   certain points you have to make a big payment.  You have to pay

23   down the principal.  It's not interest on the loan, it's

24   principal.

25          And you'll see from the rest of the message I just

1    showed you -- in the testimony -- that they actually owed four

2    million and only paid part of it.  They still owed a million

3    point three that is being dealt with here.

4            And Dave Clark goes out to his people and says, we've

5    got an Orion curtailment payment due at Sombrero.

6            "Sombrero," same name as in the Orion.

7            Sombrero, you'll learn, is a development in the

8    Florida Keys at the southern end of Marathon Key.  It is one of

9    those decrepid locations that I referred to earlier, very poor

10   condition.  Dave Clark bought it earlier in the year.  Dave

11   Clark owes money indirectly back through to Orion on it.

12           And so he has a problem.  So he tells his staff, I need

13   to get three units done as soon as possible at Sombrero.  I am

14   going to get sales done to the following people to accomplish

15   this, along with other initiatives.

16           And then down below:

17           Need to get these contracts completed today.

18           He wants the real estate closings in one day.  And the

19   key here is expeditious closing.  There is time pressure.  They

20   owe money.  They have the potential for defaulting on that

21   property.

22           So who are the saviors going to be?

23           The first is Cristal Coleman, whom I've already

24   identified to you as his girlfriend at the time.

25           The second, Fred and Marilyn Clark are Dave Clark's

1    parents.

2            The third group, Anne and Roy Drebenstedt.  Annmarie

3    Drebenstedt is his sister who lives in The Keys.

4            And what this tells you is that they're going to buy a

5    group of units during this time frame, each one's going to buy

6    a Sombrero unit, they're going to buy units in other projects;

7    Venezia is over in Clearwater, several in Las Vegas and another

8    one in Sarasota.

9            We're going to trace that money for you and we're going

10   to show you that the three Sombrero closings -- and they

11   happened, the money for those exactly matches what they need

12   for Orion.

13           Who's directing everything?  Who's telling the staff

14   what to do and what needs to be done?

15           And, essentially, the evidence will show that Dave

16   Clark is the puppet-master on those people.  He gets the loans

17   done.

18           That's the same e-mail off to the left.

19           And as you can see, the Drebenstedts, they buy a

20   Sombrero unit, a Las Vegas unit and a Sarasota unit, just as he

21   said they would in his e-mail, right up here.

22           Same thing with Cristal Coleman, she buys three units,

23   one of them at Sombrero, units' described.

24           The parents, same thing.

25           The interesting thing about that, though, is where did

1    the money come from?  How did they go from that time frame to

2    the closings on these properties?

3           Now, in the e-mail, when you see it, it says, "use J.P.

4    Morgan Chase Bank."

5           Ladies and gentlemen, we will establish that J.P.

6    Morgan Chase Bank is a Federally insured financial institution.

7    Its deposits are insured by the Federal Government against

8    loss, theft or any other degradation that you can think of.

9           And here is the timeline of the unit purchases.

10          Cristal Coleman buys her first unit on the 13th.  This

11   is a unit that he identifies, and it's unit 41 down in The Keys

12   at Indigo Reef.

13          But the next three are all done on the same day,

14   October 26th, eight days after Dave Clark's e-mail telling the

15   staff to get it done, telling Deanna Priday to get it done.

16          Those close on October 26th, just as he needs them to,

17   because they're in a cash crisis.

18          After that, from November 13th, out through December

19   13th, the other units he identified for those buyers, they all

20   close, too.

21          And, ladies and gentlemen, you're going to hear the

22   testimony that the loan applications in those cases and the

23   closing documents have forged signatures on them.

24          Those people didn't all sign those documents.  But

25   they're all related to the defendant, Dave Clark.  He's the

1    common denominator.  He needed the money.

2              The evidence will show he directed the sales.

3              This is a little busier in terms of the information,

4    but you're going to see these and have these explained to you.

5              I told you that Counts 3 through 7 are substantive

6    counts based on specific transactions.  But they're paired, 3

7    and 5, 4 and 6 relate to the same property but two different

8    documents that are active in the closing effort.

9              The first one, the lower number, is always going to be

10    the bank fraud, false statements, false representations -- as

11    the Judge referred to them -- to get money from the bank.

12             They need the bank to do this.  Even though the

13    borrower listed Cristal Coleman on the first one, is not really

14    the borrower in this case.

15             What happened here?

16             Dave Clark has a company, and it's listed here as CCM,

17    and you'll hear from the evidence that that's Cristal Clear

18    Management.  Think piggy bank.  It's really just a bank account

19    with a lot of money in it that gets swept from other Cay Clubs'

20    entities.

21             J.P. Morgan Chase is going to loan the money.  That's

22    where the applications go.  Dave Clark in his e-mail tells them

23    to use that.  J.P. Morgan's going to loan $640,000 and some

24    change.  But Dave Clark, through his company Cristal Clear

25    Management, wires $162,000 into this deal, the down payment and

1    the closing money.

2         The fact that it's coming from him is not disclosed to

3    the bank.  The bank's loan application all says this is Cristal

4    Coleman as a borrower.  But she's not, really.

5         Now, the day before the closing and the sale, October

6    25, another Dave Clark company actually buys the unit, and this

7    unit is Sombrero 426 down in The Keys.  That unit is bought for

8    about $460,000 from an investor who already owns it.

9         They turn around the next day, October 26th, and on

10   paper Dave Clark's girlfriend buys it.  When that happens the

11   bank has already been defrauded with the false document

12   claiming that she's the buyer and that she's putting in the

13   money for the deposit and for the closing.

14        That money is, as you'll see here, this is a HUD

15   form -- by the way, you'll have the real ones -- $162,070.20 to

16   the penny what Dave Clark wired in.  This money essentially

17   says Cay Clubs sold to itself.

18        Why did it sell to itself?

19        The evidence shows that they sold to themself because

20   they sold the unit for $808,000.  It doubled almost in price

21   overnight; no change to the apartment, no upgrade, the seedy

22   hotel in The Keys.

23        And what did they do?

24        They stripped out $320,000.  That is the proceeds from

25   the sale.  That's the bank's money.  The bank thought it was

1    financing a legitimate purpose, and that money goes right back

2    to Cristal Clear Management and Dave Clark is the

3    director/manager of Cristal Clear Management.

4          I neglected one item.

5          This is a copy in small form -- you'll see the full

6    size of it -- of the bank account statement Cristal Clear

7    Management showing money in, but first showing the money out to

8    start that deal.

9          But they're not the only ones -- or Cristal Clark is

10   not the only one who does this.  As I said, there are paired

11   counts going up through 7.  Counts 4 and 6 are also Sombrero,

12   and you'll see the same pattern; ironically, same dollar

13   values, same money being wired out of Cristal Clear Management

14   by Dave Clark, same amount borrowed from Chase bank, same

15   false statements.

16         But this time the buyers are the sister and

17   brother-in-law of defendant.  The dollar value's the same.

18         This money shows -- or this particular transaction

19   shows that a real estate commission of over $56,000 is taken

20   out of the transaction and sent to the girlfriend, Cristal

21   Coleman, and then later transferred into her personal bank

22   account.  So Cristal Clear Management doesn't get quite as much

23   money from the deal, money is taken away, and they enrich

24   themselves on the side as well.

25         This pattern is repeated in multiple transactions.

1              And the other set of transactions that aren't specific

2     counts, they're in the conspiracy count, Count 1, conspiracy to

3     commit bank fraud and enrich ourselves through false statements

4     to the bank, false representations to get money.

5              And we know this because we have this document, which

6     will be authenticated by one of the witnesses.  This is an

7     accounting record at Cay Clubs kept by one of the individuals

8     who worked directly for and took orders from Dave Clark.

9              138 Red Wing Road is the personal residence of Dave

10    Clark and Cristal Clark and her family down in the

11    Florida Keys.

12             You'll see the Indigo unit that we mentioned earlier,

13    41; you'll see the Sombrero unit, 426, that she supposedly

14    bought in October of 2006; you'll also see the Clarks, father

15    and mother, there are their properties listed.

16             Well, if these had been sold to third parties, why are

17    they in the books and records, the accounting records of

18    Cay Clubs?

19             The evidence shows that the Drebenstedts' properties

20    are there as well.

21             The important thing is the amount owing and the lenders

22    match up.  There's your Chase lenders.  This is a record of

23    mortgage payments, ladies and gentlemen.

24             The Drebenstedts, Cristal Coleman, and Fred Clark,

25    Senior, and his wife, they never made a payment.

1       When you borrow money, you have to pay back.  We call

2  them mortgage payments.  These are the mortgage payments, and

3  you'll learn that Cay Clubs is making the mortgage payments.

4       And beyond that, when you buy a home or you have loan

5  interests, you can deduct that on your tax return.

6       Well, they didn't.

7       And we will bring in for you accountants who handled

8  the tax returns for the Clark Seniors and the Drebenstedts.

9  It's not there; even though they disclose other properties they

10  own, other interest payments they're making, these don't exist.

11       They don't exist because they were never the borrowers.

12       The entire set of transactions from 2 through 7 are

13  fraudulent.  They were designed only to generate income for the

14  cash-strapped companies of Dave Clark, because he was lying to

15  get the money and directing people to and ensuring that that

16  money would be there to try to keep Cay Clubs afloat, when, in

17  fact, the money was not there and they were not delivering what

18  they promised.

19       These were never intended to be real sales.  They were

20  just a generator of funds to cover expenses, to cover the

21  crisis.

22       Real buyers take deductions.  They don't.

23       Later, unfortunately, Dave Clark orders the payments

24  stopped.  The flow of money of Cay Clubs all coming from bank

25  loans on other sales is no longer sufficient.

1        And with regard to these properties and these loans,

2   they throw in the towel, they give up, they walk away and every

3   one of those properties goes into foreclosure.

4        Neither Dave Clark, nor any of his co-conspirators make

5   good on the money that they borrowed or caused to be borrowed

6   or loaned from those Federal financial institutions.

7        So that's the fall of 2006.

8        October are the closings.  Some of the closings run

9   into December.  They know -- as they say, the wolf's at the

10   door -- they've got cash problems, the business is, by some

11   measures, bankrupt, but we're going to keep it going, and they

12   keep advertising and they keep selling, even though into 2007

13   they're going to end up closing their corporate offices without

14   telling their potential buyers.

