UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 13-10034-CR-MARTINEZ/Snow(s)(s)

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

FRED DAVIS CLARK, JR.,
  a/k/a "Dave Clark,"

        Defendant.

_____

## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court on a hearing on the amount of victims' losses for restitution purposes, which was referred to United States Magistrate Judge Lurana S. Snow, for Report and Recommendation, pursuant to 18 U.S.C. § 3664(d)(6).   The evidentiary hearing was conducted on May 17, 2016.

## I. PROCEDURAL HISTORY

The Defendant was charged in a Second Superseding Indictment (SSI) returned on October 1, 2015.  Counts 1-7 of the SSI ("Cay Clubs Counts") charge the Defendant with conspiracy to commit bank fraud, three counts of executing a bank fraud scheme and three counts of making a false statement in connection with a federally insured loan, all counts involving various entities utilizing in their names the words "Cay Clubs."[1] Count 12 charges the Defendant with obstruction of a Securities and Exchange Commission (SEC) investigation of allegations of fraud in connection with the Cay Clubs entities.  (ECF No. 351)

_____

[1] At the trial of this cause, the Court severed Counts 8-11, and the Government subsequently moved to dismiss those counts.

The case was tried to a jury, who returned a verdict of not guilty on Count 1 and guilty on the remaining counts. At sentencing, the Presentence Report (PSR) included as relevant conduct all of the Defendant's activities related to the Cay Clubs projects, which involved the sale "of condominiums in purported luxury resorts in Florida and elsewhere, including the Florida Keys." (ECF No. 351 at 1-2)  According to the SSI, the Defendant was the president of Cay Clubs and had authority over its funds.  Id. at 2.

As alleged in Count 1 of the SSI, the Defendant and his co-conspirators conspired "to knowingly, and with intent to defraud, execute and cause the execution of a scheme and artifice to obtain any of the moneys, funds, credits, assets, securities and other property owned by, and under the custody and control of, one or more financial institutions, including JP Morgan Chase and Fifth Third, by means of false and fraudulent pretenses, representations and promises relating to a material fact." Id.  The alleged purpose of the conspiracy was for the Defendant and his co-conspirators to

> unlawfully enrich themselves by misleading and defrauding lending institutions, by (a) using straw borrowers to purchase condominium units in investment properties; (b) submitting false and fraudulent loan applications and related documents to lending institutions, thereby inducing the lending institutions to loan, in some transactions, more money than they otherwise would have loaned; (c) preparing and submitting to the lenders false and fraudulent HUD-1 Statements that did not accurately reflect the payments made by the borrower, and (d) diverting the proceeds for their personal use and benefit, and to further the fraud scheme.

Id. at 4.

According to the SSI, the Defendant and his co-conspirators sought to accomplish the object and purpose of the conspiracy in the following manner:

> 4. FRED DAVIS CLARK, JR. and his conspirators would operate numerous corporate entities using the name "Cay Clubs," and would create bank accounts for each entity.  FRED DAVIS CLARK, JR. would have others listed as signatories or account holders on bank accounts, and keep his name off bank accounts.  This was done to conceal his compensation and to avoid collection on an outstanding unpaid court judgment against FRED DAVIS CLARK, JR. from 1989 of approximately $6.1 million.

2

5. In order to profit from the operation of Cay Clubs, and to pay the financial obligations of Cay Clubs, FRED DAVIS CLARK, JR. and his conspirators would orchestrate the purported sale or refinance of Cay Clubs units that he controlled.

6. FRED DAVIS CLARK, JR., would identify insiders including certain family members . . . . to act as straw borrowers for loans that were used to purchase Cay Clubs units. Co-conspirators prepared and caused to be prepared on behalf of the straw borrowers, fraudulent loan applications, which included false information related to employment, wages, assets and liabilities. These false and fraudulent loan applications and documents were submitted by co-conspirators to various mortgage lenders in the United States, including financial institutions such as JP Morgan Chase, Fifth Third, and other lenders, including Countrywide Home Loans, Inc.

7. In connection with the purchase of properties, FRED DAVIS CLARK, JR. and other conspirators prepared and caused to be prepared false and fraudulent HUD-1 Statements which, among other things, falsely and fraudulently represented to the mortgage lenders that the straw borrowers had met their down payment and cash to close obligations, when, in fact, the straw borrowers never made any of these payments.