15        They're going to end up telling people that this is

16   still a good deal, you're still going to get your payments, we

17   still are a solid company, great, great business plan, the best

18   business plan in the industry.

19        In June of 2007 there is a conference call with a group

20   of investors from California.  You're going to hear pieces of

21   that.  You may hear witnesses that participated in it.

22        Who's on the conference call?

23        For Cay Clubs, Dave Clark is on the conference call

24   that runs two-and-a-half hours.  We don't plan to play all

25   two-and-a-half hours of it, but we'll play to you selected

1    portions.  You'll have a transcript to help you follow along.

2         And in those you'll see that he's got a bunch of

3    disgruntled investors.  These are all people who drank the

4    Kool-Aid.  They bought into the pitch.  They were going to be

5    investors.  They were going to make money.  They were going to

6    ride their little real estate bubble.

7         But it's 2007, the real estate bubble is still pretty

8    solid.  The crash doesn't come until 2008.

9         What's the problem in June of 2007?

10        They're all asking:  Where's our payments?  We're not

11   getting our payments.

12        And Dave Clark tells them a couple of things.  One of

13   the things he says is well we had this bank and we had this big

14   property up in Orlando called IMG Cay Clubs Orlando, and some

15   bank loan officer, he just -- he didn't come through for us and

16   he doubled how much we had to pay them when we took a property

17   and resold it.

18        The bank was entitled to do that.  It's the bank's

19   money.  They were protecting their money.  With good reason,

20   based on what the evidence will show up to then, because Cay

21   Club is not doing what it said.  They're in the hole.  They

22   owed money to many, many people.

23        Some of them were on the phone call.  They asked

24   questions and Dave Clark tells them, this has never happened to

25   me before, I just -- you know, I'm a real optimistic guy and do

1   you know what, I always find a way out and -- we're going to

2   hear -- and what we're doing right now is delaying payments,

3   even though we promised them.

4       And someone said, look, my credit's on the line, if I

5   don't get that payment, I can't cover my mortgage payments for

6   that first year or two, and that's what induced me to come into

7   this.  They believed him because it was a great sell and the

8   property looked good, and so they took out those loans and now

9   they're on the hook for the loans, not Dave Clark.

10      And he's saying wait, wait, wait.

11      And evidence will show that the only people that they

12  were paying at that juncture -- the only leaseback payments

13  they wanted to make were to people to make sure they invest

14  some more; keep the gravy train flowing, take the money we have

15  and pay new people, keep it moving, don't let anybody realize

16  it, because we don't want anybody to realize that we're already

17  totally failing at what we claimed we could do.

18      And this is June 7th of 2007.

19      That same June, Cristal Coleman refinances the Red Wing

20  property, their home in The Keys with Chase Bank, to the tune

21  of 2.7 million dollars with residential loan application.  And

22  the money comes in, they get the loans; a straight loan and a

23  home equity loan, it's actually two loans kind of match up and

24  go together to make that total of 2.7 million.

25      And on that residential loan application, just as

1    earlier, again, to bring money in, false statements to the

2    banks, bank fraud, part and parcel of the practice throughout,

3    starting in 2004 and continuing.

4          By October, the corporate offices are closed but

5    they're still selling, still selling, get out there, keep

6    advertising, keep selling because they want to keep the money

7    going.

8          Then something happens in that time frame, the end of

9    2007.  The United States Securities and Exchange Commission

10   begins an investigation of Cay Clubs and Dave Clark, and they

11   ask for documents and they ask for sworn testimony about the

12   activities of Dave Clark and the Cay Clubs.

13         A proceeding begins.  He knows about it.

14         Count 8, as the Court described it to you, is a mail

15   and wire fraud conspiracy that runs from October of 2010 to

16   April of 2013.  This is another scheme of one or more people to

17   take money and property, again, by false representation, simply

18   put, by lies and deceit.

19         This one is targeted on funds belonging to a

20   partnership in the Caribbean, a partnership that Dave Clark was

21   a member of.

22         By early 2008, Cay Clubs had failed as a real business

23   entity and everything is essentially shutdown; even though Dave

24   Clark and his remaining staff continue to try to market

25   properties to keep money going.

1           He and Cristal Coleman left the United States.  Another

2    flight, if you will.  The first flight, avoid that 6.1 million

3    judgment.  This flight is a physical flight.  They leave the

4    United States, they leave the Florida Keys and they go to the

5    Turks and Caicos Islands.

6           It's admitted and the evidence will show that they did

7    that because investors in Cay Clubs are starting to sue them

8    for their promises on their contracts for what they've been

9    told would happen, and so they decided to get out of town.

10           They went to the Turks and Caicos and Dave Clark

11   actually starts getting into a different business.  He starts

12   getting into the pawn business, sets up a shop, looks around,

13   and that business grew over the period of 2010 through 2011.

14           He moved again during that period as the business

15   expanded in approximately 2010 to the Cayman Islands and he

16   became a 45 percent owner or partner, if you will, in a company

17   called "CMZ," Clark Miles Zahn, CMZ, three men.  And you will

18   hear testimony, we expect, from some of the partners.

19           "Cash Wiz" was its other name.  It ran pawn shops based

20   out the Cayman Islands and its business model is pretty simple

21   and clever.  It took in raw materials, essentially gold.

22   People would come in and pawn gold items and they would not get

23   them back, they could not reclaim them.

24           The company would take the gold and ship it to a

25   smelting plant in Illinois.  At that point the money paid by

1    the smelting company should have gone back to CMZ to fund its

2    future operations, its business activities and promote the

3    business further.

4         That money didn't go straight to the Cayman Islands.

5         Dave Clark persuaded his partners, Mr. Miles and

6    Mr. Zahn, that the smelting company couldn't do that or

7    wouldn't do that because they wouldn't send money out of the

8    United States, they wouldn't wire the money.

9         That's not true, but that's what he convinced them.

10        He said that's not a problem because I have a couple of

11   bank accounts with Bank of America in Key Largo, Florida,

12   Key Largo-Tavernier, and these two bank accounts called DC6,

13   Dave Clark and Cristal Clear Charters -- notice the spelling --

14   are preexisting bank accounts and we can just have them send

15   the money there because they're U.S. accounts and then I'll

16   arrange to have the money sent back here.

17        Dave Clark did something else during this time period.

18        He persuaded his partners that he was a well-to-do

19   investor, businessman and that their agreement called for the

20   partners not to take any salary, they were not deriving income

21   during that period.

22        But in reality, that was not true.

23        Cay Clubs had crashed.  They skipped to the islands

24   with very little.  So what does he do?

25        He arranges to embezzle some of that money, to divert

1    it, to siphon it off from his partners without their knowledge,

2    and he does it with a set of Visa debit cards and wire

3    transfers.

4         Now, why is it a mail and wire fraud?

5         The Bank of America account statements that show all

6    the withdrawals and all the activity on the Visa debit cards

7    are mailed by Bank of America to Tavernier.

8         Annmarie Drebenstedt, the sister I mentioned earlier in

9    the purchasing agreement, in 2006, lives in The Keys.  They

10   come to a mailbox, she goes and picks them up and she forwards

11   them to one of the office ladies who had worked for Dave Clark

12   under his direction back at Cay Clubs and has migrated with

13   him.  They're still working for him, either in the islands

14   physically or in the United States by long distance, work from

15   home.  And so they have the statements.

16        But the partners don't.

17        Over about the two-year period of this activity, they

18   siphoned off over a half a million dollars in personal

19   expenses.  He has a car.

20        Cristal Coleman Clark, who is now his wife because his

21   prior wife gave him a divorce, and now it's Cristal Coleman

22   Clark, are in the island, and they use that almost $500,000 for

23   school expenses for the kids for private school, they use it

24   for spas, they use it for dinners, everyday living expenses,

25   without telling the partners.

1        The partners don't know that a big chunk of the income

2    is disappearing between Florida and the Cayman Islands.  He

3    keeps it secret.

4        The problem is it can't last forever, because in 2012

5    those bank accounts are frozen by Court order because the

6    Cay Clubs investors who are suing them find them and freeze

7    those accounts, thinking it's Cay Club's money.

8        Now, the cards don't work.  He needs a new source of

9    income, starts talking to the partners about salaries.  Other

10   things are developed.

11       We come forward into January 2013 -- and we're getting

12   very close to the end, bear with me.

13       In January 2013 Dave Clark believed that the SEC was,

14   in fact, going to go forward and charge him with securities

15   fraud.  He believed it.  He told his partners and as a result

16   negotiated a sale of his interest in CMZ in the islands.  He

17   negotiated that sale to the tune of five million dollars.

18       Now, during this time frame, the partners, the other

19   partners wanted to see the bank account records, because

20   suspicions had arisen about this.  They knew now that the

21   CR-SEC was looking at him, they knew there was an issue with

22   this Cay Clubs back in Florida, they wanted the bank

23   statements.

24       Dave Clark blocked that effort.  He got his office

25   ladies to refuse to give them to him and he sent an e-mail

1    saying they're not entitled to them.  Those are my accounts.

2    They're not CMZ accounts.  They can't have them, don't give the

3    statements.

4         So the partners don't know when they're negotiating and

5    making the payments that they're missing a half million dollars

6    that Dave Clark took without any authorization or any approval,

7    money that they were entitled as partners to as much as he was.

8         He violated his fiduciary duties to his partners and

9    stole their money without telling them.  He conspired with

10   others to do it and he had the substantive counts where they

11   actually did that.

12        And what we have are specific counts in the indictment,

13   three specifically where mailings were made to the bank -- to

14   the dropbox in The Keys of those bank statements.  Those

15   mailings were in furtherance, they went there to conceal it,

16   because if they had gone to the islands the partners would have

17   figured it out and they would have never negotiated a five

18   million settlement.

19        He also, Dave Clark, created several fake management

20   agreements with Cristal Coleman Clark to try and conceal the

21   debt -- try and conceal the theft -- I'm sorry -- of the

22   activities they had engaged in.  They would make it appear that

23   money had been paid out legitimately.

24        But Cristal Coleman Clark didn't work for CMZ.  She was

25   a housewife at that point, taking care of the kids, not active

182

1    in the business, just spending a lot of money on those credit

2    cards.  She was not entitled to it.  She wasn't their employee.