8. FRED DAVIS CLARK, JR. executed HUD-1 Statements in which he falsely and fraudulently represented that the HUD-1 Statements accurately reflected all receipts and disbursements made in the transactions. The HUD-1 Statements concealed the fact that the borrower's down payment and cash to close obligations were paid by a Cay Clubs entity controlled by FRED DAVIS CLARK, JR.

9. The HUD-1 Statements would fail to disclose financial inducements made to the borrowers, including commissions, furniture packages and leaseback payments paid or promised to be paid by the seller as part of the transaction.

10. To support certain of the false and fraudulent loan applications provided to lenders, FRED DAVIS CLARK, JR. would cause others to submit to the lender: (a) documents containing false signatures and notarizations; (b) false supporting documentation including false lease agreements; and (c) tax returns and pay stubs containing false and misleading information.

11. Based on the false and fraudulent loan applications and HUD-1 Statements, the mortgage lender provided funds that were deposited into Cay Clubs accounts that FRED DAVIS CLARK, JR. controlled and were available for his personal benefit and to further the fraud.

12. For loans obtained in the names of straw borrowers, the borrowers listed on the loan applications did not make the mortgage payments.

Instead, for a period of time after the transactions closed, FRED DAVIS CLARK, JR. caused the monthly mortgage payments for these loans to be paid from accounts he controlled. Subsequently, FRED DAVIS CLARK, JR. stopped making the payments and the mortgages went into foreclosure, resulting in substantial losses to the lenders.

13. During the scheme, FRED DAVIS CLARK, JR. would make false and fraudulent statements to others as to his income related to Cay Clubs as a means of concealing his role in the fraud and use of Cay Clubs funds to obtain loans for his personal benefit.

Id. at 4-6.

Counts 2 - 4 of the SSI allege substantive acts of bank fraud in connection with the purchase of three condominium units in Marathon, Florida. Each count charges that the Defendant executed a scheme to defraud financial institutions in order to further the same purpose as alleged in Count 1, to:

unlawfully enrich himself by misleading and defrauding lending institutions, by (a) using straw borrowers to purchase condominium units in investment properties; (b) submitting false and fraudulent loan applications and related documents to lending institutions, thereby inducing the lending institutions to loan, in some transactions, more money than they otherwise would have loaned; (c) preparing and submitting to the lenders false and fraudulent HUD-1 Statements that did not accurately reflect the payments made by the borrowers; and (d) diverting fraud proceeds for his personal use and benefit, and to further the fraud scheme.

Id. at 7. Counts 5-7 alleged that the Defendant made false statements to lending institutions in connection with the purchase of the same three units in Marathon.

At sentencing, the Defendant argued that the loss attributable to him for the offenses for which he was convicted (Counts 2-7) should be limited to the loss of the victims of the three Marathon purchases. (ECF No. 532 at 11-13) Alternatively, the Defendant asserted that the loss should encompass losses attributable to straw purchases of condominium units. Id. at 176. Based on the Defendant's theory, the loss amount for the transactions identified in Counts 1-7 would be $1 - 2.4 million, and the loss attributable to all straw purchasers would be approximately $12 million.

4

Id. at 152.  The Court rejected the Defendant's arguments and accepted the loss figure computed by the Probation Office, less an amount for claims the Government found to be lacking in sufficient documentation.  Based on the information available as of the sentencing date, the total loss figure accepted by the Court was $169,267,355.08.  Id. at 146-48.

In support of this total loss computation, the Government presented the testimony of Special Agent Joseph Perera of the Criminal Investigation Division of the Internal Revenue Service. Agent Perera identified three boxes labeled Exhibits 1, 2 and 3, which contained folders for each of the victims who had submitted to the Probation Office documents supporting their claimed losses. The agent explained that he reviewed the documents contained in each of the folders, comparing the documents to those in the Government's possession and making sure that there were no duplicate claims.  The three exhibits were admitted into evidence without objection from the Defendant.  Id. at 101-104.