3    There was no consulting.

4         One payment went out, of $400,000, under this

5    settlement agreement before the partners had fully realized

6    what had gone on.  But Dave Clark didn't even take that in his

7    own name because he was still within the time frame when the

8    lawsuit back 1989 applied and he didn't want it in his name.

9    It went to others.

10        In January 2013, though, convinced he was going to be

11   charged by the SEC and worried about protecting what assets he

12   had, he flees again, almost in the middle of the night, without

13   packing the family furniture or anything else, they go from the

14   Caymans to Roatan in Honduras.

15        Roatan is a small island off the Honduran coast, famous

16   for -- you may hear -- for scuba diving, but a very small

17   enclave.  And suddenly, they're in Honduras.

18        And there's a reason he picked Honduras.  He tells

19   people, I don't think the SEC can serve a subpoena or get at my

20   assets in Honduras.  And you may hear evidence, specifically,

21   that's not true; they can.

22        But that's what he believed, and that was his motive.

23        I said at the outset, you can see the pattern repeated.

24   There's the pattern three times:  Run from the judgment, run

25   from the investors in Cay Clubs, run from the SEC.

 1           There's another payment due in April of 2013 of two

 2    million dollars and that actually was made as well.  Those

 3    funds were transferred, not to Dave Clark but to a company

 4    account in Honduras.

 5           Well, it looks like I managed to cleverly lose one of

 6    my slides for you.  The 9 through 12 counts -- I'm sorry, no.

 7           Count 12, the final count of the indictment, the Court

 8    told you it's obstruction of the Securities and Exchange

 9    Commission.

10           You heard me tell you that he learned in 2005, or

11    thereabouts, that the SEC had an investigation going, a

12    proceeding.  Dave Clark was the subject of that, along with

13    Cay Clubs, and they were trying to identify his assets and all

14    the proceeds, all the money out of Cay Clubs.

15           And there was a reason for that.

16           You'll learn from the testimony of the witnesses that,

17    in fact, the SEC has a power, it's called disgorgement.  If

18    somebody illegally acquired proceeds and income from conduct

19    that violates the security laws of the United States, the SEC

20    can go after them, can sue them and can make them give that

21    back, give it up, give it back to the victims and take the

22    profit out of the illegal conduct.

23           The SEC, as a matter of material to their

24    investigation, needed to know where did the money go, who had

25    it, was there any left and could it be reached.  So they had an

1    investigation going.

2          We know in 2013 he told his partners at CMZ about it.

3          But in the interim, during the period of May 2011

4    through April of 2013, the SEC had the other part of that,

5    tried to serve a subpoena on Dave Clark to get sworn testimony

6    and found it very difficult because he was rarely in the United

7    States and was not readily available.

8          But they finally caught him in an airport in Florida

9    and had a Federal law enforcement agency serve a subpoena on

10   him.  He came to Miami on May 13 of 2011.

11         On that date through April 2013 are the dates that

12   encompass his obstruction.  Because on that date, May 13, 2011,

13   he gave a sworn statement under oath, with penalties of

14   perjury, and they were interested in that Cay Club proceeds,

15   the assets, any of the activity, including CMZ, because the SEC

16   wanted to know if CMZ was funded out of Cay Clubs' money; if

17   they could trace the proceeds, they could bring him back.

18         So they asked him questions trying to ascertain his

19   assets, his resources.  And what they learned in the questions,

20   they learned the lies.  He lied repeatedly.

21         He claimed he had no income in all of his Cay Club

22   years.  He claimed that he had no assets, not a car, not a jet

23   ski, not a boat, not a house, not a condominium, not a single

24   unit.  Every family member you can think of bought units from

25   Dave Clark; nothing in his name.

1          He claimed that Cristal Coleman bought Cay Clubs' units

2    with bank loans and financed the purchases just like any other

3    buyer.  And you're going to have that transcript.  You're going

4    to see his exact words, "just like any other buyer."

5          Ladies and gentlemen, the evidence will show that the

6    thousand-plus sales by Cay Clubs, all those other buyers, they

7    paid the closing costs, they paid the down payment, they paid

8    their mortgages; not Cay Clubs, not Cristal Clear Management.

9          So, clearly, a lie.

10         He also claimed that he had -- further didn't admit to

11   the income on those Visa cards out of CMZ.

12         Well, Dave Clark, you'll learn, had been an accountant

13   at one of the major accounting firms in the United States.  He

14   further claims to the SEC, oh, I didn't file tax returns all

15   these years because I didn't have any income, I didn't have to

16   file tax returns.

17         All of that was calculated to obstruct, impede and

18   interfere with the SEC to keep them away from him in 2011 and

19   as the investigation proceeded, all the way up to 2013, when he

20   finally negotiated a buy-out at CMZ because he became convinced

21   they were going to charge him.

22         Ladies and gentlemen, the evidence throughout the case

23   shows exactly what I told you at the outset:

24         He lied to get money, he lied to keep the money, and he

25   lied to protect himself.

1            And on the basis of all the evidence, you'll see that

2    he's guilty as charged.  Thank you.

3            THE COURT:  Thank you, sir.

4            All right.  Let's take a short break.

5            We'll take about ten minutes and then we'll come back

6    and have the other opening statement and then we'll quit for

7    the day.  We'll be in recess for ten minutes.

8            COURT SECURITY OFFICER:  All rise.

9            (Jury exited courtroom at 3:24 p.m.)

10           (Recess taken from 3:24 p.m. to 3:38 p.m.)

11           (Jury entered courtroom at 3:38 p.m.)

12           COURT SECURITY OFFICER:  All rise.

13           Court is again in session.

14           THE COURT:  All right.  You may proceed.

15                DEFENDANT'S OPENING STATEMENT

16           MR. RODRIGUEZ:  Thank you, Your Honor.

17           Good afternoon, Ladies and Gentlemen of the Jury.

18   Thank you so much for being here.  I know it's been a long day

19   and half going through a lot of grueling questions.

20           This is definitely going to be a complex trial.

21           Before I get into that, though, I want to introduce you

22   to the team.  We are a team that are working for Mr. Clark.  So

23   I'm going to introduce you first to Todd Foster, stand up.

24           Mr. Foster and I are the team leaders.  We'll be

25   handling all the questions at the trial.

1          Mr. Clark, will you stand up.  This is Fred Davis

2    Clark.  We'll call him "Dave Clark" for ease.

3          And Linda Moreno, lawyer, who's helping us.

4          Ashley Rector and Claudia Pastorius, who you will see

5    in the background, who did a lot of work in this case.

6          We want to thank you so much for being willing to be

7    here and answer the questions truthfully yesterday and today

8    and be willing to take the time.

9          First, you see, you've heard one side of what the

10   evidence is going to show the last hour.  Mr. Watts-Fitzgerald

11   did a good job of trying to persuade you what the evidence is

12   going to be.  I'm going to tell what you the evidence won't be

13   and what it will be.

14         And I ask if you want to take notes during this

15   process, feel free.  But as the Judge told you, what I say is

16   not the evidence.  What I'm going to tell you is what the

17   evidence is going to show, and then I'll be coming back to you,

18   hopefully sooner than later, in what we call "closing

19   arguments," where I will come in and show you what the evidence

20   showed and go through it and analyze it so that you will

21   actually have evidence from the witnesses.

22         It's very important that you listen to what everybody

23   says in this trial, because this is the one chance that

24   Mr. Clark gets to convince you, a jury of his peers, to

25   determine whether he's guilty of anything at all.

1          He is merely charged with a crime and just because

2     there are five Government agents on that side bringing the

3     charges, just because there's an indictment doesn't mean he's

4     committed any crime.

5          One of the ideas that we have to think about -- it's on

6     your screen in front of you -- it's called "burden of proof."

7     And the Judge told you earlier every defendant is presumed

8     innocent, and the law does not require us, the defense, to

9     prove innocence or produce any evidence at all.

10          The Government has the burden of proving a defendant

11     guilty beyond a reasonable doubt.  You got to remember that.

12          And, most importantly, you heard a lot about taxes.

13     This is not a tax case, and do not let that red herring get in

14     your way when listening to the evidence.  This is not a tax

15     case.

16          In fact, this is a case where we have to determine that

17     there was an intent to defraud anybody.  But you will see from

18     the evidence there was no specific intent to defraud anyone or

19     any financial institution at any time.

20          And, quite frankly, the Government's overstepped its

21     boundaries and targeted an innocent man who had dreams from

22     2004 to 2013.  And what you're going to understand -- if you

23     understand anything -- is that he was completely transparent.

24          And I'm going to talk to you about transparency.

25          Now, one of the interesting things about a trial is you

1    bring together all the parties.  Obviously, you have the U.S.

2    Government against an individual.

3         But I tell you that even the Government with all its

4    might does not always do the right thing.  Might does not make

5    right.

6         This case is about the history of a man going back to

7    1989 -- that's what they've told you -- 1989, 26 years, they're

8    asking you to look at his behavior for 26 years.

9         And on October 1st of 2015 they file charges.

10        You're going to get an indictment.  It's not evidence

11   in this case, but we're going to talk a little bit about what

12   the indictment is and what it means.  Because it really is the

13   framework from which the Government has brought charges and you

14   will see in my presentation today when I come back to you for

15   the closing that, in fact, the Government can't prove anything

16   as it's framed in its own indictment, that it waited until

17   October 1st, 2015, to file.

18        This is a case about family and the importance of

19   family.  You heard the prosecutor tell you this is a case about

20   insiders.  Well, I tell you what, this is a case about a family

21   forming a business.

22        Now, why is that important?

23        Well, you'll learn a lot about family members in this

24   case.  You'll hear a lot about Cristal Coleman, which is his

25   wife.  She's now Cristal Clark.  She's called Cristal Coleman

1    during the Cay Clubs days.

2         What you will learn as you go through this is

3    transparency with his wife, with his business partners, with

4    everybody, including the Government.  Nothing was kept a

5    secret.  That's what's going to be very interesting as you

6    listen to this.

7         Everything the Government shows you, all his charts are

8    public records, bank records, things that are out there.  There

9    were audits and records of funds due to Dave Clark in all of

10   these businesses.  We call these due-to and due-from accounts.

11        No, Dave Clark did not have income the way it was

12   phrased from the Government, but he had money due to him and he

13   had money he could use in all of his accounts.