Agent Perera also stated that he spoke to representatives from each of the financial institutions which had submitted claims to ascertain how the claimed losses had been computed to ensure that revenues from foreclosure or short sales and mortgage payments were offset (subtracted) from the loss amounts.  Id. at 112.  The agent inquired of each lender whether they would have invested money in any of the Cay Clubs entities if they had known of their financial problems or the fact that the Defendant was engaging in a mortgage fraud scheme in order to keep Cay Clubs going. Each representative replied that the institution would not have lent or invested money had either of these facts been known.  Id. at 115-116.

The District Judge sentenced the Defendant to a total prison term of 480 months, to be followed by five years of supervised release. The Court found, pursuant to 18 U.S.C. § 3664(d), the victims' losses were not yet ascertainable, and set a date of April 6, 2016 for final determination of the victims' losses.  Id. at 182.  Subsequently, the Court referred the issue of the amount of victims' losses to the undersigned for an evidentiary hearing on that issue.  Considering the schedules

5

of the undersigned and counsel for the parties, the hearing was set for May 17, 2016, within the 90-day period permitted by § 3664(d).

## II.  <u>APPLICABLE LAW</u>

In the instant case, restitution must be ordered pursuant to the Mandatory Victims Restitution Act (MVRA), 18 U.S.C. § 3663-3664.  The Act requires the sentencing judge, in formulating the order of restitution, to consider  "(I) the amount of the loss sustained by each victim as a result of the offense; and (II) the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate."  18 U.S.C. § 3663(a)(1)(B)(I).  The procedure for implementing this directive is set forth in § 3664, which requires the probation officer to provide the court with "a complete accounting of the losses to each victim. . . ."  18 U.S.C. § 3664(a).  The probation office is required to provide each victim with, *inter alia*, an affidavit form on which to set forth the amount of the victim's losses subject to restitution.  18 U.S.C. § 3664(d)(2)(B).  Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence, and it is the Government's burden to demonstrate the amount of loss sustained by each victim.  18 U.S.C. § 3664(e).

"The district court, in determining the amount of restitution, may consider hearsay evidence that bears 'minimal indicia of reliability' so long as the defendant is given an opportunity to refute that evidence. "<u>United States v. Rodriguez</u>, 751 F.3d 1244, 1261 (11th Cir. 2014) (quoting <u>United States v. Hairston</u>, 888 F.2d 1349, 1353 (11th Cir. 1989)).   In <u>Rodriguez</u>, the court considered whether the magistrate judge to whom the restitution hearing in a mortgage fraud case had been referred, and the reviewing district judge, could base their findings on the testimony of an agent of the United States Postal Service regarding the lenders' and servicers' loss amounts.  The agent testified that she had obtained letters and declarations from the original lenders, as well as from lenders who as of the date of the hearing, held or serviced loans that were fraudulently obtained.  The

agent explained her loss calculations, including how she arrived at a net loss figure.  The court held that it was "entirely proper for the district court to consider her testimony."  Id.

The MRVA, 18 U.S.C. § 3663(a)(2), defines "victim" as ". . . a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern. . . ."  The Eleventh Circuit ". . . repeatedly has rejected attempts to narrow the scope of 'victim under the statute.'"  United States v. Brown, 665 F.3d 1239, 1253 (11th Cir. 2011).  Thus, the Court joined the Ninth Circuit in holding "that 'when the crime of conviction includes a scheme, conspiracy or pattern of criminal activity as an element of the offense, the court may order restitution for 'acts of related conduct for which the Defendant was not convicted.'"  United States v. Dickerson, 370 F.3d 1330, 1339 (11th Cir. 2004) (quoting United States v. Lawrence, 189 F.3d 838, 846 (9th Cir. 1999)).  Indeed, Dickerson extended this holding to include relevant conduct outside the applicable statute of limitations.  Dickerson, 370 F.3d 1342.  Similarly, in United States v. Valladares, 544 F.3d 1257, 1270 (11th Cir. 2008), the Court approved a restitution order which compensated victims of an uncharged, but related Medicare scheme and in United States v. Edwards, 665 F.3d 1239, 1253 (11th Cir. 2011), the Court permitted restitution for victims of an unrelated, but identical type of scheme.