14        You'll learn in this trial a small business, a private

15   business you may account in that way.  You will learn that

16   Cay Clubs actually was getting ready to go public.

17        You'll hear about a company called "Key Hospitality."

18        You will also learn that all the appraisals in this

19   entire case were done by banks and they were independent.

20        Most importantly, if you remember anything from what I

21   tell you this morning, you will know and learn that every

22   single loan officer for every single bank mentioned in this

23   indictment knew every fact about every mortgage loan

24   transaction.  There was never a lie.

25        And I'm going to explain to you why there weren't lies.

1          First, I want to go back to Earthmark.  You've heard

2     about Earthmark.  You heard about an individual named Michael

3     Rosen and an individual named Dave Clark, my client.

4          This company was formed in the 1990s as a development

5     company and it had unique features, such as mitigation land

6     banks -- you'll learn what that is -- they developed properties

7     over the West Coast of Florida.

8          But you will see Mr. Clark came to Mr. Rosen because of

9     a problem, a sad problem that happened in the late 1980s.  You

10    will learn in this trial that the savings and loan industry

11    crashed in late 1980s and the banks that Mr. Clark was using

12    for a construction loan for a construction project, a shopping

13    mall, went belly-under; all of a sudden, one day he calls the

14    bank and there's nobody there but an FBI agent.

15         You will learn a little bit about this crisis in the

16    late '80s, because it leads to the crisis you're going to learn

17    about in 2007.  The same factors were present in the late '80s

18    that came and really hurt everybody in 2007 and 2008.

19         So, in many ways, you're going to become experts on

20    banking.  But it's very historical, we're going way back.

21         Mr. Clark got a judgment against him in 1989.  This

22    judgment was for six million dollars because the bank that took

23    over for the successor bank, the bank that went under, said

24    we're calling your construction loan, your prior bank did a bad

25    job, they never should have given you the loan, we don't like

1    it, we're a new bank, it's called Ansell, we're calling it in.

2         Well, Mr. Clark could do nothing about it.

3         When the construction loan's called, the project ends.

4    And it's not just against Mr. Clark.  He had a partner,

5    Mr. Watts -- you'll see his name -- and there was a judgment

6    entered, and he will explain because he couldn't afford lawyers

7    to fight them, and the property's turned back.

8         That judgment goes in the records.

9         From there on out Mr. Clark has decided, well, am I

10   going to let them collect on the judgment or not?

11        How can I deal with this judgment?  What can I do?

12        I need to get the resources to fight it.

13        And you will learn that a bank can come after you for

14   up to 20 years or any judgment creditor.

15        So, as his life goes on, he meets Mr. Rosen, who you

16   see in the picture.  Mr. Rosen is a very talented,

17   multi-millionaire developer who takes Dave Clark's skills and

18   makes hundreds of millions of dollars from Mr. Clark.

19        And yes, you will hear evidence that Mr. Clark was paid

20   through companies.  And I will suggest to you if you remember

21   anything through this entire trial, you will learn one thing,

22   it is not illegal to take your money or monies due to you in

23   companies.  You will hear all witnesses talk about how that is

24   done and how that is structured and how that is legal and that

25   is structured by lawyers.

1          So the Government has thrown out this red herring.  Oh,

2     he has never taken any income.  Well, in fact, legally, it's

3     not income, and you'll learn that at trial.  But remember,

4     again, this is not a tax case, so don't go down that path.

5          Heron's Glen -- as you see in this picture -- was a

6     golf and country club by Earthmark.  It was real.  You will

7     learn about this project and how nice it was.

8          You will learn about Mariner's Club Key Largo, another

9     project that was done before Cay Clubs, successful projects.

10          You will learn about Mariner's Beach Club Bahia Beach.

11          You will learn about these projects because you need to

12     understand how we get into the founding of Cay Clubs in order

13     to understand this trial.

14          Well, it was founded in 2004.  There was an attorney

15     named Scott Callahan who formed this complex corporate

16     structure.  So the Government will tell you it's a complex

17     corporate structure.  But what they neglect to tell you is that

18     it was vetted by attorneys and law firms.

19          And you'll hear all the big law firms involved in

20     Cay Clubs; from Greenberg Traurig, Scott Callahan, Phoenix,

21     every -- Holland & Knight, big firms that were involved in the

22     formation of this company.  It was a real company.

23          The company was based upon Dave Clark's family trust

24     owning two-thirds and Dave Schwarz -- another individual who

25     you will hear a lot about -- owning one-third.

1          The company is divided into divisions.

2          And this company, Cay Clubs, teams up with Sunvest to

3     acquire interest in land banks.  And you'll hear what a land

4     bank is.  A land bank is a big piece of property with 200

5     pieces of property on it -- 200 units -- excuse me.

6          And you can't buy it, obviously, because you're just an

7     up-and-coming company, so you enter into an agreement with a

8     larger company, let me buy it at a wholesale price, develop it

9     and sell it to consumers at a higher price.

10         That's exactly what developers do.

11         So you get 200 units for a hundred thousand.  You

12    promise to make developments and the promises were fulfilled,

13    you'll hear -- the Government suggested there's just a fence

14    put up.  We're going to go into all of that in this trial --

15    and then you sell it.  And that's exactly what Cay Clubs did.

16         But the problem with Cay Clubs is, it was started at

17    the wrong time in history.  Because what happened is, it's

18    formed in 2004, the summer.  The SEC starts an investigation in

19    Cay Clubs in 2007 because Cay Clubs wanted to go public.

20         At one point in 2006 Cay Clubs was worth over 400

21    million dollars.  They were ready to go public, and they did a

22    filing.  It's all public.  There's documents you're going to

23    get to look at on everything that was disclosed to the SEC.

24         They begin an investigation.  And ultimately, you'll

25    learn that the SEC wants to bring charges -- civil charges

1   against Mr. Clark's company because they claim it's a security.

2   And, of course, there's a dispute over whether I am dealing

3   with a security.

4          When Cay Clubs shuts down, it shuts down, worth zero,

5   because we have the greatest recession in the real estate

6   industry ever here.  Everything -- it's common knowledge,

7   property values plummeted, banks stopped lending, Cay Clubs no

8   longer could do what it did because banks would not give money

9   to anybody, borrowing for Cay Clubs.  And then the properties

10  weren't worth what they were worth six months earlier.

11          It happened everywhere.

12          Now, the other timeline that's important and that the

13  Government's wrong on this -- you'll learn from the evidence --

14  is that CMZ was a company that was formed in 2011 -- it's

15  Clark, Miles and Zahn -- in March, approximately, March 2011.

16          At the same time, the SEC is asking Mr. Clark a lot of

17  questions, and Mr. Clark participates in his first long

18  deposition on May 2011.  He's asked almost 500 questions over

19  six hours.

20          Now, you'll understand that the Government is taking

21  those answers and they're calling that obstruction, and they're

22  saying because he went and talked, he's obstructed the SEC.

23          Then what they did was they went and seized money from

24  him in Honduras in April of 2013.  You're going to understand

25  how that happened.

1        And then he appears for a second deposition, even after

2   the money is seized from him, he still participates with the

3   SEC, because you will learn Mr. Clark does not give up.  So, in

4   December 2013, he answers approximately 400 questions, he does

5   it from Honduras and it lasts six hours.

6        During all of this, we've learned that there was a

7   vision for Florida Cay Clubs had.  You see the little stars,

8   the West Coast of Florida, but we're going to be talking a lot

9   about The Keys.  And I'm going to show you some of the pictures

10  of these resort units that, you understand, they will be coming

11  into evidence.

12       We have Cay Clubs Clearwater.  This is an aerial view.

13  This is another view.  The Government suggests that all that

14  was done to this property was a fence put up.

15       Well, I -- you will learn that - in this trial - that

16  this property was the premiere, flagship Cay Clubs property

17  that hosted professional teams from Tampa, that had the IMG

18  Sports Academy associated with it, and it still exists today.

19       The IMG Academy is important because this was a large

20  company that teamed up with Cay Clubs.  And you're wondering,

21  well, how is this going to be important?  Well, you're going to

22  understand how this whole entire Cay Clubs operated.

23       See, what happened was Cay Clubs wanted to expand to

24  The Keys.  And you will learn in this trial -- you're going to

25  become experts in The Keys -- so you will learn that you can't

1    go to The Keys and develop very easily.

2            So, Mr. Clark teamed up with an individual named Pritam

3    Singh.  You will learn that he's one of the most well-known

4    developers in The Keys; and he had a comprehensive plan for the

5    town of Marathon, which is halfway between Miami and Key West.

6    That was going to become the new Key West.

7            He held, enormously, through this endeavor, by

8    providing those properties through agreements, you're going to

9    learn about those properties.  You're going to see those

10   properties.

11           We have Tranquility Bay -- beautiful properties --

12   Coral Lagoon Resort; another picture of the marina; Tranquility

13   Bay here; Indigo Reef -- you'll learn about that property --

14   and the boat dockage.

15           Then you will learn that Mr. Clark expanded Cay Clubs

16   to Las Vegas.  And the deal there was, you'll learn, that there

17   was a hotel called the "Rio" and across the street from the Rio

18   there was an existing condominium development, and that he

19   bought that to develop that.  That was going to be the

20   Cay Clubs amenity that was going to be available in Key West.

21           The idea was you share these amenities.  You have them

22   in The Keys, you were going to have them on the West Coast of

23   Florida, you were going to have them in Orlando -- we will talk

24   about in a minute -- and Las Vegas.

25           All the development was rapid.

1          Orlando Cay Club.  Orlando Cay Club was originally

2     supposed to be a project with IMG Academy.

3          And then, finally, what the Government was talking to

4     you about was Sombrero Resort in Marathon Key.  There's going

5     to be a lot of discussion about that in this trial because a

6     lot of properties were at this resort.

7          What I tell you first is Sombrero Resort is not what

8     the Government told you, it's some run-down, ragged-out motel.

9     In fact, it has something that no other resort in the mid-Keys

10    have.  It's called transient rentals.  Unlike any other part of

11    The Keys, you could actually rent out your unit by the night.

12         The value for that is invaluable, and you will learn

13    that in this trial.  It had an Olympic-size pool, and it had

14    boat dockage, and it also had slips very close to open water,

15    the closest available in The Keys in that area.