Finally, although the MVRA prescribes that the restitution hearing should be conducted within 90 days from the date of sentencing, the statute is silent on the question of whether the final determination of the restitution amount must be made within 90 days.  In any event, "a sentencing court's failure to impose an order of restitution within the ninety-day limitations period does not deprive the court of the power to order restitution at some later date, at least where the sentencing court made it clear prior to the deadline's expiration that it would order restitution,

leaving only the amount." Rodriguez, 751 F.3d at 1260 (citing Dolan v. United States, 560 U.S. 605, 605 (2011).

### III. EVIDENCE PRESENTED AT RESTITUTION HEARING

At the hearing on victims' losses ("Restitution Hearing"), the Government introduced into evidence the same three boxes of documents presented at the sentencing hearing.  At the direction of the undersigned, the folders inside the three boxes,  each of which contains documents pertaining to a particular victim, were given separate exhibit numbers.  Thus, for purposes of the restitution hearing, these folders were received into evidence as Government's Exhibits 2-157.[2] Government's Exhibit 158 is a loss spreadsheet which identifies the victims by name, and Government's Exhibit 159 is that same spreadsheet with the names redacted.[3]

Agent Perera offered the same testimony as he provided at the sentencing hearing, describing the manner in which he obtained the information contained in the victims' folders, double-checked the amounts claimed with the Government's records, and made certain no claims had been duplicated.  He reiterated that with each of the institutional victims, he spoke with a representative to ascertain how they computed losses, including what offsets were used in situations where the loss was reduced by such things as sale of collateral and payments on the mortgages.  During cross examination, counsel for the Defendant brought out that the folders for JP Morgan Chase (Government's Exhibit 7) and Iberia Bank (Government's Exhibit 157) did not include the loss declaration form indicating that the information was provided under penalty of perjury generally

---

[2] Exhibit 1 dealt with Bank of America, which the Government has determined should not be deemed a victim for purposes of the MVRA and did not move the Exhibit into evidence.

[3] Pursuant to 18 U.S.C. § 3664(d)(4), this Court is obligated to maintain the privacy of the victims.  Accordingly, Government's Exhibits 9-156 and 158, containing the names of individual victims, has been filed under seal.  Government's Exhibits 2-8 and 157, involving financial institutions and Government Exhibit 159, the redacted loss spreadsheet, has not been sealed.

provided by Probation to victims who are submitting claims for reimbursement.[4]  Agent Perera testified that the documents in the folders (other than his own handwritten notes) were all of the items he had received from Probation.

During Agent Perera's cross-examination, the Defendant introduced Defendant's Exhibits A21 and A22, dealing with loans made by JP Morgan Chase.  Defendant's Exhibit A21 lists 48 transactions where the claimed loss amount equals the amount of the original note, and Defendant's Exhibit A22 lists 67 transactions where the loss amount is greater than the note.  Agent Perera explained that most of the loans were for interest only, and the bank was required to pay for such items as property taxes and flood insurance, which were included in the loss amounts.  The agent further stated that the loss amounts also included attorneys fees and other costs of collection. Agent Perera acknowledged that some of the testimony from representatives of lending institutions occurred only in the Defendant's first trial, which dealt with different charges than those in the SSI.

On redirect, Agent Perera stated that there were 150 accounts in the names of Cay Clubs entities, but none was in the name of the Defendant because of the outstanding judgment against him.  Nevertheless, the Defendant maintained control over all of the accounts.  Additionally, monies from all Cay Clubs accounts were funneled into the Crystal Clear Management Account, which the Defendant used to pay all bills and personal expenses of himself and members of his family.  The Defendant did not draw a salary, again because of the outstanding judgment.  Monies from other Cay Clubs accounts were commingled in the Crystal Clear account on a daily basis.

In his defense, the Defendant introduced several documents in addition to Defendant's Exhibits A21 and A22.  Defendant's Exhibit A1 is a copy of the JP Morgan Chase spreadsheet, contained within the folder introduced as Government's Exhibit 7, and Defendant's Exhibit A2 is

---

[4]With the consent of the parties, the undersigned contacted the Probation Office to ascertain whether victim loss affidavits had been sent to JP Morgan Chase and Iberia Bank.  In response, Senior United States Probation Officer Paul E. Czekanski authored a memorandum indicating that owing to an oversight, no loss affidavit was sent to either institution. The memorandum is filed under seal as Court Exhibit 1.

the same spreadsheet, printed from the digital version which had been provided to the Defendant. Defendant's Exhibits A3-A4 also relate to JP Morgan Chase: A3 is a copy of a settlement reached between Chase and the United States Department of Justice and Defendant's Exhibit A-4 is a copy of the Chase Annual Report for 2006. According to the Defendant, these documents suggest that restitution to Chase for some of its claimed losses might constitute a windfall.