16         So you will learn that this property had intrinsic

17    value for what it had; plus, it had a golf course next to it

18    and a restaurant.

19         And no, it wasn't the most beautiful property because

20    it was in the middle of being developed.  Unfortunately, it was

21    being developed when?  During the beginning of a recession

22    that, of course, nobody knows is happening and nobody knows

23    what's going to happen.  And of course nobody wants it to

24    happen, you will learn.

25         Cay Clubs was a real company.  They had corporate

1   headquarters in Clearwater, Florida.  What's important about

2   Cay Clubs is they employed over 1200 employees.  These

3   employees have all sorts of job titles.

4          They -- we had persons working in -- on the marinas, we

5   had landscapers, we had restauranteurs, we had caterers.  You

6   had people working in the hotels, and things of that -- just

7   over 1200 employees, operating to bring 1400 units to life,

8   which is what happened before Cay Clubs crashed, 1400 units.

9          Now, in this case, the Government in their indictment

10  has only listed a few.  They're claiming fraud occurred with a

11  few.

12         Cay Clubs was a family business.  You heard about Fred

13  and Marilyn Clark.  You will learn that Fred Clark was the

14  broker for Cay Clubs and that he was entitled to money from

15  Cay Clubs.  And that it was only natural for your mother to

16  also buy a property that you believed in.

17         You will hear that the family were not insiders.

18         Here you have a picture of his wife and children and

19  his sister, persons the Government has told you are going to be

20  discussed in this.

21         Mr. Clark had two little kids during this time.

22         More importantly, this case is really simple in many

23  ways.  Do you know why?  There's no bank fraud.  And I'm going

24  to show you an easy way why and you're going to be the

25  detectives to understand.

1          See, this is not a straw-buyer case.  The real issue to

2     focus on is really simple:

3          What was material to the bank at the time?

4          I've taken the indictment, I've highlighted the word

5     "material fact."

6          You heard the Judge state "material fact" earlier

7     today.  You're going to hear the Judge state "material fact"

8     when you get your instructions, and you're going to hear me

9     asking about material facts throughout this entire trial with

10    Mr. Foster.  We're going to go into it, we're going to discuss

11    it.

12         See, the loan process isn't what the Government is

13    telling you it is.  In fact, the loan process is just a little

14    different.  You see, the bank has a loan salesman.  That's what

15    banks have.  They're called "loan officers."

16         And as you see in this particular slide, these loan

17    officers are critical because they are the ones that are

18    connected to the banks.  They're the ones who get the banks the

19    customer and the money.  And they make a lot of money.

20         You will hear not from one bank loan officer.  They

21    will bring no bank loan officers here.

22         And you're going to wonder why.  Because the bank loan

23    officers are the ones who know exactly what the applicant is

24    telling the bank and who the applicant is and what the

25    applicant has.

1            But you will learn that these loans -- every loan

2     they're discussing in this indictment -- will be what they call

3     "no-doc loans."

4            So what is a "no-doc loan" -- you will learn -- you

5     will hear from lawyers and others -- no-doc loans are called

6     "libor loans," they're called "Ninja loans," no income, no job

7     verification.  No verification at all.

8            So you see on this where we have underwriters and we

9     have bank closers, and we have an attorney who's a closing

10    agent.  Well, a lot of that stuff didn't matter.  There's, in

11    essence, no underwriting or very little underwriting.

12           There are two main banks we're going to be talking

13    about in this trial.  You're going to learn about Chase and

14    Chase Manhattan, which was the sixth largest lender at the time

15    in 2006.  You will learn that they had over 120 products for

16    customers that did not require verifications and that Chase

17    itself was the bank that led to the bubble bursting.

18           You will learn that Chase itself did not care about

19    what an applicant put on their application, except for two

20    things, your name, your social number; because with that, they

21    could get your credit score.  And that's all they needed.

22           But there was a third thing they needed that had

23    nothing to do with you, and that's called an "appraisal."

24    Because, as you'll learn in this trial, that the appraisals are

25    done by neutral agents of the bank.

 1          So they want to make sure if I'm giving 500,000 for a

 2     Sombrero property, it's worth 600,000.  So I go hire

 3     appraisers, because I want to make sure, as a bank, that if

 4     this loan forecloses we get our money back.

 5          There is absolutely no evidence of appraisal

 6     manipulation, you will see none in this case.

 7          There's no evidence of a tainted appraisal, you will

 8     see none in this case.

 9          You will also learn -- the Government told you there

10     was the initial transaction that created the value.  That's

11     wrong.

12          You'll learn that in 2004, December -- almost 12 years

13     ago, ladies and gentlemen of the jury, before those closings

14     ever occurred, there were over a hundred people who had already

15     purchased, had signed a contract and gave a deposit.

16          Because the way Cay Clubs operated was there was a

17     master price list set and that's what you pay.

18          If your bank can get you approved, great.

19          If they can't you got to pay cash or you move on.  The

20     market was so high at that time that the price was the price

21     was the price.  So there's no manipulation and banks loved it.

22     You will learn that banks loved it.

23          Why?  Because during this time the banks really did not

24     have underwriting departments, you will learn.  These no-doc

25     loans had no verification of anything other than your credit

1    score.  The banks themselves, you will learn, undercut their

2    own underwriting.  They did it to get quick approvals.

3         They did it because the loan officers -- the ones you

4    will not hear from in this trial -- were making major money,

5    like one point per closing.  One point is 5,000 on a $500,000

6    loan.  That's just the bank loan officer.  The bank officials

7    are getting rich, you'll learn about that in the trial.

8         They designed these 100-plus loan products so that they

9    could be sold quickly.  So don't let the Government take you

10   down this path that, oh, because somebody did not pay later

11   when the bubble burst and your property's worth nothing, that

12   somehow the banks were the victims.  Wrong.  The banks did

13   this.

14        MR. WATTS-FITZGERALD:  I'm sorry, Your Honor, I have to

15   object.  This line of argument is closing argument.

16        THE COURT:  That is argument.  If you can stay in the

17   area of statement, as opposed to argument.

18        MR. RODRIGUEZ:  Thank you, Your Honor.

19        So you will learn in this trial exactly what matters to

20   the banks, and that was they just wanted to know who you were

21   and was their property -- was the property worth more than what

22   it was so they could write these big loans.

23        So you will see something very interesting.  The banks

24   themselves went to Cay Clubs and says, we want to be your

25   lender.  We want to be your preferred lender.

1          And do you want to hear something interesting you'll

2     see in this document?  That Chase preferred lending program

3     through the Pickard Group paid Cay Clubs $12,000 a month just

4     so you would put their sign on the window and send customers to

5     Chase through this Pickard Group.

6          First National Bank was even worse.  You will learn

7     that they bypassed their own underwriting procedures and they

8     allowed the loan officers to directly approve.

9          And you will learn about underwriting, you will learn a

10    little bit about this.  Now, the Government told you they were

11    bringing you in the underwriters.

12         Well, the underwriters only know one part of the story.

13    You will learn that the underwriters used to get the file, but

14    you will learn that the loan officer and the application-taker,

15    who puts all the facts on the loan application, and you will

16    learn in this trial that the loan officers were really the ones

17    who were putting wrong information on applications.

18         There's a person you will hear about that's not on the

19    witness list, but you will see his name everywhere on the

20    documents, Roger Windy.

21         Another person that was not on the witness list that

22    was read to you, but you'll see his name on all the documents,

23    Ross Pickard, with the Pickard Group.

24         You will learn about the commissions they made.  You

25    will learn about the term "exceptions."

1          What is an exception?

2          Well, that is the process of the bank continually

3   finding a way to get you approved by the loan officer putting

4   another fact in the application, another fact in the

5   application, ultimately, the computer accepts you.

6          You're going to learn these officers knew Dave Clark

7   and Cristal Clark and their family members.  They knew

8   everybody and it didn't matter.

9          MR. WATTS-FITZGERALD:  Your Honor, objection based on

10  the motion in limine filed pretrial before the Court.

11         THE COURT:  You know -- and I would really appreciate

12  it if you use the microphone -- I have no idea what you just

13  said.  I know you were saying something, but I didn't hear it.

14         MR. WATTS-FITZGERALD:  I will try it again, Your Honor.

15         THE COURT:  Okay.

16         MR. WATTS-FITZGERALD:  Your Honor, we object to this

17  line of argument based on the motion in limine filed pretrial

18  by the Government and ruled on by the Court.

19         MR. RODRIGUEZ:  Your Honor, I'm sorry, I can't respond

20  because I don't understand that.

21         THE COURT:  I'm not sure that I understand it either,

22  but I'll deal with it afterward; because if he says something

23  he's going to prove and I'm not going to let him prove it, you

24  can tell them at the end, see, told you he was going to tell

25  you that, and he couldn't and he didn't, so it's his gamble,

1    not mine.  Go ahead.

2         MR. RODRIGUEZ:  Thank you.  So what the evidence, for

3    example, will show is that certain loan officers knew Mr. Clark

4    personally, knew Cristal Coleman and Cristal Clark personally,

5    knew who they were and knew what their company was.  This was a

6    family company run by two individuals with a lot of employees.

7         You'll learn about the loan products, the hundred

8    specialty loan products designed for easy approvals; you will

9    learn no verifications and minimum down payments.

10        You will see loan memorandum approvals.  You will see

11   products like the 572-10, the 517-preferred.  You will learn

12   what those products are.  Those are the loan products that the

13   banks put out.  They're called "libor loans."

14        In fact, you'll see them in the evidence.

15        There's a Chase memorandum.  It says:  "Decision based

16   on," and it says "manual," okay.  That means somebody manually

17   made that decision to approve that loan for Cristal Coleman.

18        It was processed by ZIPPY.  You will learn who ZIPPY

19   is.  And it was a no-income verification loan.  This is just

20   one page of 600 pages from just one application.

21        We're going to make it easy for you.  We're going to

22   bring you these pages so you can understand it.

23        Here's another one, Mr. and Mrs. Clark.  This one was

24   for a no-doc processing-type, interest-only.  "Decision was

25   based on ZIPPY," again.

1          You will learn that ZIPPY is the computer system that

2     Chase created for its loan officers in its underwriting

3     department so that loans could be approved "ZIPPY," in ZIPPY

4     fashion, quickly.