Defendant's Exhibits A5-A8 reflect that Chase had assigned two of the mortgages for which losses are claimed to mortgage-backed securities. The Government agreed to investigate that issue and, if true, to deduct those losses from the amount of restitution to be paid to Chase.

## IV. <u>ANALYSIS</u>

The Defendant's primary argument is the same he made at sentencing on the issue of related conduct: that the court should limit restitution to the straw purchases identified in Counts 2-7, or at most, to the total loss resulting from straw purchases. In this context, the Defendant also asserts that the Court should not award restitution for claims made by third party commercial and private lenders (Iberia/Orion, Coast Investment Group, LLC and the GCB investment entities) who made loans to Cay Clubs entities, since the Second Superseding Indictment did not include a description of this conduct.

This issue was resolved by the District Judge at sentencing when he deemed all of the Defendant's fraudulent activities connected to Cay Clubs to be relevant conduct for purposes of computing the amount of loss. At the Restitution Hearing, the Government reiterated its responsive argument that the Defendant had engaged a single scheme, beginning with the first seven straw purchases which inflated the values of Cay Clubs units for promotional purposes. The object of the scheme was to keep the Cay Clubs ventures afloat so that the Defendant could continue to reap personal benefits for himself and members of his family.

The Eleventh Circuit case law discussed earlier in this Report supports the Government's argument. This Circuit consistently has refused to limit the categories of victims

entitled to restitution and has approved restitution even to victims of uncharged conduct by a defendant extending beyond the statute of limitations (Dickerson, *supra*) and to victims of uncharged conducted involving the same type of scheme as that for which a defendant was convicted (Edwards, *supra*).   Accordingly, in the instant case, restitution should be awarded to all victims of the Defendant's fraudulent activities connected with the Cay Clubs ventures.

The Defendant also argues that the evidence of loss to JP Morgan Chase and Iberia is insufficient to support restitution to those entities because neither filed a victim loss affidavit and neither provided the figures used in their computations of net loss.  Agent Perera testified that he met with representatives of each institution to ascertain how the loss amounts were calculated to ensure that all offsets were included in the net loss figures.  Under Rodriguez, *supra*, the agent's testimony is sufficient to support the loss claims submitted by Chase and Iberia.  The Defendant was free to refute the loss amounts by subpoenaing representatives from each of these banks to testify at the Restitution Hearing, but counsel for the Defendant stated at the hearing that he was relying on his argument that the Government had not met its burden of proof.  The undersigned finds that there is sufficient evidence to support restitution to JP Morgan Chase (reduced, if appropriate, by the two mortgages which may have been assigned to be sold as mortgage backed securities) and to Iberia.

Finally, the Defendant has expressed concerns about the computation of losses to successor lenders.  This issue is moot because the Government has stated on the record that none of the victims who have claimed losses for restitution purposes is a successor lender.

Therefore, the Court should order restitution in the amount of  $179,076,941.89 as set forth in the Government's Exhibit 158 (under seal), less the amount of any Chase mortgages assigned for sale as mortgaged backed securities.

## V. CONCLUSION

This Court having considered carefully the pleadings, arguments of counsel, and the applicable case law, it is hereby

RECOMMENDED that restitution in the amount of $179,076,941.89 as forth in the Government's Exhibit 158 (under seal), less the amount of any Chase mortgages assigned for sale as mortgaged backed securities.

The parties shall have fourteen (14) days from the date of this Report and Recommendation within which to file objections, if any, with United States District Judge Jose E. Martinez.  Failure to file timely objections waives a party's right to review before the District Judge, and bars the parties from attacking on appeal any legal rulings and factual findings contained herein. *See* Fed.R.Crim.P. 59(b)(1), (2); *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Lewis,* 492 F.3d 1219, 1222 (11th Cir. 2007) (en banc).

DONE AND SUBMITTED at Key West, Florida, this 3rd day of June, 2016.

_____
LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Copies to:

All Counsel of Record

12