5          And you will learn it could be manipulated.

6          Because during this time period, you have to focus on

7     2005, 2006, it had to be done quick.  The market was hot and

8     the banks needed to sell loans.  They needed to make loans to

9     sell loans.

10          Likewise, here's another one, based on ZIPPY, from

11     Cristal Coleman, "alternate docs," you'll learn what that

12     means.

13          "No-verification loans."  So what you will learn here

14     is the bank will write the loan, no matter what.  The banks

15     want to sell the loans immediately and no statements, you will

16     learn in this trial, were ever material to any decision by any

17     bank; and that includes Mr. Clark using his own personal money

18     in Cay Clubs to be used for down payments.

19          It did not matter.  A bank did not care.  It was not

20     germane or important to their process.

21          But don't take my word for it.  Listen to the evidence.

22          Now, the Government started to talk to you about

23     Cay Clubs and it was somehow not keeping commitments for its

24     improvements.

25          Well, quite frankly, it did accomplish improvements.

1    It scheduled improvements.  You will learn it had short-term

2    versus long-term.

3            Long-term never occurred because of the crash.

4            Short-term did.

5            They renovated virtually every unit in Clearwater

6    Cay Clubs.  The Government said, the evidence will show you, a

7    fence put up.  Wrong.  They renovated 90 percent of the units

8    in Las Vegas Cay Clubs and 95 percent of the units in Sarasota

9    Cay Clubs.  You're going to learn about renovation.  You're

10   going to become experts in this area as well.

11           Now, Cay Clubs you will learn in this trial, worked the

12   following way.  It had land-banking arrangements, and you're

13   going to learn about a company called "Sunvest."

14           Sunvest was a company that provided the land-banking.

15   The release prices Sunvest told Cay Clubs you could release a

16   property to an individual was set by Sunvest.

17           You're going to see HUD statements and that will show

18   you that, for example, if so-and-so bought a property for

19   $500,000, for example, this company would release it to

20   Cay Clubs for $300,000, for example.  That's the price

21   Cay Clubs paid at the time of closing.

22           And then what Cay Clubs offered, which was unique,

23   completely legal, you will learn, was something called a

24   "leaseback."  The Government glossed over it in opening.

25           What it really is and what you will hear evidence of is

1      that this was a program where you would get 20 percent of your

2      purchase price given back to you as an option after you close

3      if you wanted to do this.

4              And in return for the 20 percent, you gave up the

5      ownership of your property for two years so that Cay Clubs

6      could rent out your property.  You used those two years of

7      payments to pay the mortgage on your property; the theory being

8      prices are going up, value's going up.  Here's two years you

9      don't have to pay for your property.  You're paying the bank.

10             People got enough money from Cay Clubs to pay their

11     mortgages for almost two years.  Property going up, you're

12     going to make money.

13             What happens if it crashes?  Nobody knew it would.

14             But if it crashes all of a sudden, the $500,000 unit,

15     in the flip of a switch, it's worth 300,000; not because of

16     anything that Cay Clubs did, you will learn, because of the

17     banking industry and the recession.

18             The independent appraisers always verified sales

19     prices.  The prices to the public were set and were uniform.

20     There were no special prices for family members.  They paid the

21     same as everybody else.

22             The only difference you will learn here is that

23     Mr. Clark, with his own money that he had in Cay Clubs that he

24     could not touch, because it was in a trust, but he could direct

25     it to be used for these down payments.  And you will learn that

1    there's nothing improper about that.

2          And you will learn that this happened nine years ago.

3    Nine years ago.  And some of it happened 11 years ago.  I'm

4    talking a decade ago.

5          The leaseback was governed by a contract.  You'll get

6    to see the contract.  The contract made no particular promises.

7    You'll get to see that the buyers signed the contracts and that

8    the banks knew about these leasebacks, and they didn't care.

9          Nor you will learn that the banks cared who was putting

10   money down.  The bank cared about one thing, you will learn,

11   and that was, is their credit, is their credit score high

12   enough, could I close it quickly?

13         And you will learn that this whole process was done

14   based on the advice of several lawyers and reputable law firms.

15         You will learn about IMG Academy and how this

16   partnership was unique to Cay Clubs and how it brought value to

17   Cay Clubs.  The reason this is important for you to understand

18   is that there was a tennis academy by Nick Bollettieri and a

19   variety of other well-known sports amenities available to

20   Cay Clubs' members.

21         And this was because IMG connected to Cay Clubs because

22   they believed in them; just like Key Hospitality was ready to

23   buy-out Cay Clubs because it was worth 400 million dollars,

24   until the economy died.

25         You will learn a little bit about Key Hospitality.  It

1    was prepared to take Cay Clubs public.  It was valued at

2    millions of dollars in 2007 and more importantly than anything,

3    if you think of anything, the word "due diligence."

4         They performed due diligence to look at all aspects of

5    Cay Clubs, and the SEC was notified of this effort, and Cay

6    Clubs complied with all requests from the SEC.

7         To give you an example.  You'll learn evidence, for

8    example, of a company called Red & Associates, and you will see

9    how they spent -- two million dollars was spent on them to go

10   and design properties and fix properties, but you will learn it

11   wasn't something that happened overnight.  You couldn't

12   renovate a resort like Sombrero -- which is called "Lighthouse

13   Cay Club" here -- you could not renovate that in a month.  You

14   could not renovate in a year.

15        There were laws in The Keys that were very tough and

16   you'll learn that all these laws and all this zoning made it

17   very difficult and time-consuming, but it was happening.  And

18   the point is, in good faith, did Mr. Clark make this happen.

19   You will learn in this trial from the evidence he did make it

20   happen, it was happening and he spent money on it.

21        In fact, the improvements exceed 18 million dollars in

22   all of the different projects.  This is the site plan for

23   Marathon.  The plans were there.  This was not a fly-by-night,

24   oh-yeah-we're-going-to-fix-it-up and let me walk away.  This

25   was a true, bona fide effort to get a company and all of its

1    properties up-to-date.  But it was killed.

2         In 2007, you will learn that Dave Clark and Dave

3    Schwarz infused all of their monies that they had saved that

4    were in Cay Clubs back into Cay Clubs, so they had nothing in

5    the end.  They did that in a last-ditch effort to try to save

6    the company.

7         And that there was an individual named Abel Band who

8    tried to provide a large loan to help payoff leasebacks.  They

9    had downsized the leasebacks and they had operations to

10   minimize costs.  You will hear Mr. Clark explaining this to

11   investors, the people who bought Cay Clubs, in this tape that

12   the Government told you they have.

13        Mr. Clark did not hide.  He went on a podcast.  He

14   explained to everybody what was happening in the economy and

15   how they were trying to pay back leasebacks, and trying to do

16   this, he explained it.  He didn't hide.  He was always open.

17   He was always transparent.

18        Ironically, it's his transparency and his willingness

19   to talk that the Government has used against him and will use

20   against him in this trial.  They told you they will produce his

21   deposition, the deposition that took six hours, 500 or 300, 400

22   questions.

23        You will hear that deposition, you'll get to read it,

24   you'll see how he was willing to cooperate in 2011 and all the

25   years before that.  You will see and hear from lawyers who

1   provided the SEC with everything they could possibly humanly

2   need.

3            You will learn about good faith reliance on the advice

4   of counsel and countless other professionals.

5            You will see these two names show up, Scott Callahan

6   and Chuck Phoenix.  You will learn about who they are.

7            You will learn about this SEC investigation, the ways

8   Mr. Clark participated in it; how the SEC waited until January

9   2013 to file its civil suit, how he participated in it after

10  they filed it, how he participated in it before they filed it,

11  how he did everything they could possibly want.

12           And you will learn now, I come to, this company called

13  CMZ.  So, you see, the Government did not completely tell you

14  or explain to you what CMZ was.

15           But Mr. Clark doesn't give up.

16           When he lost the banks in Fort Walton Beach, you will

17  learn what he did, to go to Earthmark and from Earthmark to

18  Cay Clubs.  When Cay Clubs died, he stayed as long as he could

19  to fix as much as he could.  He moved up to Melbourne Beach for

20  awhile and then found an opportunity to open up some first pawn

21  shops in the Caribbean, because gold prices were sky high and

22  this was an opportunity to make money off of gold.

23           So he opened up what ultimately becomes today 17 pawn

24  shops in the Caribbean spread out over six or seven different

25  islands, including Honduras, the island of Roe a tone.

1          But the company he formed in February 28th of 2011, you

2     got to remember that date -- the company he formed was called

3     "CMZ."  That company was named after Clark, Miles and Zahn.

4          Even after he formed that company he went to the SEC

5     and gave additional sworn statements to them.  He provided

6     thousands of documents to them and gave them another

7     deposition, you will learn, in December 2013, and he answered

8     1,000 questions.  They got every single record they want and

9     they had their own analysts look at all the bank records.

10         And the thing with CMZ was this:  It was in the

11    Cayman Islands.  When the SEC went public in January of 2013

12    and said, we're suing you civilly, Mr. Clark, he went to his

13    two partners; one of which was a non-voting partner, one Joe

14    Zahn -- you will learn about him -- say, look, I don't want to

15    keep the name bad here, I got to leave.

16         He already had existing pawn shops in Honduras, so they

17    said, go to Honduras, you will stay there until you defend

18    yourself.

19         But you will learn in this case the Government does not

20    give up easily because they went after Mr. Clark at that point.

21    They knew at that point that Mr. Clark was leaving CMZ.

22         They learned through Mr. Zahn that he had just settled

23    with CMZ and said, okay, I'm walking out of CMZ, I can't have

24    my name associated with this lawsuit.

25         You will learn the shame it brings.  So he agreed to a

1   five million dollar settlement.  But they didn't pay that.

2   They put on paper and did a promissory note to him.

3        You will learn through this trial, through clever

4   maneuvering by Mr. Zahn and the U.S. Government, they were able

5   to freeze his money.  They froze his money when he sent it to

6   Honduras for the purpose of preventing him from defending

7   himself today in court and the purpose of preventing himself

8   for defending himself in the SEC lawsuit.

9        MR. WATTS-FITZGERALD:  Objection, Your Honor.

10        THE COURT:  What's the objection?

11        MR. WATTS-FITZGERALD:  The pretrial motion on this

12   subject, and that's totally argumentative.

13        THE COURT:  It is an argument.  The jury will disregard

14   that last statement.  Please do not argue with the jury.

15        MR. RODRIGUEZ:  Yes, Your Honor.

16        So, CMZ, Clark's Miles and Zahn, look at the date,

17   2-28-2011, remember Cayman Islands, because this is what you're

18   going to remember about all of it:

19        That when he formed it on 1-28-2011, the Government

20   says he somehow embezzled funds.  He had an existing bank

21   account in Bank of America that had been opened in The Keys,

22   okay.  This -- all the operations are being handled in the

23   Cayman Islands.

24        Money's coming in from all the different pawn shops

25   through CMZ to a company in Illinois that's smelting the gold.

1    You will learn about smelting.  And they sent the payment and

2    the payment goes back to this account in The Keys.

3         And you will learn from the witnesses in this case that

4    every single penny that went out of those accounts in The Keys

5    that the Bank of America accounts were recorded on

6    due-to/due-from accounts; meaning if Mr. Clark took money out,

7    it was recorded.  If another partner took money out, it was

8    recorded.  Because Mr. Clark owned half the company, he could

9    take whatever he wanted, as long as there was a record of it.

10        And you will learn that that's the agreement.

11        And when they settled with him in January of 2013 in

12   their own civil agreement, their own promissory note, their own

13   settlement agreement, they said we went clean, everything.  You

14   will see the evidence.  You will see what they signed.  You

15   will read the legal language where they have checked out

16   everything about Mr. Clark.

17        They've had due diligence, and it's done.  They give

18   him five million dollars.

19        But do you know what happened?  They reneged.

20        So if you hear from Joe Zahn, you will hear that he

21   reneged on Mr. Clark for the money, the five million dollars

22   that was owed to him.  And then he claimed that Mr. Clark

23   cheated him out of 2.1 million.

24        And today we're here, the Government's saying, no,

25   Mr. Clark cheated him out of $500,000, so you're going to see

1   contradictory evidence in this trial about who cheated who.

2        But the point is this:

3        You will see no cheating because you will learn that as

4   a partner he was entitled to anything in those accounts and

5   there was complete transparency.

6        So if you understand what transparency is, in

7   accounting, you will understand that everything was kept track

8   of.

9        Now, the Bank of America account ended only a year

10  later and they opened up an account in the Cayman Island called

11  Scotiabank, and that's where the money went on from there on.

12  You will know, at any point, the partners knew where the money

13  was going at any time.

14       Mr. Clark's five million dollar settlement was, quite

15  frankly, way too little.  He had put more in that company, more

16  than five million dollars, but he had to leave.  He didn't

17  flee.  He left for the sanity of the company.

18       Why didn't we hear about that?

19       Well, that's for you to figure out when you listen to

20  this evidence.  That's what makes this case confusing and

21  complex.  But what makes this case even more confusing and

22  complex, which is why are we here, on obstruction of justice?

23       You will learn that Mr. Clark answered every question

24  properly and correctly, all 2 or 300 of them.  The Government

25  didn't like the answers is what you will learn.

1        And you will hear from witnesses who asked the

2   questions and you will get to see the questions that were asked

3   and you will learn that there's a problem, a definition problem

4   with the word "income" and what that means.

5        And the Government never asked him to define "income."

6        You will learn that Mr. Clark while he worked at

7   Cay Clubs did, in fact, take an income, but he passed it onto

8   his wife, which there's nothing wrong with that, she paid taxes

9   on the income.  His wife received that income.

10        You will learn in this trial that that is appropriate,

11   and that can happen.  Again, this is not a tax case.  You're

12   not being asked to see if violations of tax laws have occurred.

13   But you will see that Mr. Clark accounted for any income he

14   received in Cay Club and the Government received its taxes.

15        So don't let that red herring bother you.

16        Ultimately, an audit was done.  You will hear about

17   audits all the time.  When Mr. Clark worked for CMZ and

18   Cay Clubs, there were audits done every year.  You will hear

19   about the audited duties and how this company passed its

20   audits; literally, one audit was off by seven cents, you'll

21   learn, seven cents.  That's how diligent Mr. Clark was.

22        They spent over $180,000 a year with a company Audit

23   BDO, which is a big auditing firm, to audit their company.

24   When Mr. Clark left they asked BDO to do an audit of his

25   company -- not of his company, of what Mr. Clark took out.

1    You're going to hear all about the BDO audit it process and

2    what they did.

3         You will learn that Mr. Clark was, in fact, transparent

4    at all times and he never embezzled one penny from my partner

5    in CMZ, and, in fact, to this day, they owe him over

6    two-and-a-half million dollars.

7         The company was called "Cash" Wiz that made the money.

8    Don't get Cash Wiz confused with CMZ.  The Government is taking

9    you back to events before CMZ was formed.  I will show you in

10   the indictment why it's CMZ and its affiliates when CMZ was

11   formed.  That's the evidence you will look at.

12        You will hear myself and Mr. Foster always talk and ask

13   questions in terms of date.  When we come back to you in

14   closing, we're going to show you why dates are so very

15   important.

16        Finally, I wanted to talk to you about the HUD process,

17   the HUDs.  There's several counts in this indictment that say

18   that -- that allege that Mr. Clark somehow put false statements

19   on the HUDs.  These are in the forms of a checks mark they're

20   claiming he did.

21        You will hear from witnesses in this case that,

22   actually, no false statements were made on HUD.  The HUD is

23   actually disclosure from the bank to the borrower.  It's not a

24   disclosure from Mr. Clark to anybody.  Okay.  Multiple HUDs are

25   created.  Most of them aren't signed.  Ultimately, in the end,

1    there's a HUD that's created.

2         You will learn that the HUD is prepared by someone

3    called a "title agent."  You'll learn that the title agent is

4    both the borrower and the bank, and that there is no

5    requirement on the HUD to tell exactly how a borrower gets

6    funds to close.  You will learn that topic.  It's going to take

7    a little bit time to explain it.

8         The HUD -- there cannot be a false statement on a HUD

9    because the HUD does not ask where the money comes from.  You

10   will learn that that whole process takes place through, guess

11   who, the bank loan officer, they're the ones to determine that

12   and if there's a requirement that money must not come from a

13   third party, they're to disclose that and they're to let the

14   borrower know.

15        And during this time period when libor loans were

16   prevalent, none of that was required, at all.  Anyone could get

17   a loan for anything as long as they had the credit score and

18   the appraisal.

19        Now, I want to end with this.

20        The question is really what is reasonable doubt.  The

21   Judge read it to you.  I ask you to listen to this evidence

22   carefully as it's presented and ask you, is it of such a

23   convincing character that you would be willing to rely and act

24   upon it without hesitation of your most important affairs.

25        And the reason I ask that is because I want you to be

1   serious when you listen to this evidence.  Will you please, I

2   emplore you to please take notes, because this is a complex

3   case by no means, we explain to you.

4        We believe our job as the defense lawyers is to explain

5   it and explain it to you how you see it, it should not be more

6   complex.  The more complex it gets is the more impossible it is

7   to understand what it happened.

8        We're talking about 12 years of transaction activities

9   involving 1400 transaction loans among hundreds of companies in

10  the Cayman Islands, a whole bunch of other islands, all over

11  Florida, and then we're talking about an SEC investigation all

12  wrapped up into one lawsuit.

13       I don't want to let you have confusion take over.  So,

14  think about this.

15       The Judge will tell you about the credibility of

16  witnesses and he's talked to you a little bit about it.  You

17  need not accept all the evidence as accurate or true.  The fact

18  that a whole Government puts in 15 witnesses does not mean it's

19  controlling.

20       Listen to how the witnesses answer the questions.

21       Mr. Foster and I will be asking a lot of questions.

22  Please listen to the questions and answers and please look at

23  the witness the way they answer.

24       That's important for you to understand what's

25  happening, because there will be a lot of witnesses you will

1    hear evidence from who are scared of these gentlemen.  They

2    will tell you that they're scared.  They will tell you that

3    threats have been made against them.

4         They will tell you what's happened.  These are scared

5    witnesses.  And that's important, because you can believe or

6    disbelieve any witness, in part or -- in whole or in part.

7         The question is:  Did the witness impress you as one

8    who's telling you the truth?

9         Does the witness have any particular reason not to tell

10   you the truth?

11        Does the witness have a personal interest in the

12   outcome of the case?

13        Does the witness seem to have a good memory?

14        Boy, oh, boy, that's going to be a fun one.  These are

15   transactions that took place in 2004 and then in 2006, and then

16   all dates in between.  The question is --

17        MR. WATTS-FITZGERALD:  Objection, Your Honor.

18        This is simply an effort to read the law to the jury,

19   which is the Court's prerogative.

20        THE COURT:  Yeah, you're not supposed to be reading the

21   law.  You're supposed to be telling them what you believe the

22   evidence will show.

23        MR. RODRIGUEZ:  I'm sorry, I won't read the law.  I

24   will rephrase it this way.

25        I would like you when you listen to the evidence to

1    listen to it carefully.

2            The Judge will come back and read to you the law.

3            What I was telling you is the law; and correct, the

4    Judge will read to you what it says.

5            In closing arguments, we're going to come back to you

6    and say this is what happened, this is what it is.  What I told

7    you was the evidence today will be the evidence and your

8    references from it.

9            The Government suggested to you in its opening

10   statement a few minutes ago that Mr. Clark is a liar, that's

11   what they said.  Now that's, of course, argument.

12           He is not a liar, that's also argument.

13           The question is:  What does the evidence show?  Okay.

14           Mr. Clark, would you stand up.

15           He is innocent, and you'll remember that.  He's

16   innocent until proven guilty, through this entire procedure,

17   please remember that.  The Judge told you that.  Because he's

18   sitting over there and because you're here does not mean that

19   you cannot carefully consider this evidence.

20           We, as a defense team, will do whatever it takes to get

21   this case done as quickly as we humanly can so we don't have

22   you here until Christmas.  We understand your time is valuable,

23   but we also understand you must understand the importance of

24   this case and what you're being asked to do.

25           So we want to thank you.  I thank you on behalf of the

1    entire team here who's worked so hard on this case to be here

2    and don't get overwhelmed by the number of lawyers, really, on

3    other side.

4         Please try not to get overwhelmed by the evidence.

5         But I tell you when I come back to you in a few weeks,

6    or a couple of weeks, or whenever it is, you will be convinced

7    that Mr. Clark, through the evidence, is not guilty of anything

8    and, in fact, the Government has overreached.

9         Don't let them destroy his life.  Thank you so much for

10   your time and have a good Veteran's Day.

11        MR. WATTS-FITZGERALD:  Your Honor, I move to strike the

12   last comment by counsel.

13        THE COURT:  That they have a good Veterans' Day; you

14   want them to have a bad Veterans' Day or what?

15        MR. WATTS-FITZGERALD:  No.  The one just in front of

16   that, Your Honor.

17        THE COURT:  Oh, all right.

18        MR. WATTS-FITZGERALD:  Counsel's claimed that there's

19   an effort by the Government to destroy --

20        THE COURT:  I remember what it was.  I'm not going to

21   strike it.  I think the jury understands that that was

22   argumentative.  Okay.

23        We're done for the day.

24        MR. DUFFY:  Sorry, Your Honor, we have just one brief

25   matter we would like to move into evidence, I believe without

1    objection, if we could do that on the record.

2         THE COURT:  I would love to have something that we

3    don't have to do Thursday.  Go ahead.

4         MR. DUFFY:  Thank you, Your Honor.  I think it would

5    save some time now.

6         THE COURT:  All right, go.  Talking about it isn't

7    going to save any time, but go.

8         MR. DUFFY:  At this time -- I'm not sure you have the

9    exhibit list.

10        THE COURT:  I have the exhibit list.

11        MR. DUFFY:  1A through 1H, inclusive.

12        THE COURT:  1A through 1H, no objection?

13        MR. RODRIGUEZ:  No objection.

14        THE COURT:  Hearing no objection, it's admitted in

15   evidence.

16        (Government's Exhibits 1A through 1H were received into

17   evidence.)

18        MR. DUFFY:  Your Honor, Government's 2A through 2N,

19   inclusive.

20        THE COURT:  2A through 2N, that starts the second page;

21   right?

22        MR. DUFFY:  Yes, Your Honor.

23        Government's 3A through 3G, inclusive.

24        THE COURT:  Okay, 3A through 3G.

25        MR. DUFFY:  I will continue, 4A through 4K, inclusive.

1    5A through 5M, inclusive.

2            THE COURT:  Okay.

3            MR. DUFFY:  Government's 8A and 8B.

4            THE COURT:  Wait a second, that's 5A through what?

5            MR. DUFFY:  5M, as in Mary.

6            THE COURT:  I got it.  I just want to make sure it went

7    all the way through to M.

8            MR. DUFFY:  Yes, Your Honor.  8A and 8B.

9            THE COURT:  Okay.

10           MR. DUFFY:  Government's 9A, 10A, 11A, Government's

11   12I.

12           THE COURT:  12I, okay.

13           MR. DUFFY:  12J and 12K, Government's 13A through 13K,

14   inclusive; Government's 14A through 14Z, inclusive;

15   Government's 15A through 15T, inclusive; Government's 16A

16   through 16L, inclusive; 17A through 17D, inclusive; 18A through

17   18E, as in Edward, inclusive.

18           20A, 20C through 20I, inclusive.

19           THE COURT:  Wait a second.  Why does my exhibit list

20   have the two columns to the right blacked out?  "Admitted" and

21   "identified" are out -- are in gray; is there any reason for

22   that?

23           MR. DUFFY:  I think that's just a highlight,

24   Your Honor.  They need to be written in as they come in.

25           THE COURT:  So what is it -- 20A, and what is it?

1          MR. DUFFY:  20A, Your Honor; and then 20C through 20I,

2     inclusive; and 23A; finally, 24E.

3          THE COURT:  23A and -- what was the last one, please?

4          MR. DUFFY:  24E, as in "Edward," Your Honor.

5          THE COURT:  24E?

6          MR. DUFFY:  Yes, Your Honor.

7          THE COURT:  All right.  Let me find that one.  All

8     right.  Those will all be admitted into evidence without

9     objection; correct?

10          MR. RODRIGUEZ:  That's correct, Your Honor.

11          THE COURT:  All right.  Without objection, they're

12     admitted in evidence.

13          (Government's Exhibits 2A through 2N; 3A through 3G; 4A

14     through 4K; 5A through 5M; 8A; 8B; 9A; 10A; 11A; 12I; 12J; 12K;

15     13A through 13K; 14A through 14Z; 15A through 15T; 16A through

16     16L; 17A through 17D; 18A through 18E; 20A; 20C through 20I;

17     23A and 24E were received into evidence.)

18          MR. DUFFY:  Thank you, Your Honor.

19          THE COURT:  Now, can we go?

20          MR. DUFFY:  Yes, Your Honor.  Thank you.

21          MR. WATTS-FITZGERALD:  One last thing, Your Honor, if I

22     may.

23          THE COURT:  Oh, no.  He said we're going to go.

24          MR. DUFFY:  We would like to invoke the rule,

25     Your Honor.

 1              THE COURT:  Okay.  The rule may be invoked upon each

 2    party.  The rule of sequestration is a rule that says a witness

 3    generally can't sit and listen to the trial before they

 4    testify.

 5              If they're going to testify, they have to wait outside

 6    until it's their turn.  That doesn't apply to opening

 7    statements, it doesn't apply to arguments, but it does apply to

 8    testimony.

 9              Since the testimony's going to start when we start

10    Tuesday, either side can invoke the rule, and usually both

11    sides do.

12              In this case, each party is responsible for their own

13    witnesses, since I don't have any idea who they are, you are

14    responsible; if you let them stay in here, it's at your own

15    risk; all right?  The rule has been invoked.

16              Yes, sir?

17              MR. FOSTER:  I thought I heard you say "Tuesday"

18    instead of "Thursday."

19              THE COURT:  If I did, I didn't mean that.  I get a

20    little punchy late in the day, but I think what I meant is day

21    after tomorrow, Thursday morning.

22              Now, I teach at seven o'clock on Thursday morning at

23    the law school, and I will be there until nine-ish, and then I

24    will be coming here.

25              So why don't we start at quarter of ten, give us an

1    extra 15 minutes.  Actually, I probably ought to tell some of

2    you to be here at 9:00 because you were late already.  Try to

3    be here a little bit before 9:45, so that we can start at 9:45.

4    I should be here by then, barring typical Miami traffic.

5            Ladies and Gentlemen of the Jury, you're reminded you

6    are not to discuss this case with anyone or permit anyone to

7    discuss it with you.  Until you retire to the jury room at the

8    end of the case to deliberate your verdict, you're simply not

9    to talk about this case.

10           Also, remember, you are not to read or listen to

11   anything touching on this case in any way.  If anyone should

12   try to talk to you about it, bring it to my attention promptly.

13   Keep in mind you must not do any research or make any

14   investigation about the case on your own.

15           The only evidence in this case which you may consider

16   is the testimony of the witnesses that you hear in court and

17   the evidence that is introduced during the official proceedings

18   in this courtroom.

19           Also, remember you must not have any contact with the

20   attorneys, parties, or witnesses in the case.  If you should

21   see them, keep in mind they are not being rude to you, they're

22   required to avoid any contact with you and they're not

23   permitted to talk to you, just as you are not permitted to talk

24   to them.

25           Finally, remember that you must not form any opinion

1    about this case until all the evidence is in.  You are required

2    to keep an open mind until you start your deliberations at the

3    end of the case.

4             Drive carefully.  It's a nice, pretty afternoon.  Have

5    a nice day tomorrow, Thursday; and Friday, we are off.  We are

6    not working Friday.  I have a naturalization ceremony in the

7    morning and then I have a -- I'm the duty judge this month, so

8    I get people walking in and handing me duty matters.

9             But one of them that I enjoy tremendously is

10   naturalization, and I will do that Friday morning, and then I'm

11   taking the afternoon off because I've got something planned.

12            So I will be -- so I will be back Monday at 9:30 and

13   we'll go next week, as I said, we will probably sit each day

14   next week.  If any of you -- if that causes any problem with

15   any of you, discuss it with Diane -- I mean, with Wanda and I

16   will do my best to work it out with you.

17            The following week is Thanksgiving week and we will go

18   Monday and Tuesday and Wednesday until noon, and then we will

19   break for the holiday, take Wednesday afternoon, Thursday and

20   Friday off of the Thanksgiving week, and then we'll do at least

21   four days the following week.  All right.  Have a good evening.

22   See you tomorrow morning -- Thursday morning.

23            COURT SECURITY OFFICER:  All rise.

24            (Jury exited courtroom at 4:45 p.m.)

25            THE COURT:  You may be seated just a second, please.

1          I do want to get out of here because I want to walk my

2    dog before it gets dark today; but you stashed a couple of kids

3    up in the attorneys' conference room.  You can't do that.

4    Unaccompanied minors aren't allowed in the courthouse, so you

5    need to find something else to do with them.

6          They said that they were told that they're -- the

7    lawyer told them to be up there, so I presume one of you guys

8    told them.  You can't do that.  You've got to keep them

9    somewhere else, so you've got to either keep them with you or

10   do something.

11         But I told the Marshal he could put them over in the

12   cell with Bubba, but he didn't think that was -- that wasn't a

13   good idea.

14         MR. RODRIGUEZ:  That wouldn't have been nice.

15         THE COURT:  Yeah.  No, I told him to leave them there

16   today and that I would discuss it with you this afternoon.  So

17   I'm just telling you that that's not an acceptable compromise,

18   all right, so come up with something; all right?

19         MR. RODRIGUEZ:  We will.  Thank you.

20         THE COURT:  We will see you then Thursday morning,

21   quarter of ten.  If I'm late, I'm late, but I will do my best

22   to be here by then.

23         (Proceedings adjourned at 4:46 p.m.)

24

25

1                    C E R T I F I C A T E

2

3          I hereby certify that the foregoing is an

        accurate transcription of the proceedings in the

4
        above-entitled matter.
5

6
        April 24th, 2016      /s/Glenda M. Powers_____
7       DATE                  GLENDA M. POWERS, RPR, CRR, FPR
                              Official Federal Court Reporter
8                             United States District Court
                              400 North Miami Avenue, 08S33
9                             Miami, Florida 33128

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25